# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:

**FUNDAMENTAL LONG TERM CARE, INC.,**

      Debtor.

_____/

Case No.: 8:11-bk-22258-MGW
Chapter 7

The ESTATE OF JUANITA AMELIA JACKSON,
by and through CATHY JACKSON-PLATTS f/k/a
CATHERINE WHATLEY, Personal Representative;
The ESTATE OF ELVIRA NUNZIATA, by and through
RICHARD NUNZIATA, Personal Representative;
The ESTATE OF JOSEPH WEBB, by and through
ROSE M. WEBB, Personal Representative;
The ESTATE OF ARLENE ANNE TOWNSEND, by and
through BRENDA S. SHATTUCK, Personal Representative;
The ESTATE OF OPAL LEE SASSER, by and
through WANDA KAY MUSSELWHITE, Personal
Representative; and The ESTATE OF JAMES HENRY
JONES, by and through FRANCINA SPIVERY-JONES,
Administratrix.

      Plaintiffs,

v.

      Adv. No._____

**GENERAL ELECTRIC CAPITAL CORPORATION;
FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC;
THI OF BALTIMORE, INC.; FUNDAMENTAL LONG TERM
CARE HOLDINGS, LLC; MURRAY FORMAN; LEONARD
GRUNSTEIN; RUBIN SCHRON; VENTAS, INC., VENTAS
REALTY, LIMITED PARTNERSHIP; GTCR GOLDER
RAUNER, LLC; GTCR FUND VI, L.P.; GTCR PARTNERS
VI, L.P.; GTCR VI EXECUTIVE FUND, L.P.; GTCR
ASSOCIATES VI; EDGAR D. JANNOTTA, JR; and
THI HOLDINGS, LLC.**

      Defendants.

_____/

## COMPLAINT FOR DECLARATORY RELIEF

Three friends, a lender, landlord, and nursing home operator, were sitting together discussing a recent large verdict against a nursing home.

At the trial, a bank president had testified that he knew the nursing home had plenty of staff to take care of the residents because he had been reviewing staffing numbers for years. Regarding the trial testimony, the lender told his friends, "He should have said he was just a mere lender."

Also at the trial, the president of a Real Estate Investment Trust testified that he knew the nursing home had plenty of supplies because the trust had been carefully reviewing the supply invoices. The landlord told his friends, "He should have said he was just a passive investor."

Lastly, at the trial, a nursing home administrator testified that it was all his fault because he knew the facility was short staffed and undersupplied. To which the nursing home operator told his friends, "He should have said, I couldn't have done it without my lender and my landlord."

Plaintiffs, the Estate of Juanita Amelia Jackson, by and through Cathy Jackson-Platts f/k/a Catherine Whatley, Personal Representative ("**Jackson Estate**"), the Estate of Elvira Nunziata, by and through Richard Nunziata, Personal Representative ("**Nunziata Estate**"), the Estate of Joseph Webb, by and through Rose M. Webb, Personal Representative ("**Webb Estate**"), the Estate of Arlene Anne Townsend, by and through Brenda S. Shattuck, Personal Representative ("**Townsend Estate**"), the Estate of Opal Lee Sasser, by and through Wanda Kay Mussel White, Personal Representative ("**Sasser Estate**"), and the Estate of James Henry Jones, by and through Francina Spivery-Jones, Administratrix ("**Jones Estate**"), sue Defendants, General Electric Capital Corporation ("**GECC**"), Fundamental Administrative Services, LLC ("**FAS**"), THI of Baltimore, Inc. ("**THIB**"), Fundamental Long Term Care Holdings, LLC ("**FLTCH**"), Murray Forman ("**Forman**"), Leonard Grunstein ("**Grunstein**"), Rubin Schron ("**Schron**"), Ventas, Inc. ("**Ventas**"), Ventas Realty, Limited Partnership ("**Ventas Realty**"), GTCR Golder Rauner, LLC ("**GTCR Golder Rauner**"), GTCR Fund VI, L.P. ("**GTCR**

2

Fund"), GTCR Partners VI, L.P. ("**GTCR Partners**"), GTCR VI Executive Fund, L.P.,

("**GTCR Executive Fund**"), GTCR Associates VI ("**GTCR Associates**"), Edgar D. Jannotta, Jr.

("**Jannotta**"), and THI Holdings, LLC ("**THIH**"), and allege as follows:

## I.    PRELIMINARY STATEMENT

A small regional nursing home operator desired to become the largest private nursing home chain in America. But in order to do so, the nursing home operator needed capital. The nursing home operator partnered with a group of financial investors to accomplish its goal.

With the financial backing from the investors, the nursing home operator attempted to acquire a large group of nursing homes from another chain in bankruptcy. It failed to get the bid for those nursing homes. The successful bidders, however, had no nursing home experience. The solution was to have the small nursing home operator manage the group of nursing homes who would pay the new owners exorbitant fees in rent.

By virtue of this arrangement, the small regional operator was able to accomplish its goal and became the largest private nursing home chain in America that at its height operated 220 healthcare facilities, including nursing homes, and had revenues of over a billion dollars. The plan, however, was not sustainable. In order to secure favorable legislation, the nursing home operator resorted to illegal campaign contributions. In order to continue the financial backing by the investors, the nursing home operator made material misrepresentations in financial statements.

Rather than expose the truth and comply with mandatory reporting requirements, the new owners defaulted the nursing home operator and entered into a series of 18 forbearance agreements. Each agreement extracted more fees, penalties, and costs for the new owners. The

owners further threatened foreclosure, eviction, and threatened to take over the nursing home operations.

Meanwhile, the nursing home residents, shrouded with the fog of Alzheimer's, did not know that their lives were in peril by the machinations of financial investors and real estate owners. Resident care suffered and lawsuits against the operator mounted. On account of the growing lawsuits and ever mounting debts, the situation became untenable.

The financial investors, however, saw their prize – thousands of nursing home beds with constant streams of federal and state backed funds available for their taking. While the lawsuits for negligent care of the residents were pending, the new real estate owners, financial investors, and others executed two linked corporate transactions wherein the assets of the nursing home operator were depleted. Through these linked transactions, everyone benefitted; everyone that is except the nursing home residents that suffered from the negligent care. The investors took the valuable nursing home assets and put them in newly formed operators who continued to generate hundreds of millions of dollars in revenue. The lenders and investors were repaid their loans and investments or spared the full weight of their economic losses. And, a shell company was left holding all the liabilities of the former nursing home operator. The shell company was purportedly the brain child of a graphic designer, who now resides in a nursing home himself, who had no capital and stated affirmatively that he never purchased the company.

The lawsuits for negligent care were defended for years. The defenses were then strategically withdrawn. The cases proceeded. One case resulted in a judgment in the amount of $110 million in July 2010. Faced with the prospect of another large verdict, the financial investors, including lenders, real estate investment trusts, real estate investors, and several others

4

put together $1.7 million in case and the promise of future funds to defend the shell and the former operator.

The financial investors took active steps to delay, hinder, and defraud the operator's creditors, including Plaintiffs, by concealing their involvement in the litigation against the nursing home operator.   Such active steps included the use of artifice by acting on behalf of a defunct corporation, but publicly denying any involvement with the defunct corporation. Publicly, the investors denounced any real involvement with the nursing home operator.   They claimed to be mere lenders, real estate investment trusts, and companies that provided only back office services approximately 4 years ago.  But, the investors' behind-the-scenes activities reveal a far different truth.   Letters and emails disclose that the control of the defense of the former operator was ceded entirely to these investors.  For example, an email was circulated whereby an attorney for the purported back office services' entity thought that ethics and duties of candor required that the court be informed of the true relationships between these parties.   Rather than reveal the truth to the court, however, the entity continued to act publicly as if they had no involvement.

By this action, the Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that the new operator's enterprise is a mere continuation of the former operator's enterprise; that the former enterprise merged into the new enterprise; that the linked transactions were a fraudulent effort to avoid liabilities; and that the financial investors, the Defendants here, are liable for the former debt of the former enterprise as a successor-in-interest.

Plaintiffs further seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 adjudging that the financial investors, the Defendants here, are the alter egos of the former enterprise; that the investors used the former enterprise for a fraudulent and improper purpose

and causing injury to the Plaintiffs; and the financial investors are liable for the debts of the former enterprise as alter egos.

## II.    PARTIES, RELATED PERSONS, JURISDICTION, AND VENUE

1.    This action is an adversary proceeding governed by Chapter VII of the Federal Rules of Bankruptcy Procedure, and is brought pursuant to 28 U.S.C. § 2201, *et seq.*

2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 (b) and 1334 (b) and 11 U.S.C. §§ 105 and 541.

3.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    Venue of this adversary proceeding in this district is proper under 28 U.S.C. § 1409 (a).

5.    Trans Health Management, Inc. ("THMI") is a Delaware corporation that formerly had its principal place of business at 920 Ridgebrook Road, Sparks MD 21152.

6.    THMI is a wholly owned subsidiary of Fundamental Long Term Care, Inc. ("FLTCI"), a Debtor in a Chapter 7 involuntary bankruptcy currently pending in the United States Bankruptcy Court, Middle District of Florida ("Bankruptcy Court"). *In re Fundamental Long Term Care, Inc.*, Case No. 8:11-bk-22258-MGW ("Bankruptcy case").

7.    Trans Healthcare, Inc. ("THI") is a Delaware corporation that formerly had its principal place of business at 920 Ridgebrook Road, Sparks, MD 21152.

8.    THI is the former parent of THMI.

9.    THMI was the management company that provided oversight management to all of THIH's 200 subsidiaries throughout the country.

10. THMI employed the officers and directors of THIH, THI, THIB, and each and every one of their subsidiaries.

11. For every THI subsidiary, THMI personnel oversaw and were responsible for the litigation management, legal & regulatory compliance, business operations, business development, labor relations, clinical services, clinical compliance, food services, rehabilitation management, reimbursement analysis & coordination, corporate financial control, financial systems analysis, accounts receivable management, accounts payable management, corporate and tax accounting, 401K and benefits administration, human resources and recruitment, payroll, treasury, purchasing, travel, information systems implementation and training, computer programming, network support, desktop support, application analysis and support, database programming and support, and website development.

12. None of the THI subsidiaries, including THIB and THI of Baltimore Management, LLC ("THIBM"), had its own management personnel. THMI employees were in charge of hiring and firing the management personnel, including Administrators and Directors of Nursing, at every THI facility.

13. THI, THMI, THIB, THIBM, and THIH ("THI enterprise") did not maintain corporate formalities, commingled funds, and were run and operated as alter egos and as a single enterprise.

14. The THI enterprise operated and managed healthcare facilities, including nursing homes, in numerous states, including Florida and Pennsylvania.

### A. The Plaintiff judgment creditors

15. On July 30, 2004, the Jackson Estate filed a wrongful death and negligence action against THMI and THI for injuries Ms. Jackson sustained while a resident at a nursing home operated by THMI and THI in Polk County, Florida. The suit proceeded to a jury trial and resulted in a final

judgment of $110,000,000.00 on July 10, 2010. The judgment is final, unstayed, uncollected, and unappealed.

16. On May 13, 2011, the Jackson Estate commenced proceedings supplementary pursuant to Florida Statute § 56.29 in Polk County, Florida against Defendants and FLTCI for their efforts in hindering, delaying, and defrauding the Jackson Estate as judgment creditor. The state court ordered the impleader defendants to show cause why they should not be held liable for the final judgment.

17. FLTCI did not respond, was defaulted, and was added to the final judgment.

18. An Amended Final Judgment against THI, THMI, and FLTCI was entered on September 13, 2011 in the Jackson state court proceeding. The amended judgment is final, unstayed, uncollected, and unappealed.

19. The Jackson Estate is a creditor of FLTCI and THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012.

20. On December 23, 2005, the Nunziata Estate filed a wrongful death and negligence action against THMI for injuries Ms. Nunziata sustained while a resident at a nursing home operated by THMI in Pinellas County, Florida. The suit proceeded to a jury trial and resulted in a final judgment of $200,000,000.00 on January 11, 2012. The judgment remains uncollected.

21. The Nunziata Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012.

22. On June 16, 2006, the Webb Estate filed a negligence action against THI and THMI for injuries Mr. Webb sustained while a resident at a nursing home operated by THI and THMI in Polk County, Florida. The suit proceeded to a jury trial and resulted in a final judgment of $900,000,000.00 on February 10, 2012. The judgment remains uncollected.

23. The Webb Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012.

24. On January 29, 2009, the Townsend Estate filed a wrongful death and negligence action against THI, THMI, and THIH for injuries Ms. Townsend sustained while a resident at a nursing home operated by THI, THMI, and THIH in Polk County, Florida. The suit proceeded to a jury trial against THI and resulted in a final judgment of $1,100,000,000.00 on July 29, 2013. The judgment remains uncollected.

25. The Townsend Estate's claim against THMI was settled with the Trustee for FLTCI and the amount of the allowed claim is governed by an approved settlement agreement.

26. The Townsend Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012 and an amended proof of claim on August 20, 2013.

27. On September 6, 2006, the Sasser Estate filed a negligence action against THI and THMI for injuries Ms. Sasser sustained while a resident at a nursing home operated by THI and THMI in Polk County, Florida.

28. The Sasser Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on March 27, 2012.

29. On March 20, 2006, the Jones Estate filed a negligence action against THI and THMI for injuries Mr. Jones sustained while a resident at a nursing home operated by THI and THMI in Montgomery County, Pennsylvania. The case will be assigned a 2014 trial date.

30. The Jones Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on March 27, 2012.

### B. The THI enterprise

31. THIH is an active Delaware limited liability company with its principal place of business in Sparks, Maryland.

32. THIH owns one hundred percent (100%) of THI. THIH controlled THI and THMI to such an extent that THI and THMI did not have an independent existence from THIH.

33. THIH is a mere continuation of THI and THMI and is liable as a successor-in-interest and alter ego.

34. THIH is wholly owned by GTCR Fund.

### C. GTCR entities

35. GTCR Golder Rauner is a Delaware limited liability company with its principal place of business in Chicago, Illinois. GTCR Golder Rauner is the general partner of GTCR Partners.

36. GTCR Partners is a Delaware limited partnership with its principal place of business in Chicago, Illinois. GTCR Partners is the general partner of GTCR Fund.

37. GTCR Fund is a Delaware limited partnership with its principal place of business in Chicago, Illinois. Upon information and belief, one or more of GTCR Fund's limited partners is a citizen of Florida.

38. GTCR Executive Fund is a Delaware limited partnership with its principal place of business in Chicago, Illinois.

39. GTCR Associates is a Delaware company with its principal place of business in Chicago, Illinois.

40. Upon information and belief, Jannotta is a resident of Teton County, Wyoming. At all relevant times, Jannotta was a managing principal at GTCR Golder Rauner and a director at THIH.

41. At all relevant times, GTCR Golder Rauner, GTCR Partners, GTCR Fund, GTCR Executive Fund, and GTCR Associates (collectively "GTCR") operated as a single enterprise to such extent that their independence was in fact non-existent and shared a continuity of management, personnel, and assets.

42. GTCR provided equity funding to THI and THMI and maintained the controlling interest of THI (82.7%).

43. At all relevant times, GTCR principals controlled the operations of the THI enterprise and dictated everything from basic operations to the disposition of assets. GTCR made all the material financial decisions and directed all the business and strategy decisions of the THI enterprise.

44. Through a Professional Services Agreement dated July 14, 1998, GTCR operated and controlled the THI enterprise by taking a hands-on-approach and day-to-day involvement in the operations of THI, THMI, and THIH.

