# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:

FUNDAMENTAL LONG TERM CARE, INC.,

     Debtor.

_____/

The ESTATE OF JUANITA AMELIA JACKSON, by and through CATHY JACKSON-PLATTS f/k/a CATHERINE WHATLEY, Personal Representative; the ESTATE OF ELVIRA NUNZIATA, by and through RICHARD NUNZIATA, Personal Representative; the ESTATE OF JOSEPH WEBB, by and through ROSE M. WEBB, Personal Representative; the ESTATE OF ARLENE ANNE TOWNSEND, by and through BRENDA S. SHATTUCK, Personal Representative; the ESTATE OF OPAL LEE SASSER, by and through WANDA KAY MUSSELWHITE, Personal Representative; and the ESTATE OF JAMES HENRY JONES, by and through FRANCINA SPIVERY-JONES, Administratrix,

     Plaintiffs,

BETH ANNE SCHARRER, as Chapter 7 Trustee, and TRANS HEALTH MANAGEMENT, INC.,

     Intervening Plaintiffs,

v.

GENERAL ELECTRIC CAPITAL CORPORATION; FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC; THI OF BALTIMORE, INC.; FUNDAMENTAL LONG TERM CARE HOLDINGS, LLC; MURRAY FORMAN; LEONARD GRUNSTEIN; RUBIN SCHRON; VENTAS, INC., VENTAS REALTY, LIMITED PARTNERSHIP; GTCR GOLDER RAUNER, LLC; GTCR FUND VI, L.P.; GTCR PARTNERS VI, L.P.; GTCR EXECUTIVE FUND,

Case No.: 8:11-bk-22258-MGW

Chapter 7

Adv. Pro. No.: 8:13-ap-00893-MGW

JURY TRIAL DEMANDED

L.P.;  GTCR    ASSOCIATES  VI;  EDGAR  D. JANNOTTA, JR.; and THI HOLDINGS, LLC,

    Defendants.

_____/

## AMENDED COMPLAINT

Three friends, a lender, landlord, and nursing home operator, were sitting together discussing a recent large verdict against a nursing home.

At the trial, a bank president had testified that he knew the nursing home had plenty of staff to take care of the residents because he had been reviewing staffing numbers for years.  Regarding the trial testimony, the lender told his friends, "He should have said he was just a mere lender."

Also at the trial, the president of a Real Estate Investment Trust testified that he knew the nursing home had plenty of supplies because the trust had been carefully reviewing the supply invoices. The landlord told his friends, "He should have said he was just a passive investor."

Lastly, at the trial, a nursing home administrator testified that it was all his fault because he knew the facility was short staffed and undersupplied. To which the nursing home operator told his friends, "He should have said, I couldn't have done it without my lender and my landlord."

Plaintiffs, the Estate of Juanita Amelia Jackson, by and through Cathy Jackson-Platts

f/k/a Catherine Whatley, Personal Representative ("**Jackson Estate**"), the Estate of Elvira

Nunziata, by and through Richard Nunziata, Personal Representative ("**Nunziata Estate**"),

the Estate of Joseph Webb, by and through Rose M. Webb, Personal Representative ("**Webb**

**Estate**"), the Estate of Arlene Anne Townsend, by and through Brenda S. Shattuck, Personal

Representative ("**Townsend Estate**"), the Estate of Opal Lee Sasser, by and through Wanda

Kay Mussel White, Personal Representative ("**Sasser Estate**"), and the Estate of James

Henry Jones, by and through Francina Spivery-Jones, Administratrix ("**Jones Estate**"),

(collectively "**Plaintiffs**"), and Intervening Plaintiffs, Beth Ann Scharrer, as Chapter 7

Trustee ("**Trustee**"), and Trans Health Management, Inc. ("**THMI**"), sue Defendants, General Electric Capital Corporation ("**GECC**"), Fundamental Administrative Services, LLC ("FAS"), THI of Baltimore, Inc. ("**THIB**"), Fundamental Long Term Care Holdings, LLC ("**FLTCH**"), Murray Forman ("**Forman**"), Leonard Grunstein ("**Grunstein**"), Rubin Schron ("**Schron**"), Ventas, Inc. ("**Ventas**"), Ventas Realty, Limited Partnership ("**Ventas Realty**"), GTCR Golder Rauner, LLC ("**GTCR Golder Rauner**"), GTCR Fund VI, L.P. ("**GTCR Fund**"), GTCR Partners VI, L.P. ("**GTCR Partners**"), GTCR VI Executive Fund, L.P., ("**GTCR Executive Fund**"), GTCR Associates VI ("**GTCR Associates**"), Edgar D. Jannotta, Jr. ("**Jannotta**"), and THI Holdings, LLC ("**THIH**"), and allege as follows:

## I.     PRELIMINARY STATEMENT

1.     This case is about a group of investors, lenders, and real estate owners who sought to surreptitiously acquire a nursing home enterprise's valuable assets free and clear of its significant tort liabilities so that the investors, lenders, and real estate owners could obtain windfall profits to the detriment of the nursing home enterprise's creditors.

2.     In the process, however, the investors, lenders, and real estate owners left the nursing home enterprise without sufficient assets to pay its debts; loaded down the nursing home enterprise with debt; defrauded and misled the nursing home enterprise's creditors; concealed the true nature of the nursing home enterprise's liabilities and assets; and set the nursing home enterprise on a path to an inevitable bankruptcy.

3.     By mid-2004, the nursing home enterprise had accumulated massive liabilities through its negligent operation of nursing homes. In addition, the nursing home enterprise's investors, lenders, and real estate owners had discovered that in order to receive financial

3

backing the nursing home enterprise made material misrepresentations in financial statements. The nursing home enterprise had also resorted to illegal campaign contributions in order to secure favorable nursing home legislation.

4.      Rather than expose the truth and comply with mandatory reporting requirements, the nursing home enterprise's investors and lenders defaulted the nursing home enterprise and entered into a series of 18 forbearance agreements. Each agreement extracted more fees, penalties, and costs for the investors and lenders. The investors, lenders, and real estate owners further threatened foreclosure, eviction, and threatened to take over the nursing home enterprise's operations.

5.      Meanwhile, the nursing home enterprise's residents, shrouded with the fog of Alzheimer's, did not know that their lives were in peril by the machinations of financial investors, lenders, and real estate owners. Resident care continued to suffer and lawsuits against the nursing home enterprise mounted.

6.      On account of the growing lawsuits and ever mounting debts, the situation became untenable.

7.      Having seen the enormous and constant profit stream available to the nursing home enterprise through federal and state backed funds, the investors, lenders, and real estate owners decided to jettison the toxic liabilities resulting from the nursing home enterprise's negligent operation of its nursing homes because those liabilities were preventing the investors, lenders, and real estate owners from reaping even greater profits for themselves.

8.      While the lawsuits for negligent care of the residents were pending, the real estate owners, investors, and lenders devised a two-step fraudulent scheme to escape the

nursing home enterprise's toxic past and attempt to place its valuable assets safely beyond the reach of its tort claimants, and other creditors.

9. First, the investors, lenders, and real estate owners would isolate the nursing home enterprise's liabilities by transferring all of the nursing home enterprise's valuable assets out of its historic operating company and into a separate entity. Thereafter, the lenders, investors, and real estate owners would achieve a clean break of the liability ridden historic operating company from the entity holding its valuable assets by arranging for an arm's-length buyer to acquire the historic operating company.

10. Realizing that a truly independent third party would never buy the liability ridden historic operating company after completing its due diligence, the investors, lenders, and real estate owners arranged for a new shell entity to acquire the historic operating company, which was left holding nothing but significant liabilities. The acquiring shell entity was purportedly the brain child of a graphic designer, who now resides in a nursing home himself, and who has since stated that he never purchased the historic operating company.

11. Second, the investors, lenders, and real estate owners arranged for a simultaneous "linked transaction" wherein they formed another new entity controlled by the real estate owners to acquire the above entity that was previously transferred the historic operating company's assets. This acquisition allowed the real estate owners to receive the historic operating company's assets free and clear of any liabilities.

12. As a result, the investors, lenders, and real estate owners would achieve a clean break between the valuable assets and the massive liabilities of the former nursing

home enterprise.   In addition, the lenders and investors were repaid their loans and investments or spared the full weight of their economic losses.

13.     These assets were then used by a new nursing home enterprise to generate hundreds of millions of dollars in revenue over the years.

14.     While the "clean" break from the massive liabilities allowed the investors, lenders, and real estate owners to receive massive profits to the detriment of the former nursing home enterprise's creditors, the former nursing home enterprise was stripped of its valuable assets through these corporate machinations and was simply broke.

15.     The lawsuits for negligent care against the former nursing home enterprise continued forward and were defended for years as if the above "linked transactions" never occurred. Then, in 2010, the investors, lenders, and real estate owners strategically withdrew the defenses on behalf of the former nursing home enterprise.

16.     To their dismay, the cases proceeded forward. One case resulted in a judgment in the amount of $110 million in July 2010.  Faced with the prospect of another large verdict, the investors, lenders, and real estate owners put together $1.7 million and the promise of future funds to defend the former nursing home enterprise, its historic operating company and the shell entity that had acquired the historic operating company's massive liabilities.

17.     The investors, lenders, and real estate owners took active steps to delay, hinder, or defraud the creditors of the former nursing home enterprise, including Plaintiffs, by concealing their involvement in the fraudulent transfers of the former nursing home enterprise's assets and in the litigation against the former nursing home enterprise.

18.     Such active steps included the use of artifice by acting on behalf of the former nursing home enterprise, while publicly denying any involvement with the former nursing home enterprise. Publicly, the investors, lenders, and real estate owners denounced any real involvement with the former nursing home Enterprise. They claimed to be mere lenders, real estate investment trusts, and companies that provided only back office services years ago.

19.     But, the investors, lenders, and real estate owners' behind-the-scenes activities reveal a far different truth. Letters and emails disclose that the control of the defense of the former nursing home enterprise was ceded entirely to these investors, lenders, and real estate owners.  For example, an email was circulated whereby an attorney for the purported back office services' entity thought that ethics and duties of candor required that the court be informed of the true relationships between these parties.  Rather than reveal the truth to the court, however, the entity continued to act publicly as if they had no involvement.

20.     By this action, the Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that the new operator's enterprise is a mere continuation of the former nursing home's enterprise; that the former nursing home enterprise merged into the new operator's enterprise; that the linked transactions were a fraudulent effort to avoid liabilities; and that the financial investors, lenders, and real estate owners, the Defendants here, are liable for the debt of the former nursing home Enterprise as a successor-in-interest.

21.     In addition, Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 adjudging that the investors, lenders, and real estate owners, the Defendants here, are the alter egos of the former nursing home enterprise; that the investors, lenders, and real estate owners used the former nursing home enterprise for a fraudulent and improper

purpose causing injury to the Plaintiffs; and the investors, lenders, and real estate owners are liable for the debts of the former nursing home enterprise as alter egos.

22.    Plaintiffs bring an additional action for damages against the Defendants for their liability arising from the fraudulent transfers of the former nursing home enterprise's assets, participation in a conspiracy to defraud the nursing home creditors of the former nursing home enterprise, breach of fiduciary duties owed to the former nursing home enterprise, and aiding and abetting the breach of fiduciary duties.

23.    Finally, in  accordance with the September 3, 2013 order by United States District Judge James S. Moody, Jr. in *Fundamental Long Term Care Holdings, LLC v. THMI*, Case No. 8:13-cv-603-T-30, the Trustee and THMI seek substantive consolidation of the Debtor and THMI.

## II.    JURISDICTION AND VENUE

24. This action is an adversary proceeding governed by Chapter VII of the Federal Rules of Bankruptcy Procedure, and is brought pursuant to 28 U.S.C. § 2201 *et seq*., 11 U.S.C. §§544, 548, and 550, and other applicable law.

25.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334 and 11 U.S.C. §§ 105 and 541.

26.    This is a core proceeding as that term is defined in 28 U.S.C. §157(b)(2).

27.    Venue in this district is proper under 28 U.S.C. § 1409(a).

III.    **PARTIES**

### A.  The Plaintiffs

28.     The Trustee is the duly appointed Chapter 7 Trustee in this case and has standing to pursue all claims and causes of action belonging to the Debtor, Fundamental Long Term Care, Inc. ("FLTCI"), as well as its wholly owned subsidiary, Trans Health Management, Inc. ("THMI"), as determined in light of this Court's Order and Memorandum Opinion on Trustee's Motions for Show-Cause Orders entered on October 9, 2012 (Bankr. Doc. 409) ("Show Cause Order"). *In re Fundamental Long Term Care, Inc.*, Case No. 8:11-bk-22258-MGW ("Bankruptcy case").

29.     On July 30, 2004, the Jackson Estate filed a wrongful death and negligence action against THMI and Trans Healthcare, Inc. ("THI") for injuries Ms. Jackson sustained while a resident at a nursing home operated by THMI and THI in Polk County, Florida.  The suit proceeded to a jury trial and resulted in a final judgment of $110,000,000 on July 10, 2010. The judgment is final, unstayed, uncollected, and unappealed.

30.     On May 13, 2011, the Jackson Estate commenced proceedings supplementary pursuant to Florida Statute § 56.29 in Polk County, Florida against certain Defendants and FLTCI for their efforts in hindering, delaying, and defrauding the Jackson Estate as judgment creditor.  The state court ordered the impleader defendants to show cause why they should not be held liable for the final judgment.

31.     FLTCI did not respond, was defaulted, and was added to the final judgment.

32.    An Amended Final Judgment against THI, THMI, and FLTCI was entered on September 13, 2011, in the *Jackson* state court proceeding. The amended judgment is final, unstayed, uncollected, and unappealed.

33.    The Jackson Estate is a creditor of FLTCI and THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012.

34.    On December 23, 2005, the Nunziata Estate filed a wrongful death and negligence action against THMI for injuries Ms. Nunziata sustained while a resident at a nursing home operated by THMI in Pinellas County, Florida. The suit proceeded to a jury trial and resulted in a final judgment of $200,000,000 on January 11, 2012. The judgment remains uncollected.

35.    The Nunziata Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012.

36.    On June 16, 2006, the Webb Estate filed a negligence action against THI and THMI for injuries Mr. Webb sustained while a resident at a nursing home operated by THI and THMI in Polk County, Florida. The suit proceeded to a jury trial and resulted in a final judgment of $900,000,000 on February 10, 2012. The judgment remains uncollected.

37.    On December 10, 2013, the First District Court of Appeal reversed the Webb judgment and remanded for a new trial.  The mandate has not yet issued and the Webb Estate will seek rehearing and reconsideration of the appellate decision.

38.    The Webb Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012.

39.     On January 29, 2009, the Townsend Estate filed a wrongful death and negligence action against THI, THMI, and THIH for injuries Ms. Townsend sustained while a resident at a nursing home operated by THI, THMI, and THIH in Polk County, Florida. The suit proceeded to a jury trial against THI and resulted in a final judgment of $1,100,000,000 on July 29, 2013. The judgment remains uncollected.

40.     The Townsend Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on February 22, 2012 and an amended proof of claim on August 20, 2013.

41.     On September 6, 2006, the Sasser Estate filed a negligence action against THI and THMI for injuries Ms. Sasser sustained while a resident at a nursing home operated by THI and THMI in Polk County, Florida.

42.     The Sasser Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on March 27, 2012.

43.     On March 20, 2006, the Jones Estate filed a negligence action against THI and THMI for injuries Mr. Jones sustained while a resident at a nursing home operated by THI and THMI in Montgomery County, Pennsylvania. The case will be assigned a 2014 trial date.

44.     The Jones Estate is a creditor of THMI and filed its proof of claim in the Bankruptcy case on March 27, 2012.

**B.  The Defendants**

     ***i.    The THI Enterprise***

45.     THMI is a Delaware corporation that formerly had its principal place of business at 920 Ridgebrook Road, Sparks MD 21152.

46.    THIH is a Delaware limited liability company with its principal place of business in Sparks, Maryland. THIH is, and at all material times was, the sole shareholder of THI.

47.    THI is a Delaware corporation that formerly had its principal place of business at 920 Ridgebrook Road, Sparks, MD 21152.

48.    THI is the former parent of THMI.

49.    THMI was the management company that provided oversight management to all of THIH's 200 subsidiaries as well as other operators throughout the country.  THMI employed the officers and directors of THIH, THI, THIB, and each and every one of their subsidiaries.

50.    For every THIH subsidiary, THMI personnel oversaw and were responsible for the litigation management, legal & regulatory compliance, business operations, business development, labor relations, clinical services, clinical compliance, food services, rehabilitation management, reimbursement analysis & coordination, corporate financial control, financial systems analysis, accounts receivable management, accounts payable management, corporate and tax accounting, 401K and benefits administration, human resources and recruitment, payroll, treasury, purchasing, travel, information systems implementation and training, computer programming, network support, desktop support, application analysis and support, database programming and support, and website development.

51.     THIH, and its subsidiaries, THI, THMI, THIB, THI of Baltimore Management, LLC ("THIBM) (collectively "THI Enterprise") did not maintain corporate formalities, commingled funds, and were run and operated as a single Enterprise.

    *ii.    The GTCR Group*

52.     GTCR Fund VI is a Delaware limited partnership with its principal place of business in Illinois.

53.     GTCR Executive Fund is a Delaware limited partnership with its principal place of business in Illinois.

54.     GTCR Associates is a Delaware general partnership with its principal place of business in Illinois.

55.     GTCR Partners is a Delaware limited partnership with its principal place of business in Illinois. GTCR Partners is the general partner of GTCR Fund and GTCR Executive Fund, and the managing general partner of GTCR Associates.

56.     GTCR Golder Rauner is a Delaware limited liability company with its principal place of business in Illinois. GTCR Golder Rauner is the general partner of GTCR Partners.

57.     Upon information and belief, Jannotta is a resident of Teton County, Wyoming.  At all relevant times, Jannotta was a managing principal of GTCR Golder Rauner and a director of THIH, THI, and THMI.

58.     At all relevant times, GTCR Golder Rauner, GTCR Partners, GTCR Fund, GTCR Executive Fund, and GTCR Associates (collectively, the "GTCR Group"), THIH,

THMI, and THI operated as a single Enterprise to such extent that their independence was in fact non-existent and shared a continuity of management, personnel, and assets.

59.     Through a Professional Services Agreement dated July 14, 1998, the GTCR Group operated and controlled the THI Enterprise by taking a hands-on-approach and day-to-day involvement in the operations of THI, THMI, and THIH.   The Professional Services Agreement provided for services including corporate strategy formulation, budgeting of corporate investments, acquisitions and divestitures, and debt and equity financings.

60.     As set forth herein, the GTCR Group and Jannotta were the control group with plenary authority over THI and its related subsidiaries and affiliates, which included THMI. Through a protracted series of divestments, under-valued sales, abandonment and improper use of receivership estate proceedings, all of which were concealed from creditors of THMI, the GTCR Group gained an economic advantage in an amount to be determined at trial.

61.     By filing a complaint for declaratory judgment under Case Number 8:13-ap-00928-MGW, and through their numerous requests for affirmative relief in this Court and other courts in the state of Florida, the GTCR Group and Jannotta have consented to the Bankruptcy Court's jurisdiction.

### iii.     The Fundamental Enterprise

62.     FAS is a Delaware limited liability corporation with its principal place of business in Sparks, Maryland.

63.     THIB is a Delaware corporation with its principal place of business in Sparks, Maryland.

64.     FLTCH is a Delaware limited liability corporation with its principal place of business in Sparks, Maryland.

65.     FLTCH is the sole member of FAS and the sole member of THIB.

66.     Schron is a resident of Brooklyn, New York.

67.     Forman is a resident of Nassau County, New York.

68.     Forman is an investment banker who advised and acted as Schron's fiduciary and agent on many business deals, including the transactions and occurrences described below, and acted as his agent and trusted fiduciary at all material times.

69.     Grunstein is a resident of Bergen County, New Jersey.

70.     At all relevant times, Grunstein was a practicing attorney in New York who provided legal and business advice and services to Schron and acted as his agent and trusted fiduciary at all material times.

71.     From 2005 to 2009, Grunstein was a partner at the law firm of Troutman Sanders, LLP ("Troutman").   In November 2009, Grunstein was placed on administrative leave.

72.     In December of 2013, Grunstein pled guilty to perjury in the third degree for testimony he gave in his lawsuit against Schron concerning the acquisition and restructuring of the former nursing home chain, Mariner Health Care, Inc., described *infra*.   In his guilty plea, Grunstein admits to having made false statements under oath.   As part of the plea agreement, Grunstein has resigned from the New York State Bar and can never re-apply for readmission. Grunstein is due to appear in court on February 4, 2014 for sentencing.

73.     FLTCH is equally owned by Schron, and his agents and fiduciaries, Forman and Grunstein.

74.     FLTCH, FAS, and THIB, owned by Schron, Grunstein, and Forman (collectively the "Fundamental Enterprise"), did not maintain corporate formalities, commingled funds, and were run and operated as a single Enterprise.

75.     The Fundamental entities do not distinguish themselves to the public, but collectively refer to themselves as the "Fundamental Long Term Care companies."

76.      By filing a complaint for declaratory judgment under Case Number 8:13-ap-00929-MGW, and through their numerous requests for affirmative relief in this Court and other courts in the state of Florida, the Fundamental Enterprise has consented to the Bankruptcy Court's jurisdiction.

### iv.     *Ventas Entities and GECC*

77.     Ventas is a Delaware corporation with its principal place of business in Louisville, Kentucky.

78.     Ventas Realty is a Delaware limited partnership with its principal place of business in Louisville, Kentucky.

79.     At all relevant times, Ventas Realty and Ventas (collectively "Ventas") operated as a single Enterprise.

80.     In November of 2002, Ventas entered into a series of loans including a $55,000,000 term loan, a $22,000,000 mezzanine loan, and executed a sale-lease back transaction with THI wherein THMI would operate nursing home properties owned by Ventas.

81.    As part of the loans, the THMI and THI stock was pledged to Ventas as collateral security and THI and THMI guaranteed the mezzanine loan and sale-lease back transaction.

82.    GECC is a Delaware corporation with its principal place of business in Norwalk, Connecticut.

83.    On December 17, 2002, GECC purchased the $55,000,000 term loan from Ventas.

84.    Ventas retained the stock pledge to the THMI stock, the mezzanine loan, and the THMI management agreements pursuant to which THMI operated Ventas' nursing home properties.

85.    As collateral and security for the loan, GECC held the real estate underlying the THI nursing homes located in Ohio and Maryland, and the THMI management contracts pursuant to which THMI operated what was known internally as the "GE owned homes."

86.    THI and THMI also guaranteed the repayment of the GECC loan.

87.    By filing a complaint for declaratory judgment under Case Number 8:13-ap-00958-MGW, and through their numerous requests for affirmative relief in this Court and other courts in the state of Florida, Ventas has consented to the Bankruptcy Court's jurisdiction.

## IV.    GENERAL ALLEGATIONS

### A.  The Creation of the THI Enterprise

88.    The GTCR Group is a private equity firm that partners with management leaders to acquire and build leading companies.  Together, the GTCR Group and their

principal, Jannotta, engaged in venture capital activities in which they would invest and partner with companies that they provided "equity capital" funding.

89.    One such company was THI.  The GTCR Group and Jannotta ventured to build a nationwide nursing home empire for the purpose of securing a financial benefit to the GTCR Group and Jannotta.  In 1998, the GTCR Group provided equity funding to THI, and by 2002 owned 82.7% of the stock of THI.

90.    The GTCR Group entered into a Professional Services Agreement dated July 14, 1998, wherein GTCR provided financial and management services to the THI Enterprise in exchange for management and consulting fees, including a percentage of any debt or financing that occurred.

91.    Through their large investment, the GTCR Group gained majority control over THI's Board of Directors and placed their principals, Jannotta and Ethan Budin, on the three-person board in order to actively manage THI and its subsidiaries.

92.    Anthony Misitano ("Misitano"), the minority shareholder, "co-founder," and Chief Executive Officer of THI, was the third member of THI's Board of Directors.

93.    The GTCR Group also appointed Jannotta and another GTCR principal, Budin, to the three-person board of directors of THMI, which at the time was the wholly owned subsidiary of THI.

94.    The THIH board consisted of Misitano, Jannotta, and Budin until June 2004. From June 2004 until March 28, 2006, the THIH board included Jannotta, Thomas Erickson, and Bennett.

95.     As a director, Jannotta and another GTCR principal owed the same duty of due care, loyalty, and good faith to THI and THMI as they did as principals of the GTCR Group.

96.     The GTCR Group and Jannotta's management of THI and its subsidiaries, including at the time THMI, was pervasive to the extent that many vendors and customers of THI dealt directly with GTCR's principals on routine matters, including negotiating lease terms, THI's satisfaction of provisions under such leases, acquisition and disposition of properties, and negotiating bonus payments to management.

97.     The GTCR Group held themselves out to their investors, vendors and consumers as in charge of their portfolio companies, including the THI Enterprise.

98.     The GTCR Group held themselves out to the public as the operator of the THI Enterprise.

99.     The GTCR Group and Jannotta made all the material financial decisions and directed all business and strategy decisions of the THI Enterprise, including THMI.

100.    In 2003, to grow their investment, the GTCR Group exchanged their stock in THI for like units in a newly formed holding company, THIH, so that THIH became the sole shareholder of THI.

101.    The 2003 restructuring of the THI Enterprise was done to facilitate a lease agreement between the GTCR Group and ABE Briarwood, Inc., the real estate investment company formed by Rubin Schron to purchase assets from the Integrated Health Services, Inc. ("IHS") bankruptcy auction (which purchase of assets is discussed in further detail below).

102.    According to a GTCR press release, the "acquisition of IHS would substantially increase THI's size and scope" of "one of the leading long-term companies in the United States."  The same press release speaks to GTCR as being the co-founder of THI in 1998 and GTCR's role in the integration of the operations of THIH and THIB.

103.    Despite the exchange of stock, the GTCR Group's control continued in the same structure and manner as it had prior to the 2003 restructuring.

104.    Through their ownership interests in THIH, the GTCR Group and Jannotta continued to maintain the majority interest in THI and its subsidiaries. As they admit in their complaint, Case No. 8:13-ap-00928-MGW, Doc. No. 1, the GTCR Group used their majority vote to appoint their own principals and insiders to the THIH Board of Managers and to the THI and THMI Board of Directors, including Jannotta, as well as appointing the officers and directors of THI and THMI, including Bradley Bennett, Mark Fulchino and Matthew Box.

105.    All members of the boards of THIH, THI and THMI, including Jannotta, owed the same duty of due care, loyalty, and good faith to each entity for which they were a board member.

106.    By maintaining control of the board of the THI Enterprise, the GTCR Group and Jannotta dominated and directed all of the THI Enterprise's material activities, business decisions and strategy.  Jannotta has testified that the business and operating decisions of the THI Enterprise had to be approved by the GTCR-controlled board.  According to Jannotta, "through [GTCR's] investment, [GTCR] became the controlling shareholder in the [THI] company."

107.    The GTCR Group and Jannotta's motivation in obtaining substantial control over the THI Enterprise was to control the operations of the THI Enterprise, thereby maximizing their return on investment.  In order to expand the THI Enterprise's business, the GTCR Group continued to make investments in the THI Enterprise, all the while increasing their percentage of fees and interest levied against the THI Enterprise.

108.    In November 2001, the GTCR Group contributed an additional $4,500,000 in the form of a secured promissory note, secured by the stock of a THI subsidiary. In addition to generating a fee of $45,000 to the GTCR Group, this investment had accrued interest of $939,000 by the end of 2003.

109.    Then, in November 2002, the GTCR Group invested an additional $5,630,000 at a rate of 13% interest.  In addition to a fee of $56,300, this investment had accrued interest $435,000 by the end of 2003.

110.    By the end of 2005, the GTCR Group had invested approximately $37,000,000 into the business of the THI Enterprise.

111.    In fact, from 1998 forward, the THI Enterprise did not function or exist independent of the GTCR Group or Jannotta.

112.    In addition to the GTCR Group's investments in the THI Enterprise, the THI Enterprise, with approval from the GTCR-controlled board of directors, entered into outstanding loans with Ventas, which further enabled the GTCR Group, Jannotta and the THI Enterprise to obtain certain nursing home leases, properties and management contracts.

113.    The series of loans included a $55,000,000 term loan and a $22,000,000 mezzanine loan. In addition, Ventas and THI entered into sales-lease back agreement

wherein THMI would operate nursing home properties owned by Ventas.  Both the loans and sale-lease back transaction were guaranteed by THI and THMI.

114.    Notably, on October 30, 2002, GTCR principals, including Jannotta, used their majority vote on the THI board to approve a $700,000 fee for the GTCR Group when debt financing from Ventas in an amount not to exceed $70,000,000 was secured by THI collateral.

115.    By mid-2003, the THI Enterprise had an estimated gross revenue of at least $1,000,000,000 per year, based on the number of nursing homes they managed.

116.    Yet, in their complaint, the GTCR Group and Jannotta allege that THI's income in 2003 was a net loss of $26.6 million.

117.    As of January 23, 2006, THIH had an adjusted Enterprise value of $183,873,730.  At this time, THIH wholly owned THI, which in turn owned THMI

**B. The Acquisitions of IHS and Mariner by Schron and his Agents and Implementation of a Professional Liability and General Liability Claim Reduction Strategy**

118.    Schron and his agents and fiduciaries Grunstein and Forman planned to gain control of the lucrative operations of numerous nursing home chains throughout the country for the purpose of building a nursing home empire.

119.    The first part of the plan involved the acquisition of the IHS nursing home chain that in February 2000, had filed a Chapter 11 case in the United States Bankruptcy Court for the District of Delaware by Schron and his agents and fiduciaries Grunstein and Forman. At the time, IHS was one of the country's largest operators of nursing homes.

120.    Among the assets purchased were Florida nursing homes, hospice facilities, and at least one Florida administrative services office.

121.    Schron, Forman, and Grunstein needed an entity to take title of the IHS properties and created ABE Briarwood, Inc. ("ABE").

122.    The resulting entity ABE was not itself licensed to operate the former IHS healthcare facilities. ABE thus entered into a series of transactions with THI—both directly and through affiliates and subsidiaries—to lease, operate and/or manage the ABE assets.

123.    ABE's acquisition of the IHS healthcare facilities was financed by an entity founded and controlled by Schron, Cammeby's Funding, LLC.

124.    ABE was represented in the IHS bankruptcy by Abraham J. Backenroth, Esq. ("Backenroth"), a partner with the law firm Backenroth, Frankel & Kinsky, LLP.

125.    To commemorate the acquisition by Schron and his arrangement with THI, Misitano and Schron enjoyed a "celebration" dinner.

126.    Schron's long-time attorney, agent, and fiduciary, Grunstein and Troutman devised most of the corporate structure, negotiated, and drafted many of the transactional documents to complete and realize the IHS deal.

127.    The operation of the nursing homes by THI and THMI for ABE created significant value for Schron and increased the volume of revenues for the nursing homes as well as for Schron and his agents, Grunstein and Forman.

128.    According to the deposition testimony of Misitano, former President and CEO of THI and THMI, by mid-2003, THI, THMI, and their affiliates had gross revenues of at least $1,000,000,000 dollars per year, based on the number of nursing homes they managed.

129.    Satisfied with the success of the IHS acquisition, Schron, Grunstein, and Forman orchestrated another deal that followed the blueprint of the IHS transaction, wherein Schron planned to acquire the real estate of 173 nursing homes in approximately 27 states owned and operated by Mariner Health Care, Inc. ("Mariner").

130.    In the Spring of 2004, a meeting took place at the New York offices of Mariner's counsel to discuss the proposed Mariner transaction wherein the parties named the proposed acquisition "Project Voyager" in order to preserve the secrecy of Mariner's identity.

131.    In its initial stages, Schron, Grunstein, and Forman planned for "Project Voyager" to not only include the acquisition of the Mariner nursing homes, but also the acquisition of certain entities within the THI Enterprise that were operating ABE's nursing homes, such as THMI.