45. The Professional Services Agreement provided for services including corporate strategy formulation, budgeting of corporate investments, acquisitions and divestitures, and debt and equity financings.

**D. The Fundamental enterprise**

46. FAS is a Delaware limited liability corporation with its principal place of business in Sparks, Maryland.

47. THIB is a Delaware corporation with its principal place of business in Sparks, Maryland.

48. FLTCH is a Delaware limited liability corporation with its principal place of business in Sparks, Maryland.

49. FLTCH is the sole member of FAS and the sole member of THIB.

50. Upon information and belief, Schron is a resident of Brooklyn, New York.

51. Upon information and belief, Forman is a resident of Nassau County, New York.

52. Forman is an investment banker who advised and acted as Schron's agent on many business deals, including the transactions and occurrences described below, and acted as his agent and trusted fiduciary at all material times.

53. Upon information and belief, Grunstein is a resident of Bergen County, New Jersey.

54. At all relevant times, Grunstein was a practicing attorney in New York who provided legal and business advice and services to Schron and acted as his agent and trusted fiduciary at all material times.

55. From 2005 to 2009, Grunstein was a partner at the law firm of Troutman Sanders, LLP. In November 2009, Grunstein was placed on administrative leave.

56. FLTCH is equally owned by Schron, and his agents, Forman and Grunstein.

57. FLTCH, FAS, and THIB, owned by Schron, Grunstein, and Forman (collectively the "Fundamental Defendants"), did not maintain corporate formalities, commingled funds, and were run and operated as alter egos and as a single enterprise.

58. The Fundamental entities do not distinguish themselves to the public but collectively refer to themselves as the "Fundamental Long Term Care companies."

**E.  Ventas and GECC entities**

59. Ventas is a Delaware corporation with its principal place of business in Louisville, Kentucky.

60. Ventas Realty is a Delaware limited partnership with its principal place of business in Louisville, Kentucky.

61. At all relevant times, Ventas Realty and Ventas (collectively "Ventas") operated as a single enterprise.

62. In November of 2002, Ventas entered into a series of loans including a $55,000,000 term loan, a $22,000,000 mezzanine loan, and executed a sale-lease back transaction with THI wherein THMI would operate nursing home properties owned by Ventas.

63. As part of the loans, the THMI and THI stock was pledged to Ventas as collateral security and THI and THMI guaranteed the mezzanine loan and sale-lease back transaction.

64. GECC is a Delaware corporation with its principal place of business in Norwalk, Connecticut.

65. On December 17, 2002, GECC purchased the $55,000,000.00 term loan from Ventas.

66. Ventas retained the stock pledge to the THMI stock, the mezzanine loan, and the THMI management agreements pursuant to which THMI operated Ventas' nursing home properties.

67. As collateral and security for the loan, GECC held the real estate underlying the THI nursing homes located in Ohio and Maryland and the THMI management contracts pursuant to which THMI operated the GECC nursing home properties.

68. THI and THMI also guaranteed the repayment of the GECC loan.

## III.    GENERAL ALLEGATIONS

### A.    The creation of the THI enterprise

69. GTCR is engaged in venture capital activities by which they invested in and took control of companies for which they had provided "equity capital" funding.

70. In 1998, GTCR provided equity funding to THI.

71. GTCR acquired the controlling interest of the THI enterprise. At that time, GTCR took over THI by acquiring over eighty percent (80%) of the company. By 2002, GTCR owned 82.7% of the stock of THI.

72. THI and its subsidiaries operated a chain of nursing homes in several states. At that time, THMI was a wholly-owned subsidiary of THI.

73. THMI was a mere instrumentality of THI. THI and its subsidiaries, including THMI, failed to uphold corporate formalities and abused the corporate form by comingling corporate funds, assets, and operations, and diverting THMI assets to avoid liabilities.

74. In July of 2002, THMI assumed the management contracts of various Florida and Pennsylvania nursing homes, including the nursing homes where the Plaintiffs resided and were injured.

75. GTCR, through THI, ventured to build a nationwide nursing home empire for the purpose of securing a financial benefit to GTCR.

76. Through a Professional Services Agreement dated July 14, 1998, GTCR provided financial and management services to the THI enterprise in exchange for management and consulting fees, including a percentage of any debt or financing that occurred.

77. GTCR provided corporate strategy formulation, budgeting of corporate investments, acquisitions and divestitures, and debt and equity financings to the THI enterprise.

78. According to GTCR managing principal Jannotta, "through [GTCR's] investment, [GTCR] became the controlling shareholder in the [THI] company" and controlled the board of directors.

79. The business model of GTCR is built around operating and controlling their portfolio of companies, including THI and THMI. GTCR did in fact implement its business model here and operated and controlled THI and THMI.

80. GTCR took a hands-on approach and had day-to-day involvement in the operations of THI and THMI.

81. GTCR held themselves out to their investors, vendors, and consumers as in charge of their portfolio companies, including the THI enterprise.

82. GTCR held themselves out to the public as the operator of the THI enterprise.

83. GTCR not only controlled THI, and its subsidiaries, but also worked closely with the representatives and owner of the nursing facilities.

84. From 1998 forward, the THI enterprise did not function or exist independent of GTCR. GTCR exercised such complete control over the THI enterprise that they are the mere alter egos of each other. The THI enterprise became the mere instruments of GTCR.

85. The unity of GTCR and the THI enterprise was pervasive to the extent that many vendors and customers of THI dealt directly with the principals of GTCR on routine matters including negotiating lease terms, THI's satisfaction of provisions under the lease, and acquisition and disposition of properties and negotiating bonus payments to management.

86. GTCR, through its majority position on the THMI's board of directors, made all the material financial decisions and directed all business and strategy decisions of the THI enterprise, including THMI, from 1998 to the present.

87. GTCR controlled THI and THMI to such an extent that the THI enterprise did not have an independent existence from GTCR and deliberately used THI and THMI for the fraudulent and improper purpose of looting the assets of THI and THMI to avoid THI and THMI liabilities

and debt and defraud creditors. GTCR's unlawful and improper conduct in the use of THI and THMI caused injury to the Plaintiffs while GTCR was enriched. GTCR is the alter ego of THI and THMI.

88. GTCR is a mere continuation of THI and THMI and is liable as a successor-in-interest as it shared a continuity of management, personnel and assets.

89. GTCR caused two of their principals, Jannotta and Ethan Budin, to be placed on the three-person board of directors of THI.

90. Jannotta was the only continuous senior management of THI from 1998 until 2009. During this time, Jannotta's conduct was no different than that of a senior management executive in the THI organization.

91. The minority shareholder and Chief Executive Officer of THI, Anthony Misitano, received one place on the three-person THI board of directors.

92. The GTCR principals used their majority vote to appoint Bradley Bennett, the former Director and Facility Financial Officer of THMI-managed nursing home facilities, to the board of THI, THMI, and THIH.

93. GTCR also appointed former officers of the licensees of THMI-managed nursing home facilities, Mark Fulchino and Matthew Box, as Senior Officers of THI, THMI, and THIH.

94. In November of 2002, Ventas entered into a series of loans including a $55,000,000 term loan, a $22,000,000 mezzanine loan, and entered into a transaction with THI wherein THMI would operate Ventas' nursing home properties.

95. As part of the loans, the THMI and THI stock was pledged to Ventas as collateral security and THI and THMI guaranteed the mezzanine loan and sale-lease back transaction.

96. In October 2002, with THI securing the debt financing from Ventas, the GTCR-controlled board approved a $700,000 fee for themselves.

97. On December 17, 2002, the $55,000,000.00 loan was purchased by GECC.

98. Ventas retained the stock pledge to the THMI stock, the mezzanine loan, and the THMI management agreements pursuant to which THMI operated Ventas' nursing home properties.

99. To grow their investment, in January 2003, GTCR executed an agreement to exchange their shares of stock in THI for like units in a new holding company, THIH.

100.   THIH had previously formed a wholly-owned subsidiary, THIB.

101.   THIBM was formed as a subsidiary of THIB.  THIBM maintained no employees.

102.   THIBM, through employees at THMI, managed the nursing homes owned and leased by THIB.

103.   THIH and THIB were formed to facilitate the acquisition of assets from the nursing home operator Integrated Health Services ("IHS") that had gone into bankruptcy.

104.   According to a GTCR press release, with the backing of GTCR, "THI had completed seven transactions over the past four years," was "one of the leading long-term companies in the United States," and the "acquisition of IHS would substantially increase THI's size and scope."

105.   The same press release speaks to GTCR as being the co-founder of THI in 1998 and GTCR's role in the integration of the operations of THIH and THIB.

106.   Despite the exchange of stock for like units in THIH, GTCR's control continued in the new structure of the THI enterprise exactly as it had in the prior scheme.

107.   The board of THIH consisted of Jannotta, Bradley Bennett, and Thomas Erickson, a chief executive officer of another GTCR portfolio company.

108.   Despite THIB's formation to lease, operate, and manage the IHS homes, the corporate formalities of THIB were ignored as THMI continued to provide the management services for the homes, THI continued to pay rent, and THI, THIB, and THIH co-mingled assets.

109.   Former CEO and President of THMI and THI, Anthony Misitano confirmed the lack of corporate formalities within the THI enterprise. He testified that "these entities that were set up were set up by attorneys, and we didn't differentiate in our mind that we are going out to THI Management today or we are going out to X today or Y today. We were looking at the [THI] company as a whole and that people had specific assignments."

110.   According to Misitano, the business of THMI on a day-to-day basis, and the other subsidiaries, was a part of THI's business as a whole. The THI subsidiaries, including THMI, THIB, and THIBM were not separate and apart from THI.

111.   THI, THMI, THIB, and THIBM operated together as a single enterprise to the extent that their independence was in fact non-existent and shared a continuity of management, personnel, assets, location, and equipment.

**B.  *The acquisitions of IHS and Mariner by Schron and his agents and implementation of a Professional Liability and General Liability claim reduction strategy***

112.   In 2000, the operator of nursing home facilities known as IHS filed for relief under Chapter 11 of the Bankruptcy Code.

113.   Schron, and his agents, Grunstein and Forman, planned to gain control of the lucrative operations of numerous nursing homes throughout the country for the purpose of building a nursing home empire.

114.   In August 2003, Schron, and his agents Grunstein and Forman, put together a deal wherein they acquired nursing homes formerly operated by IHS.

18

115.   In order to acquire the IHS properties, Schron, Grunstein and Forman created a company, ABE Briarwood, Inc. ("ABE") to purchase the former IHS assets and properties from bankruptcy.

116.   Although GTCR and THI thought it had closed the deal to purchase the IHS assets from bankruptcy, ABE, at the direction of Schron, and his agents Grunstein and Forman, came in in at the eleventh hour and purchased the assets out from under GTCR and the THI enterprise.

117.   Schron, through Cammeby's Funding, LLC, an entity founded and controlled by him, financed the acquisition of the IHS homes by ABE.

118.   ABE was represented in the bankruptcy by Abraham J. Backenroth, Esq., a partner with the law firm Backenroth, Frankel & Kinsky, LLP.

119.   ABE was not itself licensed to operate the former IHS healthcare facilities and entered into an agreement that caused THI and THMI to operate and manage many of the nursing homes Schron and his agents Forman and Grunstein had acquired.

120.   According to Anthony Misitano, the then President and CEO of both THI and THMI, he and Schron had a "celebration" dinner to commemorate both Schron's acquisition and the creation of the Schron/THI arrangement.

121.   As Schron's long-time attorney, Grunstein devised most of the corporate structure, negotiated, and drafted many of the transactional documents to complete and realize the IHS deal.

122.   Among the assets purchased were numerous Florida nursing home and hospice facilities and at least one Florida administrative services office.  The majority of the Florida nursing home properties were subsequently sold by Schron and his agents to at least two other nursing home operators.

123.    The operation of the nursing homes by THI and THMI for ABE created significant value for Schron and increased the volume of revenues for the nursing homes as well as for Schron, and his agents Grunstein and Forman.

124.    By mid-2003, THI, THMI, and their affiliates had gross revenues of at least $1 billion dollars per year, based on the number of nursing homes they managed.  This revenue figure was provided in the deposition testimony of Anthony Misitano, the then President and CEO of THI and THMI.

125.    Satisfied with the success of the IHS acquisition, Schron, Grunstein, and Forman orchestrated a similar deal that followed the blueprint of the IHS transaction, wherein Schron acquired the real estate of 173 nursing homes in about 27 states owned and operated by Mariner Health Care, Inc. ("Mariner").

126.    The complex business transaction reversed Mariner into entities Sava Senior Care, Inc., Sava Senior Care, LLC, Sava Senior Care Administrative Services, LLC, Sava Senior Care Management, LLC, and National Senior Care, Inc., through a series of intricate corporate actions.

127.    The deal essentially split the Mariner nursing home chain into two pieces: one that operated the facilities and paid rent to the other, which owned the real estate.

128.    Schron, Forman, and Grunstein partially funded the transaction with the sale of a no asset shell company for $50 million. For this part of the transaction, Schron, Forman, and Grunstein paid a $14 million fine to the federal government as settlement for an anti-kickback whistle blower lawsuit. *United States v. Omnicare, Inc., Rubin Schron, Leonard Grunstein, Murray Forman, et al.*, Civil Action No. 06-10149-RGS, in the United States District Court, District of Massachusetts.

129.   Although funded by Schron, who acquired the real estate company, Grunstein and Forman retained ownership of the operating entities to run the facilities, all the excess cash flow, and a small share of the real estate.

130.   While he sold some of the IHS and Mariner Florida properties, Schron retained the professional and general liability ("PLGL") claims and began a strategy to hinder, delay, and defraud creditors and litigants.

131.   The PLGL strategy was designed to transfer, divert, and conceal nursing home assets while improperly disposing of nursing home liabilities.

132.   Schron and his agents Forman and Grunstein restructured the newly-acquired IHS and Mariner nursing home assets using single purpose entities ("SPE") owned and controlled by Schron and his family.

133.   This restructuring focused on separating the nursing home real estate assets from its operating assets.   The business model known as "Propco-Opco-Oldco" required three separate entities: the real estate company ("Propco"), the nursing home operator who leased the real estate from Propco ("Opco"), and the entity that held the liabilities of the business prior to the separation ("Oldco").

134.   The SPEs holding each piece of real estate (the Propcos) acted as landlords to different shell SPEs that operated the nursing homes (the Opcos).

135.   The IHS and Mariner creditors and vendors were then forced to seek recourse from the Oldcos, the entities holding the liabilities of the nursing home entities prior to the separation.

136.   Many creditors and vendors were told that their claims were uncollectable as Oldco's liabilities far exceeded any assets.

137.  An example of the PLGL strategy is evidenced by the *Brunini v. Mariner* case, wherein Mariner's own lawyers sued for nearly $1 million in unpaid legal fees.  In that suit, the lawyers alleged, among other things, that the acquisition of the Mariner chain was a fraudulent conveyance that benefited insiders at the expense of the creditors.

138.  The IHS and Mariner acquisitions led to the filing of substantial litigation between Schron, Forman, and Grunstein accusing each other of various breaches of fiduciary duty, legal malfeasance, fraudulent conveyances of hundreds of millions of dollars, and the dissipation of nursing home assets. *Cammeby's Funding LLC v. I.H.S. Long Term Care, Inc. et al*, Case No. 650533/2012; *Schron v. Grunstein*, Case No. 650702/2010; *Schron v. Grunstein*, Case No. 651752/32012; *Grunstein v. Schron,* Case No.600736/2010; *Bodner v. Grunstein*, Case No. 650791; *Bodner v. Grunstein*, Case No. 653442; *Cammeby's v. Mariner*, Case No. 650778/2011; *Fundamental v. Cammeby's*, Case No. 650332/2011; *Mariner Healthcare v. Schron*, Case No. 653706/2012; *Metcap v. Troutman Sanders*, Case No. 650709/2012.