132.    In an effort to entice the GTCR Group to approve of "Project Voyager", Schron, Grunstein, and Forman offered the GTCR Group the opportunity to have a controlling interest in the resulting operating companies, along with an equity interest in one of Schron's entities, in exchange for an additional investment of $50,000,000 by the GTCR Group.

133.    For unknown reasons, the terms of "Project Voyager" were altered, and the resulting acquisition of the Mariner nursing homes resulted in a complex business transaction wherein Mariner was reversed into entities Sava Senior Care, Inc., Sava Senior Care, LLC, Sava Senior Care Administrative Services, LLC, Sava Senior Care Management, LLC, and National Senior Care, Inc., through a series of intricate corporate actions.

134.    Schron, Forman, and Grunstein partially funded the transaction with the sale of a no asset shell company for $50,000,000.    For this part of the transaction, Schron, Forman, and Grunstein paid a $14,000,000 fine to the federal government as settlement for an anti-kickback whistle blower lawsuit. *United States v. Omnicare, Inc., Rubin Schron, Leonard Grunstein, Murray Forman, et al.*, Civil Action No. 06-10149-RGS, in the United States District Court, District of Massachusetts.

135.    The lawsuit alleged that Grunstein, Forman, and Schron solicited kickback payments from Omnicare, Inc., the nation's largest pharmacy that specializes in dispensing drugs to nursing home patients, in exchange for agreements by Mariner Health Care, Inc. and SavaSeniorCare Administrative Services, LLC (in which Grunstein, Forman, and Schron are principals) to continue using Omnicare's pharmacy services for 15 years.

136.    Although funded by Schron, who acquired the real estate company, Grunstein and Forman retained ownership of the operating companies to run the facilities, all the excess cash flow, and a small share of the real estate.

137.    While he sold some of the IHS and Mariner properties in Florida, Schron retained the professional and general liability ("PLGL") claims and began a strategy to hinder, delay, and defraud creditors and litigants of all the IHS properties.

138.    The PLGL strategy was designed to transfer, divert, and conceal nursing home assets while improperly disposing of nursing home liabilities.

139.    Schron and his agents, Forman and Grunstein, restructured the newly-acquired IHS and Mariner nursing home assets using single purpose entities ("SPEs") owned and controlled by Schron and his family.

140.    This restructuring focused on separating the nursing home real estate assets from its operating assets.  The business model known as "Propco-Opco-Oldco" required three separate entities: the real estate company ("Propco"), the nursing home operator who leased the real estate from Propco ("Opco"), and the entity that held the liabilities of the business prior to the separation ("Oldco").

141.    According to Grunstein, the business model succeeds by merely feigning separateness, and isolating liabilities from assets to defraud creditors.  Oldco, an entity overburdened with the legacy liabilities and debt, and Propco and Opco, the "clean" entities that hold all the valuable assets of the operation, continue to be owned and operated by the same entities and individuals.

142.    The SPEs holding each piece of real estate (the Propcos) acted as landlords to different shell SPEs that operated the nursing homes (the Opcos).

143.    The IHS and Mariner creditors and vendors were then forced to seek recourse from the Oldcos, the entities holding the liabilities of the nursing home entities prior to the separation.

144.    Many creditors and vendors were told that their claims were uncollectable as Oldco's liabilities far exceeded any assets.

145.    An example of the PLGL strategy is evidenced by the *Brunini v. Mariner* case, wherein Mariner's own lawyers sued for nearly $1,000,000 in unpaid legal fees.  In that suit, the lawyers alleged, among other things, that the acquisition of the Mariner chain was a fraudulent conveyance that benefited insiders at the expense of the creditors.  *Brunini, et al.*

*v. Mariner Health Central, Inc., et al.*, Case No. 0200s-938, in the Chancery Court of the First Judicial District of Hinds County, Mississippi.

146.    The IHS and Mariner acquisitions led to the filing of substantial litigation between Schron, Forman, Grunstein, Troutman and others accusing each other of various breaches of fiduciary and legal duties, legal malfeasance, fraudulent conveyances of hundreds of millions of dollars, and the dissipation of nursing home assets. *Cammeby's Funding LLC v. I.H.S. Long Term Care, Inc. et al.*, Case No. 650533/2012; *Schron v. Grunstein*, Case No. 650702/2010; *Schron v. Grunstein*, Case No. 651752/32012; *Grunstein v. Schron*, Case No.600736/2010; *Bodner v. Grunstein*, Case No. 650791; *Bodner v. Grunstein*, Case No. 653442; *Cammeby's v. Mariner*, Case No. 650778/2011; *Fundamental v. Cammeby's*, Case No. 650332/2011; *Mariner Healthcare v. Schron*, Case No. 653706/2012; *Metcap v. Troutman Sanders*, Case No. 650709/2012.

147.    Schron, Forman, and Grunstein continued to mislead and defraud creditors of nursing home operators while reaping the benefits of a billion dollar business.

### C. The Commercial Mortgage-Backed Securities

148.    To finance his nursing home acquisitions, Schron had in place a plan to create a financial vehicle known as a commercial mortgage-backed security ("CMBS") bond and to sell it as a security to the international investment community to finance his nursing home acquisitions.

149.    Schron and his agents, Forman and Grunstein, ensured that each of the "clean" Propco SPEs holding the real estate of the former THI, IHS, and Mariner nursing home

properties held a mortgage supported by the revenues from the "clean" Opco SPEs as collateral.

150.    The mortgages were obtained through Column Financial, Inc., an affiliate of Credit Suisse Securities (USA), LLC and Credit Suisse First Boston Mortgage Securities Corporation (collectively, "Credit Suisse").

151.    It was these mortgages that Schron then bundled into a commercial mortgage-backed security known as CSFB 2004-HC1, and caused the securities to be sold by securities brokers, reaping access to hundreds of millions of dollars for himself and his family trusts.

152.    For the securities scheme to work, the ratings agencies also had to give favorable ratings to the bond issue.

153.    Schron gave information to credit rating agencies that was false and inflated.

154.    As an example, Schron claimed that THI was, in December 2004, "one of the country's most experienced, growth oriented nursing home operators in the country with over 19 years operational history."

155.    He also claimed THI was reaping earnings producing EBITDA ("earnings before interest, taxes, depreciation, and amortization") results in excess of 21%.

156.    As stated below, however, the THI Enterprise was and had been in default of its loans to GECC and Ventas since at least July 2004 because several years' worth of material misrepresentations in its financial statements.

157.    Schron knew this as well as other information showing that THI was in massive internal disarray, facing significant liabilities, and facing insolvency.

158.    Despite every legal duty to disclose any risk to investors, Schron deliberately and with intent to defraud, fed false information to the rating agencies and obtained an AAA rating for his bond.

159.    For Schron's bundled mortgage security scheme to work, Schron had to conceal the true financial status of THI and THMI and the risks, including tort liabilities like the claims of creditors.

160.    In December 2004, Schron's first bond issue, with a 10-year maturity, was for a total of $820,000,000.

161.    CSFB 2004-HC1 was underwritten and sold by Credit Suisse.

162.    Credit Suisse acted together with Schron to control the entire process in the creation and sale of the CMBS, including loan origination, mortgage pooling, securities underwriting, securities marketing, securities regulation and the securities' subsequent sale.

163.    Standard & Poor's Ratings and Standard & Poor's Financial Services, LLC ("S&P") acted together with Schron and examined the aggregate pool of mortgages and underlying collateral in order to rate the 2004 CMBS.

164.    Credit Suisse and S&P knew that the THI, IHS, and Mariner mortgage loan bundle comprising of the 2004 CMBS was fraud ridden in that the transactions in obtaining those assets constituted fraudulent transfers to avoid liability to creditors.

165.    But Credit Suisse and S&P failed to disclose the fraud underlying the mortgages to investors in their offering materials, public announcements, and prospectuses, in exchange for generous fees which were contingent on the successful creation and favorable rating of the 2004 CMBS.

166.    If the tort claims Schron was managing against THI and THMI and its affiliates through its PLGL model were known, Schron's scheme would not have received a AAA rating.

167.    Schron also concealed the corporate misconduct of THMI and THI to secure the ratings needed to sell the CMBS.  Schron knew that THI and THMI had been committing numerous illegal acts including Medicare and Medicaid reimbursement fraud but covered up the conduct with his co-conspirators, including GECC, the GTCR Group, Jannotta, and Ventas. By doing so, the security vehicle created by Schron could be sold with Schron and his cohorts reaping the rewards.

168.    Schron obscured the transactions, created dead-end companies, and perpetrated fraud on tort claimants and courts.

169.    But this massive scheme could not have happened with Schron as the only actor.  It required the active participation of GECC, Ventas, the GTCR Group, Jannotta, and the Fundamental Enterprise.

**D.  Ventas and GECC Exert Substantial Control over the THI Enterprise**

*i.    Fraudulent Financial Statements*

170.    By September 2003, Ventas was aware that THI had materially misrepresented its earnings to secure the 2002 term and mezzanine loans from Ventas.

171.    [REDACTED].

172.    As an example, for the year ending December 31, 2003, revenues had been overstated by $10,000,000, while expenses had been understated by $25,000,000. Instead of a reported $6,000,000 of net income, a corrected report reflected a loss of $29,000,000.

173.    By inflating financials to federal and state governments, THI obtained monies to which it was not lawfully entitled including Medicare and Medicaid monies.

174.    The misrepresentation also allowed THI to falsely obtain a loan from Ventas and GECC in the amount of approximately $55,000,000.

175.    By May 27, 2004, according to the board meeting minutes for THIH, GECC had "heard rumors of fraud regarding Tony," referring to THI and THMI President and CEO Misitano.

176.    A few weeks later, on July 1, 2004, GECC sent a notice of default of its loan to THI.   The default letter asserted that THI had materially and falsely misrepresented financial statements for the previous several years. The conduct was a non-curable default and constituted reportable behavior.

177.    Ventas also notified the THI Enterprise of a loan default under the Ventas loans, by virtue of the default under the GECC Loan Agreement.

178.    According to Jeff Erhardt, Vice President of GECC, in a letter to Brad Bennett (then CEO and President of both THI and THMI), THI had overstated its earnings in financial statements that GECC and Ventas used to determine the creditworthiness of THI.

179.    The THI Enterprise was the recipient of Medicare and Medicaid funds. There exist very specific mandatory reporting requirements regarding material misrepresentations in financial statements when one is the recipient of Medicare and Medicaid funds.

180.    Bennett, however, suggested to GECC and Ventas that in the interest of all the parties, it would be best to negotiate a mutually agreeable solution to resolve the liquidity problem of the THI Enterprise.   Bennett stated that any sanctions by Federal and/or State

regulators would likely seriously impair GECC and Ventas' ability to realize on any assets of the THI Enterprise and would result in close scrutiny of the THI Enterprise's facilities to ensure resident safety, which in turn would increase operating costs and make daily operations more burdensome.

181.    Ventas and GECC agreed to keep silent and did not report THI's material misrepresentations to any authorities. Instead, Ventas and GECC elected to join, encourage, aid, abet, facilitate, assist and conceal the unlawful activities in order to benefit themselves to the detriment of all others.

182.    GECC and Ventas knew that inflating and misrepresenting earnings on financial statements could expose THI to severe criminal and civil liability.

183.    Upon information and belief, since at least 2003, GECC has had internal policy manuals that included directives to file "suspicious activity reports" with the Office of Thrift Supervision.

184.    GECC and Ventas knew that loan inducement fraud could result in penalties as severe as a criminal indictment.  Under federal law, it was mandatory for GECC and Ventas to report THI's suspicious behavior.

185.    GECC, as a federally-regulated bank, had a legal duty to refuse to transact business with anyone or any entity engaged in profiting from illegal activity.

186.    Instead of complying with federal law and their legal duties, GECC and Ventas used the knowledge of potentially criminal misconduct to manipulate THI (and the THI subsidiaries) to the advantage of GECC and Ventas and to the detriment of THI creditors, including the Plaintiffs.

187.    Rather than defaulting THI and pursuing lawful remedies under the loan agreements, GECC and Ventas chose to use the threat of financial and criminal harm to THI as an opportunity to make greater profits.

188.    By claiming that the default was non-financial, GECC chose to profit from THI's illegal activity by utilizing the technical defaults as an opportunity to assume complete financial control of THI to assure repayment of the GECC loans and obtain additional interest and fees.

189.    At the time of default, the GECC Loan Agreement provided that the income stream of the THI Enterprise flow through lockboxes and sweep accounts.  Upon default, GECC began "trapping cash" by virtue of GECC's ability to seize the cash to all THI accounts, thereby giving GECC control of a large portion of THI's assets.  This control compromised the THI Enterprise's ability to pay their obligations as they became due and jeopardized the care provided to the residents of the nursing home facilities.

190.    Exercising its full control over THI, on July 1, 2004, GECC instructed Bank of New York, THI's depository bank, that it was exercising GECC's right to capture all money held in THI's accounts.  Bank of New York complied.

191.    Instead of the default being non-curable, as GECC alleged when it captured the cash accounts, GECC started a series of new loans with THI that included penalties (a/k/a "accommodation fees", "modification fees", "forbearance fees", etc.) and higher interest rates.

192.    An internal email discloses that GECC made additional millions of dollars from the increases in fees and interest payments.

193.    According to Kevin Pascoe, GECC Vice President, the additional fees and interests payments to GECC were "[n]ot too shabby."

194.    This is particularly true when, according to Jeffrey M. Thomas, GECC Vice President, THI "was a troubled deal with fraud in its history and the revolver was a defensive maneuver following 17 forbearance agreements and two [debtor in possession] proposals by GE . . . . We spend [sic] the past 2.5 years reducing exposure on the deal."

195.    Instead of reporting the THI Enterprise's illegal misrepresentations, Ventas similarly chose to participate in the reportable activity by leveraging this information to alter the original loan covenants with the THI Enterprise to conceal the default.

196.    At the same time, in exchange for Ventas' concealment of the THI Enterprise's misrepresentations, Ventas received additional fees from the THI Enterprise.

197.    Ventas chose to profit from the illegality by entering into fifteen (15) forbearance agreements charging arduous "fees at will" and default interest charges. Each forbearance agreement worsened the financial condition of the THI Enterprise as additional fees and penalties were levied each time.

198.    Through the concealment of the illegal conduct by the THI Enterprise, Ventas extracted millions of additional dollars from the THI Enterprise.

199.    In addition to the forbearance agreements entered into with GECC and Ventas, the GTCR Group guaranteed a $6,000,000 loan between the Bank of Montreal and the THI Enterprise.

200.    This process of threatening and accusing the THI Enterprise of default or other conditions of non-performance became the norm for the remainder of the relationship, which became a very profitable one for GECC and Ventas.

201.    In 2006, both GECC and Ventas amended and restated the onerous loans and leases in order to continue the profitable Enterprise. It was essential for GECC and Ventas to keep the THI Enterprise, and their ability to pay on the GECC and Ventas loans, afloat in order to ensure a continued stream of profits for GECC and Ventas.

202.    The terms of the restated and amended loans and leases ensured continuing defaults which meant continued "fees at will" and high interest charges for Ventas' and GECC's pockets.

203.    The onerous terms of the loans ensured that GECC and Ventas retained *de facto* control over the operation of the THI Enterprise.

204.    The unlawful Enterprise continued despite a written warning from the CEO of THI as to the risks created by the THI Enterprise's inability to fund the operations of its properties.

205.    The additional fees unlawfully extracted by GECC and Ventas deepened the insolvency of the THI Enterprise and worsened the financial condition of the THI Enterprise, as additional fees and penalties were levied each time. This prompted a bankruptcy liquidation analysis to be prepared by the THI Enterprise in conjunction with FTI Consulting and the THI Enterprise's attorneys, Kirkland & Ellis LLP ("K&E").

206. In fact, on January 25, 2006, the THI and THMI board authorized the filing of a bankruptcy finding that it was in the best interests of each of the companies of the THI Enterprise, their creditors, employees and other interested parties.

207. Nonetheless, the GTCR-controlled board of the THI Enterprise did not file for bankruptcy.

208. If either GECC or Ventas had disclosed the unlawful conduct, the THI Enterprise was almost certain to have lost its status as a Medicare and Medicaid provider, ending the very lucrative income that the THI Enterprise was generating for GECC, Ventas, and the other Defendants.

209. GECC and Ventas were aware that the THI Enterprise was experiencing liquidity problems, mismanagement, and had engaged in unlawful conduct, yet chose to continue facilitating the conduct of the THI Enterprise by providing financing to the Enterprise.

210. This allowed the THI Enterprise to continue generating revenues while forestalling an inevitable bankruptcy so that GECC, Ventas, and the other Defendants could recover significant funds in the form of penalties, default interest fees, and repayment of principal while defrauding THI creditors, like the Plaintiffs.

211. Importantly, the GTCR Group and Jannotta were directing and approving these improper actions.

212. The THI Enterprise's financial issues spawned a series of lawsuits against the GTCR Group, Jannotta, and the THI Enterprise, which included resident rights' lawsuits for abuse and neglect, such as the lawsuits filed by the Plaintiffs.

213.    By early 2006, the THI Enterprise was facing over one hundred and fifty (150) lawsuits in at least fifteen (15) states, most of those brought by nursing home residents for negligence, neglect, and abuse suffered at nursing homes operated by the THI Enterprise.

214.    The Jackson, Webb, Nunziata, and Jones Estates' claims represent just four of the numerous claims that were pending in early 2006 in which neglected and abused residents were seeking justice for the negligent care they were provided by the THI Enterprise.

215.    In addition, the THI Enterprise was facing lawsuits by other creditors and venders for: failure to maintain its healthcare facilities; failure to maintain appropriate insurance; failure to pay rent and related charges under leases; conversion; misappropriation of revenues and funds; racketeering; and for other fraud. *See Aegis Services, Inc. v. Trans Healthcare, Inc.*, Case No. 2:04-cv-01175-JLG-NMK in the United States District Court for the Southern District of Ohio; *Lyric Healthcare, LLC v. Trans Healthcare, Inc.*, Case No. C-05-013156, in the Circuit Court for Baltimore County, Maryland (owner of Florida facilities managed by THMI and THI alleging misappropriation of revenues).

216.    Specifically, Aegis Services, Inc. ("Aegis") alleged that THI, the GTCR Group, and individual board members of THI (including Jannotta) conspired to divert monies lent to the facilities from the operations of those facilities in order to pay obligations of other operating subsidiaries of THI. *Aegis Services, Inc. v. Trans Healthcare, Inc.*, Case No.: 2:04-cv-01175-JLG-NMK in the United States District Court for the Southern District of Ohio.

217.    Lyric Healthcare, LLC initiated a lawsuit against THIH, THI, and THMI alleging breach of contract, negligence, unjust enrichment, breach of fiduciary duty and fraud

arising from the implementation of the management contracts pursuant to which THMI managed the nursing homes.

218.    Jeffrey Barnhill, a former Senior Vice President of THI, filed a lawsuit against the GTCR Group, Jannotta, and the THI Enterprise for breach of contract and alleged that the GTCR Group, Jannotta, and the THI Enterprise instructed him to make the illegal political contributions in 2003 to directly benefit the GTCR Group, Jannotta, and the THI Enterprise.

219.    [REDACTED].

220.    [REDACTED].

ii.    ***Illegal Campaign Contributions***

221.    Despite the severity of the fraudulent financial statements, THI terminated its former CFO, Jeffrey Barnhill "without cause" on June 10, 2004.  His subsequent litigation with the THI Enterprise, Jannotta, and the GTCR Group revealed that Barnhill was involved in illegal campaign contributions on behalf of THI and its owners.

222.    Barnhill was reimbursed for a $49,500 illegal contribution as a non-salary and non-taxable event he made in 2003 for which THI then sought and received reimbursement from Ohio Medicaid. This allowed Barnhill to use tax payer dollars to pay for the illegal campaign contribution.

223.    Though it occurred in 2003 and was discovered in 2004, it was not reported to the state of Ohio until 2006.

224.    According to the CFO's admissions in a legal proceeding in 2005, the contribution scheme was done on behalf of THI and with knowledge and approval of GTCR principals and THI and THMI board members, Jannotta and Budin.

225.    THI had created ledger entries for the monies that had been reimbursed to the CFO and then conscientiously charged the monies as Medicaid costs to twenty four separate nursing home facility cost reports as "dues and contributions."

226.    On March 28, 2006, even after discovery that the THI Enterprise had committed the multiple acts of illegal campaign contributions to politicians in the State of Ohio and that the THI Enterprise was on the brink of financial ruin, Ventas restated and amended the sale-leaseback arrangement to continue the profitable Enterprise.

227.    On March 28, 2006, GECC also extended another $55,000,000 loan to THI, through restatement and amendment, despite being aware of the illegal campaign contributions and the THI Enterprise's financial condition.

228.    GECC discovered the scheme sometime after its inception, but before February 2006.  Nevertheless, GECC was motivated to continue its profitable venture with the THI Enterprise.

229.    In an effort to gain distance from the illegal contribution scheme, THI and GECC utilized a law firm, the Mintz Law Firm, to "self-report" the Medicaid part of the crime to the Department of Health and Human Services, Office of the Inspector General ("OIG").

230.    THI's *mea culpa* was that the misconduct was promptly reported and committed by "prior management".

231.    The truth was that the misconduct was not promptly reported as THI had known of the conduct for over two years by the time it was reported.

232.    Furthermore, THI only reported the misconduct to OIG when the then disgruntled ex-CFO blamed THI with culpability in his lawsuit against THI.

233.    THI's defense that "prior management" committed the wrongdoing was also untrue. The actual GTCR individuals in control of the THI Enterprise remained in their position of control from 1998 through 2009.

234.    While CEO Misitano purportedly resigned voluntarily, he was kept on as a consultant to the company, and paid hundreds of thousands of dollars in severance and consulting fees.

235.    Despite claims that "prior management" alone had committed this misconduct, former CFO Jeffrey Barnhill was purportedly terminated "without cause" and paid $600,000 in settlement of his lawsuit against THI, Jannotta, and the GTCR Group.

236.    When THI "self-reported" the illegal activity to the OIG, it failed to disclose Barnhill's allegations that the campaign contributions had been done for the benefit and at the direction of the GTCR's board of directors, the same board of directors that was still in place at THI.

237.    The OIG imposed a fine of $137,000.

238.    THI was also advised to report the illegal contributions to the Ohio Election Commission.

239.    Neither Ohio law enforcement nor any United States Attorney ever excused, forgave, or agreed to exonerate THI for its conduct.

240.    Nevertheless, GECC and Ventas continued to invest in the THI Enterprise.

   *iii.    GECC's Complete Control of THI Enterprise's Receivables Including Receipts from Private and Governmental Agencies*

241.    As explained in a THIH board meeting presentation, as a result of the 2004 default, GECC began "trapping cash."

242.    Through the management of lockbox arrangements, all receivables of the THI Enterprise were transferred directly to the control of GECC.  At the end of each business day, the funds in those accounts were "swept" into accounts controlled by GECC.

243.    Any disbursements of those funds were at GECC's sole and absolute discretion.

244.    GECC exercised such control in a manner that did not provide for the basic functioning and operation of the THI Enterprise and interfered with its ability to meet resident care requirements at the THI nursing homes.

245.    Through its ability to withhold funds necessary for the THI Enterprise's operation, GECC further controlled management of the THI Enterprise and its personnel. Unless GECC's demands were met by THI personnel, operating funds were not released to the THI Enterprise. Such demands included forced sales of nursing homes and transfers of the Enterprise's assets.

246.    This type of extensive *de facto* control over the operations of nursing home facilities through financing is not an isolated event, but rather a pattern and practice of GECC.

247.    Healthcare facilities financed by GECC have filed lawsuits against it alleging improper interference with the operations and healthcare services of the facilities through the illicit management of lockbox arrangements.

### iv.   Ventas, the GTCR Group, and Jannotta Consent to Unwavering Control of GECC Despite the THI Enterprise's Liquidity Crisis

248.   Ventas, the GTCR Group, and Jannotta consented to the unwavering control of GECC and allowed Medicare and Medicaid funds intended for resident care to be paid to controlling lenders.

249.   Ventas, GECC, the GTCR Group, and Jannotta were notified of the liquidity crisis of the THI Enterprise created by the lack of resources, and the risk associated with the inability to provide minimum levels of care to its residents.

250.   By the actions of Ventas, GECC, the GTCR Group, and Jannotta, the THI Enterprise was immediately rendered insolvent and faced imminent bankruptcy.

251.   During a THIH board meeting in February of 2005, the board members were informed that THI's landlord, ABE (Schron's company), "want[ed] a divorce."

252.   Upon information and belief, Grunstein, as a principal of ABE, threatened to report THI for violations in its nursing home operations, unless THI was sold to Schron, Grunstein and Forman, well below reasonably equivalent value.

253.   Jannotta also testified that Schron, Grunstein, and Forman, through ABE, were threatening the THI Enterprise with a lawsuit for breach of the ABE lease agreements.

254.   At the February 23, 2005 THIH and GTCR board meeting, it was proposed that there were only two options for the THI Enterprise to pursue: (1) THI files for bankruptcy; or (2) the THI Enterprise undergoes a "restructuring."

255.   According to the board meeting minutes, the THIH and GTCR board considered the following "potential downsides" of THI filing bankruptcy as an alternative strategy to an "exit situation": "All equity value extinguished/no opportunity for growth;

GTCR likely out of control position; Threat of Baltimore 'substantive consolidation'; Threat of accelerated ABE Briarwood actions - HUD financing and fraudulent inducement; and Litigation directed at management/GTCR."

256.    The board also considered the following "potential upsides" of restructuring THI: "Restructured Enterprise has equity value; Undermanaged assets have growth opportunities; THI Baltimore escapes reputational issues of Trans Healthcare, Inc."

257.    Rather than allowing the insolvent THI Enterprise to enter bankruptcy, negotiations commenced between the GTCR Group, Jannotta, and the other Defendants to facilitate the restoration of an operable cash structure for THI.  These negotiations were in furtherance of the scheme to divest the THI Enterprise's assets for the purpose of evading the liability to its creditors.

258.    In an attempt to keep the THI Enterprise afloat and avoid bankruptcy, in June 2005, GECC, the GTCR Group, Jannotta, and Ventas directed THI to sell off five THI facilities in Ohio to a group of companies known as Trilogy Healthcare for approximately $5,500,000.  According to GECC's internal records, this sale was considered to be a "nice job…especially under our current situation."

259.    In November 2005, GECC, the GTCR Group, Jannotta, and Ventas directed THI to sell approximately twenty outpatient centers in Pennsylvania to a company known as PT Group Acquisition, LLC, for approximately $5,600,000.

260.    These forced sales and the plan to "restructure" the THI Enterprise allowed the GTCR Group, Jannotta, GECC, Ventas, and the other Defendants to actively conceal the

THI Enterprise's mounting liabilities while maximizing their return on investment or cutting their losses.

### E.  The March 2006 Bust Out and Fraudulent Transfers

261.    As of January 23, 2006, THIH had an adjusted Enterprise value of $183,873,730.

262.    At this time, THIH wholly owned THI, which in turn owned THMI.

263.    The offices of THI and THMI were located at 920 Ridgebrook Road, Sparks, MD, 21152.

264.    The offices of THIH, THIB, and THIBM were also located at 920 Ridgebrook Road, Sparks, MD, 21152.

265.    At this time, THI and/or its subsidiaries held management contracts with about 100 nursing homes, including the homes where the Plaintiffs resided and were injured, which contracts were the most valuable asset of THI during this time.

266.    THI and THIB nominally operated the nursing homes, while THMI and THIBM provided management through THMI.

267.    From 2003 through March 28, 2006, because THIBM had few or no actual employees of its own, the employees of THMI performed the management functions of both THMI and THIBM, and THMI collected the management fees for its work.

268.    THMI collected and reported 100% of the revenue associated with the services despite having no formal written agreement with THIBM.

269.    Accordingly, THMI was the most valuable of the subsidiaries because it held the vast majority of the management contracts and had the employees that were essential to the operation of the nursing homes. The THMI employees performed all the work of the THI Enterprise pursuant to the management contracts, whether or not THMI was a named party under such contracts. THMI was the revenue generating entity for the THI Enterprise.

270.    Former CEO and President of THMI and THI, Misitano, confirmed the lack of corporate formalities within the THI Enterprise. Misitano testified that "these entities that were set up were set up by attorneys, and we didn't differentiate in our mind that we are going out to THI Management today or we are going out to X today or Y today. We were looking at the [THI] company as a whole and that people had specific assignments."

271.    THMI was the revenue generating entity for the THI Enterprise.  Without the employees of THMI, the management contracts to manage and operate the nursing homes could not be serviced.

272.    In addition to providing management services on behalf of THIBM, THMI collected and reported one hundred percent of the revenue associated with the services despite having no formal written agreement with THIBM.

273.    State licensing authorities were not informed that THMI was providing the services.  Instead, the authorities were told that THIBM was providing these services to the nursing homes.

274.    A rise in resident rights' suits for the negligent operation of the THI and THMI nursing homes threatened the profitability of the THI Enterprise for the GTCR Group, Jannotta, GECC, Ventas, and the Fundamental Enterprise, which in turn threatened the

profitability of CSFB 2004-HC1. By February and March of 2006, the THI Enterprise was on the brink of financial ruin.

275.    Instead of taking actions for the benefit of the THI Enterprise, including THMI and its creditors, such as filing for bankruptcy relief, the GTCR Group and Jannotta engaged in a joint venture with the other Defendants to "restructure" the THI Enterprise in order to reduce the Defendants' losses and maximize their returns.

276.    With knowledge of pending and future litigation aimed at the assets of the THI Enterprise, the GTCR Group, Jannotta, GECC, Ventas, and the Fundamental Enterprise agreed to initiate and execute a plan to unlawfully split up and conceal all of the assets of THI and THMI so that they could not be reached by these lawsuits and other creditors.

277.    The Defendants' plan consisted of a *de facto* merger wherein the value of the THI Enterprise would merge into a newly created Enterprise under the Fundamental name (FLTCH) and the liabilities would be ditched into a newly created shell (FLTCI). The operations (and assets) would continue through the Fundamental Enterprise, while the creditors of the THI Enterprise were left with a liability-ridden shell.

278.    According to Jannotta, FLTCH required THMI be sold as part of the transaction because it needed a management team to operate facilities.  Jannotta testified: "the sale of THI of Baltimore, along with THMI, which was viewed to be an important piece of – well, I don't know about an important piece, but a linked part of [Schron, Forman, and Grunstein's] interest in buying THI of Baltimore."

279.    Jannotta further testified that "THMI was of interest to them in the context of that buyout of THI of Baltimore in part because that entity was managing THI of Baltimore.

And – and the Fundamental group and the principals involved, as I understood it, were primarily real estate investors and not operators, and so they needed or at least were interested in having a management team to – to operate these assets and potentially other assets that they were looking at acquiring in this industry."

280.    Jannotta understood that THMI "would provide management services to the homes that [Schron, Forman, and Grunstein] were buying back through this lease acquisition that were at THI of Baltimore… and so that's how THMI got on the table as part of this transaction."

281.    The details of the plan were discussed at a February 16, 2006 meeting held at Ventas Realty in Chicago, Illinois.  Participants included representatives from "THI/GTCR Group (Bill Goldberg, Tom Erickson, Matt Box, Tom Lowenkamp), GECC (Jeff Erhardt, Jeff Thomas, Adam Sherman), and Ventas (Debbie Cafaro, Tim Doman)."  The proposed agenda for the scheduled four (4) hour meeting included major restructuring and transfer of assets of THI and its subsidiaries.

282.    Part of such plan included the creation of FLTCI, which would ultimately end up holding the liabilities of the THI Enterprise, and a day later, the creation of FLTCH, which would obtain the valuable assets of the THI Enterprise free and clear of its liabilities including the numerous resident lawsuits alleging negligent care.

283.    FLTCI was incorporated by Troutman on December 21, 2005.

284.    FLTCI's address was also at 920 Ridgebrook Road, Sparks, MD, 21152, the same as the Fundamental Enterprise and the THI Enterprise.