139.  Schron, Forman, and Grunstein continued to mislead and defraud creditors of nursing home operators while reaping the benefits of a billion dollar business.

## C.  The commercial mortgage backed securities

140.  Schron had in place a plan to create a financial vehicle known as a commercial mortgage-backed security ("CMBS") bond and to sell it as a security to the international investment community.

141.  Schron and his agents Forman and Grunstein ensured that each of the Propco SPEs holding the real estate of the former THI, IHS, and Mariner nursing home properties held a mortgage supported by the revenues from the Opco SPEs as collateral.

142.  The mortgages were obtained through an affiliate of Credit Suisse, Column Financial, Inc.

143. It was these mortgages that he then bundled into a commercial mortgage-backed security known as CSFB 2004-HC1, and caused the securities to be sold by securities brokers, reaping access to hundreds of millions of dollars for himself and his family trusts.

144. For the securities scheme to work, the ratings agencies also had to give favorable ratings to the bond issue.

145. Schron gave information to credit rating agencies that was false and inflated.

146. As an example, Schron claimed that THI was, in December 2004, "one of the country's most experienced, growth oriented nursing home operators in the country with over 19 years operational history."

147. He also claimed THI was reaping earnings producing EBITDA ("earnings before interest, taxes, depreciation, and amortization") results in excess of 21%.

148. As stated below, however, the THI enterprise was and had been in default of its loans to GECC and Ventas since at least July 2004 because several years' worth of material misrepresentations in its financial statements.

149. Schron knew this as well as other information showing that THI was in massive internal disarray.

150. Despite every legal duty to disclose any risk to investors, Schron deliberately and with intent to defraud, fed false information to the rating agencies and obtained an AAA rating for his bond.

151. For Schron's bundled mortgage security scheme to work, Schron had to conceal the true financial status of THI and THMI and the risks, including tort liabilities like the claims of creditors.

152.   Schron's first bond issue, with a 10-year maturity, was for a total of $820 million dollars.

153.   The CSFB 2004-HC1 CMBS was underwritten and sold by Credit Suisse Securities (USA), LLC and Credit Suisse First Boston Mortgage Securities Corporation (collectively "Credit Suisse").

154.   Credit Suisse acted together with Schron to control the entire process in the creation and sale of the CMBS, including loan origination, mortgage pooling, securities underwriting, securities marketing, securities regulation and the securities' subsequent sale.

155.   Standard & Poor's Ratings and Standard & Poor's Financial Services, LLC ("S&P") acted together with Schron and examined the aggregate pool of mortgages and underlying collateral in order to rate the 2004 CMBS.

156.   Credit Suisse and S&P knew that the THI, IHS, and Mariner mortgage loan bundle comprising of the 2004 CMBS was fraud ridden in that the transactions in obtaining those assets constituted fraudulent transfers to avoid liability to creditors.

157.   But Credit Suisse and S&P failed to disclose the fraud underlying the mortgages to investors in their offering materials, public announcements, and prospectuses, in exchange for generous fees which were contingent on the successful creation and favorable rating of the 2004 CMBS.

158.   GECC, Ventas, and GTCR facilitated Schron's creation of this security by signing off on their loans, despite what they knew about the THI enterprise's dire financial straits.

159.   If the tort claims Schron was managing against THI and THMI and its affiliates through its PLGL model were known, Schron's scheme would not have received a AAA rating.

160. Schron also concealed the corporate misconduct of THMI and THI to secure the ratings needed to sell the CMBS. Schron knew that THI and THM had been committing numerous illegal acts including Medicare and Medicaid reimbursement fraud but covered up the conduct with his co-conspirators, including GECC, GTCR, and Ventas. By doing so, the security vehicle created by Schron could be sold with Schron and his cohorts reaping the rewards.

161. Schron obscured the transactions, created dead-end companies, and perpetrated fraud on tort claimants and courts.

162. But this massive scheme could not have happened with Schron as the only actor. It required the active participation of GECC, Ventas, GTCR, and the Fundamental Defendants.

### D. *Ventas and GECC exert substantial control over the THI enterprise*

#### i. *Fraudulent financial statements*

163. By September 2003, Ventas was aware that THI had materially misrepresented its earnings to secure the 2002 loans from Ventas.

164. As an example, for the year ending December 31, 2003, revenues had been overstated by $10,000,000, while expenses had been understated by $25,000,000. Instead of a reported $6,000,000 of net income, a corrected report reflected a loss of $29,000,000.

165. This allowed THI to obtain monies to which it was not lawfully entitled including Medicare and Medicaid monies by inflating financials to federal and state governments.

166. The misrepresentation also allowed THI to falsely obtain a loan from Ventas and GECC in the amount of approximately fifty-five million dollars ($55,000,000) dollars.

167. By May 27, 2004, according to the board meeting minutes for THIH, GECC had "heard rumors of fraud regarding Tony," referring to THI and THMI President and CEO Anthony Misitano.

168.   A few weeks later, on July 1, 2004, GECC sent a notice of default of its loan to THI. The default letter asserted that THI had materially and falsely misrepresented financial statements for the previous several years. The conduct was a non-curable default and constituted reportable behavior.

169.   According to Jeff Erhardt, Vice President of GECC, in a letter to Brad Bennett (at the time the CEO and President of both THI and THMI), THI had overstated its earnings in financial statements that GECC and Ventas used to determine the creditworthiness of THI.

170.   The THI enterprise was the recipient of Medicare and Medicaid funds. There exist very specific mandatory reporting requirements regarding material misrepresentations in financial statements when one is the recipient of Medicare and Medicaid funds.

171.   Ventas and GECC did not report THI's material misrepresentations to any authorities. Instead, Ventas and GECC concealed the unlawful activities so that they could benefit from them.

172.   GECC and Ventas knew that inflating and misrepresenting earnings on financial statements could expose THI to severe criminal and civil liability.

173.   Upon information and belief, since at least 2003, GECC has had internal policy manuals that included directives to file "suspicious activity reports" with the Office of Thrift Supervision.

174.   GECC and Ventas knew that loan inducement fraud could result in penalties as severe as a criminal indictment. Under federal law, it was mandatory for GECC and Ventas to report THI's suspicious behavior.

175.   GECC, as a federally-regulated bank, had a legal duty to refuse to transact business with anyone or any entity engaged in profiting from illegal activity.

176.    Instead, GECC and Ventas used the knowledge of potentially criminal misconduct to manipulate THI (and the THI subsidiaries) to the advantage of GECC and Ventas and to the detriment of THI creditors including the Plaintiffs.

177.    Rather than defaulting THI and pursuing lawful remedies under the loan agreements, GECC and Ventas chose to use the threat of financial and criminal harm to THI as an opportunity to make greater profits.

178.    By claiming that the default was non-financial, GECC chose to profit from THI's illegal activity by utilizing the technical defaults as an opportunity to assume complete financial control of THI to assure repayment of the GECC loans and obtain additional interest and fees.

179.    Exercising its full control over THI, on July 1, 2004, GECC instructed Bank of New York, THI's depository bank, that it was exercising GECC's right to capture all money held in THI's accounts. Bank of New York complied.

180.    Instead of the default being non-curable, as GECC alleged when it captured the cash accounts, GECC started a series of new loans with THI that included penalties (a/k/a "accommodation fees", "modification fees", "forbearance fees", etc.) and higher interest rates.

181.    An internal email discloses that GECC made additional millions of dollars from the increases in fees and interest payments.

182.    According to Kevin Pascoe, GECC Vice President, the additional fees and interests payments to GECC were "[n]ot too shabby."

183.    This is particularly true when according to Jeffrey M. Thomas, GECC Vice President, THI "was a troubled deal with fraud in its history and the revolver was a defensive maneuver following 17 forbearance agreements and two [debtor in possession] proposals by GE . . . . We spend [sic] the past 2.5 years reducing exposure on the deal."

184. Instead of reporting THI's illegal misrepresentations, Ventas similarly chose to participate in the reportable activity by leveraging this information to alter the original loan covenants with THI to conceal the default.

185. At the same time, in exchange for Ventas' concealment of the THI misrepresentations, Ventas received additional fees from THI.

186. Ventas chose to profit from the illegality by entering into fifteen (15) forbearance agreements charging arduous "fees at will" and default interest charges. Each forbearance agreement worsened the financial condition of THI as additional fees and penalties were levied each time.

187. Through the concealment of the illegal conduct by the THI enterprise, Ventas extracted millions of additional dollars from the THI enterprise.

188. Unsatisfied with extracting millions of dollars in additional fees and interest charges, GECC and Ventas exerted their control over the THI enterprise and forced the sale of THI assets, including numerous healthcare facilities, in order to pay down the principals on the loans.

189. This process of threatening and accusing THI of default or other conditions of non-performance became the norm for the remainder of the relationship, which became a very profitable one for GECC and Ventas.

190. In 2006, both GECC and Ventas amended and restated the onerous loans and leases in order to continue the profitable enterprise. The terms of the restated and amended loans and leases ensured continuing defaults which meant continued "fees at will" and high interest charges for Ventas' and GECC's pockets.

191.   The additional fees unlawfully extracted by GECC and Ventas deepened the insolvency of the THI enterprise directly impacting THI's ability to fund basic and essential operations of the nursing homes.

192.   The onerous terms of the loans ensured that GECC and Ventas retained *de facto* control over the operation of the THI properties.

193.   The unlawful enterprise continued despite a written warning from the CEO of THI as to the risks created by THI's inability to fund the operations of its properties.

194.   If either GECC or Ventas had disclosed the unlawful conduct, the THI enterprise was almost certain to have lost its status as a Medicare and Medicaid provider, ending the very lucrative income that the THI enterprise was generating for GECC, Ventas, and other Defendants.

195.   GECC and Ventas were aware that the THI enterprise was experiencing liquidity problems, mismanagement, and had engaged in unlawful conduct, yet chose to continue facilitating the conduct of the THI enterprise by providing financing to the enterprise.

196.   This allowed the THI enterprise to continue generating revenues while forestalling an inevitable bankruptcy so that GECC, Ventas, and other Defendants could recover significant funds in the form of penalties, default interest fees, and repayment of principal while defrauding THI creditors, like the Plaintiffs.

### ii. Illegal campaign contributions

197.   Despite the severity of the fraudulent financial statements, THI terminated its former CFO, Jeffrey Barnhill "without cause." His subsequent litigation with THI revealed that Barnhill was involved in illegal campaign contributions on behalf of THI and its owners.

198.   Barnhill was reimbursed for a $49,500 contribution as a non-salary and non-taxable event he made in 2003 for which THI then sought reimbursement from Ohio Medicaid.

199. Though it occurred in 2003 and was discovered in 2004, it was not reported to the state of Ohio until 2006.

200. According to the CFO's admissions in a legal proceeding in 2005, the contribution scheme was done on behalf of THI and with knowledge and approval of GTCR partners, Jannotta and Ethan Budin, who controlled the THI enterprise.

201. THI had created ledger entries for the monies which had been reimbursed to the CFO and then conscientiously charged the monies as Medicaid costs to twenty four separate nursing home facility cost reports as "dues and contributions."

202. On March 28, 2006, even after discovery that the THI enterprise had committed the multiple acts of illegal campaign contributions to politicians in the State of Ohio, Ventas restated and amended the sale-leaseback arrangement to continue the profitable enterprise.

203. On March 28, 2006, GECC also extended another $55,000,000 loan to THI, through restatement and amendment, despite being aware of the illegal campaign contributions.

204. GECC discovered the scheme sometime after its inception, but before February 2006. Nevertheless, GECC was motivated to continue its venture with the THI enterprise.

205. In an effort to gain distance from the illegal contribution scheme, THI and GECC utilized a law firm, the Mintz Law Firm, to "self-report" the Medicaid part of the crime to the Department of Health and Human Services, Office of the Inspector General ("OIG").

206. THI's *mea culpa* was that the misconduct was promptly reported and committed by "prior management".

207. The truth was that the misconduct was not promptly reported as THI had known of the conduct for over two years by the time it was reported.

208.   Furthermore, THI only reported the misconduct to OIG when the then disgruntled ex-CFO blamed THI with culpability in his lawsuit against THI.

209.   THI's defense that "prior management" committed the wrongdoing was also untrue. The actual GTCR individuals in control of the THI enterprise remained in their position of control from 1998 through 2009.

210.   Despite claims that "prior management" alone had committed this misconduct, former CFO Jeffrey Barnhill was terminated "without cause" and paid $600,000 in settlement of his lawsuit against THI and GTCR entities.

211.   CEO Anthony Misitano was not terminated either.  He voluntarily resigned, was kept on as a consultant to the company, and paid hundreds of thousands of dollars in severance and consulting fees.

212.   When THI "self-reported" the illegal activity to the OIG, it failed to disclose Barnhill's allegations that the campaign contributions had been done for the benefit and at the direction of the GTCR's board of directors, the same board of directors that was still in place at THI.

213.   The OIG imposed a fine of  $137,000.

214.   THI was also advised to report the illegal contributions to the Ohio Election Commission.

215.   Neither Ohio law enforcement nor any United States Attorney ever excused, forgave, or agreed to exonerate THI for its conduct.

216.   Nevertheless, GECC and Ventas continued to invest in the THI enterprise.

### iii. *GECC's complete control of THI enterprise's receivables including receipts from private and governmental agencies*

217. Through the management of lockbox arrangements, all receivables of the THI enterprise were transferred directly to the control of GECC. At the end of each business day, the funds in those accounts were "swept" into accounts controlled by GECC.

218. Any disbursements of those funds were at GECC's sole and absolute discretion.

219. GECC exercised such control in a manner that did not provide for the basic functioning and operation of the THI enterprise and interfered with its ability to meet resident care requirements at the THI nursing homes.

220. Through its ability to withhold funds necessary for the THI enterprise's operation, GECC further controlled management of the THI enterprise and its personnel. Unless GECC's demands were met by THI personnel, operating funds were not released to the THI enterprise. Such demands included closing forced sales of nursing homes and transfers of the enterprise's assets.

221. This type of extensive *de facto* control over the operations of nursing home facilities through financing is not an isolated event, but rather a pattern and practice of GECC.

222. Healthcare facilities financed by GECC have filed lawsuits against it alleging improper interference with the operations and healthcare services of the facilities through the illicit management of lockbox arrangements.

223. The Ventas and GTCR Defendants consented to the unwavering control of GECC and allowed Medicare and Medicaid funds intended for resident care to be paid to controlling lenders.

224.   Ventas, GECC, and GTCR were notified of the liquidity crisis of the THI enterprise created by the lack of resources, and the risk associated with the inability to provide minimum levels of care to its residents.

225.   By the actions of Ventas, GECC, and GTCR, the THI enterprise was immediately rendered insolvent and faced imminent bankruptcy.

226.   Rather than allowing the insolvent THI enterprise to enter bankruptcy, negotiations commenced to facilitate the restoration of an operable cash structure for THI. These negotiations were in furtherance of the scheme to divest the THI enterprise's assets for the purpose of evading the liability of its creditors.

227.   Insolvency of the THI enterprise spawned a series of lawsuits against GTCR and the THI enterprise. These included the lawsuits filed by the Plaintiffs.