285.     On or about December 21, 2005, Troutman established a registered agent account for FLTCI with The Corporation Trust Company ("CT Corp").

286.     At this time, Grunstein was a partner in the New York office of Troutman. Grunstein was the head of Troutman's real estate investments and capitalization practice groups from 2004 until approximately 2009.

287.     CT Corp documentation named Lawrence M. Levinson ("Levinson"), another partner in the New York office of Troutman, as the recipient of notices received by the registered agent on behalf of FLTCI.

288.     FLTCI's CT Corp account documentation also named Forman of Met Cap Holdings, LLC as the party to receive any renewal invoices on behalf of FLTCI.

289.     Throughout the years leading up to 2011, Troutman, as an agent for FLTCI, received notification from CT Corp regarding lawsuits against FLTCI.

       ***i.***   ***Bust Out Part 1: All Assets of THI Enterprise are Transferred to the Newly Created Fundamental Enterprise at a Significant Discount from the Fair Market Value***

290.     In late February 2006, the "restructuring" plan to evade the THI Enterprise's liabilities was set into motion.

291.     THIH subsidiary, THIB and its subsidiary THIBM, were "sold" to another entity, branded with the Fundamental name, FLTCH, for approximately $9,900,000 ("FLTCH SPA").

292.     The THIBM contracts to provide management services to THIB leased and/or owned nursing homes were also sold to the Fundamental group as part of this transaction.

293.     The $9,900,000 sale price was a significant discount from the fair market value of THIB and constituted grossly inadequate consideration.

294.     The purchase price paid by FLTCH paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

295.     Like the THMI SPA, the FLTCH SPA provided that any notices should be given in writing to FLTCH, 920 Ridgebrook Road, Sparks, MD, 21152, with a copy to Troutman.

296.     The FLTCH SPA provides that Delaware law governs.

297.     According to the linked SPAs, FLTCI and FLTCH maintained the same mailing address.

298.     Troutman, Troutman partners, Levinson, and Grunstein, and Forman in concert with the GTCR Group, Jannotta, GECC, and Ventas negotiated, drafted, and prepared the closing of the FLTCH SPA.

299.     GTCR principal Jannotta described the sales as "linked transactions" wherein THMI and THIB were sold to entities controlled or invested in by Schron, Forman, and Grunstein.

300.     According to Jannotta, the sale agents for the linked transactions were Forman and Grunstein acting as agents and fiduciaries of Schron– the ultimate owners of the Fundamental family of companies.

301.    Forman's ownership of FLTCI is confirmed by his November 30, 2011 filing with the Financial Industry Regulatory Authority wherein Forman lists himself as the Principal of the Debtor.

302.    According to documents from FLTCI's registered agent, Forman was also responsible for making payments for the registered agent's services.

### ii.    Bust Out Part 2: Transfer of THMI Liabilities to a Newly Created Shell FLTCI

303.    The GTCR Group, Jannotta, and the other Defendants devised a plan to avoid any responsibility for the THI Enterprise's liabilities.

304.    With approval of the GTCR-controlled board, THMI's employees and valuable assets were transferred to THIB's subsidiary, THIBM.

305.    Upon information and belief, neither THIB nor THIBM paid THIH, THI, or THMI any consideration for the transfer of these assets.

306.    Based upon information and belief, the GTCR Group and Jannotta knew that after THMI's valuable assets were transferred away, THMI would not have sufficient assets to manage the liabilities it held and did not have sufficient assets to pay any debts as they would become due.

307.    These transfers to THIBM lacked any independent economic substance or legitimate business purpose.  These transfers were simply a means to strip the valuable assets away from THMI, while leaving THMI with significant liabilities.

308.    Next in the process to avoid any responsibility for the THI Enterprise's liabilities involved the purported arm's-length sale of THMI, approved of by the GTCR-controlled board of the THI Enterprise, to an independent third party.  However, the GTCR

Group, Jannotta, and the other Defendants knew that the liabilities held by THMI all but eliminated any possibility of an arm's-length sale of THMI to a third party.

309.    Thus, FLTCI and Barry Saacks ("Saacks") entered the picture.

310.    On February 28, 2006, a Stock Purchase Agreement ("THMI SPA") was executed.

311.    The THMI SPA provides that Delaware law governs.

312.    While the February 24, 2006 draft of the THMI SPA, drafted by the K&E law firm, required that THMI notices be sent to FLTCI, "Attention: Mr. Murray Forman", the provision in the executed SPA no longer included Forman as the recipient of notices to the buyer.

313.    The THMI SPA purported to sell the stock of THMI to the President of FLTCI, Saacks, an elderly graphic artist who now lives in a nursing home, never owned FLTCI or THMI, had no money or credit, and never even heard of THMI.

314.    Saacks is the only corporate officer of FLTCI.

315.    FLTCI did not have any directors.

316.    The THMI SPA provided that any notices were to be sent to FLTCI, 920 Ridgebrook Road, Sparks, MD, 21152, with a copy to Troutman.

317.    According to a declaratory action filed in the United States District Court for the Southern District of New York by FLTCH and FAS against THMI, Saacks did not pay the $100,000 for the purchase of the THMI stock. *FLTCH v. THMI*, Case No. 12-cv-8339.

318.     Rather, in order to close the transaction, according to FAS and FLTCH, THIB funneled the $100,000 through a purported loan to Saacks, who had no money or credit and never agreed to pay the $100,000.

319.     Upon execution of the THMI SPA, since THMI's assets had been stripped away, FLTCI simply acquired a liability ridden company that did not have sufficient assets to pay its debts as they became due.

### iii.     Closing the Bust Out

320.     Through the "linked transactions", the Defendants executed their plan to transfer the liabilities and existing debts of THMI, including pending litigation claims, to the FLTCI shell while the assets, employees, and operations were moved into Fundamental companies, including FLTCH and FAS.

321.     GECC, Ventas, the GTCR Group, and Jannotta consented and signed off on both THIB and THMI transactions with full knowledge that the discounted sales would render THMI unable to pay its creditors. As THMI was the guarantor on the GECC and Ventas homes and managed the nursing homes subject to the mortgages, the linked sales could not have occurred without their consent.

322.     Both transactions closed on March 28, 2006, at the offices of Troutman, The Chrysler Building, 405 Lexington Avenue, New York, New York, 10174.

323.     In addition, as part of the bust out, THMI purported to terminate its administrative and clinical services arrangements with THMI-managed nursing homes through Termination and Assumption Agreements.

324.    Notices to THMI regarding the Termination and Assumption Agreements were sent to Scott Krinsky, Esq. from the law firm of Backenroth, Frankel & Krinsky, who purportedly represented Saacks in connection with the Termination and Assumption Agreements.

325.    Krinsky's partner Backenroth previously represented ABE in the IHS bankruptcy discussed above.

326.    Although Saacks is alleged to have signed the Termination and Assumption Agreements, his signature does not appear to be authentic.

327.    According to testimony of former FAS senior counsel and vice president, Kristi Anderson, Esq. ("Anderson"), the Termination and Assumption Agreements were fraudulently and unlawfully backdated by FAS employees.

328.    The Agreements were actually prepared in November 2006 were illegally backdated to March 28, 2006 to coincide with the 2006 transaction described above.

329.    From formation, FLTCI was nothing more than a liability-ridden shell. FLTCI had no employees, directors, business activity, office location, nor any assets other than an equity interest in THMI, an entity that was left with nothing more than computer equipment that was never picked up by the purported buyer.

330.    These facts have been confirmed by FLTCI's own filings in the bankruptcy case, testimony of Saacks, and by the testimony of Backenroth.

331.    The continued § 341 Meeting with Saacks – FLTCI's first and only shareholder – was held on October 15, 2012, in New York.

332.    Saacks confirmed that he has never heard of THMI and did not purchase THMI or FLTCI. In fact, Saacks was totally bewildered by any suggestion that he might be or has been in control of THMI or FLTCI.

333.    Saacks testified:

**Q. What is your position with the debtor?**

> A. Does that mean Fundamental?... I think it was maybe six years ago I was asked if I would be interested in obtaining some computer equipment. ...

> A. So then I discussed this with some people, and all I remember is nothing because nobody did anything. They never followed up. Fundamental never followed up.

**Q. So when you found out about Fundamental or inquired about it or found out about it, what was it that you did?**

> A. I put verbal propositions through some people and they never got back to me. They were supposed to get back to me and they didn't. And that's really the long and short of it. You know, a couple of verbal telephone conversations. You know, I'll do this if you do that, you do that.

**Q. Okay. Let's talk about '06.  Can you tell me what transpired with Fundamental?**

> A. No. Well, I can't tell you because nothing has transpired. All that transpired was somebody lit a match and brought some light into the room, and then eventually the match went out as an example.  I don't know what you are trying to say to me. I mean, I know what you're trying to say, but I can't offer anything of any use because I don't even know if --  for those six years, nobody told me you bought it, nobody told me.

**Q. Do you remember paying any money for Fundamental in 2006?**

> A. No. I made it very clear I don't have capital, and I could maybe borrow, maybe ask somebody, another partner and another partner, but it all didn't

matter what, because they told me that the deal fell through and we'll be back to you, which they didn't.

**Q. Was there any activity with Fundamental from 2006 to 2012?**

A. Not by me. I mean, I'm not – I was not a player in that at all, that period. So let's look at this this way very quickly from my point of view. This thing came up again, and to be candid, it didn't remind me of anything. You know, okay, Fundamental, Fundamental, you could say it a thousand times to me, and each time it wouldn't mean anything because nothing ever happened with me and Fundamental.  Now, when I like the idea, the idea didn't change in six years, which was peculiar. But every time I put forward this thing about what happened to Fundamental, I didn't get a clear answer, but I got some legal stuff.

**Q. Did you ever make any money off of Fundamental?**

A. No, not yet. I'm waiting.

**Q. Do you have any books and records or tax returns or any kind of documents for Fundamental?**

A. Not to my knowledge. I don't have personally, because Mr. Backenroth would know that, what I have and what I don't have, I'm sure. Remember, it's only just -- I mean, working it Grunstein's way, it is only just come to life again. It may die again.

**Q. Did you buy it [Fundamental]?**

A. I don't know. It is a lovely question.

**Q. Okay. Do you know if you borrowed money in connection with it?**

A. No, I did not.

**Q. You did not or you don't know?**

A. Maybe I don't know, but I don't think I did.

**Q. Who would know that?**

A. I don't know. Speak to Mr. Grunstein. Speak to Mr. Schron.

**Q. Okay. I want to shift focus a little bit. We talked a lot about Fundamental, but I would like to talk a little bit about Trans Health Management.**

A. Never heard of it.

334.    In describing his relationship with Grunstein, Mr. Saacks further testified:

**Q. If you don't remember the year, if you can give me an approximate range of time over which you have known [Grunstein]?**

A. Mr. Schron introduced me to Mr. Grunstein about something - - I can't remember. It was a real estate matter, and my reward would have been, it is always would have been, would have been an apartment, I think. An apartment in Queens to the best of my memory. And I would be on this company which has this property, and a bit similar to Fundamental in a way, whereby, you know, this client of Grunstein was going somewhere, I don't know where he was going, going abroad, and he wanted to get rid of a lot of assets, and he had people to look after things, including Grunstein as their lawyers.

335.    Saacks' testimony made clear that FLTCI was never intended to be more than a shell and its purchase of THMI was a sham transaction designed to benefit a group of wrongdoers, the Defendants here, by transferring the valuable assets of THMI and THI, lodging the liabilities in a shell company, and actively concealing the whole scheme from creditors, litigants and courts.

336.    Saacks further testified that in March 2012, Grunstein, Schron and others arranged to visit Saacks at the nursing home where he resides. At that meeting, they made assurances to Saacks about business opportunities related to FLTCI and the potential for Saacks to make "big money" out of a deal involving FLTCI.

337.    At that meeting, Grunstein arranged for Abraham Backenroth, an agent of Grunstein and Schron, to obtain a power of attorney from Saacks, which Backenroth has exercised in order to use Saacks as a proxy in the bankruptcy court.

338.    At a § 341 meeting on May 17, 2012, Backenroth, as a purported power of attorney for Saacks, testified that FLTCI was "merely a holding company" and had no operations, no books and records, and was "not going to be engaged in activity."

339.    Backenroth attempted to legitimize the 2006 transactions with an *ex post facto* explanation that the transactions contemplated that FLTCI was merely a holding company for THMI, who was left only with certain computer equipment that "had value and which some money could be made out of it" for Saacks.

340.    Backenroth's testimony that Saacks purchased THMI for some computer equipment is directly contrary to what Saacks testified, in particular that he never owned FLTCI or even heard of THMI.

341.    According to Backenroth, FAS took control of the computer equipment and  a licensing rental fee was to be worked out. But, "the ball was dropped" because "Saacks didn't follow it up as well as he should have" and FAS did not pay any licensing or rental fees to THMI for its use of the former THMI computer equipment.

342.    This complicated transaction does not pass the "smell test" if the goal was simply to sell the computer equipment to an elderly graphic artist.   The graphic artist could have just purchased the equipment without the 2006 bust out transactions.

### iv.    Evidence of Continued THMI Operations by the Fundamental Enterprise

343.    THMI's bank accounts ultimately were emptied with THMI's remaining cash transferred to THIB.

344.    THIBM also transferred $35,000 to itself from a THMI payroll account to purportedly "offset" the cost of FLTCI's purchase of THMI.

345.    In conjunction with the bust out, having lost its management assets, THI had created Pathway Health Management, Inc. ("Pathway") to manage the nursing homes it still owned and/or leased after the above "linked transactions." In essence, Pathway took the place of THMI.

346.    In essence, Pathway took the place of THMI.

347.    However, because Pathway was a new shell entity with few or no employees, it entered into an Administrative Services Agreement with THIBM to manage THI's remaining nursing homes.

348.    Because THIBM had few or no employees, it was THMI employees who moved to THIBM, and now under the "Fundamental" umbrella, provided services under the Administrative Services Agreement.

349.    In essence, the same employees and structure of management continued in the Fundamental Enterprise, just without the THMI liabilities.

350.    On or about September 19, 2006, THIBM changed its name to Fundamental Clinical Consulting, LLC ("FCC") and on August 31, 2006, FAS was created to take over the administrative services contracts to the nursing homes previously serviced by THIBM.

351.    The former employees of THMI became employees of FAS or FCC depending on their duties. On or about October 1, 2006, FCC reassigned the THMI employees who provided administrative services to FAS but retained the THMI employees involved with operational and clinical consulting and support.

352.    The directors and officers of THMI became the directors and officers of the Fundamental entities.

353. On October 31, 2005, Bennett and the rest of the Officers of THMI participated in an email referencing a mock-up of a services agreement between the buyer (FLTCH) and THI. Attached to the email is a listing of the current employees of THMI who are to be transferred to the buyer (FLTCH) and the percentage of their time that will be required to service THI's assets pursuant to a future Administrative Services Agreement.

354. The Officers and Directors of THMI as of January 7, 2005 included:

    a. W. Bradley Bennett: President; Chief Executive Officer

    b. Mark Fulchino: Executive Vice President; Chief Financial Officer

    c. Toni-Jean Lisa: Executive Vice President; General Counsel; Secretary

    d. Sean Nolan: Senior Vice President - Finance; Chief Accounting Officer

    e. Matthew Box: Senior Vice President of Financial Operations

    f. Kimberly McCarty: Vice President; Treasurer

    g. Melissa Warlow: Vice President; Assistant Secretary

355. The officers and directors of FAS as of March 6, 2009 included:

    a. Directors:

W. Bradley Bennett
Mark Fulchino

    b. Officers:

W. Bradley Bennett: President; Chief Executive Officer
Mark Fulchino: Executive Vice President; Chief Financial Officer
Toni-Jean Lisa: Executive Vice President; General Counsel; Secretary
Sean Nolan: Senior Vice President-Finance; Chief Accounting Officer
Kimberly McCarty: Vice President; Treasurer
Melissa Warlow: Vice President; Assistant Secretary
Ken Tabler: Vice President

356.    With the exception of Box and the addition of Tabler, the FAS officers and directors are identical to those of THMI in 2005.  Mr. Tabler was the Vice President of Finance for THIBM immediately prior to his employment with FAS.

357.    FAS and FCC took over virtually all the former responsibilities of THMI. FCC took over the operations of the formerly THMI-managed nursing homes, while FAS directed the litigation and administrative services for the nursing homes.

358.    The assets, operations, and personnel of THMI were rebranded into Fundamental companies to continue generating millions of dollars of profits, but without the liabilities for the negligent care provided to the residents of the nursing homes managed by THMI, including the Plaintiffs.

359.    Even to this day, the Fundamental companies operate out of the same building, at the same address, with the same employees and management team, using the same desks, furniture, computers and equipment of the predecessor THMI.

360.    To this day, FAS continues to use the former THMI computer equipment without making any payments to THMI or FLTCI for its use.

361.    In addition, notwithstanding the purported sale of THMI stock to Saacks, Christine Zack, Esq. ("Zack"), FAS general counsel, held herself out as the spokesperson and decision maker for THMI beginning in the fall of 2006.

362.    According to Anderson, former senior counsel and vice president of FAS, Zack provided substantive direction as a representative of THMI to the lawyers who were purporting to represent THMI in the Plaintiffs' state court litigation, subsequent to the 2006 sale to Saacks.

363.    By the next year, FLTCI and THMI became defunct and simply disappeared.

364.    FLTCI became delinquent on its corporate registration taxes and fees and ceased payments to its registered agent.  FLTCI failed to file any reports with its state of incorporation.

365.    THMI had simply vanished by the end of 2007.

366.    The only corporate existence that THMI maintained after the transaction was as the holder of nursing home liabilities, including the Plaintiffs' claims. Corporate formalities, including shareholder and board of director meetings, were not followed by THMI after the 2006 "restructuring" transaction.

367.    Despite the fact that THMI ceased to exist as a corporation, actions were taken on behalf of THMI by FAS, its agents and employees, and with the cooperation of the Defendants, the Fundamental Enterprise, the GTCR Group, Ventas, GECC, THIH, and Jannotta.  Examples of such actions include:

    a.  **March 28, 2006**: GECC's entry into a Business Associate Agreement with THMI to share HIPAA protected patient information post-sale, executed by Matt Box on behalf of THMI and Jeffrey Erhardt for GECC ;

    b.  **March 28, 2006**: Ventas and THMI execute a Release & Covenant Not to Sue executed by Mark Fulchino, current CEO of FAS, on behalf of THMI, and T. Richard Riney on behalf of Ventas;

    c.  **April 2006**: One month after THMI was sold to FLTCI, Bennett wrote checks on a THMI account, paying out nearly $1.5 million in THMI funds

to himself and his colleagues, who were now working for THIBM, as bonuses.

d. **May 4, 2006**: Correspondence from Toni-Jean Lisa, Esq., senior counsel of FAS, on Fundamental letterhead demanding indemnification from THI on behalf of THMI. The Fundamental letterhead listed the same phone number and address as that for THI and THMI (the Jones Estate state court litigation);

e. **July 6, 2006:** THMI officer resignations of Kimberly McCarty, Melissa Warlow, Sean Nolan, and Toni-Jean Lisa, all of whom became officers of FAS;

f. **July 6, 2006:** THMI director resignations of W. Bradley Bennett and Mark Fulchino, who both became directors of FAS;

g. **July 6, 2006**: Correspondence from Toni-Jean Lisa, Esq., senior counsel of FAS, on THIBM letterhead demanding indemnification from THI on behalf of THMI (the Webb Estate state court litigation);

h. **September 25, 2006**: Correspondence from Zack, senior counsel of FAS, on THIBM letterhead demanding indemnification from THIH on behalf of THMI (the Estate of Sasser litigation). The letterhead listed the same address and phone number as that formerly used by THI and THMI;

i. **March 10, 2006**: Funds transfer of $35,569.40 from THMI Wachovia Payroll Bank Account into THIB Wachovia Bank Account;

j. **November 2006**: Creation of March 28, 2006 Vida Encantada Termination & Assumption Agreement by FAS employees and/or agents with notices and communications to THMI to be sent to Scott Krinsky, Esq., Backenroth, Frankel & Krinsky;

k. **November 22, 2006**: Payment of fine to Ohio OIG on THMI letterhead by Matt Box;

l. **August 1, 2007**: Update on litigation, including the Jackson Estate litigation and other Florida litigation, by Toni-Jean Lisa, general counsel for FAS, to Matt Box on Trans Health letterhead listing the same address and phone number as that formerly used by THI and THMI;

m. **February 2, 2007**: Email from Robin Goodman of FAS (former THMI employee) to THMI's Registered Agent to resign THMI in Delaware;

n. **March 26, 2007**: Correspondence from Matt Box to Jannotta regarding disclosure of related party transactions on THMI letterhead;

o. **May 25, 2007**: Affidavit of Zack as Counsel for THMI sent to Wilkes & McHugh, P.A in order to release THMI from claim in *Rocca v Andorra Woods,* Case No. 07-02985;

p. **September 4, 2007**: Update on litigation, including the Jackson Estate litigation and other Florida litigation, by Anderson to Matt Box on Trans Health letterhead listing the same address and phone number as THI and THMI. The Update names Zack, senior counsel of FAS, as the contact person for THI uninsured claims;

q. **April 18, 2008**: Ventas and THMI Execute a Release and Covenant Not to Sue executed by Matt Box for THMI, T Richard Riney for Ventas, and Philip Canfield for GTCR;

r. **January 20, 2009**: Affidavit of Zack as Authorized Representative for THMI filed in Ohio State Court in support of motion for summary judgment in *Estate of Ardyth H. Kroll v. Heatherdowns Rehabilitation & Residential Care Center, et al.*, Case No. CI-200305626;

s. **October 26, 2009**: Affidavit of Zack as Counsel for THMI in *Brown v THI of South Carolina*, Case No. 07-CP-42-606, filed in South Carolina State Court in order to challenge service on THMI; and

t. **March 28, 2006 – present:** Actions taken by Defendants in the Plaintiffs' state court and federal court litigation on behalf of THMI at the direction of FAS and its agents and employees, including Zack and Anderson.

368. In addition, the Fundamental Enterprise assumed the THI employee retirement and benefit plans including Medical, Pharmacy, Dental, Vision, Disability and Life Insurance Benefits.

369. The Fundamental Enterprise assumed the THI Enterprise's national contracts, including Pharmacy providers, IT, food service, and medical supply vendors.

370. The Fundamental Enterprise assumed control and oversight over the THI litigation nationwide, including the Plaintiffs' claims.

371. FAS Vice President Tabler testified that the only way to tell the difference between THMI and FAS documents is by referring to the business unit number because

operational and financial records for THMI, THIBM and FAS were continuously kept on the same systems.  Otherwise the documents are commingled "as part of a group of companies that filed consolidated financial statements and consolidated returns. So that information would be integrated with the results and reporting of those other entities."

372.    Bennett has also testified that he could not differentiate THMI from any of the entities he worked for, stating: "I just don't recall what any one did."  Bennett further stated that he could not recall any differences between the THI Enterprise or the Fundamental Enterprise.

373.    The confusing morass of shells and subsidiaries created by the 2006 transactions was in name only.  The very same individuals and entities continued to control the operations of the THI Enterprise, although now under different corporate names.

374.    The Fundamental Enterprise shares a continuity of business, management, personnel who perform the same jobs and tasks, location and building, office and computer equipment, phone number, logo, employee retirement and benefit plans, and assets as the THI Enterprise.

375.    The Fundamental Enterprise is nothing more than a continuation of the former THI Enterprise under a new "hat."

376.    According to an April 14, 2010 affidavit by Forman, under the Fundamental Enterprise's ownership, the THI Enterprise currently operates 98 health care providers, including 77 nursing homes in 14 different states.  In 2010, the Fundamental Enterprise had a net operating revenue of $710,000,000.

> **v.**    ***District Court and Jury find FLTCH, FAS and FCC to be a Single Integrated Enterprise***

377.    Not surprisingly, it has been found that FAS, FLTCH, and THIB had interrelated operations, common management, centralized control of labor relations, and common ownership and financial control such that they operated as a single integrated Enterprise controlled by Grunstein and Forman.

378.    The United States District Court for the District of New Mexico in the case of *Prendergrast v. Fundamental Long Term Care Holdings, LLC*, CIV 07-1265 CG/LFG,  made the following factual findings:

  a.  When FLTCH acquired THIB in March 2006, it created FCC and FAS to do the work that THIB, which is now defunct, had been doing.

  b.  Employees of THIB became employees of FAS or FCC depending on their duties.

  c.  FLTCH is owned solely by Forman and Grunstein, the only officers and directors in a company with no employees.

  d.  FLTCH and THIB have the same address (and also share the same address as THI and THMI).

  e.  FLTCH is the sole shareholder of THIB.

  f.  FAS has the same officers, directors, and address that THIB used to have.

  g.  Zack is a corporate representative for FLTCH, FAS, and THIB and provides regular updates on operational and legal matters at the facility-level several times a month to Forman. As senior vice president of FAS, she has her employment controlled by Forman.

  h.  The FAS tax department prepares the tax filings for FLTCH and THIB.

    i.   FLTCH holds the insurance for THIB, FAS, and FCC. The professional and general liability insurance policy is written in the name of THIB and FCC.

    j.   Employees are wrong all the time about who they are employed by and by whom their coworkers are employed.

379.   In fact, the *Prendergrast* judge and jury found that FLTCH, THIB, and the state level THI operators constituted an "integrated Enterprise."

380.   Subsequently the *Prendergrast* parties filed a Joint Motion for Vacatur as a condition of settlement, not as a result of any newly discovered facts, which the court granted.  Therefore, the factual findings in the court's previous rulings remain intact.

381.   Similarly, a United States District Court for the District of South Carolina upheld a magistrate finding that THMI was the employer at a THIB facility for purposes of suit for race discrimination in violation of Title VII and 42 U.S.C. § 1981. *Clark v. THI of South Carolina at Moncks Corner, LLC, et al.*, Case No. 2:05-cv-03445-PMD, Doc. Nos. 55, 64.

382.   The Fundamental Enterprise fails to maintain corporate formalities amongst the entities, run the entities as a single Enterprise, and utilize them interchangeably for improper purposes, mainly to defeat the claims of the creditors.

        *vi.*    ***The Bust Out Benefits to GTCR and Jannotta***

383.   The GTCR Group and Jannotta received direct benefits from the transfers of THIB and THMI, including satisfying their own existing obligations to GECC and Ventas, to the detriment of THI, THMI and their creditors.

384.     The 2006 fraudulent transfers also allowed for the GTCR Group, Jannotta, and the THI Enterprise to avoid filing for bankruptcy, which would have led to a mandated winding up of the THI Enterprise's affairs and the proper transition of the assets of the organization.

385.     Instead, the transfers guaranteed that GECC would receive preferential payments over other creditors.  In return for ensuring that GECC had its loans repaid to the detriment of other creditors of the THI Enterprise, the GTCR Group and Jannotta were able to maximize its return on its investment while reducing their losses, which would not have been possible if legitimate creditors were paid.

386.     In addition to avoiding bankruptcy, the 2006 fraudulent transfer of THMI benefited the GTCR Group and Jannotta by providing the GTCR Group and Jannotta with funds to settle existing lawsuits against the GTCR Group, Jannotta, and the THI Enterprise.

387.     The THI Enterprise, through the GTCR-controlled board of directors, reached a settlement of the Aegis lawsuit concurrent with the restructuring for approximately $6,000,000.

388.     Along with settling the Aegis lawsuit, the GTCR Group and Jannotta used the funds received from the transfers of THIB and THMI to settle five other existing lawsuits against the GTCR Group, Jannotta, and/or the THI Enterprise, for the total amount of $9,710,000.

389.     At the same time the GTCR Group and Jannotta fraudulently transferred THIB and THMI, the GTCR Group and Jannotta entered into various agreements with

GECC, such as a Release Agreement between THI, the GTCR Group, and other GTCR principals, executed on March 28, 2006.

390.    In exchange for additional GTCR capital and the recapitalization of GECC's THI loan, the GTCR Group and Jannotta obtained a release from GECC of any causes of action relating to the THI loan. The GTCR Group then invested an additional $20,000,000 into the THI Enterprise and GECC issued a new $42,000,000 Term Loan and a $13,000,000 Revolver.  Now without the liabilities of THMI, the GTCR Group, Jannotta, and GECC were able to provide THI with additional credit and liquidity without the fear of creditors seeking payment from such capital.

391.    In addition, one of the loans between Ventas and THI was paid in full using the funds obtained from the fraudulent transfers.  The 2006 fraudulent transfers allowed the GTCR Group and Jannotta to ensure that Ventas had one of its loans repaid to the detriment of other creditors of the THI Enterprise.

392.    This too allowed the GTCR Group and Jannotta to maximize the return on their investment and cutting their losses while reducing their liability on the THI Enterprise's loans, which would not have been possible if the GTCR Group and Jannotta had properly acted in the best interests of THMI and its creditors, such as filing for bankruptcy.

393.    Avoiding bankruptcy also allowed the GTCR Group and Jannotta to sell off most of the THI Enterprise's remaining assets in order to increase their own net worth at the expense of the THI Enterprise's legitimate creditors.

394.    Because the THI Enterprise was essentially insolvent during the 2006 fraudulent transfers, the GTCR Group and Jannotta owed fiduciary duties to THI and

THMI's creditors. Nonetheless, the GTCR Group and Jannotta facilitated, assisted, and participated in the fraudulent transfers and did nothing to stop the fraudulent transfers or take any action to protect THI and THMI's creditors. Instead, the GTCR Group and Jannotta approved of the completion of the 2006 linked sales.

### F.  The 2006 Reissuance of the Commercial Mortgage-Backed Security

395.    In 2006, CSFB 2004-HC1 was reissued by Credit Suisse resulting in the issuance of CSFB 2006-TFL2.

396.    However, by this time the valuable assets of the THI Enterprise had been transferred to FLTCH, while the liabilities of the THI Enterprise were deposited into the shell entity FLTCI.

397.    Despite evidence to the contrary, Schron and his agents claim FLTCI has no affiliation or association with FLTCH or the Fundamental entities.

398.    Credit Suisse echoes this claim as evidenced in its November 15, 2006 Offering Circular for CSFB 2006-TFL2.  FLTCI is not mentioned in the 2006 Offering Circular nor are the liabilities it holds factored into the creation and sale of CSFB 2006-TFL2.

399.    While the 2006 Offering Circular discusses Fundamental as the nursing home operator, it makes no mention of how the Fundamental entities acquired the former assets of the THI Enterprise.

400.    In April 2011, Schron and his agents modified and extended the mortgage loans underlying CSFB 2006-TFL2 to a payoff date of June 2013, with an additional one-year extension option to June 2014.

401.    CSFB 2006-TFL2 continues to be rated through present day.  As such, upon information and belief, the THI Enterprise's valuable assets (now controlled by Fundamental) are still being utilized to generate profits for the Fundamental entities, Schron and his agents.

### G. Defendants Sue Each Other over the Assets of the Former THI Enterprise and Admit the Fraudulent Nature of the Asset Transfers

402.    On June 23, 2010, Schron filed a suit accusing his agents and fiduciaries Grunstein and Forman of stealing for themselves tens of millions of dollars in value from Schron's acquisition and operation of healthcare businesses worth more than $2,000,000. *Schron v. Grunstein et al.*, Case No. 650702/2010.

403.    Schron's verified complaint filed in the 2010 lawsuit addresses the "The Seizure of THI." Schron's verified complaint claims that Grunstein, "[w]hile purporting to represent Schron and the Schron Entities, [Grunstein sought to] seize THI's assets for himself and Forman at a below market price." Schron further alleges that "Grunstein and Forman are the sole owners of Fundamental" and "THI … is 100% owned by Fundamental." *Schron v. Grunstein et al.*, Case No. 650702/2010, Amended Verified Complaint filed August 5, 2010, ¶¶ 16, 50, 51.