228.   As a result of the misconduct, THI was unable to fulfill its operating obligations, resulting in lawsuits against various THI subsidiaries for: failure to maintain its healthcare facilities; failure to maintain appropriate insurance; failure to pay rent and related charges under leases; conversion; misappropriation of revenues and funds; racketeering; and for other fraud. *See Aegis Services, Inc. v. Trans Healthcare, Inc.,* Case No.: 2:04-cv-01175-JLG-NMK in the United States District Court for the Southern District of Ohio; *Lyric Healthcare, LLC v. Trans Healthcare, Inc.,* Case No. C-05-013156, in the Circuit Court for Baltimore County, Maryland (owner of Florida facilities managed by THMI and THI alleging misappropriation of revenues).

229.   Specifically, Aegis Services, Inc. alleged that THI, GTCR, and individual board members of THI (including Jannotta) conspired to divert monies lent to the facilities from the operations of those facilities in order to pay obligations of other operating subsidiaries of THI.

*Aegis Services, Inc. v. Trans Healthcare, Inc.,* Case No.: 2:04-cv-01175-JLG-NMK in the United States District Court for the Southern District of Ohio.

### E. The Defendants' fraudulent efforts to avoid the liabilities of THI and THMI through a March 2006 transaction that liquidated the THI and THMI assets and created the FLTCI shell that would hold the liabilities.

230. As of January 23, 2006, THIH had an adjusted enterprise value of one hundred and eighty three million, eight hundred and seventy three thousand, seven hundred thirty dollars ($183,873,730).

231. At this time, THIH wholly owned THI, which in turn owned THMI.

232. The offices of THI and THMI were located at 920 Ridgebrook Road, Sparks MD 21152.

233. The offices of THIH, THIB, and THIBM were located at 920 Ridgebrook Road, Sparks MD 21152.

234. THIBM, a subsidiary of THIB, had contracts to provide management services to certain subsidiaries of THIB that operated nursing homes. As THIBM had no employees, the management services contemplated by the contracts were provided by THMI employees.

235. In addition to providing management services on behalf of THIBM, THMI collected and reported 100% of the revenue associated with the services despite having no formal written agreement with THIBM.

236. State licensing authorities were not informed that THMI was providing the services. Instead, the authorities were told that THIBM was providing these services to the nursing homes.

237. A rise in resident rights' suits for the negligent operation of the THI and THMI nursing homes threatened the profitability of the THI enterprise for GTCR, GECC, Ventas, and the Fundamental Defendants.

238.  With knowledge of pending and future litigation aimed at the assets of the THI enterprise, GTCR, GECC, Ventas, and the Fundamental Defendants, including Schron, Forman, and Grunstein, decided to initiate and execute a plan to unlawfully split up and conceal all of the assets of THI and THMI so that they could not be reached by these lawsuits and other creditors.

239.  The Defendants' plan consisted of a *de facto* merger wherein the value of the THI enterprise would merge into a newly created enterprise under the Fundamental name (FLTCH) and the liabilities would be ditched into a newly created shell (FLTCI). The operations (and assets) would continue through the Fundamental enterprise, while the creditors of the THI enterprise were left with a liability-ridden shell.

240.  The details of the plan were discussed at a February 16, 2006 meeting held at Ventas Realty in Chicago, Illinois.  Participants included representatives from THI, GTCR, GECC, and Ventas.  The proposed agenda for the scheduled four (4) hour meeting included major restructuring and transfer of assets of THI and its subsidiaries.

241.  Part of such plan included the creation of FLTCI and a day later, the creation of FLTCH.

242.  FLTCI was incorporated by Troutman Sanders LLP ("Troutman") on December 21, 2005.

243.  FLTCI was located at 920 Ridgebrook Road, Sparks, MD 21152.

244.  On or about December 21, 2005, Troutman established a registered agent account for FLTCI with The Corporation Trust Company ("CT Corp").

245.  At this time, Grunstein was a partner in the New York office of Troutman.  Grunstein was the head of Troutman's real estate investments and capitalization practice groups from 2004 until approximately 2010.

246.    CT Corp documentation named Lawrence M. Levinson, another partner in the New York office of Troutman, as the recipient of notices received by the registered agent on behalf of FLTCI.

247.    FLTCI's CT Corp Account Documentation also named Forman of Met Cap Holdings, LLC as the party to receive any renewal invoices on behalf of FLTCI.

248.    Throughout the years leading up to 2011, Troutman, as an agent for FLTCI, received notification from CT Corp regarding lawsuits against FLTCI.

### i.    Part 1: Transfer of THMI liabilities to newly created shell FLTCI

249.    In late February 2006, the "restructuring" plan was set into motion. On February 24, 2006, a Stock Purchase Agreement ("THMI SPA"), wherein THI agreed to sell the stock of THMI to the newly created FLTCI for the sum of $100,000.00, was drafted by the Kirkland & Ellis, LLP law firm.

250.    The February 24, 2006 draft required that THMI SPA notices to the buyer be sent to Fundamental Long Term Care, Inc., "Attention: Mr. Murray Forman."

251.    On February 28, 2006, the THMI SPA selling the stock of THMI for $100,000.00 was executed. The notice provision of the THMI SPA no longer included Forman as the recipient of notices to the buyer.

252.    The THMI SPA purported to sell the stock of THMI to Barry Saacks ("Saacks"), who was listed as President of FLTCI.

253.    Saacks is the only corporate officer of FLTCI.

254.    FLTCI did not have any directors.

255.    The THMI SPA provided that any notices were to be sent to FLTCI, 920 Ridgebrook Road, Sparks MD 21152, with a copy to Troutman.

256. According to a declaratory action filed in the United States District Court for the Southern District of New York by FLTCH and FAS against THMI, Saacks did not pay the $100,000 for the purchase of the THMI stock. *FLTCH v. THMI*, Case No. 12-cv-8339.

257. Rather, according to FAS and FLTCH, THIB had advanced the $100,000 sum of money to THIH (as seller) on behalf of FLTCI and Saacks (as buyer) in order to close the transaction.

258. As part of the 2006 "restructuring" transactions, THMI purported to terminate its administrative and clinical services arrangements with THMI-managed nursing homes through Termination and Assumption Agreements.

259. The Termination and Assumption Agreements were drafted by Troutman in its capacity as counsel for FAS.

260. But, Troutman denies that Saacks was a client.

261. Notices to THMI regarding the Termination and Assumption Agreements were sent to Scott Krinsky, Esq. from the law firm of Backenroth, Frankel & Krinsky, who represented Saacks in connection with the Termination and Assumption Agreements.

262. Although Saacks is alleged to have signed the Termination and Assumption Agreements, his signature does not appear to be authentic.

263. According to testimony of former FAS senior counsel and vice president, Kristi Anderson, Esq. ("Anderson"), the Termination and Assumption Agreements were fraudulently and unlawfully backdated by FAS employees.

264. The Agreements prepared in November 2006 were illegally backdated to March 28, 2006 to coincide with the 2006 transaction described above.

265. In addition, notwithstanding the purported sale of THMI stock to Saacks, Christine Zack, Esq. ("Zack"), FAS general counsel, held herself out as the spokesperson and decision maker for THMI beginning in the fall of 2006.

266. According to Anderson, former senior counsel and vice president of FAS, Zack provided substantive direction as a representative of THMI to the lawyers who were purporting to represent THMI in the Plaintiffs' state court litigation, subsequent to the 2006 sale to Saacks.

### *ii. Part II: All assets of THI enterprise are transferred to the newly created Fundamental enterprise at a significant discount from the fair market value*

267. Simultaneously, another THI subsidiary, THIB, and it subsidiary THIBM, were sold to another entity, also branded with the Fundamental name, FLTCH for approximately $10 million ("FLTCH SPA").

268. The $10 million sale price was a significant discount from the fair market value of THIB and constituted grossly inadequate consideration.

269. The THIBM contracts to provide management services to THIB leased and/or owned nursing homes were also sold to the Fundamental group as part of this transaction.

270. Like the THMI SPA, the FLTCH SPA provided that any notices should be given in writing to FLTCH, 920 Ridgebrook Road, Sparks MD 21152, with a copy to Troutman.

271. According to the linked SPAs, FLTCI and FLTCH maintained the same mailing address.

272. Troutman, Levinson, and Grunstein in concert with the Defendants negotiated, drafted, and prepared the closing of the FLTCH SPA.

273. GTCR principal Jannotta described the sales as "linked transactions" wherein THMI and THIB were sold to entities controlled or invested in by Schron, Forman, and Grunstein.

274. According to Jannotta, the sale agents for the linked transactions were Forman and Grunstein – the ultimate owners of the Fundamental family of companies.

275. Forman's ownership of FLTCI is confirmed by his November 30, 2011 filing with the Financial Industry Regulatory Authority wherein Forman lists himself as the Principal of the Debtor.

276. According to documents from FLTCI's registered agent, Forman was also responsible for making payments for the registered agent's services.

277. Through the linked transaction, the Defendants executed their plan to transfer the liabilities and existing debts of THMI, including pending litigation claims, to the FLTCI shell while the assets, employees, and operations were moved into Fundamental companies, including FLTCH and FAS.

278. Former THMI employees were transferred to THIBM, now under the Fundamental umbrella.

279. GECC, Ventas, and GTCR consented and signed off on both THIB and THMI transactions with full knowledge that the discounted sales would render the THI enterprise unable to pay its creditors. Without their consent, the linked sales could not have occurred.

280. Both transactions closed on March 28, 2006 at the offices of Troutman, The Chrysler Building, 405 Lexington Avenue, New York, New York, 10174.

281. From formation, FLTCI was nothing more than a liability-ridden shell. FLTCI had no employees, directors, business activity, office location, nor any assets other than an equity interest in THMI.

282. These facts have been confirmed by FLTCI's own filings in the bankruptcy case and by the testimony of Saacks, and his power of attorney Abraham Backenroth.

39

283.  The continued § 341 Meeting with Saacks - FLTCI's first and only shareholder - was held on October 15, 2012 in New York.

284.  Saacks confirmed that he has never heard of THMI and did not purchase THMI or FLTCI. In fact, Saacks was totally bewildered by any suggestion that he might be or has been in control of THMI or FLTCI.

285.  Saacks testified:

**Q. What is your position with the debtor?**

A. Does that mean Fundamental?... I think it was maybe six years ago I was asked if I would be interested in obtaining some computer equipment. ...
A. So then I discussed this with some people, and all I remember is nothing because nobody did anything. They never followed up. Fundamental never followed up.

**Q. So when you found out about Fundamental or inquired about it or found out about it, what was it that you did?**

A. I put verbal propositions through some people and they never got back to me. They were supposed to get back to me and they didn't. And that's really the long and short of it. You know, a couple of verbal telephone conversations. You know, I'll do this if you do that, you do that.

**Q. Okay. Let's talk about '06. Can you tell me what transpired with Fundamental?**

A. No. Well, I can't tell you because nothing has transpired. All that transpired was somebody lit a match and brought some light into the room, and then eventually the match went out as an example. I don't know what you are trying to say to me. I mean, I know what you're trying to say, but I can't offer anything of any use because I don't even know if --  for those six years, nobody told me you bought it, nobody told me.

**Q. Do you remember paying any money for Fundamental in 2006?**

A. No. I made it very clear I don't have capital, and I could maybe borrow, maybe ask somebody, another partner and another partner, but it all didn't matter what, because they told me that the deal fell through and we'll be back to you, which they didn't.

**Q. Was there any activity with Fundamental from 2006 to 2012?**

A. Not by me. I mean, I'm not – I was not a player in that at all, that period.  So let's look at this this way very quickly from my point of view. This thing came up again, and to be candid, it didn't remind me of anything. You know, okay, Fundamental, Fundamental, you could say it a thousand times to me, and each time it wouldn't mean anything because nothing ever happened with me and Fundamental.  Now, when I like the idea, the idea didn't change in six years, which was peculiar. But every time I put forward this thing about what happened to Fundamental, I didn't get a clear answer, but I got some legal stuff.

**Q. Did you ever make any money off of Fundamental?**

A. No, not yet. I'm waiting.

**Q. Do you have any books and records or tax returns or any kind of documents for Fundamental?**

A. Not to my knowledge. I don't have personally, because Mr. Backenroth would know that, what I have and what I don't have, I'm sure. Remember, it's only just -- I mean, working it Grunstein's way, it is only just come to life again. It may die again.

**Q. Did you buy it [Fundamental]?**

A. I don't know. It is a lovely question.

**Q. Okay. Do you know if you borrowed money in connection with it?**

A. No, I did not.

**Q. You did not or you don't know?**

A. Maybe I don't know, but I don't think I did.

**Q. Who would know that?**

A. I don't know. Speak to Mr. Grunstein. Speak to Mr. Schron.

**Q. Okay. I want to shift focus a little bit. We talked a lot about Fundamental, but I would like to talk a little bit about Trans Health Management.**

A. Never heard of it.

286.     In describing his relationship with Grunstein, Mr. Saacks further testified:

**Q. If you don't remember the year, if you can give me an approximate range of time over which you have known [Grunstein]?**

A.   Mr. Schron introduced me to Mr. Grunstein about something - - I can't remember. It was a real estate matter, and my reward would have been, it is always would have been, would have been an apartment, I think. An apartment in Queens to the best of my memory. And I would be on this company which has this property, and a bit similar to Fundamental in a way, whereby, you know, this client of Grunstein was going somewhere, I don't know where he was going, going abroad, and he wanted to get rid of a lot of assets, and he had people to look after things, including Grunstein as their lawyers.

287.   Saacks' testimony made clear that FLTCI was never intended to be more than a shell and its purchase of THMI was a sham transaction designed to benefit a group of wrongdoers, the Defendants here, by transferring the valuable assets of THMI and THI, lodging the liabilities in a shell company, and concealing the whole scheme from the creditors, litigants and courts.

288.   Saacks further testified that in March 2012, Grunstein, Schron and others arranged to visit Saacks at the nursing home where he resides. At that meeting, they made assurances to Saacks about business opportunities related to FLTCI and the potential for Saacks to make "big money" out of a deal involving FLTCI.

289.   At that meeting, Grunstein arranged for Abraham Backenroth, an agent of Grunstein and Schron, to obtain a power of attorney from Saacks, which Backenroth has exercised in order to use Saacks as a proxy in litigation.

290.   Abraham Backenroth is and was at all relevant times a partner of the law firm of Backenroth, Frankel & Krinsky.

291.   At a Rule 2004 examination on May 17, 2012, Abraham Backenroth, as power of attorney for Saacks, testified that FLTCI was "merely a holding company" and had no operations, no books and records, and was "not going to be engaged in activity."

292.   Backenroth attempted to legitimize the 2006 transactions with an *ex post facto* explanation that the transactions contemplated that FLTCI would merely be a  holding company

for THMI, who would be left with certain computer equipment that would be rented to FAS for a licensing rental fee.

293.    But, FAS did not pay any licensing or rental fees to THMI for its use of the former THMI computer equipment.

294.    To this day, FAS continues to use the former THMI computer equipment without making any payments to THMI or FLTCI for its use.

295.    FLTCI was exactly what it was intended to be, a dead-end company. Within a month after the creation of FLTCI and March 28, 2006 closing, FLTCI and THMI became defunct and simply disappeared.

296.    FLTCI became delinquent on its corporate registration taxes and fees and ceased payments to its registered agent. FLTCI failed to file any reports with its state of incorporation.

297.    THMI had simply vanished by the end of 2006.

298.    The only corporate existence that THMI maintained after the transaction was as the holder of nursing home liabilities, including the Plaintiffs' claims. Corporate formalities, including shareholder and board of director meetings, were not followed by THMI after the 2006 "restructuring" transaction.