404.    In additional court filings, Schron has asserted that his agents and fiduciaries, Grunstein and Forman, are "more interested in distributions than patient care" and has charged his agents with poorly running their nursing home operations. *Schron v. Grunstein et*

*al.*, Case No. 650702/2010.  In support of Schron's claims, he identifies the Jackson Estate as one of his agents' victims.  *Schron v. Grunstein et al.*, Case No. 650702/2010.

405.    Schron also filed the transcript of a tape recorded conversation in support of his 2010 suit that he had with his long-time agents and fiduciaries, Grunstein and Forman, without their knowledge.  In that conversation, Forman told Schron that together, "We're in the nursing home business and the insurance business." *Schron v. Grunstein et al.*, Case No. 650702/2010.

406.    In that same phone conversation, Schron was advised by his lawyer, agent and fiduciary Grunstein: "You had THI owned in Fundamental and the employees were supposed to be operators just like THI and we were going to arrange money for them in the Mariner deal." *Schron v. Grunstein et al.*, Case No. 650702/2010.

407.    On May 21, 2012, Schron filed another action by verified complaint in New York state court conceding that his agents and fiduciaries, Grunstein and Forman, "surreptitiously" acquired THI. *Schron v. Grunstein, et al.*, Case No. 651752/2012.

408.    In Schron's 2012 lawsuit in New York state court, Schron swears to the following in his Verified Complaint:

> Beginning at least in 2002, Grunstein leveraged his position as attorney and trusted fiduciary of Schron and his family into material equity interests for himself and co-defendant Murray Forman in transactions they undertook with their clients. Grunstein and Forman ultimately took ownership and control of a series of operating companies that were tenants, borrowers, or other counterparties to the Schron Entities - - entities with interests directly adverse to those of Grunstein's clients.
>
> In the last nine years alone, Grunstein and Forman's exploitation of their roles as attorney and advisor, respectively,

has resulted in their emerging as owner, director, officer, member and shareholder in a series of companies that are part of a nursing home empire operating more than 250 nursing homes in the United States. The operators of these facilities are defendant Fundamental, SavaSeniorCare LLC ("Sava") and THI of Baltimore, Inc. ("THI"). Most of Grunstein and Forman's "success" in building this health-care business stems from their taking improper advantage of Schron in connection with the acquisition and operation of complex real estate and healthcare businesses worth more than $2 billion. . . .

Later, Grunstein and Forman formed Fundamental in order to acquire THI surreptitiously in a transaction at issue in the Schron v. Grunstein litigation.

From the time of the 2003 transaction, through the matters at issue in the Complaint, Grunstein, Forman, and Troutman Sanders represented Schron, SWC and SWC Special as lawyers and fiduciaries. They were obliged to act on behalf of their clients and principals as fiduciaries.

As fiduciaries of [the Schron Entities], Grunstein and Forman owed duties of loyalty to the Schron Entities. Grunstein and Forman owed fiduciary duties both in their capacity as agents of the companies[.]

*Schron v. Grunstein, et al.*, Case No. 651752/2012; Verified Complaint filed May 21, 2012,

¶¶ 7, 8, 33, 34, 79.

409.    On September 6, 2012, after a ten day trial in Schron's suit against Grunstein

and Forman initiated in 2010, Justice O. Peter Sherwood of the Supreme Court of the State of

New York issued a Decision and Order after Trial stating: "[t]he mendacity of Grunstein and

Forman entitles their testimony to be given no weight." *Schron v. Grunstein, et al.*, Case No.

650702/2010.

410.    Justice O. Peter Sherwood also found that Schron maintains a valid option to

purchase Fundamental and its operating company Sava SeniorCare, LLC, which he recently

exercised to the consternation of Grunstein and Forman. *Schron v. Grunstein, et al.*, Case No. 650702/2010.

411.    In December of 2013, Grunstein pled guilty to perjury in the third degree for testimony he gave in his lawsuit against Schron.  In his guilty plea, Grunstein admits to having made false statements under oath.  As part of the plea agreement, Grunstein has resigned from the New York State Bar and can never re-apply for readmission. Grunstein is due to appear in court on February 4, 2014 for sentencing.

412.    Allen Bodner, former President and Director of ABE, filed suit on June 30, 2010, against Troutman, Levinson, Grunstein, Forman, and Harry Grunstein, business partner and brother of Grunstein. In his suit, Bodner accuses the defendants of legal malpractice, fraudulent conveyance, unjust enrichment, fraud, tortious interference, aiding and abetting fraud, and breach of fiduciary duty as part of a scheme to divest Bodner and a company he controlled of an interest in a lucrative health care and real estate venture. *Bodner v. Grunstein et al.*, Case No. 650791/2010.  After dismissal of the complaint without prejudice, Bodner filed an additional action against the same defendants on December 13, 2011, further detailing the scheme to divert millions of dollars of income due to the long-term care companies and to line their own pockets at the companies' expense. *Bodner v. Grunstein et al.*, Case No. 653442/2011.

413.    Evidence supporting the allegations herein is contained in the numerous statements by Schron and his agents in their lawsuits against one another and in the documents produced therein. These recently disclosed documents have – in part – revealed and unraveled the elaborate scheme to hinder, delay, and defraud nursing home creditors of

the THI Enterprise.  However, many documents have yet to be disclosed as many have been filed under seal.

### H. Post-2006 Bust Out to Further Liquidate the Assets of THI and the Sale to Omega and CommuniCare

414.    After the 2006 Bust Out, the GTCR Group, Jannotta, GECC, Ventas, and the other Defendants continued in their efforts to further liquidate the assets of the THI Enterprise, further hindering the THI Enterprise's ability to deliver care to the residents of its nursing facilities.

415.    As a result of the unlawful and wrongful transfers in 2006, the THI Enterprise was left with only a small group of unprofitable subsidiaries and property, which GECC, Ventas, the GTCR Group, and Jannotta forced THI to sell off.

416.    In November 2007, the GTCR Group and Jannotta sold a THI entity named THI of Ohio at Greenbriar South, LLC for approximately $4,700,000.

417.    The GTCR Group, Jannotta, GECC, Ventas and the other Defendants also engineered the February 6, 2008 sale of the remaining THI properties, with the exception of a Maryland facility GECC executives described as a "toxic dump," to Omega Healthcare Investors, Inc. ("Omega") and CommuniCare Health Services ("CommuniCare").

418.    According to Omega's Quarterly 10-Q Report dated March 31, 2008, twenty-four healthcare properties in Ohio and Maryland were sold to Omega and CommuniCare.

419.    In the same transaction, THI sold its operating rights in those facilities to CommuniCare.

420.    The transaction closed on April 18, 2008.

421.    THI purportedly received $47,579,195 in this transaction.

422.    The GTCR Group, as owner and parent of the THI Enterprise, and Jannotta as a board member of the THI Enterprise, consented to the 2007 and 2008 transactions.

423.    Communications between THI and GECC reveal that CommuniCare engaged in discussions directly with the GTCR Group and Jannotta concerning disposition of the THI properties.

424.    In addition, communications between Jannotta, GECC and Ventas reveal that Jannotta was negotiating for funds to pay severance and bonus payments to the THI Enterprise's management rather than to its creditors.

425.    Communications between GECC employees also reveal concerns about the February 2008 transaction passing a "smell test" should they be examined by creditors in the future.

426.    According to its Quarterly 10-Q Report dated May 7, 2008, Ventas recorded a profit of $24,000,000 off the sale of those properties in 2008.

427.    In conjunction with this sale, Ventas entered into a release agreement with the GTCR Group and the THI Enterprise.  The GTCR Group directed Matthew Box to sign the release with T. Richard Riney, Ventas' Executive Vice President, Chief Administrative Officer, and General Counsel,  as CFO of several THI Enterprise, including THMI, even though THMI was no longer under the THI umbrella.

428.    GECC consented to the release of the collateral upon the payoff of its real estate and revolving loans totaling approximately $30,000,000.

429.    By slowly selling off the THI Enterprise's remaining assets, the GTCR Group and Jannotta benefited by escaping any liability in conjunction with the THI Enterprise,

including the Ventas and GECC loans, all while hindering, delaying, and defrauding the THI Enterprise's legitimate creditors.

### I.    For Years, Defendants Undertake Efforts to Conceal the Fraudulent Nature of the 2006 Transfers of Assets to the Fundamental Enterprise

430.    The fraudulent nature of the 2006 transfers of assets described above was concealed from creditors, claimants, and courts.

431.    In *Jackson*, *Nunziata*, *Webb*, and *Sasser* litigation, Phillip Mancuso, Esq. and either the law firm of Romaguera, Baker, Dawson, Bringardner & Dias, P.A. or Mancuso & Dias, P.A represented THMI.  Prior to joining Romaguera, Mancuso was in house counsel for IHS and then THMI.

432.    In litigation against THMI, defense counsel continued to file pleadings, answer discovery and act as if nothing transpired.

433.    It is clear that the continuation of the litigation by counsel for at least four years after THMI ceased to exist was a purposeful effort to deceive creditors, litigants, and the courts by the Fundamental Enterprise, the GTCR Group, Jannotta, GECC, and Ventas.

434.    This deception led to a Florida state court finding that THMI and FAS had knowingly committed a fraud on the court by lying or concealing who the true parties in interest were and continuing to defend THMI and not notifying the court, or the litigants, of the status of THMI.

435.    Other courts have also concluded that FAS has engaged in an ongoing and concealed effort to orchestrate a defense of THMI without particular eye or concern for candor with the court to protect the interests of the Fundamental Enterprise, the GTCR

Group, Jannotta, GECC, and Ventas.  The litigation strategy was to stall and delay the underlying litigation and avoid producing discovery.

436.    As recently of November 2013, this Court has had to compel FAS to produce discovery requested by the Trustee after numerous attempts to get FAS to comply with this Court's orders.

437.    Defendants have perpetrated a multi-state fraud, and continue to do so, to conceal the actions taken to loot THMI as well as any fruits of their illegal conduct.

438.    Although THMI had apparently ceased to exist in 2006, Defendants acted as if it continued to operate.

439.    This included execution of a Release and Covenant Not to Sue on April 18, 2008, wherein Matthew Box signed as CFO of several THI Enterprise including THMI, THI, THIH, and THIB.

440.    The agreement was made over two years after the supposed sale of THMI to FLTCI, an allegedly unrelated entity to the Fundamental group.

441.    Matthew Box also conducted other business, including seeking the consent to sell THI assets from a landlord, on behalf of THMI in 2008.

> ### i.    *The Ex Parte Maryland Receivership of a Delaware Corporation to Conceal the Conspiracy, Fraudulent Transfers, and Fruits of Illegal Conduct*

442.    In January 2009, THI, through GECC and Jannotta's attorneys, Tydings & Rosenberg, LLP ("Tydings"), filed an *ex parte*, uncontested receivership on behalf of THI and its affiliates in Maryland.

443.    The Petition alleged that GECC had no objection to the appointment of a

Receiver.

444.   By 2009, GTCR principal Jannotta was the sole member of the THI board. Jannotta, as sole member, consented to the entry of the Maryland receivership.

445.   THMI was not a party to the receivership.

446.   The day after THI filed the Petition, on January 8, 2009, Tydings presented the Petition to a Maryland state court judge *ex parte* in chambers.  The court did not hold a hearing and no transcript of the proceedings in chambers exists.

447.   Nonetheless, that same day, January 8, 2009, the Maryland state court approved the Petition and entered an order establishing the Receivership over THI assets in Maryland.

448.   The order authorized the Receiver to employ Tydings, GECC and Jannotta's former counsel, as the Receiver's counsel.

449.    THI creditors were not provided with notice or opportunity to object to this filing. The only creditor that received notice of the receivership filing was GECC, THI's only secured lender.

450.   The purpose of the receivership was three-fold.

451.   First, the Defendants designed the receivership scheme to avoid a federal bankruptcy, the thorough scrutiny of which they knew would have revealed the nature and extent of the massive fraud described above.

452.   Second, the Defendants designed the receivership to prevent creditors from learning of the fraudulent transfers and the assets owners' true identities.

453.    Third, the Defendants designed the receivership in an attempt to buy time on the Defendants' fraudulent activities.

454.    Under the Maryland receivership statute, the Order Appointing the Receiver was invalid. THI did not satisfy the requirements under the statute.

455.    The Maryland receivership statute requires dissolution of the company before the receivership can go forward. THI never properly dissolved.

456.    Maryland law only provides for receivership protection for Maryland corporations. THI is a Delaware corporation.

457.    Michael Sandnes, a former director of operations of THI, was appointed as receiver of the THI receivership just one day after the Maryland court filing.

458.    On July 27, 2010, one of GECC's collection attorneys, Alan Grochal, Esq. of Tydings, was appointed as a replacement to the original receiver.

459.    By this time, GECC's collection attorneys, Tydings, acted as the THI Receiver, represented the largest THI creditor, GECC, represented the THI Receiver, and represented THI.

460.    These relationships created numerous conflicts of interests.

461.    This is particularly significant where a court-appointed receiver only has the power and a singular duty to act on behalf of the corporations' creditors as an officer of the court.

462.    GECC, Ventas, the GTCR Group, Jannotta, and the Fundamental Enterprise colluded to fraudulently use the receivership as a mechanism to mislead creditors and the Maryland court into believing that THI and its subsidiaries were insolvent.

463.    Creditors of THI, including the Plaintiffs, were not provided with notice or opportunity to object to this filing.

464.    In its January 2009 Petition for Receivership, THI listed legitimate unsecured creditors of over $15,000,000, and claimed assets of only $3,200,000, despite the fact they had a value of over $180,000,000 just three years before and had just completed the Omega transaction in 2008 for $47,579,195.

465.    GECC and OmniCare, Inc., who had a separate deal with Schron, were the only creditors with knowledge of and participation in the receivership filing.

466.    Many creditors, including the Plaintiffs, did not receive timely notice of the receivership.

467.    FAS entered into a Post-Close Administrative Services Agreement with THI.

468.    Legal services were provided to THI by Anderson, former employee of FAS.

469.    Legal services were provided to THMI by Zack, senior counsel of FAS, in cases that were allegedly being defended by the Receiver.

470.    On March 31, 2011, FAS terminated the administrative services to the Maryland receivership on account of a "conflict of interest."

471.    In addition to providing legal advice to the THI Receivership, the Fundamental Enterprise directed the tort litigation in Florida involving THI and THMI.

472.    This included improper attempts to stay cases in Florida and other litigation, and to delay and avoid the Plaintiffs' claims by the maintenance of the illegal receivership.

473.    The Fundamental Enterprise, through their employees and agents, colluded and participated in the effort to cover up the improper transfer of assets from the THI

Enterprise and to mislead, defraud, and hinder the creditors of the THI Enterprise, including the Plaintiffs.

474.     On April 8, 2009, Schron, GECC, Ventas, the GTCR Group, the other Defendants, and the Receiver they controlled, caused a certification of satisfaction of the former GECC "debt" to be filed in the Maryland Court.

475.     This certification confirmed GECC had been paid in full ($55,000,000 plus interest).

476.     By ensuring that GECC had been completely paid, the GTCR Group and Jannotta were able to avoid any liability to GECC, maximizing the GTCR Group's return on its investment in the THI Enterprise at the expense of the THI Enterprise's creditors.

477.     The only substantive payments made by the Receivership were to GECC, the Receiver, and Tydings.  As of January 2013, the payments were distributed as follows:

    a.   Tydings: $1,091,000

    b.   Receiver: $313,000

    c.   GECC: $412,000

478.     To date, claimants and vendors have not received any payment from the Receivership.

479.     By paying themselves, without paying other creditors, GECC, the Receiver and his counsel, and the other Defendants were able to keep assets they had fraudulently received and avoid any liability to other creditors, including the Plaintiffs.

480.     Schron, GECC, Ventas, the GTCR Group, Jannotta, and the other Defendants utilized the subterfuge of an *ex parte* receivership, rather than filing for bankruptcy, because

they realized that their illegal transfers of the THI Enterprise's assets for their own benefit to defraud legitimate creditors would never withstand the close scrutiny of a Federal Bankruptcy Court.

481.    In March 2009, the Receiver and the Defendants facilitated the sale of THI's last remaining asset for just ten to twenty cents on the dollar, well below GECC's own appraised value, sufficient only to cover the remaining amounts GECC was owed.

> ii.    *The Defendants' Attempt to Further Conceal the Fraudulent Transfers of the Assets of the THI Enterprise through Abuse of Process by Moving to Stay Litigation and Withdrawing Defenses*

482.    On January 13, 2009, Schron, GECC, Ventas, the GTCR Group, and the other Defendants caused the THI Enterprise to file motions to stay in the Plaintiffs' state court litigation against THI and/or THMI in Florida and Pennsylvania.

483.    This was done to buy time and cause the Statute of Limitations to run and further defraud the Plaintiff creditors.

484.    The Florida state courts denied the motions to stay.

485.    On June 15, 2009, as a part of their continuing efforts to delay, hinder, and defraud creditors, THI, upon the recommendation of FAS, had their attorneys try again and file a Motion to Domesticate the Receivership Order in the State of Florida.

486.    The Motion was filed in another attempt to prevent all Florida tort claimants from obtaining money judgments against the THI Enterprise.

487.    The Motion was filed by Defendants in Miami, Florida, even though no cases were pending there against the THI Enterprise.

488.    The Motion was filed under the style "TRANS HEALTHCARE, INC. a Foreign Corporation, v. BONNIE CREEKMOR[E]", another client of the Jackson Estate's counsel who had not filed a lawsuit against any entity of the THI Enterprise.

489.    In the Motion, the Receiver and its attorney claimed that "the receivership is a liquidating receivership and upon the discharge of the receiver, there will be no entity from which the Plaintiffs may obtain recovery."

490.    The Receiver and its attorneys also claimed that "the expeditious enforcement of the receivership order is required because the receivership is drawing to a close and the receiver must make arrangements for the disposition of the remaining assets of the estate."

491.    There was no mention that the receivership order was obtained *ex parte* and without satisfying the requirements of the Maryland receivership statute.

492.    The Miami court granted the domestication, but expressly left the question of whether to stay each individual case to the respective judges in those cases.

493.    The THI Enterprise then filed renewed motions to stay in the Plaintiffs' state court litigation in Florida and Pennsylvania.

494.    The motion for stay filed by counsel for the THI Receiver in the *Nunziata* litigation misrepresented that THMI was part of the Maryland receivership. The motion to stay stated that the Receiver was also a "Receiver for THMI," and referred generally to the receivership of THI and "related entities."   Attached to the motion was a copy of the receivership order, but not the list of entities actually included in the receivership – a list that did not include THMI.

495.    The Florida state courts also denied these renewed motions to stay.

496.    When Defendants learned that they could not stay these proceedings, they caused the THI attorneys to withdraw from the cases.

497.    In mid-2010, the defense counsel abruptly moved to withdraw from all pending THI and THMI cases around the country.

498.    Anderson of FAS sent an email to THI and THMI defense counsel, informing them that THI was in receivership and a decision had been made to cease defending cases, including the Plaintiffs' cases.

499.    In the motions to withdraw, the courts were told that the Florida defense firms were ordered to withdraw by Anderson.

500.    Some of the orders provided that Anderson would be the contact person for the THI Enterprise.

501.    The withdrawal of defense counsel was directly contrary to a Maryland court's refusal to grant the Receiver permission to abandon the THI and THMI litigation.

502.    On January 29, 2010, the Receiver filed a motion in the Maryland court seeking among other things authority to abandon the defense of claims not asserted in the receivership proceeding with proofs of claim.

503.    On March 24, 2010, Judge Fader, a Maryland circuit court judge, did not grant the request to abandon defenses by the Receiver and Tydings. In particular, the court in its order stated, "I know of no authority that would allow me to pass an order authorizing the Receiver to abandon the defense of any and all Unasserted claims."

504.    Dissatisfied with Judge Fader's order, on April 23, 2010, the Receiver and Tydings, sent an *ex parte* letter to another Maryland state court judge, Judge Martin,

requesting authority to withdraw the defenses. In the letter, his counsel stated: "The receivership estate's counsel in some of the litigation (described in my Motion and my response) have informed the receiver that they need retainers (one is $75,000) by Monday morning or they will withdraw as the receiver's counsel."

505.    From the date of withdrawal, no counsel appeared on behalf of THI or THMI. As a result, defaults were entered against THI and THMI, resolving all issues of liability.

506.    The *Jackson* case proceeded to a jury trial. A final judgment against THI and THMI was entered in the amount of $110,000,000.  THI and THMI did not file any post-judgment motions nor seek any appellate review, rendering the judgment final in all respects.

507.    The Jackson Estate has been unable to collect its judgment against the asset-less and judgment proof THI and THMI due, in whole or in part, to the improper actions of Defendants in furtherance of the scheme to defraud nursing home creditors of the THI Enterprise.

508.    In an effort to collect its judgment, on December 14, 2010, and May 17, 2011, the Jackson Estate initiated proceedings supplementary pursuant to Florida Statute § 56.29 and Florida Rule of Civil Procedure 1.250 against Defendants here, including GECC, the GTCR Group, Jannotta, Ventas, Schron, Grunstein, Forman, FAS, FLTCH, THIB, and FLTCI in Polk County Circuit Court. *Estate of Jackson v. THM and THI*, Case No. 2004-CA-3229.

509.    Causing delay, the majority of the impleader defendants improperly removed the post-judgment matter to federal court. The Jackson Estate promptly moved to remand the proceedings.

510.    Relying on the Maryland receivership, the impleader defendants opposed the remand, refused to provide discovery, and moved to dismiss the proceedings asserting that the Maryland court had exclusive jurisdiction over the claims and litigation against THI and THMI.

511.    After a ten-month delay, the ancillary proceedings were remanded to state court for lack of federal subject-matter jurisdiction. *Estate of Jackson v. Ventas Realty, Limited Partnership*, 812 F.Supp.2d 1306 (M.D. Fla. 2011); *Estate of Jackson v. Trans Health Management, Inc.*, 2011 WL 4345315 (M.D. Fla. September 16, 2011).

512.    GECC and Schron appealed the district court's order remanding the proceeding supplementary to the Eleventh Circuit. On August 22, 2013, the Eleventh Circuit reversed the district court's remand order and sent the ancillary proceeding back to the district court. *Jackson-Platts v. Gen. Elec. Capital Corp.*, 727 F.3d 1127 (11th Cir. 2013).

513.    Upon remand to state court, certain of the impleader defendants continued to assert, amongst other grounds, the Maryland receivership as a basis to prohibit and interfere with the Jackson Estate's pursuit of valid claims by seeking dismissal and delay.

514.    Indeed, the Receiver willfully refused to complete a Fact Information Sheet, Form 1.977 mandated by Florida Rule of Civil Procedure 1.560 (b), on behalf of the judgment debtor THI asserting that the Receivership order stays all litigation and discovery, including discovery in aid of execution.

515.    To date, nearly three years since entry of the final judgment, the Receiver has yet to comply with the state court order.

516.    Schron and his agents retained Zack to direct the litigation against the THI Enterprise and head this part of the fraud, which was furthered by Zack's use of multiple job titles for herself.

517.    Zack, an attorney, thereafter assisted Schron, Forman, and the Fundamental Enterprise, by calling herself "Associate Counsel of Mariner Health" (a Schron company), "Corporate Counsel, Integrated Health Services Long Term Care, Inc.," "Senior Vice President of Fundamental Administrative Services," and "Counsel for Trans Health Management."

518.    The undisclosed behind-the-scenes direction of litigation against THI and THMI by the Receiver and FAS led to a Florida state court finding that THMI and FAS had knowingly committed a fraud on the court by lying or concealing who the true parties in interest were and continuing to defend THMI and not notifying the court, or the litigants, of the status of THMI. *Estate of Nunziata v. THMI,* Case No. 05-8540CI in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County.

519.    Other courts have also concluded that FAS has engaged in an ongoing and concealed effort to orchestrate a defense of THMI without particular eye or concern for candor with the court to protect the interests of GECC, the GTCR Group, Ventas, and other co-conspirators. *James Henry Jones v. TFN Health Care Investors LLC et al*, Case No. 2006-06672, in the Court of Common Pleas of Montgomery County, Pennsylvania, Opinion dated April 17, 2012.

520.    On April 22, 2013, the Superior Court of Pennsylvania upheld a trial court's finding that FAS controlled the THI defendants' defense since 2006, "deliberately chose to

withhold relevant information regarding the THI defendants," and "actively worked to stall the underlying litigation, as well as delay and avoid producing discoverable and relevant information." *Spivery-Jones v. TFN Health Care Investors, LLC et al*, Case No. 498 EDA 2012, Superior Court of Pennsylvania.

521.     The litigation strategy was to stall and delay the underlying litigation, avoid producing discovery, and ultimately hinder, delay, and defraud the THI Enterprise's creditors.

522.     In addition to being a fraud on the Plaintiffs, the concealment of these relationships, and the entities controlling matters behind the scenes, was all part of the Defendants' plan to disguise the THI and THMI nursing home assets into revenue-generating, judgment-proof assets.

**J.   Entry in Joint Venture Agreement on January 5, 2012**

523.     In January 2012, the THI Receiver and the Defendants entered into a joint venture agreement ("2012 Agreement") to unlawfully put the judgments and claims beyond the reach of the Plaintiffs and to conceal the liquidation of the nursing home Enterprise's assets for themselves while defrauding its creditors.

524.     The 2012 Agreement specifically refers to the Plaintiffs and their state court actions against THI and THMI.

525.     In the 2012 Agreement, the Receiver and the Defendants expressly pledged mutual cooperation to continue their efforts to defraud and defeat the Plaintiffs in their claims against THI and THMI.

526.    The Receiver also pledged to give testimony that is agreeable to FAS – the very entity that was found by Florida and Pennsylvania circuit and appellate courts to be engaged in a fraud in its involvement in the defense of THMI.

527.    The Agreement further provides an unlimited defense fund, funded by the Defendants, to be used by the Receiver and FAS in their efforts to defeat the Plaintiffs' claims on behalf of the Defendants.

528.    The Defendants also agreed to indemnify the Receiver in his efforts to defeat the Plaintiffs' claims on behalf of the Defendants.

529.    The Receiver unlawfully released any and all claims, causes of action and choses in action that THI may have against the Defendants for much less than reasonably equivalent value, in an attempt to avoid liability to the Plaintiffs.

530.    These claims, causes of action, and choses of action are property rights reachable by the Plaintiff judgment creditors.

531.    The 2012 Agreement further assigns to the Defendants any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel. The assignment includes claims for contribution and indemnification.

532.    Pursuant to the 2012 Agreement, the Defendants were assigned THI's rights under the attorney-client privilege and the work-product doctrine and were granted access to all of THI's books and records.

533.    FAS agreed to indemnify THI, pay for the defense, and put up $800,000 in defense costs.

534.    FAS had in fact terminated its legal relationship with THI and the Maryland receivership on account of a "conflict of interest" on March 31, 2011.  Then, after admitting this conflict of interest, FAS purchased THI's defense, THI's attorney-client privilege and work product doctrine rights in the Plaintiffs' cases, and purchased any and all claims of THI including claims against the Plaintiffs and the Plaintiffs' counsel.

535.    GECC agreed to pay $300,000 to purchase the defense of THI and THMI, its attorney-client privilege and work product doctrine rights, and purchase any and all claims of THI including claims against the Plaintiffs and the Plaintiffs' counsel.  GECC further agreed to indemnify THI and THMI and agreed to pay the first $200,000 in defense costs in defending the Plaintiffs' litigation.

536.    Schron agreed to pay $200,000 to purchase the defense of THI and THMI, its attorney-client privilege and work product doctrine rights, and purchase any and all claims of THI and THMI including claims against the Plaintiffs and the Plaintiffs' counsel.

537.    Ventas agreed to pay $200,000 to purchase the defense of THI and THMI, its attorney-client privilege and work product doctrine rights, and purchase any and all claims of THI and THMI including claims against the Plaintiffs and the Plaintiffs' counsel.

538.    The GTCR Group, Jannotta, THIH, THIB, FLTCH, Forman, and Grunstein paid no consideration to purchase the defense of THI, its attorney-client privilege and work product doctrine rights, and all THI claims including claims against the Plaintiffs and the Plaintiffs' counsel.

539.    Pursuant to the 2012 Agreement, the Receiver became the nominee of the Defendants.  Having sold all of THI and THMI's interests in the defense, any and all claims,

attorney client privilege, work product documents, and others, the defense belonged to the Defendants.

540.    The Defendants nominated the Receiver to appear in the Florida courts on their behalf.

541.    The Receiver, on behalf of the Defendants, has used the Agreement as a sword and shield in numerous Florida state and federal courts to ensure the details of the conspiracy remain hidden.

### K. Defendants' Efforts to Defraud and Defeat Creditors and Conceal Fraudulent Transfers of Assets from the THI Enterprise Continues to this Day

542.    After execution of the 2012 Agreement, which provided an unlimited defense fund, the THI Receiver, as nominee for the Defendants, directed local counsel to enter appearances on behalf of THMI and THI, on the eve of trial, seeking to set aside the default judgments and continue the trials at the eleventh hour.

#### i.    The Nunziata State Court Litigation in Pinellas County

543.    On the eve before the trial in the *Estate of Nunziata v. THMI*, Case No. 05-8540CI in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Marsha Rydberg, Esq. of the Rydberg law firm ("Rydberg") served a notice of appearance, motions for admission *pro hac vice* of Carl Hagwood, Esq. and J. Michael Coleman, Esq., and a motion to set aside default and vacate the order setting trial on behalf of THMI. On January 9, 2012, the morning of the first day of trial, Rydberg served a motion for partial summary judgment on behalf of THMI.

544.    The motion for summary judgment filed on behalf of THMI was prepared by Anderson and Carl Hagwood, Esq.

545.    Rydberg did not have the authority or consent to represent THMI.  THMI was defunct and had no known representative.  In addition, Florida Department of State records showed that THMI's corporate status had been revoked for failing to file annual reports on October 1, 2004.

546.    Upon questioning by the state court to explain how could she defend THMI if it was defunct and had no known representative, Rydberg admitted that she was not retained by THMI but "retained by the receiver" or "as [she understood] it, the receiver is the one that [would] be retaining [her firm]." Rydberg likened the situation to an insurance company paying counsel to represent an insured.

547.    But, just two weeks earlier, the THI Receiver denounced his authority to defend THMI. At a December 26, 2011 hearing before the Circuit Court for Baltimore County, Maryland, the Receiver testified:

> That – that was the rationale that I was told, after the fact for doing it. Had I been the Receiver at the time I would not have tried to convince a court to stay [the Florida litigation] *because I would have had no authority to represent THMI. And Fundamental hired counsel and had them enter appearance for THMI under my auspices or under the Receiver's auspices, and that was just plain wrong because they were not part of this receivership estate* . . . . The - - in my view the receivership only had an authority to represent the entities covered by the receivership, not to hire counsel in Florida and entered an appearance on behalf of an entity that is not in the receivership. *I believe that was wrong then and I believe it is wrong now."*

> "Someday I need to have it explained to me why [FAS] saw reason to protect Trans Health Management, which was not

part of this [receivership] proceeding. Because [FAS] insisted that it be done. I think it's a parent company and that [FAS] somehow has an interest in there and that did not further at all as a Receiver, ***yet that was part of [FAS'] litigation strategy to protect THMI.***

(emphasis added).

548.     In addition, at a May 29, 2013 hearing in another case, the Receiver confirmed that he had no authority to hire counsel in the *Nunziata* litigation.  According to the Receiver, he "had no authority to hire counsel in Florida in early January 2012."

549.     When questioned who had hired counsel to represent THMI in *Nunziata*, the Receiver answered: "I don't know who officially hired them. I believe Fundamental might have paid them to be there, but I don't know that for a fact, because I wasn't - - that was not my decision. I wasn't involved."

550.     Having failed to explain how she or any other attorney could defend the defunct THMI, the Pinellas Circuit Court struck the Rydberg pleadings, finding that the attorneys hired by the Receiver had no authority to defend the defunct THMI.