299.    Despite the fact that THMI ceased to exist as a corporation, actions were taken on behalf of THMI by FAS, its agents and employees. Examples of such actions include:

   a.    **March 28, 2006**: GECC's entry into a Business Associate Agreement with THMI to share HIPAA protected patient information post-sale, executed by Matt Box on behalf of THMI;

   b.    **March 28, 2006**: Ventas and THMI execute a Release & Covenant Not to Sue executed by Mark Fulchino, current CEO of FAS, on behalf of THMI;

c. **May 4, 2006**: Correspondence from Toni-Jean Lisa, Esq. senior counsel of FAS, on Fundamental letterhead demanding indemnification from THI on behalf of THMI. The Fundamental letterhead listed the same phone number and address as that for THI and THMI (the Jones Estate state court litigation);

d. **July 6, 2006:** THMI officer resignations of Kimberly McCarty, Melissa Warlow, Sean Nolan, and Toni-Jean Lisa, all of whom became officers of FAS;

e. **July 6, 2006:** THMI director resignations of W. Bradley Bennett and Mark Fulchino, who both became directors of FAS;

f. **July 6, 2006**: Correspondence from Toni-Jean Lisa, Esq., senior counsel of FAS, on THIBM letterhead demanding indemnification from THI on behalf of THMI (the Webb Estate state court litigation);

g. **September 25, 2006**: Correspondence from Zack, senior counsel of FAS, on THIBM letterhead demanding indemnification from THIH on behalf of THMI (the Estate of Sasser litigation). The letterhead listed the same address and phone number as that formerly used by THI and THMI;

h. **March 10, 2006**: Funds transfer of $35,569.40 from THMI Wachovia Payroll Bank Account into THI of Baltimore Wachovia Bank Account;

i. **November 2006**: Creation of March 28, 2006 Vida Encantada Termination & Assumption Agreement by FAS employees and/or agents;

j. **November 22, 2006**: Payment of fine to Ohio OIG on THMI letterhead by Matt Box;

k. **August 1, 2007**: Update on litigation, including the Jackson Estate litigation and other Florida litigation, by Toni-Jean Lisa to Matt Box on Trans Health letterhead

44

listing the same address and phone number as that formerly used by THI and THMI;

l. **February 2, 2007**: Email from Robin Goodman of FAS (former THMI employee) to THMI's Registered Agent to resign THMI in Delaware;

m. **March 26, 2007**: Correspondence from Matt Box to Jannotta regarding disclosure of related party transactions on THMI letterhead;

n. **May 25, 2007**: Affidavit of Zack as Counsel for THMI sent to Wilkes & McHugh, P.A in order to release THMI from claim in *Rocca v Andorra Woods,* Case No. 07-02985;

o. **September 4, 2007**: Update on litigation, including the Jackson Estate litigation and other Florida litigation, by Anderson to Matt Box on Trans Health letterhead listing the same address and phone number as THI and THMI. The Update names Zack, senior counsel of FAS, as the contact person for THI uninsured claims;

p. **April 18, 2008**: Ventas and THMI Execute a Release and Covenant Not to Sue executed by Matt Box for THMI;

q. **January 20, 2009**: Affidavit of Zack as Authorized Representative for THMI filed in Ohio State Court in support of motion for summary judgment in *Estate of Ardyth H. Kroll v. Heatherdowns Rehabilitation & Residential Care Center, et al,* Case No. CI-200305626;

r. **October 26, 2009**: Affidavit of Zack as Counsel for THMI in *Brown v THI of South Carolina*, Case No. 07-CP-42-606, filed in South Carolina State Court in order to challenge service on THMI; and

    s. **March 28, 2006 – present:** Actions taken by Defendants in the Plaintiffs' state court and federal court litigation on behalf of THMI at the direction of FAS and its agents and employees, including Zack and Anderson.

300. Because FAS employees and agents took actions in the name of THMI after it ceased to exist as a corporation, FAS is the successor-in-interest to THMI.

301. On or about September 19, 2006, THIBM changed its name to Fundamental Clinical Consulting, LLC ("FCC") and on August 31, 2006, FAS was created to take over the administrative services contracts to the nursing homes previously serviced by THIBM.

302. The employees of THMI became employees of FAS or FCC depending on their duties. On or about October 1, 2006, FCC reassigned the THMI employees who provided administrative services to FAS but retained the THMI employees involved with operational and clinical consulting and support.

303. The directors and officers of THMI became the directors and officers of the Fundamental entities.

304. On October 31, 2005, Brad Bennett and the rest of the Officers of THMI participated in an email referencing a mock-up of a services agreement between the buyer (FLTCH) and THI. Attached to the email is a listing of the current employees of THMI who are to be transferred to the buyer (FLTCH) and the percentage of their time that will be required to service THI's assets pursuant to a future Administrative Services Agreement.

305. The Officers and Directors of THMI as of January 7, 2005 included:

    a. W. Bradley Bennett President; Chief Executive Officer

    b. Mark Fulchino Executive Vice President; Chief Financial Officer

    c. Toni-Jean Lisa Executive Vice President; General Counsel; Secretary

    d. Sean Nolan Senior Vice President - Finance; Chief Accounting Officer

e. Matthew Box Senior Vice President of Financial Operations

f. Kimberly McCarty Vice President; Treasurer

g. Melissa Warlow Vice President; Assistant Secretary

306. The officers and directors of FAS as of March 6, 2009 included:

a. Directors:

W. Bradley Bennett
Mark Fulchino

b. Officers:

W. Bradley Bennett-President; Chief Executive Officer
Mark Fulchino-Executive Vice President; Chief Financial Officer
Toni-Jean Lisa-Executive Vice President; General Counsel; Secretary
Sean Nolan- Senior Vice Finance; Chief Accounting Officer
Kimberly McCarty-Vice President; Treasurer
Melissa Warlow-Vice President; Assistant Secretary
Ken Tabler - Vice President

307. FAS and FCC took over virtually all the former responsibilities of THMI. FCC took over the operations of the formerly THMI-managed nursing homes, while FAS directed the litigation and administrative services for the nursing homes.

308. The assets, operations, and personnel of THMI were rebranded into Fundamental companies to continue generating millions of dollars of profits, but without the liabilities for the negligent care provided to the residents of the nursing homes managed by THMI, including the Plaintiffs.

309. Each of the Fundamental successor entities used the same employees, management team, furniture, equipment, and even office location as its predecessor, the THI enterprise.

310. Even to this day, the Fundamental companies operate out of the same building, at the same address, with many of the same employees, using the same desks, computers and equipment of the predecessor THMI.

311.   According to an April 14, 2010 affidavit by Forman, under Fundamental's ownership, THI currently operates 98 health care providers, including 77 nursing homes in 14 different states. In 2010, the Fundamental enterprise had a net operating revenue of $710,000,000.

312.   The confusing morass of shells and subsidiaries created by the 2006 transactions was in name only. The very same individuals and entities continued to control the operations of the THI enterprise, although now under different corporate names.

313.   In addition, the Fundamental enterprise assumed the THI employee retirement and benefit plans including Medical, Pharmacy, Dental, Vision, Disability and Life Insurance Benefits.

314.   The Fundamental enterprise assumed the THI enterprise's national contracts, including Pharmacy providers, IT, food service, and medical supply vendors.

315.   The Fundamental enterprise assumed control and oversight over the THI litigation nationwide, including the Plaintiffs' claims.

316.   As the Fundamental enterprise shares a continuity of business, management, personnel who perform the same jobs and tasks, location and building, office and computer equipment, phone number, logo, employee retirement and benefit plans, and assets as the THI enterprise, FAS, FLTCH, THIB, Forman, Grunstein, and Schron are the successors-in-interest to the THI enterprise.

317.   The Fundamental enterprise is nothing more than a continuation of the former THI enterprise under a new "hat."

318.   FAS, FLTCH, and THIB had interrelated operations, common management, centralized control of labor relations, and common ownership and financial control such that they operated as a single integrated enterprise controlled by Grunstein and Forman.

319.     The United States District Court for the District of New Mexico agreed in the case of

*Prendergrast v. Fundamental Long Term Care Holdings, LLC*, CIV 07-1265 CG/LFG.

Specifically, the New Mexico court made the following factual findings:

a.   When FLTCH acquired THIB in March 2006, it created FCC and FAS to do the work that THIB, which is now defunct, had been doing.

b.   Employees of THIB became employees of FAS or FCC depending on their duties.

c.   FLTCH is owned solely by Forman and Grunstein, the only officers and directors in a company with no employees.

d.   FLTCH and THIB have the same address (and also share the same address as THI and THMI).

e.   FLTCH is the sole shareholder of THIB.

f.   FAS has the same officers, directors, and address that THIB used to have.

g.   Zack is a corporate representative for FLTCH, FAS, and THIB and provides regular updates on operational and legal matters at the facility-level several times a month to Forman. As senior vice president of FAS, she has her employment controlled by Forman.

h.   The FAS tax department prepares the tax filings for FLTCH and THIB.

i.   FLTCH holds the insurance for THIB, FAS, and FCC. The professional and general liability insurance policy is written in the name of THIB and FCC.

j.   Employees are wrong all the time about who they are employed by and by whom their coworkers are employed.

320.     In fact, the *Prendergrast* judge and jury found that FLTCH, THIB, and the state level

THI operators constituted an "integrated enterprise."

321.     The Fundamental entities are used as mere instrumentalities and alter egos of each

other to confuse creditors and evade liability.   They fail to maintain corporate formalities

amongst the entities, run the entities as a single enterprise, and utilize them interchangeably for

improper purposes, mainly to defeat the claims of the creditors.

### iii. Defendants sue each other over the assets of the former THI enterprise and admit the fraudulent nature of the asset transfers

322.    There is no question that the THI enterprise was looted. The principals of Fundamental, Schron, Grunstein, and Forman, and related companies, have filed numerous lawsuits in New York state court accusing each other of stealing revenues and assets resulting in damages of hundreds of millions in dollars.    *Cammeby's Funding LLC v. I.H.S. Long Term Care, Inc. et al*, Case No. 650533/2012; *Schron v. Grunstein*, Case No. 650702/2010; *Grunstein v. Schron*, Case No.10600736; *Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding, LLC*, Case No. 650332/2011.

323.    On June 23, 2010, Schron filed a suit accusing his agents Grunstein and Forman of stealing for themselves tens of millions of dollars in value from Schron's acquisition and operation of healthcare businesses worth more than $2 million.    *Schron v. Grunstein et al.*, Case No. 650702/2010; *Cammeby's Funding LLC v. I.H.S. Long Term Care, Inc. et al*, Case No. 650533/2012; *Cammeby's Equity Holdings, LLC v. Mariner Health Care, Inc. et al*, Case No. 650778/2011.

324.    In support of his suit, Schron filed the transcript of a tape recorded conversation that he had with his long-time agents, Grunstein and Forman without their knowledge.    In that conversation, Forman told Schron that together, "We're in the nursing home business and the insurance business."

325.    In that same phone conversation, Schron was advised by his lawyer, "You had THI owned in Fundamental and the employees were supposed to be operators just like THI and we were going to arrange money for them in the Mariner deal."

326.    Most recently, on May 21, 2012, Schron filed a verified complaint in New York state court conceding that this agents, Grunstein and Forman, "surreptitiously" acquired THI, an entity owned by Schron and his agents. *Schron v. Grunstein, et al.*, Case No. 651752/2012.

327.    Shortly after, Allen Bodner filed suit on July 1, 2010 against Troutman, partners Grunstein and Lawrence Levinson, Forman, and Harry Grunstein, business partner and brother of Grunstein. In his suit, Bonder accuses the defendants of legal malpractice, fraudulent conveyance, unjust enrichment, fraud, tortious interference, aiding and abetting fraud, and breach of fiduciary duty as part of a scheme to divest Bonder and a company he controlled of an interest in a lucrative health care and real estate venture. *Bodner v. Grunstein et al.*, Case No. 650791/2010.    After dismissal of the complaint without prejudice, Bodner filed an additional action against the same defendants on December 13, 2011, further detailing the scheme to divert millions of dollars of income due to the Long-Term Companies and to line their own pockets at the companies' expense. *Bodner v. Grunstein et al.*, Case No. 653442/2011.

### F.  The 2008 transactions to further liquidate the assets of THI

328.    As a result of all these unlawful and wrongful transfers in 2006, THI was left with only a small group of unprofitable subsidiaries and property, which GECC and Ventas forced to sell off.

329.    Ventas, GTCR, GECC, and other Defendants continued in their efforts to further liquidate the assets of THI, further hindering THI's ability to deliver care to the residents of its nursing facilities.

330.    Ventas, GTCR, GECC, and other Defendants engineered the February 6, 2008 sale of the remaining THI properties, with the exception of a Maryland facility GECC executives described as a "toxic dump," to Omega Healthcare Investors, Inc. and CommuniCare Health Services.

331. According to Omega Healthcare Investors, Inc.'s Quarterly 10-Q Report dated March 31, 2008, twenty-four (24) healthcare properties in Ohio and Maryland were sold to Omega Healthcare Investors, Inc. and CommuniCare Health Services.

332. In the same transaction, THI sold its operating rights to those facilities to CommuniCare Health Services.

333. The transaction closed on April 18, 2008.

334. Communications between GECC employees referenced concerns about the February 2008 transaction passing a "smell test" should they be examined by creditors in the future.

335. According to its Quarterly 10-Q Report dated May 7 2008, Ventas recorded a profit of $24,000,000 off the sale of those properties in 2008.

336. GECC consented to the release of the collateral upon the payoff of its real estate and revolving loans totaling approximately $30 million.

337. GTCR, as owner and parent of the THI enterprise, consented to the 2008 transaction.

### G. For years, Defendants undertake efforts to conceal the fraudulent nature of the 2006 transfers of assets to the Fundamental enterprise

338. Neither creditors, claimants, nor courts were informed that THMI had ceased to exist sometime in 2006. Instead, Defendants unlawfully used their own defense counsel to perpetuate the fraud that THMI continued to exist and operate.

339. In litigation against THMI, defense counsel continued to file pleadings, answer discovery and act as if nothing transpired.

340. It is clear that the continuation of the litigation by counsel for at least four years after THMI ceased to exist was a purposeful effort to deceive creditors, litigants, and the courts by the Fundamental, GTCR, GECC, and Ventas Defendants.

341.    This deception led to a Florida state court finding that THMI and FAS had knowingly committed a fraud on the court by lying or concealing who the true parties in interest were and continuing to defend THMI and not notifying the court, or the litigants, of the status of THMI.

342.    Other courts have also concluded that FAS has engaged in an ongoing and concealed effort to orchestrate a defense of THMI without particular eye or concern for candor with the court to protect the interests of Fundamental, GTCR, GECC, and Ventas.  The litigation strategy was to stall and delay the underlying litigation and avoid producing discovery.

343.    Defendants have perpetrated a multi-state fraud, and continue to do so, to conceal the actions taken to loot THMI as well as any fruits of their illegal conduct.

344.    Although THMI had apparently ceased to exist in 2006, Defendants acted as if it continued to operate, as set forth in paragraph 305 above.

345.    This included execution of a Release and Covenant Not to Sue on April 18, 2008, wherein Matthew Box signed as Chief Financial Officer of THMI.

346.    The agreement was made over two years after the supposed sale of THMI to Debtor, an allegedly unrelated entity to the Fundamental group.

347.    Mr. Box also conducted other business, including seeking the consent to sell THI assets from a landlord, on behalf of THMI in 2008.