551.     According to a recent Notice of Filing Documents Produced in Discovery in Compliance with Rule 4-3.3 of the Florida Rules of Professional Conduct by the Chapter 7 Trustee, counsel for FAS warned Zack, Anderson, Rydberg, Hagwood and others that the trial court should be very carefully informed of the authority that they had to represent THMI, to explain the assignment of rights to the Defendants by THI, and the Receiver's interests in connection with it.

552.    According to the email from FAS counsel, if the assignment memorialized in the 2012 Agreement and the representation was not detailed, counsel was concerned that "FAS will certainly be found to have engaged in a fraud on the court."

553.    This warning was ignored.    The same day as the email exchange, the Defendants entered into the January 2012 Agreement described above.

554.    Rydberg and Hagwood showed up on the first day of trial.    But they did not explain the assignment of interests and did not detail the representation.

555.    The trial court reiterated her previous concerns of fraud and struck counsels' appearances.

556.    The jury trial proceeded but no attorney with the authority to defend THMI appeared.    The jury heard the evidence and returned a verdict against THMI for $60 million in compensatory damages and $140 million in punitive damages.

557.    On January 11, 2012, a final judgment against THMI in the amount of $200 million was entered.

558.    After trial, the Nunziata Estate moved for an injunction to prohibit the Receiver from making collateral attacks on the trial court's orders in other jurisdictions, including Maryland.

559.    The Receiver's joinder in two motions pending before the Maryland receivership court necessitated the injunction.

560.    The first was FLTCH's expedited motion to enforce the Maryland stay order against the Plaintiffs asking the Maryland court to direct the Plaintiffs "to refrain from proceeding any further with [their] claims" against THMI.

561.    The second motion filed by GECC asked the Maryland court to hold the Plaintiffs in contempt for pursuing claims against THMI even though the Plaintiffs' claims were filed long before the Maryland receivership began, the trial courts expressly denied the stay of Florida proceedings in the Plaintiffs' cases, and THMI was not involved in the Maryland receivership.

562.    The Nunziata Estate presented the motion for injunction to the state trial court and handed a copy to Rydberg.  Rydberg asked to be heard on the motion and the court granted the request.

563.    Rydberg first argued that although the Receiver had hired her, she "never represented the Receiver" but only represented THMI and that the Receiver was not subject to the jurisdiction of the court.

564.    Rydberg then asked that the trial court continue the hearing to give the Receiver time to adequately respond.  A temporary injunction was entered but the trial court set a hearing for two days later to consider whether a final injunction should issue.

565.    When the injunction hearing convened two days later on January 13, 2012, Rydberg did not sit at the counsel table.  When the trial court asked her to approach, she stated, "I would, but I don't represent anybody in these proceedings." No one else appeared for the THI Receiver.

566.    A final injunction was entered and the "Receiver and his agents and assignees are prohibited from making collateral attacks on any orders of the Court."

567.    On March 4, 2013, in direct violation of the final injunction order, the Receiver, acting as nominee for the Defendants, filed a lawsuit against the Nunziata, Jackson,

and Webb Estates in the United States District Court for the Middle District of Florida seeking a declaration that the duly obtained final judgment is void.  *Grochal v. The Estate of Juanita Amelia Jackson*, Case No. 8:13-cv-00582-MMS-AEP.

568.    In that lawsuit, the Receiver reaffirms his repudiation of a Florida receivership and once again, makes a collateral attack on final state court judgments in a federal court, including the judgments obtained by the Plaintiffs, the Nunziata, Jackson, and Webb Estates.

569.    The filing of the federal lawsuit led to an adjudication of contempt against the Receiver in the *Nunziata* litigation by a state court for the Sixth Judicial Circuit on March 13, 2013.

570.    On March 13, 2013, after a hearing on the Nunziata Estate's motion for contempt, the Receiver was held in civil contempt for filing the federal complaint by a Pinellas Circuit Court.

571.    The Pinellas Circuit Court expressly found that the suit was an abuse of process and in violation of duties of candor to the court.

572.    The court held:

> And now I see this lawsuit come about, this new one over in federal court that was attached to this emergency motion that misrepresents, mischaracterizes, and is not in accordance with the rules. I think it's a violation of the candor to the tribunal as to what actually happened in this case specifically for the estate of Ms. Nunziata.
>
> ***
>
> The appellate one, I want to make totally clear, appealing the Court's decision in this is totally appropriate. However, ***this action filed in federal court is just flat-out wrong. It's a flat-out abuse of the process***. There's no way in any rule that I can see that that is anywhere near appropriate. It sort of goes to the

justice denied, justice - - justice delayed, justice denied. ***And it's really, quite frankly, appalling.  I think you can tell that I think that it's totally wrong***. The issue for me to decide is to whether or not to hold the receiver in contempt.

(emphasis added).

573.    The Receiver's declaratory suit was subsequently dismissed with prejudice by United States District Judge Mary S. Scrivens for lack of subject-matter jurisdiction. *Grochal v. The Estate of Jackson*, Case No. 8:13-cv-582-T35-AEP.

574.    Two post-trial motions were filed by Rydberg, but abandoned shortly thereafter with the filing of a notice of appeal purportedly on behalf of THMI, the THI Receiver, and his counsel.

575.    Concerned about its liability to the Nunziata Estate, GECC sued the Estate of Nunziata in Federal Court for a declaration that it was not liable for the final judgment. United States District Judge James D. Whittemore dismissed GECC's suit. *GECC v. Estate of Nunziata*, 2012 WL 1581860 (M.D. Fla. May 4, 2012).   GECC appealed Judge Whittemore's decision to the Eleventh Circuit Court of Appeals, where the case currently pends.  *GECC v. Estate of Nunziata*, Case No. 12-12993.

### ii.    ***The Webb State Court Litigation in Polk County Circuit Court***

576.    The *Webb* state court litigation followed the same track as the *Nunziata* litigation.

577.    Just before trial, after almost three years of litigation, THI moved to stay the lawsuit, but never pursued the motion. Instead, in July 2010, the Defendants directing THI and THMI's litigation changed course and withdrew defense counsel of THI and THMI.

578.   Despite the Plaintiff's vigorous opposition, the withdrawal was granted. No further counsel appeared on behalf of THI and THMI despite being served with numerous pleadings, notices, and filings, which resulted in the entry of defaults.

579.   The jury trial was set to begin on February 6, 2012.  On the Friday before trial, Hala Sandridge, Esq. ("Sandridge"), filed a notice of appearance, motion to admit Maryland attorney Maria Ellena Chavez-Ruark ("Ruark") *pro hac vice*, and motion to continue the trial and set aside defaults.

580.   Ruark and Sandridge appeared on the morning of trial, solely to seek a continuance. Ruark and Sandridge admitted that they were not willing or prepared to defend the trial that was about to begin.

581.   As neither attorney was prepared to try the case, the Polk County Circuit Court struck the notice of appearance and motion for admission *pro hac vice*.

582.   No attorney asked to participate in the three-day damages trial that followed. The jury heard evidence and returned a verdict of $200,000,000 in compensatory damages and $700,000,000 in punitive damages.

583.   Although she took no part in the trial, Sandridge filed a motion for new trial on behalf of THI and THMI, but later abandoned it with the filing of a notice of appeal.

584.   On December 10, 2013, the First District Court of Appeal reversed the final judgment and remanded the cause for a new trial. The mandate has not yet issued and the Webb Estate will seek rehearing and reconsideration of the appellate decision.

### iii.    *The Townsend Polk County Litigation*

585.    THMI and THI were actively defended from January 29, 2009 until counsel was instructed to withdraw and did withdraw on January 3, 2011. As in the *Nunziata* and *Webb* litigation, no further counsel appeared on behalf of THI and THMI and defaults were entered.

586.    Pursuant to the January 5, 2012 Agreement, the Receiver for THI appeared to present a defense for THI on March 27, 2012.

587.    The Receiver was not a party to the action nor did he move to intervene. Neither the Receiver nor the Receivership was named in the Complaint.

588.    The Receiver appeared to defend THI at the trial commencing on July 15, 2013.

589.    The undisputed testimony before the trial court was that the defense was provided by the parties to the January 5, 2012 Agreement – the Defendants here.

590.    Having assigned and transferred his interest in defending THI to the Defendants by virtue of the 2012 Agreement, the THI Receiver presented a defense for THI on behalf of the Defendants.

591.    The Receiver acted as the nominee for the Defendants who were the real parties in interest.

592.    The Receiver objected to discovery on behalf of the Defendants asserting attorney-client and work product privileges. The privilege log produced revealed dozens of communications between the Receiver's counsel, Ruark and:

a. GECC's counsel, Ed Dolan, and GECC senior vice president, Dwight Meier, regarding seven cases, including the Plaintiffs' cases, labeled as "communication regarding trial strategy." The privilege log even included an email sent by GECC's counsel to the Receiver's counsel regarding litigation strategy in the *Townsend* case;

b. GTCR and THIH's counsel, Ben Rottenborn labeled as a "communication regarding litigation strategy";

c. Ventas' counsel, Daniel Weiss labeled as a "communication regarding litigation strategy;

d. Schron's counsel, Nicolle Jacoby labeled as a "communication regarding litigation strategy;

e. FLTCH, Grunstein and Forman's counsel, Malcolm Harkins labeled as "communication regarding litigation strategy." There were even communications between the Receiver's counsel and FLTCH, Grunstein and Forman's counsel, Sanders McNew, regarding trial strategy in the *Townsend* case. This included emails in the period leading up to the appearance by the Receiver's counsel pursuant to the January 5, 2012 Agreement; and

f. Thousands of entries involving the Receiver and FAS discussing litigation strategy and trial strategy. For example, there were specific entries from the Receiver and Receiver's counsel, Ruark to FAS and THIB's agents and counsel, Anderson, Zack and Stacie Tobin.  There were even communications between FAS and the Receiver regarding trial strategy in the Plaintiffs' state court cases.

This included emails in the period leading up to the appearance by the Receiver's counsel pursuant to the January 2012 Agreement.

593.    The jury returned a verdict for $1.11 billion.  Judgment was entered against THI on July 29, 2013.

594.    Because of the evidence at trial, the statements of counsel, as well as the prior assertion of privilege, on July 31, 2013, the Townsend Estate moved to amend the judgment to add the Defendants, the parties to the January 5, 2012 Agreement, to the judgment as the real parties in interest.

595.    The Townsend Estate served the motion on counsel for the Receiver that had been appearing in the case pursuant to the 2012 Agreement and as a nominee for the Defendants.

596.    On the same day that counsel for the Receiver was served with the motion, the Defendants wrote the trial judge a letter requesting that he take no action on the Townsend Estate's motion.

597.    Based on the testimony and documentary evidence at trial, the trial judge found that the Receiver was the nominee to the sixteen parties to the 2012 Agreement and that the Defendants here were the real parties in interests.

598.    The Defendants were added to the judgment on August 2, 2013.

599.    All conditions precedent to the filing of this lawsuit have been fulfilled.

600.    Plaintiffs, the Estates of Jackson, Nunziata, Webb, Townsend, Sasser, and Jones, have standing as creditors of FLTCI and THMI, to bring claims in this proceeding, including without limitation, fraudulent transfer claims.

## COUNT I

### Trustee and THMI's Claim for Substantive Consolidation of THMI and FLTCI

601.    The Trustee and THMI incorporate by reference each and every allegation as if fully set forth herein.

602.    This Count is filed on behalf of the Debtor's Estate, for THMI, and on behalf of the creditors.

603.    In this Count, the Trustee seeks to substantively consolidate THMI into the Debtor's bankruptcy estate.

604.    There is substantial identity and unity of interests between FLTCI and THMI.

605.    On or about February 28, 2006, THIH, THI and FLTCI entered into a Stock Purchase Agreement for FLTCI's purchase of 100% of the outstanding stock of THMI (the "THMI SPA").

606.    The THMI SPA closed on March 28, 2006.

607.    FLTCI was formed just two months earlier by Troutman Sanders, LLP, who at the same time formed FLTCH for the other side of the linked transaction fully described in the Complaint.

608.    The sole shareholder of FLTCI is ostensibly Barry Saacks, an elderly graphic artist who lives in a nursing home.

609.    Mr. Saacks was listed as president of FLTCI in the THMI SPA.

610.    But, as described in more detail in the Complaint, Mr. Saacks never knew he actually owned FLTCI.

611.    Mr. Saacks had no knowledge of the formation of FLTCI or of its purchase of THMI.

612.    Mr. Saacks testified that he did not have any money in 2006 to purchase the assets of THMI, but that it did not matter because "the deal fell through."

613.    Nevertheless, FLTCI and THMI shared the same business address in Sparks, Maryland—the same business address shared by THI, THIB, THIBM, FLTCH, FAS, and FCC.

614.    FLTCI never had any officers other than Saacks.

615.    FLTCI never had any directors, employees, operations, or business.

616.    FLTCI never had a bank account, capital or assets other than the stock of THMI.

617.    FLTCI never maintained corporate formalities and became defunct shortly after the 2006 transaction.

618.    Just like FLTCI, after the 2006 transaction, THMI did not conduct any business, had no employees, maintained no corporate formalities, and became defunct shortly after the 2006 transaction.

619.    All of THMI's officers and directors resigned their positions with THMI in or before July 2006.

620.    FLTCI has admitted that "both the Debtor and THMI ceased all operations" and that "[s]ince the cessation of THMI's operations in March 2006, both the Debtor and THMI have been inactive and, out of business, and, although no steps have been taken to formally dissolve either entity, both have remained inactive." (Bankr. Doc. 40 at ¶¶ 5, 14).

621.    For several years, THMI's only activity was the defense of certain personal injury and wrongful death lawsuits, which lawsuits were controlled and directed by third parties without any authorization, input, or involvement from Saacks, FLTCI, or THMI.

622.    According to the declaratory action filed by FLTCH and FAS in the United States District Court for the Southern District of New York (the "New York Action"), neither FLTCI nor Saacks paid any money for the purchase of the stock of THMI.

623.    Instead, THIB purportedly paid to THIH the $100,000 required to be paid by FLTCI or Saacks pursuant to the THMI SPA.

624.    In the New York Action, FAS and FLTCH assert this payment from THIB was a loan to FLTCI, although the only person purportedly associated with FLTCI stated that no such loan was made.

625.    It is likely nothing was paid as consideration for THMI to be parked underneath FLTCI.

626.    In October 2006, three months after THMI's officers had all resigned and THMI's assets and employees transferred to THIBM, $35,569.40 was transferred from THMI (rather than from FLTCI) to THIB, which FLTCH and FAS claim in the New York Action was a "repayment" of the loan to FLTCI.

627.    This $35,569.40 transfer from THMI's payroll account, however, was just one of a number of payments made with THMI funds after the 2006 transaction without authorization, input, or involvement from Saacks, FLTCI, or THMI.

628.    One month after THMI was sold to FLTCI, Bradley Bennett was still writing checks on THMI accounts, paying out nearly $1.5 million in THMI funds to himself and his

colleagues, even though he and his colleagues were by then working for THIBM—not THMI.

629.    THMI's bank accounts ultimately were emptied, with THMI's remaining cash transferred to THIB.  Upon information and belief, THIB used these funds to pay THMI's trade creditors, leaving only the tort claimants as creditors of THMI.

630.    In fact, as of October 2012, nearly a year after the filing of this bankruptcy case, Saacks had never heard of THMI and had no paper work relating to THMI.

631.    Mr. Saacks testified: "Nobody ever phoned me about it…. Nobody has ever sent a piece of paper in an envelope."

632.    Testifying that he was not a signatory on any FLTCI bank accounts, Mr. Saacks stated: "How can that be if I don't know … about it?"

633.    FLTCI and THMI never had any business operations separate and apart from each other.

634.    At the Debtor's May 17, 2012 Meeting of Creditors, Abraham Backenroth, who appeared as the corporate representative for the Debtor after nominating himself as CEO pursuant to a power of attorney obtained from Mr. Saacks by FAS, testified that corporate formalities were not adhered to, attempting to excuse the failure by describing FLTCI and THMI as "a little mom and pop operation."

635.    There is no effective difference between THMI and FLTCI.

636.    Pursuant to the testimony cited above, even FLTCI's owner cannot tell the difference between the entities.

637.    The Defendants worked together to separate out the assets and liabilities of THMI by moving the operations and other assets to FLTCH and its principals and affiliates, and by moving the liabilities to a fraudulently created "holding company" with no purpose but to try to launder the liabilities of THMI.

638.    Pursuant to 11 U.S.C. §105, this Court, as a court of equity, has the power to issue any order, process or judgment necessary or appropriate to carry out the provisions of this title.

639.    This Court may look beyond the corporate form to give effect to this Court's jurisdiction under 28 U.S.C. §1334(e) and 11 U.S.C. §541.

640.    Given the identity of interest between FLTCI and THMI, it is necessary and appropriate that this Court collapse the corporate structure to administer the assets and liabilities, if any, of THMI along with the assets and liabilities of FLTCI.

641.    There is such a unity of interest and ownership between FLTCI and THMI that the independence of each corporation had, in effect, never begun, and therefore adherence to the fiction of separate identities serves only to defeat justice.

642.    As set forth herein and in the Complaint, special circumstances exist, including the creation of FLTCI as a "sham" or "dummy" corporation with no actual corporate identify separate from THMI, such that the failure to disregard the separateness of FLTCI and THMI would result in injustice.

643.    Consolidation is necessary to realize benefits to the creditors of FLTCI and THMI, and is necessary to avoid harm.

644.     Specifically, given the lack of actual and perceived separateness between FLTCI and THMI, and given the tort liabilities being determined both by this Court through the claims process and state courts through the litigation process, THMI's assets, including litigation claims, should be part of the consolidated estate and made available to the Trustee for distribution to creditors.

645.     This is now especially appropriate relief given the agreement amongst the tort claimants to share all assets ratably regardless of recovery source.

646.     Finally, even the Defendants have argued, although perhaps not directly, that the automatic stay afforded by 11 U.S.C. § 362 should bar pursuit of THMI's assets by any party other than the Trustee.

647.     The facts alleged herein and various positions of the parties throughout this case support the purpose of consolidation.

648.     Consolidation will streamline the prosecution of litigation claims and distribution of assets among all creditors, and eliminate any potential remaining question about the breadth and depth of the property of the estate.

649.     The benefits borne by consolidation offset any imaginable harm consolidation may inflict on any objecting party.  The creditors of FLTCI and THMI have agreed to share recoveries without regard to corporate distinction, and no other parties will conceivably be affected.

650.     No known creditor of FLTCI or THMI, or other interested party, relied on the separate credit or operations of either FLTCI and THMI following the 2006 transaction.

651. No known creditor of FLTCI or THMI, or other interested party, will be prejudiced by consolidation.

652. Even if such prejudice exists, it is outweighed by the benefits of consolidation.

WHEREFORE, the Trustee and THMI respectfully request this Court enter a judgment substantively consolidating THMI with and into the Debtor's bankruptcy estate, effective as of the date of entry of any judgment, and for such other and further relief as the Court may deem just and proper.

## COUNT II

### Trustee and THMI's Claim against Defendants the GTCR Group, Jannotta, and THIH for Breaches of Fiduciary Duties owed to THMI

653. The Trustee and THMI incorporate by reference each and every allegation as if fully set forth herein.

654. Directors and officers of a wholly-owned subsidiary owe fiduciary duties to the subsidiary.

655. Individuals who act in a dual capacity as directors of two corporations, one of which is the parent and the other a subsidiary, owe the same duty of good management to both corporations.

656. One who controls property of another may not intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner.

657. Jannotta owed a fiduciary duty to THMI.

658.    Similarly, the GTCR Group and THIH, as the parties controlling the officers and directors of THMI, who were similarly officers, directors or principals of the GTCR Group and THIH, owed a fiduciary duty to THMI.

659.    As fiduciaries, the GTCR Group, Jannotta, and THIH were obligated by their duty of loyalty to act in a fully informed manner, in a manner consistent with the interests of THMI, and with the highest degree of good faith.

660.    As fiduciaries, the GTCR Group, Jannotta, and THIH were also obligated by their duty of care to act at all times using the amount of care that a reasonable person would use under similar circumstances.

661.    As fiduciaries, the GTCR Group, Jannotta, and THIH were required to act on behalf of the entities they served, including THMI, and each of them failed to do so in a reasonable manner.

662.    Specifically, the GTCR Group, Jannotta, and THIH breached their fiduciary duties owed to THMI by:

    a.  Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between ABE and the THI Enterprise that included onerous above market lease terms, such as a 4% annual rent escalator as opposed to an annual escalation based upon the standard Consumer Price Index (CPI), and an EBITDA sharing agreement of 20-30%.

    b.  Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between Ventas and the THI Enterprise that included onerous terms, such as terms that restrict exit/sale options and dilute equity value.

c.  Negotiating, structuring, advising, influencing, advocating, and approving of loan agreements between Ventas and the THI Enterprise that included onerous terms, such as a 17% interest rate per term letter.

d.  Negotiating, structuring, advising, influencing, advocating, and approving of eighteen (18) forbearance agreements between GECC, Ventas, and the THI Enterprise, wherein each agreement extracted more fees, penalties, and costs for the THI Enterprise.

e.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in materially misrepresenting its financial statements in a misleading manner by overstating its revenues for the year ending December 31, 2003, by approximately $10,000,000, while understating its expenses by $25,000,000.

f.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in making illegal campaign contributions on behalf of THI and its owners, deducting those contributions as "dues and contributions" charged to Ohio Medicaid, and reimbursing its CFO for the contributions as a non-salary and non-taxable event.

g.  Negotiating, structuring, advising, influencing, advocating, and approving of the March 2006 bust out of the THI Enterprise's valuable assets, while depositing its liabilities into an asset-less shell.

h.  Claiming that the March 2006 bust out of the THI Enterprise's valuable assets was an arm's-length transaction, and failing to effectuate the March 2006 "sale" in accordance with the closing documents.

    i.   Paying bonuses to upper management of the THI Enterprise, despite the fact that the THI Enterprise was essentially insolvent and about to file for bankruptcy.

    j.   Allowing the Fundamental Enterprise to transfer monies out of THMI's bank account after the March 2006 bust out.

    k.   Structuring the managing and operating business model of the THI Enterprise in such a way as to constrain the THI Enterprise's ability to properly operate its nursing homes, resulting in numerous resident rights' lawsuits against the THI Enterprise for abuse and neglect.

663.    The actions of the GTCR Group, Jannotta, and THIH as set forth above drove, the THI Enterprise, including THMI, into insolvency.

664.    The actions of the GTCR Group, Jannotta, and THIH as set forth above, were a conscious disregard for their responsibilities to THMI, in breach of their duties owed to THMI.

665.    The actions described above were patently inequitable to THMI.  Indeed, THMI was simply plundered for the benefit of the GTCR Group, Jannotta, and THIH and to the detriment of THMI.

666.    The actions of the GTCR Group, Jannotta, and THIH as set forth above, were intentional acts that served no other purpose than to advance their own interest to the detriment of THMI.

667.    For example, the GTCR Group, Jannotta, and THIH's sole motivation for negotiating and approving of the March 2006 bust out was in order to protect their

investment in the THI Enterprise in the face of guaranteed loses in light of the fact that the GTCR Group, Jannotta, and THIH never received any sale proceeds from the "linked transactions."

668.    The GTCR Group, Jannotta, and THIH breached their fiduciary duties owed to THMI and acted with gross negligence and recklessness, by failing to investigate and inform themselves properly of the effect of the transactions and activities described above on THMI, by abdicating their decision-making authority on behalf of THMI, not acting in the best interests of THMI, and by taking the actions described above solely to benefit THIH, Jannotta, the GTCR Group, the GTCR Group's shareholders and Defendants GECC, Ventas, and the Fundamental Enterprise.

669.    The GTCR Group, Jannotta and THIH have actively concealed facts that would have put the Trustee and THMI on notice of their breaches of fiduciary duties owed to THMI. The GTCR Group, Jannotta, and THIH's breaches of their fiduciary duties owed to THMI have only recently been discovered by the Trustee and THMI through the Plaintiffs' complex and intertwined legal proceedings.

670.    THMI and THMI's creditors have been damaged by the GTCR Group, Jannotta, and THIH's breaches as set forth above by, among other things, improperly harming and diminishing the value of THMI.

WHEREFORE, the Trustee and THMI respectfully requests this Court to: (i) enter judgment in their favor in an amount to be determined at trial, which includes disgorgement of money and profits arising from the breaches of fiduciary duties and any damages as a

consequence of the breaches; (ii) awarding the Trustee and THMI their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

## COUNT III

### Plaintiffs' Claim against Defendants the GTCR Group, Jannotta, and THIH for Breaches of Fiduciary Duties owed to THMI's Creditors

671.    The Plaintiffs incorporate by reference each and every allegation as if fully set forth herein.

672.    Directors and officers of a wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors.

673.    Individuals who act in a dual capacity as directors of two corporations, one of which is the parent and the other a subsidiary, owe the same duty of good management to both corporations.

674.    One who controls property of another may not intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner.

675.    Directors and officers of an insolvent corporation must consider the interests of the corporation's creditors who are owed more than the corporation has the ability to pay.

676.    Corporate fiduciaries are required to exercise their duty for the benefit of all those who may have an interest in an insolvent company.

677.    Jannotta, as a board member of THIH, THI, and THMI owed fiduciary duties to THMI's creditors.

678.     Similarly, the GTCR Group and THIH, as the parties controlling the officers and directors of THIH, THI and THMI, who were similarly officers, directors or principals of the GTCR Group, owed fiduciary duties to THMI's creditors.

679.     According to the GTCR Group, THIH, and Jannotta's complaint, THI along with its subsidiaries, including THMI, were insolvent as early as 2003. The insolvency of the THI Enterprise, including THMI, reinforces the fact that Jannotta, THIH, and the GTCR Group owed fiduciary duties to THMI's creditors.

680.     As fiduciaries, the GTCR Group, Jannotta, and THIH were obligated by their duty of loyalty to act in a fully informed manner, in a manner consistent with the interests of THMI's creditors, and with the highest degree of good faith.

681.     As fiduciaries, the GTCR Group, Jannotta, and THIH were also obligated by their duty of care to act at all times using the amount of care that a reasonable person would use under similar circumstances.

682.     As fiduciaries, the GTCR Group, Jannotta, and THIH were required to act on behalf of the entities they served, including THMI, and each of them failed to do so in a reasonable manner.

683.     Specifically, the GTCR Group, Jannotta, and THIH breached their fiduciary duties owed to THMI's creditors by:

    a.   Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between ABE and the THI Enterprise that included onerous above market lease terms, such as a 4% annual rent escalator as opposed to an

annual escalation based upon the standard Consumer Price Index (CPI), and an EBITDA sharing agreement of 20-30%.

b.   Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between Ventas and the THI Enterprise that included onerous terms, such as terms that restrict exit/sale options and dilute equity value.

c.   Negotiating, structuring, advising, influencing, advocating, and approving of loan agreements between Ventas and the THI Enterprise that included onerous terms, such as a 17% interest rate per term letter.

d.   Negotiating, structuring, advising, influencing, advocating, and approving of eighteen (18) forbearance agreements between GECC, Ventas, and the THI Enterprise, wherein each agreement extracted more fees, penalties, and costs for the THI Enterprise.

e.   Influencing, advocating, and approving of the THI Enterprise's improper conduct in materially misrepresenting its financial statements in a misleading manner by overstating its revenues for the year ending December 31, 2003, by approximately $10,000,000, while understating its expenses by $25,000,000.

f.   Influencing, advocating, and approving of the THI Enterprise's improper conduct in making illegal campaign contributions on behalf of THI and its owners, deducting those contributions as "dues and contributions" charged to Ohio Medicaid, and reimbursing its CFO for the contributions as a non-salary and non-taxable event.

116

g.  Negotiating, structuring, advising, influencing, advocating, and approving of the March 2006 bust out of the THI Enterprise's valuable assets, while depositing its liabilities into an asset-less shell.

h.  Claiming that the March 2006 bust out of the THI Enterprise's valuable assets was an arm's-length transaction, and failing to effectuate the March 2006 "sale" in accordance with the closing documents.

i.  Paying bonuses to upper management of the THI Enterprise, despite the fact that the THI Enterprise was essentially insolvent and about to file for bankruptcy.

j.  Allowing the Fundamental Enterprise to transfer monies out of THMI's bank account after the March 2006 bust out.

k.  Structuring the managing and operating business model of the THI Enterprise in such a way as to constrain the THI Enterprise's ability to properly operate its nursing homes, resulting in numerous resident rights' lawsuits against the THI Enterprise for abuse and neglect.

684.    The actions of the GTCR Group, Jannotta, and THIH as set forth above drove, the THI Enterprise, including THMI, into insolvency.

685.    The actions of the GTCR Group, Jannotta, and THIH as set forth above, were a conscious disregard for their responsibilities to THMI's creditors, in breach of their duties owed to THMI.

686.    The actions described above were patently inequitable to THMI's creditors. Indeed, THMI was simply plundered for the benefit of the GTCR Group, Jannotta, and THIH and to the detriment of THMI's creditors.

687.    The actions of the GTCR Group, Jannotta, and THIH as set forth above, were intentional acts that served no other purpose than to advance their own interest to the detriment of THMI's creditors.

688.    For example, the GTCR Group, Jannotta, and THIH's sole motivation for negotiating and approving of the March 2006 bust out was in order to protect their investment in the THI Enterprise in the face of guaranteed loses in light of the fact that the GTCR Group, Jannotta, and THIH never received any sale proceeds from the "linked transactions."

689.    The GTCR Group, Jannotta, and THIH breached their fiduciary duties owed to THMI's creditors and acted with gross negligence and recklessness, by failing to investigate and inform themselves properly of the effect of the transactions and activities described above on THMI's creditors, by abdicating their decision-making authority on behalf of THMI, not acting in the best interests of THMI's creditors, and by taking the actions described above solely to benefit THIH, Jannotta, the GTCR Group, the GTCR Group's shareholders and Defendants GECC, Ventas, and the Fundamental Enterprise.

690.    The GTCR Group, Jannotta and THIH have actively concealed facts that would have put the Plaintiffs on notice of their breaches of fiduciary duties owed to THMI's creditors. The GTCR Group, Jannotta, and THIH's breaches of their fiduciary duties owed to

THMI's creditors have only recently been discovered by the Plaintiffs through their complex and intertwined legal proceedings.

691.    THMI's creditors, such as the Plaintiffs here, have been damaged by the GTCR Group, Jannotta, and THIH's breaches as set forth above by, among other things, improperly harming and diminishing the value of THMI.

WHEREFORE, the Plaintiffs respectfully request this Court to: (i) enter judgment in their favor in an amount to be determined at trial, which includes disgorgement of money and profits arising from the breaches of fiduciary duties and any damages as a consequence of the breaches; (ii) awarding Plaintiffs their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

## COUNT IV

### Trustee and THMI's Claim against Defendants the GTCR Group, Jannotta, and THIH for Aiding and Abetting Breaches of Fiduciary Duties owed to THMI

692.    The Trustee and THMI incorporate by reference each and every allegation as if fully set forth herein.

693.    A party may be liable for aiding and abetting breaches of fiduciary duties if a non-fiduciary's knowing participation in the breach can be reasonably inferred.

694.    Knowing participation only requires that the non-fiduciary act with knowledge that the conduct advocated or assisted constitutes a breach.