### i.    *The ex parte maryland receivership of a Delaware corporation to conceal the conspiracy, fraudulent transfers, and fruits of illegal conduct*

348.    In January 2009, THI, through GECC and Jannotta's attorneys, Tydings & Rosenberg, LLP, filed an *ex parte*, uncontested receivership on behalf of THI and its affiliates in Maryland.

349.    The Petition alleged that GECC had no objection to the appointment of a Receiver.

350.    By 2009, Jannotta was the sole member of the THI board.  Jannotta, as sole member, consented to the entry of the Maryland receivership.

351.    THMI was not a party to the receivership.

352.    The day after THI filed the Petition, on January 8, 2009, Tydings presented the Petition to a Maryland state court judge *ex parte* in chambers.  The court did not hold a hearing and no transcript of the proceedings in chambers exists.

353.    Nonetheless, that same day, January 8, 2009, the Maryland state court approved the Petition and entered an order establishing the Receivership over THI assets in Maryland.

354.    The order authorized the Receiver to employ Tydings, GECC and Jannotta's former counsel, as its counsel.

355.    THI creditors were not provided with notice or opportunity to object to this filing. The only creditor that received notice of the receivership filing was GECC, THI's only secured lender.

356.    The purpose of the receivership was three-fold.

357.    First, the Defendants designed the receivership scheme to avoid a federal bankruptcy, the thorough scrutiny of which they knew would have revealed the nature and extent of the massive fraud described above.

358.    Second, the Defendants designed the receivership to prevent creditors from learning of the fraudulent transfers from 2006 to 2009 and the true owners' identities.

359.    Third, the Defendants designed the receivership to buy time, thereby allowing the Statute of Limitations to run on the Defendants' fraudulent activities.

360.    Under the Maryland receivership statute, the Order Appointing the Receiver was invalid. THI did not satisfy the requirements under the statute.

361. The Maryland receivership statute requires dissolution of the company before the receivership can go forward. THI never properly dissolved.

362. Maryland law only provides for receivership protection for Maryland corporations. THI is a Delaware corporation.

363. Michael Sandnes, a former director of operations of THI, was appointed as receiver of the THI receivership just one day after the Maryland court filing.

364. On July 27, 2010, one of GECC's collection attorneys, Alan Grochal, Esq. of Tydings & Rosenberg, LLP, was appointed as a replacement to the original receiver.

365. By this time, GECC's collection attorneys, Tydings & Rosenberg, LLP, acted as the receiver, represented the largest creditor, GECC, represented the receiver, and represented THI.

366. These relationships created numerous conflicts of interests.

367. This is particularly significant where a court-appointed receiver only has the power and a singular duty to act on behalf of the corporations' creditors as an officer of the court.

368. The GECC, Ventas, GTCR, and Fundamental Defendants colluded to fraudulently use the receivership as a mechanism to mislead creditors and the Maryland court into believing that THI and its subsidiaries were insolvent.

369. In fact, THI had previously owned or controlled assets in excess of one hundred eighty million dollars ($180,000,000).

370. Creditors of THI, including the Plaintiffs, were not provided with notice or opportunity to object to this filing.

371. In its January 2009 Petition for Receivership, THI listed legitimate unsecured creditors of over fifteen million dollars ($15,000,000.00), and claimed assets of only three

million, two hundred thousand dollars ($3,200,000.00), despite the fact they had a value of over one hundred and eighty million dollars ($180,000,000.00) just three years before.

372.    GECC and OmniCare, Inc., who had a separate deal with Schron, were the only creditors with knowledge of and participation in the receivership filing.

373.    Many creditors, including the Plaintiffs, did not receive timely notice of the receivership.

374.    FAS entered into a Post-Close Administrative Services Agreement with THI.

375.    Legal services were provided to THI by Anderson, former employee of FAS.

376.    Legal services were provided to THMI by Zack, senior counsel of FAS, in cases that were allegedly being defended by the Receiver.

377.    On March 31, 2011, FAS terminated the administrative services to the Maryland receivership on account of a "conflict of interest."

378.    In addition to providing legal advice to the THI Receivership, the Fundamental Defendants directed the tort litigation in Florida involving THI and THMI.

379.    This included improper attempts to stay cases in Florida and other litigation, and to delay and avoid the Plaintiffs' claims by the maintenance of the illegal receivership.

380.    The Fundamental Defendants, through their employees and agents, colluded and participated in the effort to cover up the improper transfer of assets from the THI enterprise and to mislead, defraud, and hinder the creditors of the THI enterprise, including the Plaintiffs.

381.    On April 8, 2009, Schron, GECC, Ventas, GTCR, other Defendants, and the Receiver they controlled, caused a certification of satisfaction of the former GECC "debt" to be filed in the Maryland Court.

382.    This certification confirmed GECC had been paid in full ($55,000,000 plus interest).

383.    The only substantive payments made by the Receivership were to GECC, the Receiver, and Tydings. As of January 2013, the payments were distributed as follows:

      a.    Tydings: $1,091,000

      b.    Receiver: $313,000

      c.    GECC: $412,000

384.    Claimants and vendors did not receive any payment from the Receivership.

385.    By paying themselves, without paying other creditors, GECC, the Receiver and his counsel, and the other Defendants were able to keep assets they had fraudulently received and avoid any liability to other creditors, including the Plaintiffs.

386.    Schron, GECC, Ventas, GTCR, and the other Defendants utilized the subterfuge of an *ex parte* receivership, rather than filing for bankruptcy, because they realized that their illegal transfer of the THI enterprise for their own benefit to defraud legitimate creditors would never withstand the close scrutiny of a Federal Bankruptcy Court.

387.    In March 2009, the Receiver and the Defendants facilitated the sale of THI's last remaining asset for just ten to twenty cents on the dollar, well below GECC's own appraised value, sufficient only to cover the remaining amounts GECC was owed.

### ii. The Defendants' attempt to further conceal the fraudulent transfers of the assets of the THI enterprise through abuse of process by moving to stay litigation and withdrawing defenses

388.    On January 13, 2009, Schron, GECC, Ventas, GTCR, and the other Defendants caused the THI enterprise to file motions to stay in the Plaintiffs' state court litigation against THI and/or THMI in Florida and Pennsylvania.

389.    This was done to buy time and cause the Statute of Limitations to run and further defraud the Plaintiff creditors.

390.    The Florida state courts denied the motions to stay.

391.    On June 15, 2009, as a part of their continuing efforts to delay, hinder, and defraud creditors, THI, upon the recommendation of FAS, had their attorneys try again and file a Motion to Domesticate the Receivership Order in the State of Florida.

392.    The Motion was filed in another attempt to prevent all Florida tort claimants from obtaining money judgments against the THI enterprise.

393.    The Motion was filed by Defendants in Miami, Florida, even though no cases were pending there against the THI enterprise.

394.    The Motion was filed under the style "In re Bonnie Creekmor", another client of the Plaintiffs' counsel who had not filed a lawsuit against any entity of the THI enterprise.

395.    In the Motion, the Receiver and its attorney claimed that "the receivership is a liquidating receivership and upon the discharge of the receiver, there will be no entity from which the Plaintiffs may obtain recovery."

396.    The Receiver and its attorneys also claimed that "the expeditious enforcement of the receivership order is required because the receivership is drawing to a close and the receiver must make arrangements for the disposition of the remaining assets of the estate."

397.    There was no mention that the receivership order was obtained *ex parte* and without satisfying the requirements of the Maryland receivership statute.

398.    The Miami court granted the domestication, but expressly left the question of whether to stay each individual case to the respective judges in those cases.

399.    The THI enterprise then filed renewed motions to stay in the Plaintiffs' state court litigation in Florida and Pennsylvania.

400.    The motion for stay filed by counsel for the THI Receiver in the Nunziata Estate litigation misrepresented that THMI was part of the Maryland receivership. The motion to stay

stated that the Receiver was also a "Receiver for THMI," and referred generally to the receivership of THI and "related entities." Attached to the motion was a copy of the receivership order, but not the list of entities actually included in the receivership – a list that did not include THMI.

401.    The Florida state courts also denied these renewed motions to stay.

402.    When Defendants learned that they could not stay these proceedings, they caused the THI attorneys to withdraw from the cases.

403.    In mid-2010, the defense counsel abruptly moved to withdraw from all pending THI and THMI cases around the country.

404.    Anderson of FAS sent an email to THI and THMI defense counsel, informing them that THI was in receivership and a decision had been made to cease defending cases, including the Plaintiffs' cases.

405.    In the motions to withdraw, the courts were told that the Florida defense firms were ordered to withdraw by Anderson.

406.    Some of the orders provided that Anderson would be the contact person for the THI enterprise.

407.    The withdrawal of defense counsel was directly contrary to a Maryland court's refusal to grant the Receiver permission to abandon the THI and THMI litigation.

408.    On January 29, 2010, the Receiver filed a motion in the Maryland court seeking among other things authority to abandon the defense of claims not asserted in the receivership proceeding with proofs of claim.

409.    On March 24, 2010, Judge Fader, a Maryland circuit court judge, did not grant the request to abandon defenses by the Receiver and Tydings. In particular, the court in its order

stated, "I know of no authority that would allow me to pass an order authorizing the Receiver to abandon the defense of any and all Unasserted claims."

410.    Dissatisfied with Judge Fader's order, on April 23, 2010, the Receiver and Tydings, sent an *ex parte* letter to another Maryland state court judge, Judge Martin, requesting authority to withdraw the defenses. In the letter, his counsel stated: "The receivership estate's counsel in some of the litigation (described in my Motion and my response) have informed the receiver that they need retainers (one is $75,000) by Monday morning or they will withdraw as the receiver's counsel."

411.    From the date of withdrawal, no counsel appeared on behalf of THI or THMI. As a result, defaults were entered against THI and THMI, resolving all issues of liability.

412.    The Jackson case proceeded to a jury trial. A final judgment against THI and THMI was entered in the amount of $110,000,000.00. THI and THMI did not file any post-judgment motions nor seek any appellate review, rendering the judgment final in all respects.

413.    On December 14, 2010 and May 17, 2011, the Jackson Estate initiated proceedings supplementary pursuant to Florida Statute § 56.29 and Florida Rule of Civil Procedure 1.250 against Defendants here, including GECC, GTCR, Ventas, Schron, Grunstein, Forman, FAS, FLTCH, and FLTCI in Polk County Circuit Court. *Estate of Jackson v. THM and THI*, Case No. 2004-CA-3229.

414.    Causing delay, the majority of the impleader defendants improperly removed the post-judgment matter to federal court. The Jackson Estate promptly moved to remand the proceedings.

415.    Relying on the Maryland receivership, the impleader defendants opposed the remand, refused to provide discovery, and moved to dismiss the proceedings asserting that the Maryland court had exclusive jurisdiction over the claims and litigation against THI and THMI.

416.    After a ten-month delay, the ancillary proceedings were remanded to state court for lack of federal subject-matter jurisdiction. *Estate of Jackson v. Ventas Realty, Limited Partnership*, 812 F.Supp.2d 1306 (M.D. Fla. 2011); *Estate of Jackson v. Trans Health Management, Inc.*, 2011 WL 4345315 (M.D. Fla. September 16, 2011).

417.    Upon remand to state court, certain of the impleader defendants continued to assert, amongst other grounds, the Maryland receivership as a basis to prohibit and interfere with the Jackson Estate's pursuit of valid claims by seeking dismissal and delay.

418.    Indeed, the Receiver willfully refused to complete a Fact Information Sheet, Form 1.977 mandated by Florida Rule of Civil Procedure 1.560 (b), on behalf of the judgment debtor THI asserting that the Receivership order stays all litigation and discovery, including discovery in aid of execution.

419.    To date, nearly three years since entry of the final judgment, the Receiver has yet to comply with the state court order.

420.    Schron and his agents retained Zack to head this part of the fraud, which was furthered by Zack's use of multiple job titles for herself.

421.    Zack, an attorney, thereafter assisted Schron, Forman, and the Fundamental group, by calling herself "Associate Counsel of Mariner Health" (a Schron company), "Corporate Counsel, Integrated Health Services Long Term Care, Inc.," "Senior Vice President of Fundamental Administrative Services," and "Counsel for Trans Health Management."

422.    While FAS had no apparent relationship of record to either THI or THMI, unbeknownst to the Court, the Florida Plaintiffs, and even to local defense counsel, FAS had been directing all pending litigation nationally against THI, THMI and their affiliates since at least 2006.

423.    The undisclosed behind-the-scenes direction of litigation against THI and THMI by the Receiver, his counsel, and FAS led to a Florida state court finding that THMI and FAS had knowingly committed a fraud on the court by lying or concealing who the true parties in interest were and continuing to defend THMI and not notifying the court, or the litigants, of the status of THMI. *Estate of Nunziata v. THMI,* Case No. 05-8540CI in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County.

424.    Other courts have also concluded that FAS has engaged in an ongoing and concealed effort to orchestrate a defense of THMI without particular eye or concern for candor with the court to protect the interests of GECC, GTCR, Ventas, and other co-conspirators. *James Henry Jones v. TFN Health Care Investors LLC et al*, Case No. 2006-06672, in the Court of Common Pleas of Montgomery County, Pennsylvania, Opinion dated April 17, 2012.

425.    On April 22, 2013, the Superior Court of Pennsylvania upheld a trial court's finding that FAS controlled the THI defendants' defense since 2006, "deliberately chose to withhold relevant information regarding the THI defendants," and "actively worked to stall the underlying litigation, as well as delay and avoid producing discoverable and relevant information." *Spivery-Jones v. TFN Health Care Investors, LLC et al*, Case No. 498 EDA 2012, Superior Court of Pennsylvania.

426.    The litigation strategy was to stall and delay the underlying litigation and avoid producing discovery.

427. In addition to being a fraud on the Plaintiffs, the concealment of these relationships, and the entities controlling matters behind the scenes, was all part of the Defendants' plan to disguise the THI and THMI nursing home assets into revenue-generating, judgment-proof assets.

### H. Entry in Joint Venture Agreement on January 5, 2012

428. In January 2012, the Receiver and Defendants entered into a joint venture agreement ("**2012 Agreement**") to unlawfully put the judgments and claims beyond the reach of the Plaintiffs and to conceal the liquidation of the nursing home chain's assets for themselves while defrauding its creditors.

429. The 2012 Agreement specifically refers to the Plaintiffs and their state court actions against THI and THMI.

430. In the 2012 Agreement, the Receiver and the Defendants expressly pledged mutual cooperation to continue their efforts to defraud and defeat the Plaintiffs in their claims against THI and THMI.

431. The Receiver also pledged to give testimony that is agreeable to FAS – the very entity that was found by Florida and Pennsylvania circuit and appellate courts to be engaged in a fraud in its involvement in the defense of THMI.

432. The Agreement further provides an unlimited defense fund, funded by the Defendants, to be used by the Receiver and FAS in their efforts to defeat the Plaintiffs' claims on behalf of the Defendants.

433. The Defendants also agreed to indemnify the Receiver in his efforts to defeat the Plaintiffs' claims on behalf of the Defendants.

434. The Receiver unlawfully released any and all claims, causes of action and choses in action that THI may have against the Defendants for much less than reasonably equivalent value, in an attempt to avoid liability to the Plaintiffs.

435.    These claims, causes of action, and choses of action are property rights reachable by the Plaintiff judgment creditors.

436.    The 2012 Agreement further assigns to the Defendants any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel. The assignment includes claims for contribution and indemnification.

437.    Pursuant to the 2012 Agreement, the Defendants were assigned THI's rights under the attorney-client privilege and the work-product doctrine and were granted access to all of THI's books and records.