695.    If and to the extent the GTCR Group, Jannotta, or THIH are found not to have owed a fiduciary duties to THMI, in the alternative, the GTCR Group, Jannotta, and THIH are liable for substantially and knowingly participating in, inducing, encouraging, substantially assisting, and/or aiding or abetting the breaches of fiduciary duties committed

by one or more of the officers and directors of THMI owing such fiduciary duties to THMI, by:

a. Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between ABE and the THI Enterprise that included onerous above market lease terms, such as a 4% annual rent escalator as opposed to an annual escalation based upon the standard Consumer Price Index (CPI), and an EBITDA sharing agreement of 20-30%.

b. Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between Ventas and the THI Enterprise that included onerous terms, such as terms that restrict exit/sale options and dilute equity value.

c. Negotiating, structuring, advising, influencing, advocating, and approving of loan agreements between Ventas and the THI Enterprise that included onerous terms, such as a 17% interest rate per term letter.

d. Negotiating, structuring, advising, influencing, advocating, and approving of eighteen (18) forbearance agreements between GECC, Ventas, and the THI Enterprise, wherein each agreement extracted more fees, penalties, and costs for the THI Enterprise.

e. Influencing, advocating, and approving of the THI Enterprise's improper conduct in materially misrepresenting its financial statements in a misleading manner by overstating its revenues for the year ending December 31, 2003, by approximately $10,000,000, while understating its expenses by $25,000,000.

f.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in making illegal campaign contributions on behalf of THI and its owners, deducting those contributions as "dues and contributions" charged to Ohio Medicaid, and reimbursing its CFO for the contributions as a non-salary and non-taxable event.

g.  Negotiating, structuring, advising, influencing, advocating, and approving of the March 2006 bust out of the THI Enterprise's valuable assets, while depositing its liabilities into an asset-less shell.

h.  Claiming that the March 2006 bust out of the THI Enterprise's valuable assets was an arm's-length transaction, and failing to effectuate the March 2006 "sale" in accordance with the closing documents.

i.  Paying bonuses to upper management of the THI Enterprise, despite the fact that the THI Enterprise was essentially insolvent and about to file for bankruptcy.

j.  Allowing the Fundamental Enterprise to transfer monies out of THMI's bank account after the March 2006 bust out.

k.  Structuring the managing and operating business model of the THI Enterprise in such a way as to constrain the THI Enterprise's ability to properly operate its nursing homes, resulting in numerous resident rights' lawsuits against the THI Enterprise for abuse and neglect.

696.    The GTCR Group, Jannotta, and THIH were aware of the fiduciary's wrongful actions, yet advocated, participated, and approved of such actions.

697. The actions of the GTCR Group, Jannotta, and THIH as set forth above, served no other purpose than to advance their own interest.

698. By aiding and abetting the breaches of their fiduciary duties owed to THMI, the GTCR Group, Jannotta, and THIH damaged THMI by, among other things, improperly harming and diminishing the value of THMI.

699. The GTCR Group, Jannotta and THIH have actively concealed facts that would have put the Trustee and THMI on notice of their aiding and abetting breaches of fiduciary duties owed to THMI. The GTCR Group, Jannotta, and THIH's aiding and abetting breaches of fiduciary duties owed to THMI have only recently been discovered by the Trustee and THMI through the Plaintiffs' complex and intertwined legal proceedings.

WHEREFORE, the Trustee and THMI respectfully request this Court to: (i) enter judgment in their favor in an amount to be determined at trial, which includes disgorgement of money and profits arising from the breaches of fiduciary duties and any damages as a consequence of the breaches; (ii) awarding the Trustee and THMI their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

## COUNT V

### Plaintiffs' Claim against Defendants the GTCR Group, Jannotta, and THIH for Aiding and Abetting Breaches of Fiduciary Duties owed to THMI's Creditors

700. The Plaintiffs incorporate by reference each and every allegation as if fully set forth herein.

701. A party may be liable for aiding and abetting breaches of fiduciary duties if a non-fiduciary's knowing participation in the breach can be reasonably inferred.

702.    Knowing participation only requires that the non-fiduciary act with knowledge that the conduct advocated or assisted constitutes a breach.

703.    If and to the extent the GTCR Group, Jannotta, or THIH are found not to have owed a fiduciary duties to THMI's creditors, in the alternative, the GTCR Group, Jannotta, and THIH are liable for substantially and knowingly participating in, inducing, encouraging, substantially assisting, and/or aiding or abetting the breaches of fiduciary duties committed by one or more of the officers and directors of THMI owing such fiduciary duties to THMI's creditors, by:

> a.   Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between ABE and the THI Enterprise that included onerous above market lease terms, such as a 4% annual rent escalator as opposed to an annual escalation based upon the standard Consumer Price Index (CPI), and an EBITDA sharing agreement of 20-30%.
>
> b.   Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between Ventas and the THI Enterprise that included onerous terms, such as terms that restrict exit/sale options and dilute equity value.
>
> c.   Negotiating, structuring, advising, influencing, advocating, and approving of loan agreements between Ventas and the THI Enterprise that included onerous terms, such as a 17% interest rate per term letter.
>
> d.   Negotiating, structuring, advising, influencing, advocating, and approving of eighteen (18) forbearance agreements between GECC, Ventas, and the THI

Enterprise, wherein each agreement extracted more fees, penalties, and costs for the THI Enterprise.

e.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in materially misrepresenting its financial statements in a misleading manner by overstating its revenues for the year ending December 31, 2003, by approximately $10,000,000, while understating its expenses by $25,000,000.

f.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in making illegal campaign contributions on behalf of THI and its owners, deducting those contributions as "dues and contributions" charged to Ohio Medicaid, and reimbursing its CFO for the contributions as a non-salary and non-taxable event.

g.  Negotiating, structuring, advising, influencing, advocating, and approving of the March 2006 bust out of the THI Enterprise's valuable assets, while depositing its liabilities into an asset-less shell.

h.  Claiming that the March 2006 bust out of the THI Enterprise's valuable assets was an arm's-length transaction, and failing to effectuate the March 2006 "sale" in accordance with the closing documents.

i.  Paying bonuses to upper management of the THI Enterprise, despite the fact that the THI Enterprise was essentially insolvent and about to file for bankruptcy.

j.  Allowing the Fundamental Enterprise to transfer monies out of THMI's bank account after the March 2006 bust out.

k.   Structuring the managing and operating business model of the THI Enterprise in such a way as to constrain the THI Enterprise's ability to properly operate its nursing homes, resulting in numerous resident rights' lawsuits against the THI Enterprise for abuse and neglect.

704.   The GTCR Group, Jannotta, and THIH were aware of the fiduciary's wrongful actions, yet advocated, participated, and approved of such actions.

705.   The actions of the GTCR Group, Jannotta, and THIH as set forth above, served no other purpose than to advance their own interest.

706.   THMI's creditors, such as the Plaintiffs here, have been damaged by the GTCR Group, Jannotta, and THIH's aiding and abetting breaches as set forth above by, among other things, improperly harming and diminishing the value of THMI.

707.   The GTCR Group, Jannotta and THIH have actively concealed facts that would have put the Plaintiffs on notice of their aiding and abetting breaches of fiduciary duties owed to THMI's creditors. The GTCR Group, Jannotta, and THIH's aiding and abetting breaches of fiduciary duties owed to THMI's creditors have only recently been discovered by the Plaintiffs through their complex and intertwined legal proceedings.

WHEREFORE, the Plaintiffs respectfully request this Court to: (i) enter judgment in their favor in an amount to be determined at trial, which includes disgorgement of money and profits arising from the breaches of fiduciary duties and any damages as a consequence of the breaches; (ii) awarding Plaintiffs their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

## COUNT VI

## Trustee and THMI's Claim against Defendants GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron for Aiding and Abetting Breaches of Fiduciary Duties owed to THMI

708.    The Trustee and THMI incorporate by reference each and every allegation as if fully set forth herein.

709.    A party may be liable for aiding and abetting breaches of fiduciary duties if a non-fiduciary's knowing participation in the breach can be reasonably inferred.

710.    Knowing participation only requires that the non-fiduciary act with knowledge that the conduct advocated or assisted constitutes a breach.

711.    The GTCR Group, Jannotta, and THIH, and in the alternative, THMI's directors, and/or managers, breached their fiduciary duties to THMI– including their duties of loyalty, care and good faith – and acted with gross negligence and recklessness by:

    a.    Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between ABE and the THI Enterprise that included onerous above market lease terms, such as a 4% annual rent escalator as opposed to an annual escalation based upon the standard Consumer Price Index (CPI), and an EBITDA sharing agreement of 20-30%.

    b.    Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between Ventas and the THI Enterprise that included onerous terms, such as terms that restrict exit/sale options and dilute equity value.

c.  Negotiating, structuring, advising, influencing, advocating, and approving of loan agreements between Ventas and the THI Enterprise that included onerous terms, such as a 17% interest rate per term letter.

d.  Negotiating, structuring, advising, influencing, advocating, and approving of eighteen (18) forbearance agreements between GECC, Ventas, and the THI Enterprise, wherein each agreement extracted more fees, penalties, and costs for the THI Enterprise.

e.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in materially misrepresenting its financial statements in a misleading manner by overstating its revenues for the year ending December 31, 2003, by approximately $10,000,000, while understating its expenses by $25,000,000.

f.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in making illegal campaign contributions on behalf of THI and its owners, deducting those contributions as "dues and contributions" charged to Ohio Medicaid, and reimbursing its CFO for the contributions as a non-salary and non-taxable event.

g.  Negotiating, structuring, advising, influencing, advocating, and approving of the March 2006 bust out of the THI Enterprise's valuable assets, while depositing its liabilities into an asset-less shell.

h.  Claiming that the March 2006 bust out of the THI Enterprise's valuable assets was an arm's-length transaction, and failing to effectuate the March 2006 "sale" in accordance with the closing documents.

i.   Paying bonuses to upper management of the THI Enterprise, despite the fact that the THI Enterprise was essentially insolvent and about to file for bankruptcy.

j.   Allowing the Fundamental Enterprise to transfer monies out of THMI's bank account after the March 2006 bust out.

k.   Structuring the managing and operating business model of the THI Enterprise in such a way as to constrain the THI Enterprise's ability to properly operate its nursing homes, resulting in numerous resident rights' lawsuits against the THI Enterprise for abuse and neglect.

712.   GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron were aware of the fiduciary's wrongful actions, yet aided, abetted, induced, encouraged, substantially assisted, and/or participated in the breaches of fiduciary duties by, among other things, pressuring, threatening, and requiring the GTCR Group, Jannotta, and THIH, or in the alternative, THMI's directors, and/or managers, to negotiate, direct, and approve of the actions described above.

713.   The actions of the GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron as set forth above, served no other purpose than to advance their own interest.

714.   By aiding and abetting the breaches of their fiduciary duties owed to THMI, GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron damaged THMI by, among other things, improperly harming and diminishing the value of THMI.

715.   GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron have actively concealed facts that would have put the Trustee and THMI on notice of their aiding

and abetting breaches of fiduciary duties owed to THMI. GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron's aiding and abetting breaches of fiduciary duties owed to THMI have only recently been discovered by the Trustee and THMI through the Plaintiffs' complex and intertwined legal proceedings.

WHEREFORE, the Trustee and THMI respectfully request this Court to: (i) enter judgment in their favor in an amount to be determined at trial, which includes disgorgement of money and profits arising from the breaches of fiduciary duties and any damages as a consequence of the breaches; (ii) awarding the Trustee and THMI their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

## COUNT VII

### Plaintiffs' Claim against Defendants GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron for Aiding and Abetting Breaches of Fiduciary Duties owed to THMI's Creditors

716.   The Plaintiffs incorporate by reference each and every allegation as if fully set forth herein.

717.   A party may be liable for aiding and abetting breaches of fiduciary duties if a non-fiduciary's knowing participation in the breach can be reasonably inferred.

718.   Knowing participation only requires that the non-fiduciary act with knowledge that the conduct advocated or assisted constitutes a breach.

719.   The GTCR Group, Jannotta, and THIH, and in the alternative, THMI's directors, and/or managers, breached their fiduciary duties to THMI's creditors – including their duties of loyalty, care and good faith – and acted with gross negligence and recklessness by:

a.  Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between ABE and the THI Enterprise that included onerous above market lease terms, such as a 4% annual rent escalator as opposed to an annual escalation based upon the standard Consumer Price Index (CPI), and an EBITDA sharing agreement of 20-30%.

b.  Negotiating, structuring, advising, influencing, advocating, and approving of a lease agreement between Ventas and the THI Enterprise that included onerous terms, such as terms that restrict exit/sale options and dilute equity value.

c.  Negotiating, structuring, advising, influencing, advocating, and approving of loan agreements between Ventas and the THI Enterprise that included onerous terms, such as a 17% interest rate per term letter.

d.  Negotiating, structuring, advising, influencing, advocating, and approving of eighteen (18) forbearance agreements between GECC, Ventas, and the THI Enterprise, wherein each agreement extracted more fees, penalties, and costs for the THI Enterprise.

e.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in materially misrepresenting its financial statements in a misleading manner by overstating its revenues for the year ending December 31, 2003, by approximately $10,000,000, while understating its expenses by $25,000,000.

f.  Influencing, advocating, and approving of the THI Enterprise's improper conduct in making illegal campaign contributions on behalf of THI and its owners, deducting those contributions as "dues and contributions" charged to

Ohio Medicaid, and reimbursing its CFO for the contributions as a non-salary and non-taxable event.

g.  Negotiating, structuring, advising, influencing, advocating, and approving of the March 2006 bust out of the THI Enterprise's valuable assets, while depositing its liabilities into an asset-less shell.

h.  Claiming that the March 2006 bust out of the THI Enterprise's valuable assets was an arm's-length transaction, and failing to effectuate the March 2006 "sale" in accordance with the closing documents.

i.  Paying bonuses to upper management of the THI Enterprise, despite the fact that the THI Enterprise was essentially insolvent and about to file for bankruptcy.

j.  Allowing the Fundamental Enterprise to transfer monies out of THMI's bank account after the March 2006 bust out.

k.  Structuring the managing and operating business model of the THI Enterprise in such a way as to constrain the THI Enterprise's ability to properly operate its nursing homes, resulting in numerous resident rights' lawsuits against the THI Enterprise for abuse and neglect.

720.    GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron were aware of the fiduciary's wrongful actions, yet aided, abetted, induced, encouraged, substantially assisted, and/or participated in the breaches of fiduciary duties by, among other things, pressuring, threatening, and requiring the GTCR Group, Jannotta, and THIH, or in the

alternative, THMI's directors, and/or managers, to negotiate, direct, and approve of the actions described above.

721.    The actions of GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron as set forth above, served no other purpose than to advance their own interest.

722.    THMI's creditors, such as the Plaintiffs here, have been damaged by GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron's aiding and abetting breaches as set forth above by, among other things, improperly harming and diminishing the value of THMI.

723.    GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron have actively concealed facts that would have put the Plaintiffs on notice of their aiding and abetting breaches of fiduciary duties owed to THMI's creditors. GECC, Ventas, FAS, THIB, FLTCH, Forman, Grunstein, and Schron's aiding and abetting breaches of fiduciary duties owed to THMI's creditors have only recently been discovered by the Plaintiffs through their complex and intertwined legal proceedings.

WHEREFORE, the Plaintiffs respectfully request this Court to: (i) enter judgment in their favor in an amount to be determined at trial, which includes disgorgement of money and profits arising from the breaches of fiduciary duties and any damages as a consequence of the breaches; (ii) awarding Plaintiffs their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

## COUNT VIII

### Declaratory Judgment – THI, THMI, and FLTCI Successor Liability against Defendants FAS, FLTCH, THIB, Forman, Grunstein, and Schron (Fundamental Enterprise)

724.     The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

725.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

726.     The Plaintiffs seek a declaratory judgment that:

    a.   the Fundamental Enterprise is a mere continuation of the THI Enterprise;

    b.   the merger of the THI Enterprise into the Fundamental Enterprise was a *de facto* merger;

    c.   that the 2006 transaction wherein the stock and liabilities of THMI were sold to FLTCI and the assets of the THI Enterprise were sold to FLTCH was a fraudulent effort to avoid the liabilities of the THI Enterprise; or

    d.   that the Fundamental Enterprise is liable for the debt and liabilities of the THI Enterprise, including Plaintiffs' claims and judgments, as successors-in-interests.

727.     "The declaration sought herein deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts and is not sought merely as an advisory opinion or propounded from curiosity.

728.      There exists a real, actual and justiciable controversy between the parties that warrants the seeking of a declaratory judgment.  As a result of the efforts of the Fundamental Enterprise to fraudulently transfer assets to avoid liabilities, the Plaintiffs, the Trustee, and

THMI are left only with a liability ridden shell to satisfy the Plaintiffs' claims against THI, THMI, and FLTCI. There is thus a *bona fide* need for a declaration as the Fundamental Enterprise has repeatedly disclaimed successor liability for THI, THMI, and FLTCI.

729.    The Court's issuance of declaratory relief in this case will settle the controversy between the parties and will serve a useful purpose in clarifying the liability of the Fundamental Enterprise for the debt and liabilities of the THI Enterprise and FLTCI.

730.    The Fundamental Enterprise used the THI Enterprise for the improper purpose of avoiding liability for resident right suits, defrauding creditors of the THI Enterprise, and saddling FLTCI and THMI with massive debt.

731.    On March 28, 2006, in a fraudulent effort to avoid liabilities of the THI Enterprise, the Fundamental Enterprise completed two linked transactions wherein all of the assets of the THI Enterprise (including THI and THMI) were fraudulently transferred to the newly created Fundamental Enterprise for much less than market value.

732.    But, the liabilities of the THI Enterprise, along with the stock of THMI, were transferred to a shell company created for the sole purpose of holding such liabilities and defrauding the creditors.

733.    The March 28, 2006 Bust Out was planned, structured, and executed by the Fundamental Enterprise with full knowledge of the pending litigation, including the Plaintiffs' claims against the THI Enterprise.

734.    The March 28, 2006 Bust Out was aimed at the improper purpose of securing the assets of the THI Enterprise free and clear of existing liabilities and debt.

735.    The March 28, 2006 Bust Out was done with an intent to hinder, delay, or defraud the creditors of the THI Enterprise, including the Plaintiffs.

736.    After the transfers of assets, the Fundamental Enterprise used the former THI and THMI assets to continue in the same business as the THI Enterprise.

737.    The March 28, 2006 Bust Out constituted a fraudulent effort by the Fundamental Enterprise to avoid liabilities of the THI Enterprise.

738.    After the March 28, 2006 Bust Out, there was a clear continuity and consolidation of business from the THI Enterprise to the Fundamental Enterprise as evidenced by the following indicia:

a. the Fundamental Enterprise is in the same business as the THI Enterprise of operating and managing nursing homes throughout Florida, Pennsylvania and other states;

b. the Fundamental Enterprise uses the same management as the THI Enterprise in that  the former executive officers of the THI Enterprise became the executive officers of the Fundamental Enterprise on March 28, 2006;

c. the Fundamental Enterprise uses the same employees who perform the same tasks, job functions, and work under substantially the same working functions, as they did when employed by the THI Enterprise;

d. the Fundamental Enterprise operates out of the same building and office location as the THI Enterprise;

e. the Fundamental Enterprise uses the same office and computer equipment as the THI Enterprise;

f.  the Fundamental Enterprise uses the same phone number as the THI Enterprise;

g.  the Fundamental Enterprise uses the same logo as the THI Enterprise;

h.  the Fundamental Enterprise assumed control over the website of THI which is virtually indistinguishable from the THI and THMI website, with only a change to the site's name;

i.  the Fundamental Enterprise assumed the THI employee retirement and benefit plans including Medical, Pharmacy, Dental, Vision, Disability and Life Insurance benefits;

j.  the Fundamental Enterprise assumed the THI Enterprise's national contracts, including Pharmacy providers and IT, food service, and medical supply vendors;

k.  the Fundamental Enterprise acquired all of the assets of the THI Enterprise by virtue of the March 28, 2006 Bust Out;

l.  the Fundamental Enterprise concealed its acquisition of the THI Enterprise by virtue  of the March 28, 2006 Bust Out from Plaintiffs, creditors, courts, the Trustee, and THMI;

m.  the Fundamental Enterprise assumed control of the oversight of THI litigation nationwide; and

n.  the THI Enterprise ceased to operate and exist shortly after the March 28, 2006 transactions.

739.     The Fundamental Enterprise is nothing more than a "new hat" for the THI Enterprise, a change only in name but not in substance.

740.     After the March 2006 Bust Out, the result was the same core management employees associated with the THI Enterprise continued to manage the same homes, now as part of the Fundamental family, from the same offices in Sparks, Maryland, just under different corporate names.

741.     Literally overnight, the Fundamental Enterprise kick-started operations immediately upon the transformation from the THI Enterprise to the Fundamental Enterprise; received THMI's assets for no consideration; employed the same people; serviced the same customers; engaged in the same business using the same equipment; occupied the same office space; and used the same receptionist, all to defraud THMI's creditors.

742.     The Fundamental Enterprise is a reincarnation of the THI Enterprise under a different name.  The Fundamental Enterprise was a "relay-style passing of the baton" from the THI Enterprise.

743.     The March 28, 2006 Bust Out described above constitutes a *de facto* merger wherein the Fundamental Enterprise, consisting of FLTCH, FAS, and THIB, was absorbed by the THI Enterprise as it shared a continuity of management, personnel, assets, location, and equipment.

744.     The Fundamental Enterprise, consisting of FLTCH, FAS, and THIB, is a continuation and successor of the THI Enterprise as it shared a continuity of management, personnel, assets, location, and equipment.

745.    The March 28, 2006 Bust Out caused injustice to the Plaintiffs, the Trustee and THMI by moving the valuable assets of the THI Enterprise into newly created "clean" companies within the Fundamental Enterprise and saddling the shell legacy companies with massive liabilities.

746.    As a result of the improper and fraudulent March 28, 2006 Bust Out, the Plaintiffs are unable to collect billions of dollars in judgments against THI and THMI.

747.    As a result of the improper and fraudulent March 28, 2006 Bust Out, the Trustee and THMI are saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) the Fundamental Enterprise is a mere continuation of the THI Enterprise; (2) the merger of the THI Enterprise into the Fundamental Enterprise was a *de facto* merger; (3) the 2006 Bust Out wherein the stock and liabilities of THMI were sold to FLTCI and the assets of the THI Enterprise were sold to FLTCH was a fraudulent effort to avoid the liabilities of the THI Enterprise; or that (4) the Fundamental Enterprise is liable for the debt and liabilities of the THI Enterprise, including Plaintiffs' claims and judgments, as successors-in-interests.

## COUNT IX

### Declaratory Judgment – Piercing the Corporate Veil of THI and THMI against Defendants GTCR Group, Jannotta, and THIH

748.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

749.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

750.    The Plaintiffs, Trustee, and THMI seek a declaratory judgment that the Defendants GTCR Group, Jannotta, and THIH are liable for the debts of THI and THMI such that it would be proper to pierce the corporate veils.

751.    The declaration sought herein deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts and is not sought merely as an advisory opinion or propounded from curiosity.

752.    There exists a real, actual and justiciable controversy between the parties that warrants the seeking of a declaratory judgment.  As a result of the Defendants GTCR Group, Jannotta, and THIH's efforts to misuse THI and THMI for an improper purpose of avoiding and defeating their liabilities, the Plaintiffs, the Trustee, and THMI are left only with a liability ridden shell to satisfy the Plaintiffs' claims against THI and THMI.

753.    There is thus a *bona fide* need for a declaration as the Defendants GTCR Group, THIH, and Jannotta have repeatedly disclaimed liability for THI and THMI.

754.    The Court's issuance of declaratory relief in this case will settle the controversy between the parties and will serve a useful purpose in clarifying the Defendants GTCR Group, THIH, and Jannotta's liability for the debt and liabilities of THI and THMI.

755.    As described in detail above, the GTCR Group, THIH, and Jannotta exercised complete dominion and control over THI and THMI such that they effectively own THI and THMI.

756.    The Defendants GTCR Group, THIH, and Jannotta dominated and controlled THI and THMI to the extent that their independence was, in fact, non-existent.

757.    The Defendants GTCR Group, THIH, and Jannotta organized and used THI and THMI to perpetrate a fraud upon the creditors and to mislead the creditors, including the Plaintiffs, the Trustee, and THMI.

758.    The Defendants GTCR Group, THIH, and Jannotta deliberately used THI and THMI for the fraudulent and improper purpose of looting the assets of THI and THMI and concealing them in newly created companies to avoid THI and THMI liabilities and debt and defraud creditors.

759.    To conceal the Defendants GTCR Group, THIH, and Jannotta's fraudulent and improper use of THI and THMI, Defendants caused THMI to become defunct shortly after the transfer of its assets, placed THI in a Maryland receivership to avoid federal bankruptcy scrutiny of the fraudulent asset transfers, abused process and committed frauds on numerous state courts, and entered into a January 5, 2012 Agreement whereby Defendants agreed to fund the defense of THI and THMI through the January 5, 2012 Agreement and purchase the defense of THI and THMI, their attorney-client and work product doctrine rights, and any and all claims, causes of action and choses in action that THI and THMI have against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel.

760.    The Defendants GTCR Group, THIH, and Jannotta's misuse of THI and THMI caused injury to the Plaintiffs, the Trustee, and THMI by liquidating the THI and THMI assets, concealing the assets in newly created entities, and leaving behind only a liability-ridden shell to satisfy the Plaintiffs' tort claims against THI and THMI.

761.    The Defendants GTCR Group, THIH, and Jannotta deliberately engaged in improper conduct in the use of THI and THMI which caused injury to the Plaintiffs, the Trustee, and THMI.

762.    The injury suffered by each Plaintiff is personal to that Plaintiff and is not the type suffered by general creditors. To date, Plaintiffs have each been delayed, hindered, and/or defrauded in their ability to prosecute their tort actions and collect on duly obtained final judgments against THI and THMI.

763.    To date, the Jackson Estate has not collected its final and non-appealable judgment against FLTCI in the amount of $110 million entered on July 10, 2010.

764.    To date, the Jackson Estate has not collected its final and non-appealable judgment against THI and THMI in the amount of $110 million entered on September 13, 2011.

765.    To date, the Nunziata Estate has not collected its final judgment against THMI in the amount of $200 million, entered on January 11, 2012.

766.    To date, the Townsend Estate has not collected its final judgment against THI in the amount of $1.1 billion, entered on July 29, 2013.

767.    To date, the Webb Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI.

768.    The Sasser Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI commenced on September 6, 2006.

769.    The Jones Estate has been hindered, delayed, and defrauded in its ability to prosecute her tort action against THI and THMI, commenced on March 20, 2006.

770.    The Defendants GTCR Group, THIH, and Jannotta's misconduct in delaying, hindering, and defrauding creditors of THI and THMI was specifically directed at the Plaintiffs' claims.

771.    In further efforts to delay, hinder, and defraud the Plaintiff creditors, the Trustee, and THMI, Defendants GTCR Group, THIH, and Jannotta took active steps to conceal their relationship with THI and THMI.  They each presented a "public face" and "private face."

772.    Publicly, the GTCR Group claimed to be a passive investor.

773.    Privately, however, as correspondence and emails have revealed, Defendants the GTCR Group, Jannotta, and THIH are closely aligned in discussing litigation strategy and directing litigation against THI and THMI behind-the-scenes, despite having no authority to represent or speak on behalf of THMI.

774.    In addition, Defendants GTCR Group, Jannotta, and THIH entered into a joint venture agreement, directed specifically at the Plaintiff creditors, wherein they have purchased the defense of THI and THMI, agreed to fund THI and THMI's defense, purchased their attorney-client privilege and work product doctrine rights, and purchased any and all claims of THI and THMI against the Plaintiffs and the Plaintiffs' counsel.

775.    Defendants have further agreed that the Receiver will act as the nominee and continue in efforts to defeat the Plaintiffs' claims on behalf of the Defendants the GTCR Group, Jannotta, and THIH.

776.    A Polk County Circuit Court recently found that based on the testimony and documentary evidence at trial, the Receiver was the nominee to the sixteen parties to the

January 2012 Agreement and that the Defendants were the real parties in interests.   The Defendants were added to the judgment as the real parties in interest on August 2, 2013.

777.    Piercing of the corporate veil under the facts alleged above is necessary to prevent injustice in this case.

778.    THIH controlled THI and THMI to such extent that THI and THMI did not have an independent existence from THIH.

WHEREFORE, the Plaintiffs, Trustee, and THMI seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) under the facts alleged, it is necessary to pierce the corporate veil of THI and THMI to the GTCR Group, Jannotta, and THIH to prevent injustice;   (2) Defendants used THI and THMI for a fraudulent and improper purpose which caused injury to the Plaintiffs, the Trustee, and THMI; and that (3) the Defendants GTCR Group, Jannotta, and THIH are liable for the debts and liabilities of THI and THMI.

## COUNT X

### Declaratory Judgment – Piercing the Corporate Veil of FLTCI against Defendants FAS, THIB, FLTCH, Forman, Grunstein, and Schron (Fundamental Enterprise)

779.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

780.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

781.    The Plaintiffs, Trustee, and THMI seek a declaratory judgment that the Fundamental Enterprise is liable for the debts of FLTCI such that it would be proper to pierce the corporate veil of the Fundamental Enterprise.

782. The declaration sought herein deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts and is not sought merely as an advisory opinion or propounded from curiosity.

783. There exists a real, actual and justiciable controversy between the parties that warrants the seeking of a declaratory judgment. As a result of the Fundamental Enterprise's efforts to misuse FLTCI for an improper purpose of avoiding and defeating THI and THMI liabilities, the Plaintiffs, the Trustee, and THMI are left only with a liability ridden shell to satisfy the Plaintiffs' claims against FLTCI.

784. There is thus a *bona fide* need for a declaration as the Fundamental Entities have repeatedly disclaimed liability for FLTCI.

785. The Court's issuance of declaratory relief in this case will settle the controversy between the parties and will serve a useful purpose in clarifying the Fundamental Enterprises' liability for the debt and liabilities of FLTCI.

786. As described in detail above, the Fundamental Enterprise exercised complete dominion and control over FLTCI such that the Fundamental Enterprise owned FLTCI.

787. The Fundamental Enterprise dominated and controlled FLTCI to the extent that its independence was, in fact, non-existent.

788. The Fundamental Enterprise used FLTCI to perpetrate a fraud upon the creditors and to mislead the Trustee, THMI, and the creditors, including the Plaintiffs.

789. The Fundamental Enterprise deliberately used FLTCI for the fraudulent and improper purpose of looting the assets of THI and THMI and concealing them in newly created companies to avoid THI and THMI liabilities and debt and defraud creditors.

790.    To conceal the Fundamental Enterprise's fraudulent and improper use of FLTCI, the Fundamental Enterprise caused FLTCI to become defunct shortly after the March 28, 2006 Bust Out, placed THI in a Maryland receivership to avoid federal bankruptcy scrutiny of the fraudulent asset transfers, abused process and committed frauds on numerous state courts, and entered into a January 5, 2012 Agreement whereby Defendants agreed to fund the defense of THI and THMI through the January 5, 2012 Agreement and purchase the defense of THI and THMI, their attorney-client and work product doctrine rights, and any and all claims, causes of action and choses in action that THI and THMI have against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel.

791.    The Fundamental Enterprise's misuse of FLTCI caused injury to the Plaintiffs, the Trustee, and THMI by liquidating the THI and THMI assets, concealing the assets in newly created entities, and leaving FLTCI behind as only a liability-ridden shell to satisfy the Plaintiffs' tort claims against THI and THMI.

792.    The Fundamental Enterprise deliberately engaged in improper conduct in the use of FLTCI which caused injury to the Plaintiffs, the Trustee, and THMI.

793.    To date, Plaintiffs have each been delayed, hindered, and/or defrauded in their ability to prosecute their tort actions and collect on duly obtained final judgments against FLTCI.

794.    To date, the Jackson Estate has not collected its final and non-appealable judgment against FLTCI in the amount of $110 million entered on July 10, 2010.

795.    The Trustee and THMI were injured by the improper use of FLTCI because FLTCI is now saddled with a $110 million liability that is final and unappealable.

796.    The Fundamental Enterprise's misconduct in delaying, hindering, and defrauding creditors of THI and THMI was specifically directed at the Plaintiffs' claims.

797.    Piercing of the corporate veil under the facts alleged above is necessary to prevent injustice in this case.

WHEREFORE, the Plaintiffs, Trustee, and THMI seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) under the facts alleged, it is necessary to pierce the corporate veil of FLTCI to the Fundamental Enterprise; (2) the Fundamental Enterprise used FLTCI for a fraudulent and improper purpose which caused injury to the Plaintiffs, the Trustee, and THMI; and that (3) the Fundamental Enterprise is liable for the debts and liabilities of FLTCI.