438.    FAS agreed to indemnify THI, pay for the defense, and put up $800,000 in defense costs.

439.    FAS had in fact terminated its legal relationship with THI and the Maryland receivership on account of a "conflict of interest" on March 31, 2011. Then, after admitting this conflict of interest, FAS purchased THI's defense, THI's attorney-client privilege and work product doctrine rights in the Plaintiffs' cases, and purchased any and all claims of THI including claims against the Plaintiffs and the Plaintiffs' counsel.

440.    GECC agreed to pay $300,000 to purchase the defense of THI, its attorney-client privilege and work product doctrine rights, and purchase any and all claims of THI including claims against the Plaintiffs and the Plaintiffs' counsel. GECC further agreed to indemnify THI and agreed to pay the first $200,000 in defense costs in defending the Plaintiffs' litigation.

441.    Schron agreed to pay $200,000 to purchase the defense of THI, its attorney-client privilege and work product doctrine rights, and purchase any and all claims of THI including claims against the Plaintiffs and the Plaintiffs' counsel.

442.   Ventas agreed to pay $200,000 to purchase the defense of THI, its attorney-client privilege and work product doctrine rights, and purchase any and all claims of THI including claims against the Plaintiffs and the Plaintiffs' counsel.

443.   Defendants GTCR, THIH, THIB, FLTCH, Forman, and Grunstein paid no consideration to purchase the defense of THI, its attorney-client privilege and work product doctrine rights, and all THI claims including claims against the Plaintiffs and the Plaintiffs' counsel.

444.   Pursuant to the 2012 Agreement, the Receiver became the nominee of the Defendant signatories.  Having sold all of THI's interests in the defense, any and all claims, attorney client privilege, work product documents, and others, the defense belonged to the Defendants.

445.   The Defendants nominated the Receiver to appear in the Florida courts on their behalf.

446.   The Receiver, on behalf of the Defendants, has used the Agreement as a sword and shield in numerous Florida state and federal courts to ensure the details of the conspiracy remain hidden.

### I.   *Defendants' efforts to defraud and defeat creditors and conceal fraudulent transfers of assets from the THI enterprise continues to this day*

447.   After execution of the 2012 Agreement, which provided an unlimited defense fund, the THI Receiver, as nominee for the Defendants, directed local counsel to enter appearances on behalf of THMI and THI, on the eve of trial, seeking to set aside the default judgments and continue the trials at the eleventh hour.

#### i.   *The Nunziata State Court Litigation in Pinellas County*

448.   On the eve before the trial in the *Estate of Nunziata v. THMI*, Case No. 05-8540CI in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Marsha Rydberg, Esq.

of the Rydberg law firm ("Rydberg") served a notice of appearance, motions for admission *pro hac vice* of Carl Hagwood, Esq. and J. Michael Coleman, Esq., and a motion to set aside default and vacate the order setting trial on behalf of THMI. On January 9, 2012, the morning of the first day of trial, Rydberg served a motion for partial summary judgment on behalf of THMI.

449.    The motion for summary judgment filed on behalf of THMI was prepared by Anderson and Carl Hagwood, Esq.

450.    Rydberg did not have the authority or consent to represent THMI. THMI was defunct and had no known representative. In addition, Florida Department of State records showed that THMI's corporate status had been revoked for failing to file annual reports on October 1, 2004.

451.    Upon questioning by the state court to explain how could she defend THMI if it was defunct and had no known representative, Rydberg admitted that she was not retained by THMI but "retained by the receiver" or "as [she understood] it, the receiver is the one that [would] be retaining [her firm]." Rydberg likened the situation to an insurance company paying counsel to represent an insured.

452.    But, just two weeks earlier, the THI Receiver denounced his authority to defend THMI. At a December 26, 2011 hearing before the Circuit Court for Baltimore County, Maryland, the Receiver testified:

> "That – that was the rationale that I was told, after the fact for doing it. Had I been the Receiver at the time I would not have tried to convince a court to stay [the Florida litigation] *because I would have had no authority to represent THMI. And Fundamental hired counsel and had them enter appearance for THMI under my auspices or under the Receiver's auspices, and that was just plain wrong because they were not part of this receivership estate* . . . . The - - in my view the receivership only had an authority to represent the entities covered by the receivership, not to hire counsel in Florida and entered an appearance on behalf of an entity that is not in the receivership. *I believe that was wrong then and I believe it is wrong now."*

"Someday I need to have it explained to me why [FAS] saw reason to protect Trans Health Management, which was not part of this [receivership] proceeding. Because [FAS] insisted that it be done. I think it's a parent company and that [FAS] somehow has an interest in there and that did not further at all as a Receiver, *yet that was part of [FAS'] litigation strategy to protect THMI.*"

(emphasis added).

453.    In addition, at a May 29, 2013 hearing in another case, the Receiver confirmed that he had no authority to hire counsel in the Nunziata litigation. According to the Receiver, he "had no authority to hire counsel in Florida in early January 2012."

454.    When questioned who had hired counsel to represent THMI in Nunziata, the Receiver answered: "I don't know who officially hired them. I believe Fundamental might have paid them to be there, but I don't know that for a fact, because I wasn't - - that was not my decision. I wasn't involved."

455.    Having failed to explain how she or any other attorney could defend the defunct THMI, the Pinellas Circuit Court struck the Rydberg pleadings, finding that the attorneys hired by the Receiver had no authority to defend the defunct THMI.

456.    According to a recent Notice of Filing Documents Produced in Discovery in Compliance with Rule 4-3.3 of the Florida Rules of Professional Conduct by the Chapter 7 Trustee, counsel for FAS warned Zack, Anderson, Rydberg, Hagwood and others that the trial court should be very carefully informed of the authority that they had to represent THMI, to explain the assignment of rights to the settling third parties by THI, and the Receiver's interests in connection with it.

457.    According to the email from FAS counsel, if the assignment memorialized in the 2012 Agreement and the representation was not detailed, counsel was concerned that "FAS will certainly be found to have engaged in a fraud on the court."

458.   This warning was ignored.  The same day as the email exchange, the Defendants entered into the January 2012 Agreement described above.

459.   Rydberg and Hagwood showed up on the first day of trial.  But they did not explain the assignment of interests and did not detail the representation.

460.   The trial court reiterated her previous concerns of fraud and struck counsels' appearances.

461.   The jury trial proceeded but no attorney with the authority to defend THMI appeared. The jury heard the evidence and returned a verdict against THMI for $60 million in compensatory damages and $140 million in punitive damages.

462.   On January 11, 2012, a final judgment against THMI in the amount of $200 million was entered.

463.   After trial, the Nunziata Estate moved for an injunction to prohibit the Receiver from making collateral attacks on the trial court's orders in other jurisdictions, including Maryland.

464.   The Receiver's joinder in two motions pending before the Maryland receivership court necessitated the injunction.

465.   The first was FLTCH's expedited motion to enforce the Maryland stay order against the Plaintiffs asking the Maryland court to direct the Plaintiffs "to refrain from proceeding any further with [their] claims" against THMI.

466.   The second motion filed by GECC asked the Maryland court to hold the Plaintiffs in contempt for pursuing claims against THMI even though the Plaintiffs' claims were filed long before the Maryland receivership began, the trial courts expressly denied the stay of Florida proceedings in the Plaintiffs' cases, and THMI was not involved in the Maryland receivership.

467.    The Nunziata Estate presented the motion for injunction to the state trial court and handed a copy to Rydberg.  Rydberg asked to be heard on the motion and the court granted the request.

468.    Rydberg first argued that although the Receiver had hired her, she "never represented the Receiver" but only represented THMI and that the Receiver was not subject to the jurisdiction of the court.

469.    Rydberg then asked that the trial court continue the hearing to give the Receiver time to adequately respond.  A temporary injunction was entered but the trial court set a hearing for two days later to consider whether a final injunction should issue.

470.    When the injunction hearing convened two days later on January 13, 2012, Rydberg did not sit at the counsel table.  When the trial court asked her to approach, she stated, "I would, but I don't represent anybody in these proceedings." No one else appeared for the THI Receiver.

471.    A final injunction was entered and the "Receiver and his agents and assignees are prohibited from making collateral attacks on any orders of the Court."

472.    On March 4, 2013, in direct violation of the final injunction order, the Receiver, acting as nominee for the Defendants, filed a lawsuit against the Nunziata, Jackson, and Webb Estates in the United States District Court for the Middle District of Florida seeking a declaration that the duly obtained final judgment is void.  *Grochal v. The Estate of Juanita Amelia Jackson*, Case No. 8:13-cv-00582-MMS-AEP.

473.    In that lawsuit, the Receiver reaffirms his repudiation of a Florida receivership and once again, makes a collateral attack on final state court judgments in a federal court, including the judgments obtained by the Plaintiffs, the Nunziata, Jackson, and Webb Estates.

474.    The filing of the federal lawsuit led to an adjudication of contempt against the Receiver in the Nunziata litigation by a state court for the Sixth Judicial Circuit on March 13, 2013.

475.    On March 13, 2013, after a hearing on the Nunziata Estate's motion for contempt, the Receiver was held in civil contempt for filing the federal complaint by a Pinellas Circuit Court.

476.    The Pinellas Circuit Court expressly found that the suit was an abuse of process and in violation of duties of candor to the court.

477.    The court held:

> "And now I see this lawsuit come about, this new one over in federal court that was attached to this emergency motion that *misrepresents, mischaracterizes, and is not in accordance with the rules. I think it's a violation of the candor to the tribunal* as to what actually happened in this case specifically for the estate of Ms. Nunziata.
>
> ***
>
> The appellate one, I want to make totally clear, appealing the Court's decision in this is totally appropriate. However, *this action filed in federal court is just flat-out wrong. It's a flat-out abuse of the process.* There's no way in any rule that I can see that that is anywhere near appropriate. It sort of goes to the justice denied, justice - - justice delayed, justice denied. *And it's really, quite frankly, appalling. I think you can tell that I think that it's totally wrong.* The issue for me to decide is to whether or not to hold the receiver in contempt. (emphasis added)."

478.    The Receiver's declaratory suit was subsequently dismissed with prejudice by United States District Judge Mary S. Scrivens for lack of subject-matter jurisdiction. *Grochal v. The Estate of Jackson*, Case No. 8:13-cv-582-T35-AEP.

479.    Two post-trial motions were filed by Rydberg, but abandoned shortly thereafter with the filing of a notice of appeal purportedly on behalf of THMI, the THI Receiver, and his counsel.

480.   Concerned about its liability to the Nunziata Estate, GECC sued the Estate of Nunziata in Federal Court for a declaration that it was not liable for the final judgment. United States District Judge James D. Whittemore dismissed GECC's suit. *GECC v. Estate of Nunziata*, 2012 WL 1581860 (M.D. Fla. May 4, 2012).   GECC appealed Judge Whittemore's decision to the Eleventh Circuit Court of Appeals, where the case currently pends.   *GECC v. Estate of Nunziata*, Case No. 12-12993.

### ii. The Webb State Court Litigation in Polk County Circuit Court

481.   The Webb state court litigation followed the same track as the Nunziata litigation.

482.   Just before trial, after almost three years of litigation, THI moved to stay the lawsuit, but never pursued the motion. Instead, in July 2010, the Defendants directing THI and THMI's litigation changed course and withdrew defense counsel of THI and THMI.

483.   Despite the Plaintiff's vigorous opposition, the withdrawal was granted. No further counsel appeared on behalf of THI and THMI despite being served with numerous pleadings, notices, and filings, which resulted in the entry of defaults.

484.   The jury trial was set to begin on February 6, 2012. On the Friday before trial, Hala Sandridge, Esq. ("Sandridge"), filed a notice of appearance, motion to admit Maryland attorney Maria Ellena Chavez-Ruark ("Ruark") *pro hac vice*, and motion to continue the trial and set aside defaults.

485.   Ruark and Sandridge appeared on the morning of trial, solely to seek a continuance. Ruark and Sandridge admitted that they were not willing or prepared to defend the trial that was about to begin.

486.   As neither attorney was prepared to try the case, the Polk County Circuit Court struck the notice of appearance and motion for admission *pro hac vice*.

487.    No attorney asked to participate in the three-day damages trial that followed.   The jury heard evidence and returned a verdict of $200 million in compensatory damages and $700 million in punitive damages.

488.    Although she took no part in the trial, Sandridge filed a motion for new trial on behalf of THI and THMI, but later abandoned it with the filing of a notice of appeal.

### iii. The Townsend Polk County Litigation

489.    THMI and THI were actively defended from January 29, 2009 until counsel was instructed to withdraw and did withdraw on January 3, 2011. As in the *Nunziata* and *Webb* litigation, no further counsel appeared on behalf of THI and THMI and defaults were entered.

490.    Pursuant to the January 5, 2012 Agreement, the Receiver for THI appeared to present a defense for THI on March 27, 2012.

491.    The Receiver was not a party to the action nor did he move to intervene.   Neither the Receiver nor the Receivership was named in the Complaint.

492.    The Receiver appeared to defend THI at the trial commencing on July 15, 2013.

493.    The undisputed testimony before the trial court was that the defense was provided by the parties to the January 5, 2012 Agreement – the Defendants.

494.    Having assigned and transferred his interest in defending THI to the Defendants by virtue of the January Agreement, the THI Receiver presented a defense for THI on behalf of the Defendants.

495.    The Receiver acted as the nominee for the Defendants who were the real parties in interest.

496.    The Receiver objected to discovery on behalf of the Defendants asserting attorney-client and work product privileges. The privilege log produced revealed dozens of communications between the Receiver's counsel, Ruark and:

    a.  GECC's counsel, Ed Dolan, and GECC senior vice president, Dwight Meier, regarding seven cases, including the Plaintiffs' cases, labeled as "communication regarding trial strategy." The privilege log even included an email sent by GECC's counsel to the Receiver's counsel regarding litigation strategy in the *Townsend* case;

    b.  GTCR and THIH's counsel, Ben Rottenborn labeled as a "communication regarding litigation strategy";

    c.  Ventas's counsel, Daniel Weiss labeled as a "communication regarding litigation strategy;

    d.  Schron's counsel, Nicolle Jacoby labeled as a "communication regarding litigation strategy;

    e.  FLTCH, Grunstein and Forman's counsel, Malcolm Harkins labeled as "communication regarding litigation strategy." There were even communications between the Receiver's counsel and FLTCH, Grunstein and Forman's counsel, Sanders McNew, regarding trial strategy in the *Townsend* case. This included emails in the period leading up to the appearance by the Receiver's counsel pursuant to the January 5, 2012 Agreement; and

    f.  thousands of entries involving the Receiver and FAS discussing litigation strategy and trial strategy. For example, there were specific entries from the Receiver and Receiver's counsel, Ruark to FAS and THIB's agents and counsel, Anderson, Zack and Stacie Tobin. There were even communications between FAS and the Receiver regarding trial strategy in the Plaintiffs' state court cases. This included emails in the period leading up to the appearance by the Receiver's counsel pursuant to the January 2012 Agreement.

497.    The jury returned a verdict for $1.11 billion. Judgment was entered against THI on July 29, 2013.

498.    Because of the evidence at trial, the statements of counsel, as well as the prior assertion of privilege, on July 31, 2013, the Townsend Estate moved to amend the judgment to add the Defendants, the parties to the January 5, 2012 Agreement, to the judgment as the real parties in interest.

499.    The Townsend Estate served the motion on counsel for the Receiver that had been appearing in the case pursuant to the January 2012 Agreement and as a nominee for the Defendants.