## COUNT XI

### Declaratory Judgment – Alter Ego of THI and THMI against Defendants FAS, THIB, FLTCH, Forman, Grunstein, and Schron (Fundamental Enterprise)

798.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

799.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

800.    As discussed above, the Fundamental Enterprise exercised complete domination and control over THI and THMI and acted as the owners of THI and THMI, to such extent that THI and THMI had no separate mind, will, or independent existence.

801.    The Fundamental Enterprise was closely affiliated, commonly owned, and functioned as a single Enterprise with THI and THMI.

802.    The Fundamental Enterprise disregarded the corporate formalities of THI and THMI.

803.    THI and THMI were but mere instrumentalities and conduits through which the Fundamental Enterprise conspired to dump the liabilities of THI and THMI and transfer the THI and THMI assets to the Fundamental Enterprise to avoid THI and THMI liability and debt.

804.    The Fundamental Enterprise used its complete domination and control to improperly and fraudulently strip THI and THMI of their assets, transfer the assets to the newly formed Fundamental Enterprise, and leave THI and THMI as shell entities to defraud creditors, in contravention of the rights of the Plaintiffs, the Trustee, and THMI.

805.    The Plaintiffs, the Trustee, and THMI were injured by the improper use of the Fundamental Enterprise's complete domination and control of THI and THMI.

806.    To date, Plaintiffs have each been delayed, hindered, and/or defrauded in their ability to prosecute their tort actions and collect on duly obtained final judgments against THI and THMI.

807.    To date, the Jackson Estate has not collected its final and non-appealable judgment against THI and THMI in the amount of $110 million entered on September 13, 2011.

808.    To date, the Nunziata Estate has not collected its final judgment against THMI in the amount of $200 million, entered on January 11, 2012.

809.    To date, the Townsend Estate has not collected its final judgment against THI in the amount of $1.1 billion, entered on July 29, 2013.

810.    To date, the Webb Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI.

811.    The Sasser Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI commenced on September 6, 2006.

812.    The Jones Estate has been hindered, delayed, and defrauded in its ability to prosecute her tort action against THI and THMI, commenced on March 20, 2006.

813.    The Trustee and THMI were saddled with billions of dollars in liability as a result of the Fundamental Enterprise's improper and fraudulent use of its complete domination and control over THI and THMI.

814.    The March 28, 2006 transactions directed and implemented by the Fundamental Enterprise left THI and THMI undercapitalized and unable to pay the outstanding liability and debt.

815.    In further efforts to delay, hinder, and defraud the Plaintiff creditors, the Trustee, and THMI, the Fundamental Enterprise took active steps to conceal their relationship with THI and THMI.  They presented a "public face" and "private face."

816.    Publicly, Defendant FAS claimed that its only relationship with THI and THMI was as provider of back office services to THI approximately four years prior. Privately, however, FAS directed and controlled the defense of THI and THMI in litigation around the country, including the Plaintiffs' litigation from at least 2006 to the present.  FAS also claimed that it had no connection to FLTCI.

817.    According to the Receiver, "Fundamental hired counsel and had [defense counsel] enter an appearance for THMI  . . .  under the Receiver's auspices, and that was just plain wrong."  It was "at Fundamental's direction [that] pleadings were filed on behalf of [THMI]" and "part of [FAS'] litigation strategy [was] to protect THMI."

818.    Florida and Pennsylvania state courts have found that FAS and its agents or employees orchestrated the defense of the THI defendants, but deliberately chose to withhold relevant information regarding its relationship with the THI defendants.

819.    While FAS had previously terminated its relationship with THI and the Maryland receivership on account of a "conflict of interest" on March 30, 2011, and returned monies paid to it, FAS entered into a joint venture agreement on January 5, 2012, directed solely at the Plaintiff creditors, wherein it purchased the defense of THI and THMI, their attorney-client privilege and work product doctrine rights, and purchased any and all claims of THI and THMI  against the Plaintiffs and the Plaintiffs' counsel.

820.    Pursuant to the joint venture agreement, FAS controls and directs the defense of THI and nominated the Receiver to act on behalf of the Defendants and continue in efforts to defeat the Plaintiffs' claims. Yet, FAS continues to denounce any relationship with THI and THMI.

821.    The Fundamental Enterprise has further agreed that the Receiver will act as the nominee and continue in efforts to defeat the Plaintiffs' claims on the Fundamental Enterprise's behalf.

822.    A Polk County Circuit Court recently found that based on the testimony and documentary evidence at trial, the Receiver was the nominee to the sixteen parties to the January 2012 Agreement and that the Defendants were the real parties in interests.  The Defendants were added to the judgment as the real parties in interest on August 2, 2013.

823.    A finding of alter ego liability against the Fundamental Enterprise under the facts alleged above is necessary to prevent injustice in this case. If the acts of THI and THMI

described above are treated as the acts of THI and THMI alone, an inequitable result will follow.

WHEREFORE, the Plaintiffs, Trustee, and THMI seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) under the facts alleged, the Fundamental Enterprise is the alter ego of THI and THMI; (2) the Fundamental Enterprise used THI and THMI for a fraudulent and improper purpose causing injury to the Plaintiffs, the Trustee, and THMI; and that (3) the Fundamental Enterprise is liable for the debts and liabilities of THI and THMI as alter egos.

## COUNT XII

### Declaratory Judgment – Alter Ego of THI and THMI against Defendants the GTCR Group, Jannotta, and THIH

824.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

825.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

826.    As discussed above, the GTCR Group, Jannotta, and THIH exercised complete domination and control over THI and THMI and acted as the owners of THI and THMI, to such extent that THI and THMI had no separate mind, will, or independent existence.

827.    The GTCR Group, Jannotta, and THIH were closely affiliated, commonly owned, and functioned as a single Enterprise with THMI and THI.

828.    The GTCR Group, Jannotta, and THIH disregarded the corporate formalities of THI and THMI.

829.    THI and THMI were but mere instrumentalities and conduits through which the GTCR Group, Jannotta, and THIH conspired to dump the liabilities of THI and THMI and transfer the THI and THMI assets to the Fundamental Enterprise to avoid THI and THMI liability and debt.

830.    The GTCR Group, Jannotta, and THIH used their complete domination and control to fraudulently strip THI and THMI of their assets, transfer the assets to the newly formed Fundamental Enterprise, and leave THI and THMI as shell entities to defraud creditors, in contravention to the rights of the Plaintiffs, the Trustee, and THMI.

831.    The Plaintiffs, Trustee, and THMI were injured by the improper and fraudulent use of the GTCR Group, Jannotta, and THIH's complete domination and control of THI and THMI.

832.    While the creditors of THI and THMI were left with asset-less shells, the GTCR Group, Jannotta, and THIH gained an economic advantage by reducing inevitable losses and maximizing their return on investment.

833.    The March 28, 2006 transactions directed and implemented by the GTCR Group, Jannotta, and THIH left THI and THMI undercapitalized and unable to pay the outstanding liability and debt.

834.    To date, Plaintiffs have each been delayed, hindered, and/or defrauded in their ability to prosecute their tort actions and collect on duly obtained final judgments against THI and THMI.

835.    To date, the Jackson Estate has not collected its final and non-appealable judgment against THI and THMI in the amount of $110 million entered on September 13, 2011.

836.    To date, the Nunziata Estate has not collected its final judgment against THMI in the amount of $200 million, entered on January 11, 2012.

837.    To date, the Townsend Estate has not collected its final judgment against THI in the amount of $1.1 billion, entered on July 29, 2013.

838.    To date, the Webb Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI.

839.    The Sasser Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI commenced on September 6, 2006.

840.    The Jones Estate has been hindered, delayed, and defrauded in its ability to prosecute her tort action against THI and THMI, commenced on March 20, 2006.

841.    The Trustee and THMI were saddled with billions of dollars in liability as a result of the GTCR Group, Jannotta, and THIH's improper and fraudulent use of its complete domination and control over THI and THMI.

842.    A finding of alter ego liability against the GTCR Group, Jannotta, and THIH under the facts alleged above is necessary to prevent injustice in this case. If the acts of THI and THMI described above are treated as the acts of THI and THMI alone, an inequitable result will follow.

WHEREFORE, the Plaintiffs, Trustee, and THMI seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) under the facts alleged, the

GTCR Group, Jannotta, and THIH are the alter egos of THI and THMI; (2) the GTCR Group, Jannotta, and THIH used THI and THMI for a fraudulent and improper purpose causing injury to the Plaintiffs, the Trustee, and THMI; and that (3) the GTCR Group, Jannotta, and THIH is liable for the debts and liabilities of THI and THMI as alter egos.

### COUNT XIII

### Declaratory Judgment – Alter Ego of THI and THMI against Defendant GECC

843.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

844.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

845.    As discussed above, GECC exercised complete domination and control over THI and THMI and acted as the owners of THI and THMI, to such extent that THI and THMI had no separate mind, will, or independent existence.

846.    GECC was closely affiliated and functioned as a single Enterprise with THI and THMI.

847.    GECC disregarded the corporate formalities of THI and THMI.

848.    THI and THMI were but mere instrumentalities and conduits through which GECC unlawfully extracted millions of dollars in additional onerous fees and interest from THI and THMI, conspired to dump the liabilities of THI and THMI and transfer the THI and THMI assets to the Fundamental Enterprise.

849.    GECC used its complete domination and control to fraudulently strip THI and THMI of their assets, transfer the assets to the newly formed Fundamental Enterprise, and

leave THI and THMI as shell entities to defraud creditors and avoid the debts and liability of THI and THMI.

850.    The March 28, 2006 transactions directed and implemented by GECC left THI and THMI undercapitalized and unable to pay the outstanding liability and debt, including Plaintiffs' claims and judgments.

851.    The Plaintiffs, Trustee, and THMI were injured by the improper and fraudulent use of the GTCR Group, Jannotta, and THIH's complete domination and control of THI and THMI.

852.    While the creditors of THI and THMI were left with asset-less shells, GECC gained an economic advantage by reducing inevitable losses and maximizing their return on investment.

853.    The March 28, 2006 transactions directed and implemented by GECC undercapitalized and unable to pay the outstanding liability and debt.

854.    To date, Plaintiffs have each been delayed, hindered, and/or defrauded in their ability to prosecute their tort actions and collect on duly obtained final judgments against THI and THMI.

855.    To date, the Jackson Estate has not collected its final and non-appealable judgment against THI and THMI in the amount of $110 million entered on September 13, 2011.

856.    To date, the Nunziata Estate has not collected its final judgment against THMI in the amount of $200 million, entered on January 11, 2012.

857. To date, the Townsend Estate has not collected its final judgment against THI in the amount of $1.1 billion, entered on July 29, 2013.

858. To date, the Webb Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI.

859. The Sasser Estate has been hindered, delayed, and defrauded in its ability to prosecute a tort action against THI and THMI commenced on September 6, 2006.

860. The Jones Estate has been hindered, delayed, and defrauded in its ability to prosecute her tort action against THI and THMI, commenced on March 20, 2006.

861. The Trustee and THMI were saddled with billions of dollars in liability as a result of GECC's improper and fraudulent use of its complete domination and control over THI and THMI.

862. A finding of alter ego liability against GECC under the facts alleged above is necessary to prevent injustice in this case. If the acts of THI and THMI described above are treated as the acts of THI and THMI alone, an inequitable result will follow.

WHEREFORE, the Plaintiffs, Trustee, and THMI seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, adjudging that: (1) under the facts alleged, GECC is the alter ego of THI and THMI; (2) GECC used THI and THMI for a fraudulent and improper purpose causing injury to the Plaintiffs, the Trustee, and THMI; and that (3) GECC is liable for the debts and liabilities of THI and THMI as alter egos.

## COUNT XIV

**Plaintiffs' Claim against Defendants FLTCH, FAS, THIB, Forman, Grunstein, and Schron for Actual Fraudulent Transfers**

863.    The Plaintiffs incorporate by reference each and every allegation as if fully set forth herein.

864.    This is an action for equitable or statutory relief pursuant to Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), *et seq.*, and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq.*, all of which contain substantially similar elements.

865.    The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

866.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron are "insiders" and/or "affiliates" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

867.    Continuing to this day, FLTCH, FAS, THIB, Forman, Grunstein, and Schron, have actively concealed the fraudulent transfers identified herein, their full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of FLTCH, FAS, THIB, Forman, Grunstein, and Schron's involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

868.    A transfer made by a debtor is fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

869.    In determining actual intent, consideration may be given to the following factors: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made incurred; and (10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

870.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron, fraudulently transferred or caused to be transferred the assets of the THI Enterprise with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs.

## A. The 2006 Fraudulent Transfers

871.    Starting in 2006, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred to themselves the employees, management, and operations of the THI Enterprise for approximately $10,000,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

872.    The price paid by FLTCH, FAS, THIB, Forman, Grunstein, and Schron, paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

873.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron's sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that they could receive the THI Enterprise's assets free and clear of any liabilities, and then use the assets under the Fundamental Enterprise in order to generate hundreds of millions of dollars in revenue over the years.

874.    As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

875.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following factors: (1) the 2006 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets of the THI Enterprise; (3) the 2006 transfers were not disclosed and were concealed from creditors and others; (4) the 2006 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (5) the 2006 transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (6) the 2006 transfers were of substantially all of the THI Enterprise's assets; (7) the value of the consideration received by the THI Enterprise was not reasonably equivalent to the value of the asset transferred; (8) THMI and FLTCI simply vanished by the end of 2006; (9) THMI

ceased to have any employees, management, or operations as an effect of the 2006 transfers; and (10) THMI was rendered insolvent as an effect of the 2006 transfers.

876.    The Plaintiffs have been harmed and continue to be harmed by the actions of FLTCH, FAS, THIB, Forman, Grunstein, and Schron in that, as a direct and proximate result of the 2006 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

**B.  The 2012 Fraudulent Transfers**

877.    In 2012, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise.

878.    The THI Receiver also unlawfully settled with FLTCH, FAS, THIB, Forman, Grunstein, and Schron any and all claims that THI has or may have against FLTCH, FAS, THIB, Forman, Grunstein, and Schron.

879.    The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to FLTCH, FAS, THIB, Forman, Grunstein, and Schron and assigned THI's rights under the attorney-client privilege and the work-product doctrine to FLTCH, FAS, THIB, Forman, Grunstein, and Schron. FLTCH, FAS, THIB, Forman, Grunstein, and Schron were also granted access to all of THI's books and records.

880.    These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims.  Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

881.    These claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.

882.    The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.  Courts routinely set aside transfers in court approved agreements when they are fraudulent. *See Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

883.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron's sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

884.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the

2012 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets; (3) the 2012 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (4) the 2012 transfers were of substantially all of the THI Enterprise's remaining assets; (5) the value of the consideration received was not reasonably equivalent to the value of the assets transferred; and (6) the THI Enterprise was insolvent at the time of the 2012 transfers.

885.    The Plaintiffs have been harmed and continue to be harmed by the actions of FLTCH, FAS, THIB, Forman, Grunstein, and Schron in that, as a direct and proximate result of the 2012 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

WHEREFORE, the Plaintiffs respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in Plaintiffs' favor in an amount to be determined at trial; (iii) award Plaintiffs their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XV

### Plaintiffs' Claim against Defendants FLTCH, FAS, THIB, Forman, Grunstein, and Schron for Constructive Fraudulent Transfers

886.    The Plaintiffs incorporate by reference each and every allegation as if fully set forth herein.

887.    This is an action for equitable or statutory relief pursuant to Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq*., the Unif.

Fraudulent Transfer Act § 1, (1984), *et seq*., and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq*., Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq*., and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq*., all of which contain substantially similar elements.

888.    The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

889.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron are "insiders" and/or "affiliates" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

890.    Continuing to this day, FLTCH, FAS, THIB, Forman, Grunstein, and Schron, have actively concealed the fraudulent transfers identified herein, their full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of FLTCH, FAS, THIB, Forman, Grunstein, and Schron's involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

891.    A constructive fraudulent transfer occurs when a debtor makes a transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor: (i) was engaged or was about to engage in a business for which the remaining assets of the debtor were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

892.   FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused the assets of the THI Enterprise to be transferred without the THI Enterprise receiving equivalent value in exchange for the transfers when the THI Enterprise was engaged in a business for which its remaining assets were unreasonably small in relation to its business, and when the THI Enterprise was incurring debts beyond its ability to pay as they became due.

### A.  The 2006 Fraudulent Transfers

893.   Starting in 2006, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred to themselves the employees, management, and operations of the THI Enterprise for approximately $10,000,000, which was far less than the reasonably equivalent value of the transferred assets.

894.   The price paid by FLTCH, FAS, THIB, Forman, Grunstein, and Schron, paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

895.   FLTCH, FAS, THIB, Forman, Grunstein, and Schron knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

896.   FLTCH, FAS, THIB, Forman, Grunstein, and Schron also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse

suffered at nursing homes operated by the THI Enterprise.  Despite this knowledge, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

897.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron's sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that they could receive the THI Enterprise's assets free and clear of any liabilities, and then use the assets under the Fundamental Enterprise in order to generate hundreds of millions of dollars in revenue over the years.

898.    As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

899.    The fraudulently transferred assets of the THI Enterprise in 2006 could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

900.    As a direct and proximate result of the 2006 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of FLTCH, FAS, THIB, Forman, Grunstein, and Schron in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

**B.  The 2012 Fraudulent Transfers**

901.    In 2012, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action

that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, which was less than the reasonably equivalent value of the transferred assets.

902.    The THI Receiver also unlawfully settled with FLTCH, FAS, THIB, Forman, Grunstein, and Schron any and all claims that THI has or may have against FLTCH, FAS, THIB, Forman, Grunstein, and Schron.

903.    The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to FLTCH, FAS, THIB, Forman, Grunstein, and Schron and assigned THI's rights under the attorney-client privilege and the work-product doctrine to FLTCH, FAS, THIB, Forman, Grunstein, and Schron. FLTCH, FAS, THIB, Forman, Grunstein, and Schron were also granted access to all of THI's books and records.

904.    These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims.  Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

905.    The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.  Courts routinely set aside transfers in court approved agreements when they are fraudulent. *See Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

906.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron's sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

907.    These transferred claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.  As such, the fraudulently transferred assets of the THI Enterprise in 2012 could have been applicable to the payment of the debts due to the Plaintiffs.

908.    FLTCH, FAS, THIB, Forman, Grunstein, and Schron knew that the THI Enterprise was facing claims by the Plaintiffs here.  Despite this knowledge, FLTCH, FAS, THIB, Forman, Grunstein, and Schron transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts due to the Plaintiffs here.

909.    As a result of the 2006 transfers, the Plaintiffs as creditors of the THI Enterprise have been left without any recourse since the remaining assets of the THI Enterprise have been stripped away.

910.    As a direct and proximate resulted of the 2012 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of FLTCH, FAS, THIB, Forman, Grunstein, and Schron in that, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

WHEREFORE, the Plaintiffs respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in Plaintiffs' favor in an amount to be determined at trial; (iii) award Plaintiffs their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XVI

## Actual Fraudulent Transfers against Defendants the GTCR Group, Jannotta, and THIH

911.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

912.    This is an action for equitable or statutory relief pursuant to 11 U.S.C. § 544(b) and § 550(a), Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), *et seq.*, and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq.*, all of which contain substantially similar elements.

913.    The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

914.    The GTCR Group, Jannotta, and THIH are "insiders" and/or "affiliates" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

915.    Continuing to this day, the GTCR Group, Jannotta, and THIH, have actively concealed the fraudulent transfers identified herein, their full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of the GTCR Group, Jannotta, and THIH's involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

916.    A transfer made by a debtor is fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

917.    In determining actual intent, consideration may be given to the following factors: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made incurred; and (10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

918.    The GTCR Group, Jannotta, and THIH, fraudulently transferred or caused to be transferred the assets of the THI Enterprise with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs.

### A. The Fraudulent Transfers in the Form of Exorbitant Interest and Fees Paid the GTCR Group, Jannotta and THIH

919.    The GTCR Group, Jannotta, and THIH transferred or caused to be transferred the assets of the THI Enterprise to themselves with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

920.    Specifically, the GTCR Group, Jannotta, and THIH received exorbitant interest and fee payments on their loans and investments to the THI Enterprise.

921.    These payments were made when the GTCR Group, Jannotta, and THIH knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

922.    Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, the GTCR Group, Jannotta, and THIH forced the THI Enterprise to continue to enter into forbearance agreements in order to receive exorbitant interest and fee payments.

923.    The GTCR Group, Jannotta, and THIH knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

924.     The GTCR Group, Jannotta, and THIH also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.  Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

925.     It is inappropriate for a secured lender, such as GECC and Ventas, to behave in the manner they did in light of the fact that they knew the THI Enterprise was in dire straits and patient care was suffering.

926.     The GTCR Group, Jannotta, and THIH's sole purpose and motive for these exorbitant interest and fee payments was to further their own benefit to the detriment of the THI Enterprise's creditors.

927.     The GTCR Group, Jannotta, and THIH caused the THI Enterprise to make these exorbitant interest and fee payments with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

928.     The GTCR Group, Jannotta, and THIH's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the transfers of the THI Enterprise's assets were to insiders; (2) the transfers of the THI Enterprise's assets were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (3) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (4) the transfers were of substantially all of the THI Enterprise's assets; (5) the THI Enterprise was

rendered insolvent as an effect of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

929.    The Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the these fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

930.    The Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the these fraudulent transfers of the THI Enterprise's assets, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**B.  The 2005 Fraudulent Transfers**

931.    In 2005, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the assets of the THI Enterprise in the form of forced sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

932.    Specifically, in 2005, the GTCR Group, Jannotta, and THIH forced the THI Enterprise to sell approximately twenty outpatient centers for approximately $5,600,000. The GTCR Group, Jannotta, and THIH also forced the THI Enterprise to sell off five THI facilities in Ohio for $5,500,000.

933.    At the time of the forced sales, the GTCR Group, Jannotta, and THIH knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was

unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

934.    Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, the GTCR Group, Jannotta, and THIH forced the THI Enterprise sell off its facilities in order to maximize their profits in the face of guaranteed loses.

935.    The GTCR Group, Jannotta, and THIH's sole purpose and motive for these forced sales was to further their own benefit to the detriment of the THI Enterprise's creditors.

936.    The GTCR Group, Jannotta, and THIH caused the THI Enterprise to effectuate these sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

937.    The GTCR Group, Jannotta, and THIH's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the 2005 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (2) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (3) the THI Enterprise was essentially insolvent at the time of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

938.    The Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2005 fraudulent transfers of THI and THMI assets, the Plaintiffs have been hindered, delayed, or

defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

939.    The Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2005 fraudulent transfers of the THI Enterprise's assets, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### C.  The 2006 Fraudulent Transfers

940.    In 2006, with actual intent to hinder, delay, or defraud creditors of the GTCR Group, Jannotta, and THIH transferred or caused to be transferred to FLTCH, FAS, THIB, Forman, Grunstein, and Schron the employees, management, and operations of the THI Enterprise for approximately $10,000,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

941.    The price paid by FLTCH, FAS, THIB, Forman, Grunstein, and Schron, paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

942.    The GTCR Group, Jannotta, and THIH's sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that they could maximize their profits in the face of guaranteed loses.

943.    As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

944.    The GTCR Group, Jannotta, and THIH's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following factors: (1) the 2006 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets of the THI Enterprise; (3) the 2006 transfers were not disclosed and were concealed from creditors and others; (4) the 2006 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (5) the 2006 transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (6) the 2006 transfers were of substantially all of the THI Enterprise's assets; (7) the value of the consideration received by the THI Enterprise was not reasonably equivalent to the value of the asset transferred; (8) THMI and FLTCI simply vanished by the end of 2006; (9) THMI ceased to have any employees, management, or operations as an effect of the 2006 transfers; and (10) THMI was rendered insolvent as an effect of the 2006 transfers.

945.    The Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2006 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

946.    The Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2006 fraudulent transfers of the THI Enterprise's assets, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### D.  The 2007 and 2008 Fraudulent Transfers

947.    In 2007 and 2008, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the assets of the THI Enterprise in the form of forced sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

948.    Specifically, in 2007, the GTCR Group, Jannotta, and THIH forced the THI Enterprise to sell a THI entity for approximately $4,700,000.

949.    In addition, in 2008, the GTCR Group, Jannotta, and THIH forced the THI Enterprise to sell the remaining THI Enterprise's properties, with the exception of a Maryland facility GECC executives described as a "toxic dump," for approximately $47,579,195.

950.    At the time of these forced sales, the GTCR Group, Jannotta, and THIH knew that the THI Enterprise was essentially insolvent, was unable to provide its nursing home residents with proper care, and was facing numerous resident rights' lawsuits for abuse and neglect.

951.    Rather than allow the THI Enterprise to properly file for bankruptcy, the GTCR Group, Jannotta, and THIH forced the THI Enterprise to effectuate these forced sales in order to maximize their profits in the face of guaranteed loses.

952.    The GTCR Group, Jannotta, and THIH's sole purpose and motive for these forced sales were to further their own benefit to the detriment of the THI Enterprise's creditors.

953.    The GTCR Group, Jannotta, and THIH caused the THI Enterprise to effectuate these sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

954.    The GTCR Group, Jannotta, and THIH's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (2) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (3) the THI Enterprise was essentially insolvent at the time of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

955.    The Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2007 and 2008 fraudulent transfers of THI and THMI assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

956.    The Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2007 and 2008 fraudulent transfers of the THI Enterprise's assets, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**E.  The 2012 Fraudulent Transfers**

957.    In 2012, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may

have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise.

958.   The THI Receiver also unlawfully settled with the GTCR Group, Jannotta, and THIH any and all claims that THI has or may have against the GTCR Group, Jannotta, and THIH.

959.   The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to the GTCR Group, Jannotta, and THIH and assigned THI's rights under the attorney-client privilege and the work-product doctrine to the GTCR Group, Jannotta, and THIH. The GTCR Group, Jannotta, and THIH were also granted access to all of THI's books and records.

960.   These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims.  Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

961.    These claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.

962.    The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.  Courts routinely set aside transfers in court approved agreements when they are fraudulent. S*ee Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

963.    The GTCR Group, Jannotta, and THIH's sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

964.    The GTCR Group, Jannotta, and THIH's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the 2012 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets; (3) the 2012 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (4) the 2012 transfers were of substantially all of the THI Enterprise's remaining assets; (5) the value of the consideration received was not reasonably equivalent to the value of the assets transferred; and (6) the THI Enterprise was insolvent at the time of the 2012 transfers.

965.    The Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2012 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed,

or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

966.    The Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, as a direct and proximate result of the 2012 fraudulent transfers of the THI Enterprise's assets, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in favor of the Plaintiffs, Trustee, and THMI, in an amount to be determined at trial; (iii) award the Plaintiffs, Trustee, and THMI their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XVII

## Constructive Fraudulent Transfers against Defendants the GTCR Group, Jannotta, and THIH

967.    The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

968.    This is an action for equitable or statutory relief pursuant to 11 U.S.C. § 544(b) and § 550(a), Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), *et seq.*, and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act,

N.Y. Debtor and Creditor Law § 270, (2013), *et seq*., all of which contain substantially similar elements.

969.    The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

970.    The GTCR Group, Jannotta, and THIH are "insiders" and/or "affiliates" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

971.    Continuing to this day, the GTCR Group, Jannotta, and THIH, have actively concealed the fraudulent transfers identified herein, their full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of the GTCR Group, Jannotta, and THIH's involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

972.    A constructive fraudulent transfer occurs when a debtor makes a transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor: (i) was engaged or was about to engage in a business for which the remaining assets of the debtor were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

973.    The GTCR Group, Jannotta, and THIH transferred or caused the assets of the THI Enterprise to be transferred without the THI Enterprise receiving equivalent value in exchange for the transfers when the THI Enterprise was engaged in a business for which its

remaining assets were unreasonably small in relation to its business, and when the THI Enterprise was incurring debts beyond its ability to pay as they became due.

### A. The Fraudulent Transfers in the Form of Exorbitant Interest and Fees Paid to the GTCR Group, Jannotta, and THIH

974.   The GTCR Group, Jannotta, and THIH transferred or caused to be transferred the assets of the THI Enterprise to themselves without the THI Enterprise receiving reasonably equivalent value in exchange for the transfers.

975.   Specifically, the GTCR Group, Jannotta, THIH received exorbitant interest and fee payments on their loans and investments.

976.   These payments were made when the GTCR Group, Jannotta, and THIH knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

977.   Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, the GTCR Group, Jannotta, and THIH forced the THI Enterprise to continue to enter into forbearance agreements in order to receive exorbitant interest and fee payments.

978.   The GTCR Group, Jannotta, and THIH knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.   Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

979.    The GTCR Group, Jannotta, and THIH also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.  Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

980.    It is inappropriate for a secured lender, such as GECC and Ventas, to behave in the manner they did in light of the fact that they knew the THI Enterprise was in dire straits and patient care was suffering.

981.    The GTCR Group, Jannotta, and THIH's sole purpose and motive for these exorbitant interest and fee payments was to further their own benefit to the detriment of the THI Enterprise's creditors.

982.    The fraudulently transferred assets of the THI Enterprise in the form of exorbitant interest and fee payments could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

983.    As a direct and proximate result of these fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

984.    As a direct and proximate result of the 2005 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**B.  The 2006 Fraudulent Transfers**

985.    Starting in 2006, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred to FLTCH, FAS, THIB, Forman, Grunstein, and Schron the employees, management, and operations of the THI Enterprise for approximately $10,000,000, which was far less than the reasonably equivalent value of the transferred assets.

986.    The price paid paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

987.    The GTCR Group, Jannotta, and THIH knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

988.    The GTCR Group, Jannotta, and Schron also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.  Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

989.    The GTCR Group, Jannotta, and THIH's sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that they could maximize their profits in the face of guaranteed loses.

990.    As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

991.    The fraudulently transferred assets of the THI Enterprise in 2006 could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

992.    As a direct and proximate result of the 2006 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH, in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

993.    As a direct and proximate result of the 2006 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### C.  The 2012 Fraudulent Transfers

994.    In 2012, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, which was less than the reasonably equivalent value of the transferred assets.

995.    The THI Receiver also unlawfully settled with the GTCR Group, Jannotta, and THIH and all claims that THI has or may have against the GTCR Group, Jannotta, and THIH.

996.    The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to the GTCR Group, Jannotta, and THIH and assigned THI's rights under the attorney-client privilege and the work-product doctrine to the GTCR Group, Jannotta, and THIH. The GTCR Group, Jannotta, and THIH were also granted access to all of THI's books and records.

997.    These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims.   Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

998.    The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.   Courts routinely set aside transfers in court approved agreements when they are fraudulent. S*ee Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

999.   The GTCR Group, Jannotta, and THIH's sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

1000.   These transferred claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.  As such, the fraudulently transferred assets of the THI Enterprise in 2012 could have been applicable to the payment of the debts due to the Plaintiffs.

1001.   The GTCR Group, Jannotta, and THIH knew that the THI Enterprise was facing claims by the Plaintiffs here.  Despite this knowledge, the GTCR Group, Jannotta, and THIH transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts due to the Plaintiffs here.

1002.   As a result of the 2006 transfers, the Plaintiffs as creditors of the THI Enterprise have been left without any recourse since the remaining assets of the THI Enterprise have been stripped away.

1003.   As a direct and proximate resulted of the 2012 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1004.   As a direct and proximate result of the 2012 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of the GTCR Group, Jannotta, and THIH in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in favor of the Plaintiffs, Trustee, and THMI, in an amount to be determined at trial; (iii) award the Plaintiffs, Trustee, and THMI their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XVIII

### Actual Fraudulent Transfers against Defendant GECC

1005.   The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

1006.   This is an action for equitable or statutory relief pursuant to 11 U.S.C. § 544(b) and § 550(a), Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), *et seq.*, and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq.*, all of which contain substantially similar elements.