500.    On the same day that counsel for the Receiver was served with the motion, the Defendants wrote the trial judge a letter requesting that he take no action on the Townsend Estate's motion.

501.    Based on the testimony and documentary evidence at trial, the trial judge found that the Receiver was the nominee to the sixteen parties to the January 2012 Agreement and that the Defendants were the real parties in interests.

502.    The Defendants were added to the judgment on August 2, 2013.

## COUNT I

**(Declaratory Judgment – THI, THMI, and FLTCI Successor Liability against Defendants FAS, FLTCH, THIB, Forman, Grunstein, and Schron)**

503.    The Plaintiffs incorporate by reference all of the factual allegations made in paragraphs 1 through 507 as if fully set forth herein.

504.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

505.    The Plaintiffs seek a declaratory judgment that: (1) the Fundamental enterprise is a mere continuation of the THI enterprise; (2) the merger of the THI enterprise into the Fundamental enterprise was a *de facto* merger; (3) and that the 2006 transaction wherein the stock and liabilities of THMI were sold to FLTCI and the assets of the THI enterprise were sold to FLTCH was a fraudulent effort to avoid the liabilities of the THI enterprise; and that (4) the Defendants are liable for the debt and liabilities of the THI enterprise, including Plaintiffs' claims and judgments, as successors-in-interests.

506.    The declaration sought herein deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts and is not sought merely as an advisory opinion or propounded from curiosity.

507.    There exists a real, actual and justiciable controversy between the parties that warrants the seeking of a declaratory judgment.  As a result of the Defendants' efforts to fraudulently transfer assets to avoid liabilities, the Plaintiffs are left only with a liability ridden shell to satisfy their claims against THI, THMI, and FLTCI.  There is thus a *bona fide* need for a declaration as the Defendants have repeatedly disclaimed successor liability for THI, THMI, and FLTCI.

508.    The Court's issuance of declaratory relief in this case will settle the controversy between the parties and will serve a useful purpose in clarifying the Defendants' liability for the debt and liabilities of the THI enterprise and FLTCI.

509.    On March 28, 2006, in a fraudulent effort to avoid liabilities of the THI enterprise, the Defendants completed two linked transactions wherein all of the assets of the THI enterprise (including THI and THMI) were fraudulently transferred to the newly created Fundamental enterprise for much less than market value.

510.    But, the liabilities of the THI enterprise, along with the stock of THMI, were transferred to a shell company created for the sole purpose of holding such liabilities.

511.    The March 28, 2006 linked transactions were planned, structured, and executed by the Defendants with full knowledge of the pending litigation, including the Plaintiffs' claims against the THI enterprise, and aimed at securing the assets of the THI enterprise free and clear of existing liabilities and debt.

512.  · The March 28, 2006 linked transactions were done with an intent to hinder, delay, or defraud the creditors of the THI enterprise, including the Plaintiffs.

513.  After the transfers of assets, the Fundamental enterprise used the former THI and THMI assets to continue in the same business as the THI enterprise.

514.  The March 28, 2006 linked transactions constituted a fraudulent effort by the Defendants to avoid liabilities of the THI enterprise.

515.  After the March 28, 2006 transactions, there was a clear continuity of business from the THI enterprise to the Fundamental enterprise as evidenced by the following indicia of continuity:

    a.  the Fundamental enterprise is in the same business as the THI enterprise of operating and managing nursing homes throughout Florida, Pennsylvania and other states;

    b.  the Fundamental enterprise uses the same management as the THI enterprise in that the former executive officers of the THI enterprise became the executive officers of the Fundamental enterprise on March 28, 2006;

    c.  the Fundamental enterprise uses the same employees who perform the same tasks, job functions, and work under substantially the same working functions,  as they did when employed by the THI enterprise;

    d.  the Fundamental enterprise operates out of the same building and office location as the THI enterprise;

    e.  the Fundamental enterprise uses the same office and computer equipment as the THI enterprise;

    f.  the Fundamental enterprise uses the same phone number as the THI enterprise;

    g.  the Fundamental enterprise uses the same logo as the THI enterprise;

    h.  the Fundamental enterprise assumed control over the website of THI which is virtually indistinguishable from the THI and THMI website, with only a change to the site's name;

    i.  the Fundamental enterprise assumed the THI employee retirement and benefit plans including Medical, Pharmacy, Dental, Vision, Disability and Life Insurance benefits;

    j.  the Fundamental enterprise assumed the THI enterprise's national contracts, including Pharmacy providers and IT, food service, and medical supply vendors;

    k.  the Fundamental enterprise acquired all of the assets of the THI enterprise by virtue of the March 28, 2006 transactions;

    l.  the Fundamental enterprise concealed its acquisition of the THI enterprise by virtue of the March 28, 2006 transactions from Plaintiffs, creditors, and courts;

    m.  the Fundamental enterprise assumed control of the oversight of THI litigation nationwide; and

    n.  the THI enterprise ceased to operate and exist shortly after the March 28, 2006 transactions.

516.    The Fundamental enterprise is nothing more than a "new hat" for the THI enterprise, a change only in name but not in substance.

517.    The Fundamental enterprise is a reincarnation of the THI enterprise under a different name. The Fundamental enterprise was a "relay-style passing of the baton" from the THI enterprise.

518.    The March 28, 2006 transactions described above constitute a *de facto* merger wherein the Fundamental enterprise, consisting of FLTCH, FAS, and THIB, was absorbed by the THI enterprise as it shared a continuity of management, personnel, assets, location, and equipment.

519.    The Fundamental enterprise, consisting of FLTCH, FAS, and THIB, is a continuation and successor of the THI enterprise as it shared a continuity of management, personnel, assets, location, and equipment.

WHEREFORE, the Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) the Fundamental enterprise is a mere continuation of the THI enterprise; (2) the merger of the THI enterprise into the Fundamental enterprise was a *de facto* merger; (3) the 2006 transaction wherein the stock and liabilities of THMI were sold to FLTCI and the assets of the THI enterprise were sold to FLTCH was a fraudulent effort to avoid the

liabilities of the THI enterprise; and that (4) the Defendants are liable for the debt and liabilities

of the THI enterprise, including Plaintiffs' claims and judgments, as successors-in-interests.

## COUNT II

**(Declaratory Judgment – Alter Ego/ Piercing the Corporate Veil of THI, THMI, FLTCI to
Defendants GECC, FAS, THIB, FLTCH, Forman, Grunstein, Schron, Ventas, GTCR,
Jannotta, and THIH )**

520.    The Plaintiffs incorporate by reference all of the factual allegations made in

paragraphs 1 through 507 as if fully set forth herein.

521.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

522.    The Plaintiffs seek a declaratory judgment that the Defendants GECC, FAS, THIB,

FLTCH, Forman, Grunstein, Schron, Ventas, GTCR, Jannotta, and THIH are liable for the debts

of THI, THMI, and FLTCI such that it would be proper to pierce the corporate veils.

523.    The declaration sought herein deals with a present, ascertained or ascertainable state

of facts or present controversy as to a state of facts and is not sought merely as an advisory

opinion or propounded from curiosity.

524.    There exists a real, actual and justiciable controversy between the parties that

warrants the seeking of a declaratory judgment. As a result of the Defendants' efforts to misuse

THI, THMI, and FLTCI for an improper purpose of avoiding and defeating their liabilities, the

Plaintiffs are left only with a liability ridden shell to satisfy their claims against THI, THMI, and

FLTCI. There is thus a *bona fide* need for a declaration as the Defendants have repeatedly

disclaimed alter ego liability for THI, THMI, and FLTCI.

525.    The Court's issuance of declaratory relief in this case will settle the controversy

between the parties and will serve a useful purpose in clarifying the Defendants' liability for the

debt and liabilities of THI, THMI, and FLTCI.

526.   The Defendants dominated and controlled THI and THMI to the extent that their independence was, in fact, non-existent and the Defendants were, in fact, alter egos for THI and THMI.

527.   The Defendants organized and used THI and THMI to perpetrate a fraud upon the creditors and to mislead the creditors, including the Plaintiffs.

528.   The Defendants deliberately used THI and THMI for the fraudulent and improper purpose of looting the assets of THI and THMI and concealing them in newly created companies to avoid THI and THMI liabilities and debt and defraud creditors.

529.   To conceal the Defendants' fraudulent and improper use of THI and THMI, Defendants caused THMI to become defunct shortly after the transfer of its assets, placed THI in a Maryland receivership to avoid federal bankruptcy scrutiny of the fraudulent asset transfers, abused process and committed frauds on numerous state courts, and entered into a January 5, 2012 Agreement whereby Defendants agreed to fund the defense of THI and THMI through the January 5, 2012 Agreement and purchase the defense of THI, its attorney-client and work product doctrine rights, and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel.

530.   The Defendants' misuse of THI and THMI caused injury to the Plaintiffs by liquidating the THI and THMI assets, concealing the assets in newly created entities, and leaving behind only a liability-ridden shell to satisfy their tort claims against THI and THMI.

531.   The Defendants deliberately engaged in improper conduct in the use of THI and THMI which caused injury to the Plaintiffs.

532.   The Defendants organized and used FLTCI to perpetrate a fraud upon the creditors and to mislead the creditors, including the Plaintiffs.

533.   The Defendants also dominated and controlled FLTCI to the extent that FLTCI's independence was, in fact, non-existent and the Defendants were, in fact, alter egos for FLTCI.

534.   The Defendants deliberately created and used FLTCI for the fraudulent and improper purpose of avoiding and defeating the liabilities of THI and THMI and concealing the fraudulent nature of their conduct.

535.   FLTCI was created for the unlawful and fraudulent purpose of holding the liabilities of THI and THMI and defrauding the creditors of THI and THMI, including Plaintiffs.

536.   THI and THMI creditors, including Plaintiffs, were injured by the Defendants' fraudulent and improper use of FLTCI as the Plaintiffs are unable to satisfy their final judgment and/or tort claims from the liability-ridden shell.

537.   Defendants deliberately engaged in improper conduct in the use of FLTCI which caused injury to the Plaintiffs.

538.   The injury suffered by each Plaintiff is personal to that Plaintiff and is not the type suffered by general creditors. To date, Plaintiffs have each been delayed, hindered, and/or defrauded in their ability to prosecute their tort actions and collect on duly obtained final judgments against THI and THMI.

539.   To date, the Jackson Estate has not collected its final and non-appealable judgment against FLTCI in the amount of $110 million entered on July 10, 2010.

540.   To date, the Jackson Estate has not collected its final and non-appealable judgment against THI and THMI in the amount of $110 million entered on September 13, 2011.

541.   To date, the Nunziata Estate has not collected its final judgment against THMI in the amount of $200 million, entered on January 11, 2012.

542.   To date, the Webb Estate has not collected its final judgment against THI and THMI in the amount of $900 million, entered on February 10, 2012.

543.   To date, the Townsend Estate has not collected its final judgment against THI in the amount of $1.1 billion, entered on July 29, 2013.

544.   The Sasser Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI commenced on September 6, 2006.

545.   The Jones Estate has been hindered, delayed, and defrauded in its ability to prosecute her tort action against THI and THMI, commenced on March 20, 2006.

546.   The Defendants' misconduct in delaying, hindering, and defrauding creditors of THI, THMI, and FLTCI was specifically directed at the Plaintiffs' claims.

547.   In further efforts to delay, hinder, and defraud the Plaintiff creditors, Defendants took active steps to conceal their relationship with THI, THMI and FLTCI.  They each presented a "public face" and "private face."

548.   Publicly, Defendant FAS claimed that its only relationship with THI and THMI was as provider of back office services to THI approximately four years prior.   Privately, however, FAS directed and controlled the defense of THI and THMI in litigation around the country, including the Plaintiffs' litigation from at least 2006 to the present.

549.   According to the Receiver, "Fundamental hired counsel and had [defense counsel] enter an appearance for THMI  . . .  under the Receiver's auspices, and that was just plain wrong."  It was "at Fundamental's direction [that] pleadings were filed on behalf of [THMI]" and "part of [FAS'] litigation strategy [was] to protect THMI."

550.    Florida and Pennsylvania state courts have found that FAS and its agents or employees orchestrated the defense of the THI defendants, but deliberately chose to withhold relevant information regarding its relationship with the THI defendants.

551.    While FAS had previously terminated its relationship with THI and the Maryland receivership on account of a "conflict of interest" on March 30, 2011 and returned monies paid to it, FAS entered into a joint venture agreement, directed solely at the Plaintiff creditors, wherein it purchased the defense of THI, its attorney-client privilege and work product doctrine rights, and purchased any and all claims of THI against the Plaintiffs and the Plaintiffs' counsel.

552.    Pursuant to the joint venture agreement, FAS controls and directs the defense of THI and nominated the Receiver to act on behalf of the Defendants and continue in efforts to defeat the Plaintiffs' claims. Yet, FAS continues to denounce any relationship with THI, THMI, and FLTCI.

553.    Publicly, Defendant GTCR claimed to be a passive investor.

554.    Publicly, Defendant Ventas claimed to be a passive Real Estate Investment Trust.

555.    Publicly, Defendant GECC claimed to be a mere lender.

556.    Publicly, Defendants Schron, Forman, Grunstein, and FLTCH claimed to have no connection with THI, THMI, or FLTCI.

557.    Privately, however, as correspondence and emails have revealed, Defendants FAS, GTCR, Ventas, GECC, FLTCH, Schron, Forman, and Grunstein, are closely aligned in discussing litigation strategy and directing litigation against THI and THMI behind-the-scenes, despite having no authority to represent or speak on behalf of THMI.

558.    In addition, Defendants entered into a joint venture agreement, directed specifically at the Plaintiff creditors, wherein they have purchased the defense of THI, agreed to fund THI's

defense, purchased its attorney-client privilege and work product doctrine rights, and purchased any and all claims of THI against the Plaintiffs and the Plaintiffs' counsel.

559.   Defendants have agreed that FAS will direct the defense of THI.

560.   Defendants have further agreed that the Receiver will act as the nominee and continue in efforts to defeat the Plaintiffs' claims on behalf of the Defendants FAS, GTCR, Ventas, GECC, FLTCH, Schron, Forman, and Grunstein.

561.   A Polk County Circuit Court recently found that based on the testimony and documentary evidence at trial, the Receiver was the nominee to the sixteen parties to the January 2012 Agreement and that the Defendants were the real parties in interests.  The Defendants were added to the judgment as the real parties in interest on August 2, 2013.

562.   Piercing of the corporate veil and finding of alter ego under the facts alleged above is necessary to prevent injustice in this case.

WHEREFORE, the Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) Defendants are the alter egos of THI, THMI, and FLTCI; (2) Defendants used THI, THMI, and FLTCI for a fraudulent and improper purpose which caused injury to the Plaintiffs; and that (3) the Defendants are liable for the debts and liabilities of THI, THMI, and FLTCI under an alter ego theory of liability.

Respectfully submitted,

Isaac Ruiz-Carus, Esquire
Fla. Bar No. 0017004
iruiz-carus@wilkesmchugh.com
James L. Wilkes, II, Esquire
Fla. Bar No. 0405337
jwilkes@wilkesmchugh.com
Bennie Lazzara, Jr., Esquire
Fla. Bar No. 0119568

bennie@wilkesmchugh.com
Joanna M. Greber, Esquire
Fla. Bar No. 0027830
jgreber@wilkesmchugh.com
WILKES & McHUGH, P.A.
One North Dale Mabry, Suite 800
Tampa, Florida 33609
813/873-0026 // 813/286-8820 Fax
*Attorneys for Plaintiff*