1007.   The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1008.   GECC is an "insider" and/or "affiliate" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

187

1009.   Continuing to this day, GECC has actively concealed the fraudulent transfers identified herein, its full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of GECC's involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

1010.   A transfer made by a debtor is fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

1011.   In determining actual intent, consideration may be given to the following factors: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made incurred; and (10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

1012.   GECC fraudulently transferred or caused to be transferred the assets of the THI Enterprise with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs.

### A. The Fraudulent Transfers in the Form of Exorbitant Interest and Fees Paid to GECC

1013.   GECC transferred or caused to be transferred the assets of the THI Enterprise to itself with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

1014.   Specifically, on a loan of $55 million, GECC received approximately $21.5 million in the form of exorbitant interest and fee payments.

1015.   These payments were made when GECC knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

1016.   Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, GECC forced the THI Enterprise to continue to enter into forbearance agreements in order to receive exorbitant interest and fee payments.

1017.   It is inappropriate for a secured lender, such as GECC, to behave in the manner it did in light of the fact that GECC knew the THI Enterprise was in dire straits and patient care was suffering.

1018.   GECC's sole purpose and motive for these exorbitant interest and fee payments was to further its own benefit to the detriment of the THI Enterprise's creditors.

1019.   GECC caused the THI Enterprise to make these exorbitant interest and fee payments with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1020.  GECC's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the transfers of the THI Enterprise's assets were to insiders; (2) the transfers of the THI Enterprise's assets were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (3) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (4) the transfers were of substantially all of the THI Enterprise's assets; (5) the THI Enterprise was rendered insolvent as an effect of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

1021.  The Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that, as a direct and proximate result of the these fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1022.  As a direct and proximate result of the fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**B.  The 2005 Fraudulent Transfers**

1023.  In 2005, GECC transferred or caused to be transferred the assets of the THI Enterprise in the form of forced sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

1024.  Specifically, in 2005, GECC directed and approved of the THI Enterprise selling approximately twenty outpatient centers for approximately $5,600,000. GECC also

directed and approved of the THI Enterprise selling five THI facilities in Ohio for $5,500,000.

1025.   At the time of the forced sales, GECC knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

1026.   Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, GECC directed and approved of the forced sales in order to maximize their profits in the face of guaranteed loses.

1027.   GECC's sole purpose and motive for directing and approving of these forced sales was to further its own benefit to the detriment of the THI Enterprise's creditors.

1028.   GECC caused the THI Enterprise to effectuate these sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1029.   GECC's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the 2005 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (2) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (3) the THI Enterprise was essentially insolvent at the time of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

1030.   The Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that, as a direct and proximate result of the 2005 fraudulent transfers of THI and

THMI assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1031.   As a direct and proximate result of the 2005 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### C.  The 2006 Fraudulent Transfers

1032.   In 2006, with actual intent to hinder, delay, or defraud creditors of GECC transferred or caused to be transferred to FLTCH, FAS, THIB, Forman, Grunstein, and Schron the employees, management, and operations of the THI Enterprise for approximately $10,000,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1033.   The price paid by FLTCH, FAS, THIB, Forman, Grunstein, and Schron, paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

1034.   GECC's sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that it could maximize its profits in the face of guaranteed loses.

1035.   As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

1036.   GECC's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following factors: (1) the 2006 transfers of the THI

Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets of the THI Enterprise; (3) the 2006 transfers were not disclosed and were concealed from creditors and others; (4) the 2006 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (5) the 2006 transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (6) the 2006 transfers were of substantially all of the THI Enterprise's assets; (7) the value of the consideration received by the THI Enterprise was not reasonably equivalent to the value of the asset transferred; (8) THMI and FLTCI simply vanished by the end of 2006; (9) THMI ceased to have any employees, management, or operations as an effect of the 2006 transfers; and (10) THMI was rendered insolvent as an effect of the 2006 transfers.

1037.   The Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that, as a direct and proximate result of the 2006 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1038.   As a direct and proximate result of the 2006 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**D.  The 2007 and 2008 Fraudulent Transfers**

1039.   In 2007 and 2008, GECC transferred or caused to be transferred the assets of the THI Enterprise in the form of forced sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

1040.   Specifically, in 2007, GECC directed and approved of the THI Enterprise selling a THI entity for approximately $4,700,000.

1041.   In addition, in 2008, GECC directed and approved of the THI Enterprise selling its remaining properties, with the exception of a Maryland facility GECC executives described as a "toxic dump," for approximately $47,579,195.

1042.   At the time of the forced sales, GECC knew that the THI Enterprise was essentially insolvent, was unable to provide its nursing home residents with proper care, and was facing numerous resident rights' lawsuits for abuse and neglect.

1043.   Rather than allowing the THI Enterprise to properly file for bankruptcy, GECC directed and approved of these forced sales in order to maximize its profits in the face of guaranteed loses.

1044.   GECC's sole purpose and motive for directing and approving of these forced sales was to further its own benefit to the detriment of the THI Enterprise's creditors.

1045.   GECC caused the THI Enterprise to effectuate these sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1046.   GECC's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (2) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (3) the THI Enterprise was essentially insolvent at the time of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

1047.   The Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that, as a direct and proximate result of the 2007 and 2008 fraudulent transfers of THI and THMI assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1048.   As a direct and proximate result of the 2007 and 2008 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### E.  The 2012 Fraudulent Transfers

1049.   In 2012, GECC transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise.

1050.   The THI Receiver also unlawfully settled with GECC any and all claims that THI has or may have against GECC.

1051.   The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to GECC and assigned THI's rights under the attorney-client privilege and the work-product doctrine to GECC. GECC was also granted access to all of THI's books and records.

1052.   These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI

Enterprise's claims, including legal malpractice claims. Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise. Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

1053. These claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.

1054. The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer. Courts routinely set aside transfers in court approved agreements when they are fraudulent. *See Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

1055. GECC's sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

1056. GECC's actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the 2012 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets; (3) the 2012 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (4) the 2012 transfers were

of substantially all of the THI Enterprise's remaining assets; (5) the value of the consideration received was not reasonably equivalent to the value of the assets transferred; and (6) the THI Enterprise was insolvent at the time of the 2012 transfers.

1057.   The Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that, as a direct and proximate result of the 2012 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1058.   As a direct and proximate result of the 2012 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in favor of the Plaintiffs, Trustee, and THMI, in an amount to be determined at trial; (iii) award the Plaintiffs, Trustee, and THMI their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XIX

### Constructive Fraudulent Transfers against Defendant GECC

1059.   The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

1060.   This is an action for equitable or statutory relief pursuant to 11 U.S.C. § 544(b) and § 550(a), Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), et seq., and/or other

applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq.*, all of which contain substantially similar elements.

1061.   The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1062.   GECC is an "insider" and/or "affiliate" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1063.   Continuing to this day, GECC has actively concealed the fraudulent transfers identified herein, its full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of GECC's involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

1064.   A constructive fraudulent transfer occurs when a debtor makes a transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor: (i) was engaged or was about to engage in a business for which the remaining assets of the debtor were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

1065.   GECC transferred or caused the assets of the THI Enterprise to be transferred without the THI Enterprise receiving equivalent value in exchange for the transfers when the

THI Enterprise was engaged in a business for which its remaining assets were unreasonably small in relation to its business, and when the THI Enterprise was incurring debts beyond its ability to pay as they became due.

### A. The Fraudulent Transfers in the Form of Exorbitant Interest and Fees Paid to GECC

1066.   GECC transferred or caused to be transferred the assets of the THI Enterprise to itself in the form of exorbitant interest and fee payments, without the THI Enterprise receiving reasonably equivalent value in exchange for the transfers.

1067.   Specifically, on a loan of $55 million, GECC received approximately $21.5 million in the form of exorbitant interest and fee payments.

1068.   These payments were made when GECC knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

1069.   Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, GECC forced the THI Enterprise to continue to enter into forbearance agreements in order to receive exorbitant interest and fee payments.

1070.   GECC knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, GECC transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

1071.   GECC also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.   Despite this knowledge, GECC transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

1072.   It is inappropriate for a secured lender, such as GECC, to behave in the manner they did in light of the fact that they knew the THI Enterprise was in dire straits and patient care was suffering.

1073.   GECC's sole purpose and motive for these exorbitant interest and fee payments was to further their own benefit to the detriment of the THI Enterprise's creditors.

1074.   The fraudulently transferred assets of the THI Enterprise in the form of exorbitant interest and fee payments could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

1075.   As a direct and proximate result of these fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1076.   As a direct and proximate result of the fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### B.  The 2006 Fraudulent Transfers

1077.   Starting in 2006, GECC transferred or caused to be transferred to FLTCH, FAS, THIB, Forman, Grunstein, and Schron the employees, management, and operations of the THI Enterprise for approximately $10,000,000, which was far less than the reasonably equivalent value of the transferred assets.

1078.   The price paid paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

1079.   GECC knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, GECC transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

1080.   GECC also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.   Despite this knowledge, GECC transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

1081.   GECC's sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that they could maximize their profits in the face of guaranteed loses.

1082.   As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

1083.   The fraudulently transferred assets of the THI Enterprise in 2006 could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

1084.   As a direct and proximate result of the 2006 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of GECC, in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1085.   As a direct and proximate result of the 2006 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with of dollars in liabilities and no assets.

**C.  The 2012 Fraudulent Transfers**

1086.   In 2012, GECC transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, which was less than the reasonably equivalent value of the transferred assets.

1087.   The THI Receiver also unlawfully settled with GECC and all claims that THI has or may have against GECC.

1088.   The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to GECC and assigned THI's rights under the attorney-client privilege and the work-product doctrine to GECC. GECC was also granted access to all of THI's books and records.

1089.   These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims.   Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

1090.   The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.   Courts routinely set aside transfers in court approved agreements when they are fraudulent. *See Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

1091.   GECC's sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

1092.   These transferred claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.  As such, the fraudulently transferred assets of the THI Enterprise in 2012 could have been applicable to the payment of the debts due to the Plaintiffs.

1093.   GECC knew that the THI Enterprise was facing claims by the Plaintiffs here. Despite this knowledge, GECC transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts due to the Plaintiffs here.

1094.   As a result of the 2006 transfers, the Plaintiffs as creditors of the THI Enterprise have been left without any recourse since the remaining assets of the THI Enterprise have been stripped away.

1095.   As a direct and proximate resulted of the 2012 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of GECC in that, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1096.   As a direct and proximate result of the 2012 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of GECC in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in favor of the Plaintiffs, Trustee, and THMI, in an amount to be determined at trial; (iii) award the Plaintiffs, Trustee,

and THMI their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XX

### Actual Fraudulent Transfers against Defendant Ventas

1097.  The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

1098.  This is an action for equitable or statutory relief pursuant to 11 U.S.C. § 544(b) and § 550(a), Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), *et seq.*, and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102, (2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq.*, all of which contain substantially similar elements.

1099.  The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1100.  Ventas is an "insider" and/or "affiliate" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1101.  Continuing to this day, Ventas has actively concealed the fraudulent transfers identified herein, its full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of Ventas' involvement with the fraudulent

transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

1102.   A transfer made by a debtor is fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

1103.   In determining actual intent, consideration may be given to the following factors: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made incurred; and (10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

1104.   Ventas fraudulently transferred or caused to be transferred the assets of the THI Enterprise with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs.

## A.  The Fraudulent Transfers in the Form of Exorbitant Interest and Fees Paid to Ventas

1105.   Ventas transferred or caused to be transferred the assets of the THI Enterprise to itself in the form of exorbitant interest and fees payments with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

1106.   These payments were made when Ventas knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing

home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

1107. Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, Ventas forced the THI Enterprise to continue to enter into forbearance agreements in order to receive exorbitant interest and fee payments.

1108. It is inappropriate for a secured lender, such as Ventas, to behave in the manner it did in light of the fact that GECC knew the THI Enterprise was in dire straits and patient care was suffering.

1109. Ventas' sole purpose and motive for these exorbitant interest and fee payments was to further its own benefit to the detriment of the THI Enterprise's creditors.

1110. Ventas caused the THI Enterprise to make these exorbitant interest and fee payments with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1111. Ventas' actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the transfers of the THI Enterprise's assets were to insiders; (2) the transfers of the THI Enterprise's assets were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (3) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (4) the transfers were of substantially all of the THI Enterprise's assets; (5) the THI Enterprise was rendered insolvent as an effect

of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

1112.   The Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that, as a direct and proximate result of the these fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1113.   As a direct and proximate result of the fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**B.   The 2005 Fraudulent Transfers**

1114.   In 2005, Ventas transferred or caused to be transferred the assets of the THI Enterprise in the form of forced sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

1115.   Specifically, in 2005, Ventas directed and approved of the THI Enterprise selling approximately twenty outpatient centers for approximately $5,600,000. Ventas also directed and approved of the THI Enterprise selling five THI facilities in Ohio for $5,500,000.

1116.   At the time of the forced sales, Ventas knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

1117.   Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, Ventas directed and approved of the forced sales in order to maximize their profits in the face of guaranteed loses.

1118.   Ventas' sole purpose and motive for directing and approving of these forced sales was to further its own benefit to the detriment of the THI Enterprise's creditors.

1119.   Ventas caused the THI Enterprise to effectuate these sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1120.   Ventas' actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the 2005 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (2) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (3) the THI Enterprise was essentially insolvent at the time of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

1121.   The Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that, as a direct and proximate result of the 2005 fraudulent transfers of THI and THMI assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1122.   As a direct and proximate result of the 2005 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### C.  The 2006 Fraudulent Transfers

1123.   In 2006, with actual intent to hinder, delay, or defraud creditors of the Ventas transferred or caused to be transferred to FLTCH, FAS, THIB, Forman, Grunstein, and Schron the employees, management, and operations of the THI Enterprise for approximately $10,000,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1124.   The price paid by FLTCH, FAS, THIB, Forman, Grunstein, and Schron, paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

1125.   Ventas' sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that it could maximize its profits in the face of guaranteed loses.

1126.   As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

1127.   Ventas' actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following factors: (1) the 2006 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets of the THI Enterprise; (3) the 2006 transfers were not disclosed and were concealed from creditors and others; (4) the 2006 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (5) the 2006 transfers were made when the THI Enterprise was facing

significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (6) the 2006 transfers were of substantially all of the THI Enterprise's assets; (7) the value of the consideration received by the THI Enterprise was not reasonably equivalent to the value of the asset transferred; (8) THMI and FLTCI simply vanished by the end of 2006; (9) THMI ceased to have any employees, management, or operations as an effect of the 2006 transfers; and (10) THMI was rendered insolvent as an effect of the 2006 transfers.

1128.   The Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that, as a direct and proximate result of the 2006 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1129.   As a direct and proximate result of the 2006 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**D.  The 2007 and 2008 Fraudulent Transfers**

1130.   In 2007 and 2008, Ventas transferred or caused to be transferred the assets of the THI Enterprise in the form of forced sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, such as the Plaintiffs here.

1131.   Specifically, in 2007, Ventas directed and approved of the THI Enterprise selling a THI entity for approximately $4,700,000.

1132.   In addition, in 2008, Ventas directed and approved of the THI Enterprise selling its remaining properties, with the exception of a Maryland facility GECC executives described as a "toxic dump," for approximately $47,579,195.

1133.  According to its Quarterly 10-Q Report, Ventas recorded a profit of $24,000,000 off the sale of those properties in 2008.

1134.  At the time of the forced sales, Ventas knew that the THI Enterprise was essentially insolvent, was unable to provide its nursing home residents with proper care, and was facing numerous resident rights' lawsuits for abuse and neglect.

1135.  Rather than allowing the THI Enterprise to properly file for bankruptcy, Ventas directed and approved of these forced sales in order to maximize its profits in the face of guaranteed loses.

1136.  Ventas' sole purpose and motive for directing and approving of these forced sales was to further its own benefit to the detriment of the THI Enterprise's creditors.

1137.  Ventas caused the THI Enterprise to effectuate these sales with actual intent to hinder, delay, or defraud creditors of the THI Enterprise, including the Plaintiffs.

1138.  Ventas' actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (2) the transfers were made when the THI Enterprise was facing significant lawsuits by THI Enterprise's own insiders, venders, and other creditors; (3) the THI Enterprise was essentially insolvent at the time of these transfers; and (6) these transfers occurred shortly after the THI Enterprise incurred substantial debts.

1139.  The Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that, as a direct and proximate result of the 2007 and 2008 fraudulent transfers of

THI and THMI assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1140. As a direct and proximate result of the 2007 and 2008 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

### E. The 2012 Fraudulent Transfers

1141. In 2012, Ventas transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, with actual intent to hinder, delay, or defraud creditors of the THI Enterprise.

1142. The THI Receiver also unlawfully settled with Ventas any and all claims that THI has or may have against Ventas.

1143. The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to Ventas and assigned THI's rights under the attorney-client privilege and the work-product doctrine to Ventas. Ventas was also granted access to all of THI's books and records.

1144. These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims. Damages in a legal malpractice action are the amount of damages sustained by the client as result of malpractice. As of the

date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

1145.  These claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.

1146.  The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.  Courts routinely set aside transfers in court approved agreements when they are fraudulent. S*ee Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

1147.  Ventas' sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

1148.  Ventas' actual intent to hinder, delay, or defraud the creditors of the THI Enterprise is evidenced by the following: (1) the 2012 transfers of the THI Enterprise's assets were to insiders; (2) the insiders retained possession and control of the fraudulently transferred assets; (3) the 2012 transfers were made when the THI Enterprise was facing significant resident rights' lawsuits, such as the Plaintiffs' suits; (4) the 2012 transfers were of substantially all of the THI Enterprise's remaining assets; (5) the value of the

consideration received was not reasonably equivalent to the value of the assets transferred; and (6) the THI Enterprise was insolvent at the time of the 2012 transfers.

1149.   The Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that, as a direct and proximate result of the 2012 fraudulent transfers of the THI Enterprise's assets, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1150.   As a direct and proximate result of the 2012 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in favor of the Plaintiffs, Trustee, and THMI, in an amount to be determined at trial; (iii) award the Plaintiffs, Trustee, and THMI their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XXI

### Constructive Fraudulent Transfers against Defendant Ventas

1151.   The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

1152.   This is an action for equitable or statutory relief pursuant to 11 U.S.C. § 544(b) and § 550(a), Delaware's Uniform Fraudulent Transfer Act, Del. Code Ann., tit. 6, § 1301, (2009), *et seq.*, the Unif. Fraudulent Transfer Act § 1, (1984), *et seq.*, and/or other applicable law such as Florida's Uniform Fraudulent Transfer Act, Fla. Stat. Ann. § 726.102,

(2013), *et seq.*, Maryland's Uniform Fraudulent Conveyance Act, MD. Code Ann., Commercial Law § 15-201, (1975), *et seq.*, and New York's Fraudulent Conveyances Act, N.Y. Debtor and Creditor Law § 270, (2013), *et seq.*, all of which contain substantially similar elements.

1153.   The Plaintiffs are "creditors" as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1154.   Ventas is an "insider" and/or "affiliate" of the THI Enterprise as the term is defined in Del. Code Ann., tit. 6, § 1301 and UFTA § 1.

1155.   Continuing to this day, Ventas has actively concealed the fraudulent transfers identified herein, its full involvement with the fraudulent transfers, and where the assets of the THI Enterprise are located. Knowledge of Ventas' involvement with the fraudulent transfers of the THI Enterprise's assets has only recently been discovered through the complex and intertwined legal proceedings described herein.

1156.   A constructive fraudulent transfer occurs when a debtor makes a transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor: (i) was engaged or was about to engage in a business for which the remaining assets of the debtor were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

1157.   Ventas transferred or caused the assets of the THI Enterprise to be transferred without the THI Enterprise receiving equivalent value in exchange for the transfers when the THI Enterprise was engaged in a business for which its remaining assets were unreasonably

small in relation to its business, and when the THI Enterprise was incurring debts beyond its ability to pay as they became due.

### A. The Fraudulent Transfers in the Form of Exorbitant Interest and Fees Paid Ventas

1158.   Ventas transferred or caused to be transferred the assets of the THI Enterprise to itself in the form of exorbitant interest and fee payments, without the THI Enterprise receiving reasonably equivalent value in exchange for the transfers.

1159.   These payments were made when Ventas knew that the THI Enterprise was on the brink of insolvency, was about to declare bankruptcy, was unable to provide its nursing home residents with proper care, was misstating its financial statements, and was making illegal campaign contributions.

1160.   Rather than notify the proper authorities of the THI Enterprise's unlawful conduct, or allow the THI Enterprise to properly file for bankruptcy, Ventas forced the THI Enterprise to continue to enter into forbearance agreements in order to receive exorbitant interest and fee payments.

1161.   Ventas knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, Ventas transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

1162.   Ventas also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.   Despite this knowledge, Ventas transferred or caused to be transferred the

valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

1163.  It is inappropriate for a secured lender, such as Ventas, to behave in the manner they did in light of the fact that they knew the THI Enterprise was in dire straits and patient care was suffering.

1164.  Ventas' sole purpose and motive for these exorbitant interest and fee payments was to further their own benefit to the detriment of the THI Enterprise's creditors.

1165.  The fraudulently transferred assets of the THI Enterprise in the form of exorbitant interest and fee payments could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

1166.  As a direct and proximate result of these fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1167.  As a direct and proximate result of the fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**B.  The 2006 Fraudulent Transfers**

1168.  Starting in 2006, Ventas transferred or caused to be transferred to FLTCH, FAS, THIB, Forman, Grunstein, and Schron the employees, management, and operations of the THI Enterprise for approximately $10,000,000, which was far less than the reasonably equivalent value of the transferred assets.

1169.  The price paid paled in comparison to a Lancaster Group, LLC Valuation Report dated January 23, 2006, which ascribed an adjusted Enterprise value of $183,873,730 for the THI Enterprise.

1170.  Ventas knew that the THI Enterprise was engaged in the business of operating nursing homes and providing care to its nursing homes' residents.  Despite this knowledge, Ventas transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise without sufficient assets to properly operate its business.

1171.  Ventas also knew that the THI Enterprise was facing numerous claims and lawsuits by residents for neglect and abuse suffered at nursing homes operated by the THI Enterprise.  Despite this knowledge, Ventas transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts as they became due.

1172.  Ventas' sole purpose and motive for transferring or causing to be transferred the assets of the THI Enterprise in 2006 was so that they could maximize their profits in the face of guaranteed loses.

1173.  As a result of the 2006 transfers, the creditors of the THI Enterprise were left without any recourse since the assets of the THI Enterprise had been stripped away and only significant liabilities remained.

1174.  The fraudulently transferred assets of the THI Enterprise in 2006 could have been applicable to the payment of the debts due to the Plaintiffs as nursing home creditors of the THI Enterprise.

1175.   As a direct and proximate result of the 2006 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of Ventas, in that the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1176.   As a direct and proximate result of the 2006 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

**C.  The 2012 Fraudulent Transfers**

1177.   In 2012, Ventas transferred or caused to be transferred the THI Enterprise's claims, causes of action, and choses of action that THI may have against them and any and all claims, causes of action and choses in action that THI has against any and all third parties including claims against the Plaintiffs and the Plaintiffs' counsel, for $700,000, which was less than the reasonably equivalent value of the transferred assets.

1178.   The THI Receiver also unlawfully settled with Ventas and all claims that THI has or may have against Ventas.

1179.   The THI Receiver further assigned the right to defend THI and THMI in the Plaintiffs' litigation to Ventas and assigned THI's rights under the attorney-client privilege and the work-product doctrine to Ventas. Ventas was also granted access to all of THI's books and records.

1180.   These asset transfers have a potential value of approximately $2 billion in light of Section 3.2 of the 2012 Agreement, which includes an assignment of the THI Enterprise's claims, including legal malpractice claims.  Damages in a legal malpractice

action are the amount of damages sustained by the client as result of malpractice. As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest. Three of the Plaintiffs here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion. As such, these assets were transferred for less than reasonably equivalent value.

1181.  The Maryland court's approval of the 2012 Agreement is of no moment because the 2012 Agreement constitutes a fraudulent transfer.  Courts routinely set aside transfers in court approved agreements when they are fraudulent. *See Travelers Indem. Co. v. Cormaney*, 138 N.W.2d 50 (IA 1965); *Johnson v. Dowell*, 592 So.2d 1194, 1197 (Fla. 2d DCA 1992).

1182.  Ventas' sole purpose and motive in fraudulently transferring the THI Enterprise's assets in 2012 was in furtherance of its plan to hinder, delay, and defraud creditors of the THI Enterprise, including the Plaintiffs here.

1183.  These transferred claims, causes of action, and choses of action are property rights reachable by the Plaintiffs as judgment creditors.  As such, the fraudulently transferred assets of the THI Enterprise in 2012 could have been applicable to the payment of the debts due to the Plaintiffs.

1184.  Ventas knew that the THI Enterprise was facing claims by the Plaintiffs here. Despite this knowledge, Ventas transferred or caused to be transferred the valuable assets of the THI Enterprise, which in turn left the THI Enterprise unable to pay its debts due to the Plaintiffs here.

1185.   As a result of the 2006 transfers, the Plaintiffs as creditors of the THI Enterprise have been left without any recourse since the remaining assets of the THI Enterprise have been stripped away.

1186.   As a direct and proximate resulted of the 2012 fraudulent transfers, the Plaintiffs have been harmed and continue to be harmed by the actions of Ventas in that, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI Enterprise.

1187.   As a direct and proximate result of the 2012 fraudulent transfers, the Trustee and THMI have been harmed and continue to be harmed by the actions of Ventas in that, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) declare that the fraudulent transfers are void; (ii) enter judgment in favor of the Plaintiffs, Trustee, and THMI, in an amount to be determined at trial; (iii) award the Plaintiffs, Trustee, and THMI their attorney fees and costs; and (iv) grant such other and further relief as the Court deems appropriate.

## COUNT XXII

### Civil Conspiracy to Commit Fraudulent Transfers against Defendants GECC, FAS, THIB, FLTCH, Forman, Grunstein, Schron, Ventas, the GTCR Group, Jannotta, and THIH

1188.   The Plaintiffs, Trustee, and THMI incorporate by reference each and every allegation as if fully set forth herein.

1189.   Pursuant to the SPAs for the "linked transactions" detailed above, Delaware law governs.

1190.   The Defendants, their employees, and agents were informed of and were aware of the unlawful scheme to defraud nursing home creditors of the THI Enterprise, such as the Plaintiffs here.

1191.   The Defendants, their employees, and agents agreed to participate in the unlawful scheme to defraud nursing home creditors of the THI Enterprise.

1192.   The Defendants, their employees, and agents combined to facilitate and effectuate the unlawful scheme to defraud nursing home creditors of the THI Enterprise, such as the Plaintiffs here.

1193.   The Defendants, their employees, and agents committed numerous overt acts in furtherance of their conspiracy, including:

    a.   Failing to notify the proper parties of the scheme's existence;

    b.   Actively concealing the improper acts committed by third parties;

    c.   Concealing the true financial status of the THI Enterprise;

    d.   Fraudulently transferring THI and THMI's assets;

    e.   Consenting on numerous occasions to the unlawful transfers of THI and THMI's assets for less than reasonably equivalent value;

    f.   Concealing the unlawful transfers of the THI Enterprise's liabilities;

    g.   Placing THI into an invalid Maryland Receivership to conceal the multi-year liquidation of the former nursing home operators;

    h.   Using the invalid Maryland Receivership to interfere with Florida litigation, including the Plaintiffs' claim against THI and THMI, including attempts to stay the litigation and withdrawal of defense;

    i.   Filing motions in a Maryland circuit court to hold the Plaintiffs in contempt of court for following orderly process in Florida against Delaware corporations doing business in Florida;

    j.   Filing a motion seeking to enjoin Florida state courts from proceeding with the Plaintiffs' litigation;

    k.   Attempting to direct litigation against the THI entities in Florida state courts admittedly without the authority or consent to do so;

    l.   Entry into a written agreement memorializing the existing conspiracy and pledging further cooperation to unlawfully defeat the claims of the Plaintiffs and seize the assets of THI and THMI; and

    m.  Filing a lawsuit against the Plaintiffs in the Middle District of Florida seeking a declaration that their final judgments entered against THI and THMI in their favor are void.

1194.   Rather than preventing or reporting the unlawful activities described herein, the Defendants, their employees, and agents conspired with and encouraged others to engage in the same or similar activities, thus broadening the web of the wrongful activities engaged in by the Defendants.

1195.   The Defendants, as co-conspirators, may be liable for their co-conspirators overt acts in furtherance of the unlawful scheme to defraud nursing home creditors of the THI Enterprise, such as the Plaintiffs here.

1196.   As such, the Defendants are jointly and severally liable for each act done in furtherance of the unlawful scheme to defraud nursing home creditors of the THI Enterprise.

1197.  The Defendants continue to take overt acts in furtherance of the unlawful scheme to defraud the Plaintiffs as creditors of the THI Enterprise.

1198.  To date, the Defendants have not withdrawn from the unlawful scheme to defraud nursing home creditors of the THI Enterprise.

1199.  The Plaintiffs have been harmed and continue to be harmed by the actions of the Defendants, their employees, and agents in furtherance of the conspiracy to defraud nursing home creditors of the THI Enterprise, in that, as a direct and proximate result of the scheme to defraud nursing home creditors of the THI Enterprise, the Plaintiffs have been hindered, delayed, or defrauded in their efforts to collect any judgments against asset-less and judgment proof THI entities.

1200.  The Trustee, and THMI have been harmed and continue to be harmed by the actions of the Defendants, their employees, and agents in furtherance of the conspiracy to defraud nursing home creditors of the THI Enterprise, in that, as a direct and proximate result of the scheme to defraud nursing home creditors of the THI Enterprise, the Trustee and THMI have been saddled with billions of dollars in liabilities and no assets.

1201.  The actions of the Defendants were intentional, wanton, malicious, and oppressive, thereby entitling the Plaintiffs to an award of punitive damages.

WHEREFORE, the Plaintiffs, Trustee, and THMI respectfully request this Court to: (i) enter judgment in their favor in an amount to be determined at trial; (ii) awarding the Plaintiffs, Trustee, and THMI their attorney fees and costs; and (iii) granting such other and further relief as the Court deems appropriate.

Dated: December 19, 2013

Respectfully submitted,

*/s/ Isaac Ruiz-Carus*
**Isaac Ruiz-Carus, Esquire**
Fla. Bar No. 0017004
iruiz-carus@wilkesmchugh.com
**James L. Wilkes, II, Esquire**
Fla. Bar No. 0405337
jwilkes@wilkesmchugh.com
**Bennie Lazzara, Jr., Esquire**
Fla. Bar No. 0119568
bennie@wilkesmchugh.com
**Joanna M. Greber, Esquire**
Fla. Bar No. 0027830
jgreber@wilkesmchugh.com
**WILKES & McHUGH, P.A.**
One North Dale Mabry, Suite 800
Tampa, Florida 33609
813/873-0026 // 813/286-8820 Fax
*Attorneys for Plaintiff Creditors*


**SHUMAKER, LOOP & KENDRICK, LLP**

*/s/ Seth P. Traub*
**STEVEN M. BERMAN, ESQ.**
Florida Bar No. 856290
sberman@slk-law.com
**SETH P. TRAUB, ESQ.**
Florida Bar No. 022088
straub@slk-law.com
101 E. Kennedy Blvd., Ste. 2800
Tampa, FL 33602
Phone: 813-229-7600; Fax: 813-229-1660
*Counsel for the Trustee and THMI*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 19, 2013, a true and correct copy of the foregoing was served via CM/ECF notice upon counsel for the parties in this adversary proceeding, and on the Office of the United States Trustee.

*/s/ Isaac Ruiz-Carus*
Attorney

## SUPPLEMENTAL CERTIFICATE OF SERVICE

Pursuant to Order Granting Motion to Seal Amended Complaint and For Leave to File a Redacted Version of Amended Complaint [Doc. No. 95], I HEREBY CERTIFY that on January 31, 2014, a true and correct copy of the foregoing Redacted Amended Complaint was served via CM/ECF notice upon counsel for the parties in this adversary proceeding, and on the Office of the United States Trustee.

*/s/ Isaac Ruiz-Carus*
Attorney