UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                              Case No. 8:11-bk-22258-MGW
                                                    Chapter 7
Fundamental Long Term Care, Inc.,

      Debtor.

_____/

Estate of Juanita Jackson, *et al.*,                Adv. No. 8:13-ap-00893-MGW

      Plaintiffs,

v.

General Electric Capital Corporation,
*et al.*,

      Defendants.

_____/

## <u>MEMORANDUM OPINION ON MOTIONS TO DISMISS</u>

Before this bankruptcy case was filed, three probate estates obtained more than $1 billion in judgments against the Debtor's wholly owned subsidiary—Trans Health Management, Inc. ("THMI")—and THMI's former parent—Trans Healthcare, Inc. ("THI"). One of the probate estates, in an attempt to collect on its judgment against THI and THMI, obtained a $110 million judgment against the Debtor in state-court proceedings supplementary before filing this involuntary bankruptcy case. Those three probate estates (along with three others) (collectively, the "Probate Estates")—all creditors in this bankruptcy case—are seeking to recover those judgments from: THI's former parent and shareholders, THI's primary secured lenders, and several entities and individuals that allegedly received THMI's assets as part of an alleged "bust-out scheme."

According to the complaint, THI Holdings, LLC ("THIH") and THIH's primary shareholder, a series of entities referred to as the "GTCR Group," conspired to allow THI's two primary secured lenders—General Electric Capital Corporation ("GECC") and Ventas, Inc. ("Ventas")—to loot THI and THMI to repay $75 million in loans before the GTCR Group and THIH ultimately sold THI's and THMI's assets to a group of individuals and entities referred to as the "Fundamental Entities"—Fundamental Long Term Care Holdings, LLC ("FLTCH"), Fundamental Administrative Services ("FAS"), Trans Health, Inc.-Baltimore ("THI-Baltimore"), Murray Forman, Leonard Grunstein, and Rubin Schron—for far less than their fair market value in order to preserve the substantial investment the GTCR Group made in THI.[1] To complete the alleged bust-out scheme, THMI's liabilities were transferred to the Debtor (a sham entity created for the sole purpose of acquiring THMI's liabilities), and THI was allowed to slowly go out of business before being put into a state-court receivership.

This Court must now decide whether those facts (alleged with excruciatingly more detail in the complaint) give rise to liability under alter-ego or veil-piercing theories and for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent transfer (and conspiracy to commit a fraudulent transfer), and successor liability. For the reasons set forth below, the Court concludes that the Plaintiffs fail to state a claim for relief under any alter-ego or veil-piercing theories but that they do state claims for relief against (i) Edgar Jannotta (a GTCR principal and director of THI and THMI) for breach of fiduciary duty; (ii) GTCR, THIH, THI-Baltimore, FLTCH, Forman, and Grunstein for aiding and abetting a breach of fiduciary duty; (iii) THI-Baltimore, FLTCH, FAS, Forman, and Grunstein for fraudulent transfer; (iv) THI-

---

[1] These, of course, are only allegations in the complaint. As discussed below, the Court is required to accept all well-pled allegations in the complaint as true. By reciting the factual background of this case, the Court is not making any determination regarding the veracity of the allegations. They are just that—allegations.

Baltimore, FLTCH, and FAS for successor liability; and (v) THI-Baltimore, FLTCH, FAS,

Forman, and Grunstein for conspiracy to commit a fraudulent transfer.

## FACTUAL BACKGROUND

The "bust-out" scheme alleged in the complaint—even if not told in the most compelling

fashion—has all the makings of a legal thriller. Of course, it is important to remember it is not

the Court's job to determine—at the pleading stage—whether the allegations in the complaint are

true or whether they are mostly the work of fiction. Some of the Defendants here tell a

completely different story in complaints for declaratory judgment they filed in related adversary

proceedings. Instead, the Court must accept all of the facts in the complaint as true in

determining whether the scheme alleged by the Plaintiffs gives rise to any claim for relief. To

understand the "bust-out" scheme alleged by the Plaintiffs, it is easiest to start with THI.

### THI is founded as a nursing home operator

THI, which was founded in 1998, operated nursing homes, assisted living facilities, and

long-term acute care hospitals throughout the United States through various operating

subsidiaries. THMI, which was a wholly owned subsidiary of THI until March 2006, provided

management services to THI's operating subsidiaries, including clinical services and compliance,

business management, corporate financial control, financial systems analysis, accounts payable

and receivable management, corporate and tax accounting, payroll, and benefits administration.

### THI is funded by the GTCR Group and other lenders

The initial funding for THI came from a private equity firm the Plaintiffs refer to as the

"GTCR Group." The GTCR Group consists of GTCR VI Executive Fund; GTCR Fund VI, LP;

GTCR Associates VI; GTCR Partners VI, LP; and GTCR Golder Rauner, LLC (the "GTCR

Group"). According to the Plaintiffs, the GTCR Group was intent on building a nationwide nursing home empire.

The GTCR Group provided the initial funding for THI at its inception in 1998. Three years later, the GTCR Group contributed another $4.5 million to THI. And the following year, the GTCR Group contributed another $5.63 million. In all, the GTCR Group contributed a total of $37 million of its own capital to THI between 1998 and 2005.

In addition to its own investment, the GTCR Group also helped raise capital from other lenders—namely Ventas and GECC. Ventas initially entered into two loan transactions with THI in 2002: a $55-million term loan and a $22-million mezzanine loan. Ventas also entered into a sale-leaseback transaction with THI whereby THMI would operate nursing homes owned by Ventas Realty, Inc. ("Ventas Realty"). The two loans from Ventas were secured by the stock in THI and THMI, and both THI and THMI guaranteed the mezzanine loan and the sale-leaseback transaction. In late 2002, GECC  acquired the $55 million term loan from Ventas.

<u>The GTCR Group runs THI's day-to-day operations</u>

Aside from raising capital for THI, the GTCR Group was also instrumental in THI's day-to-day management and administration. From the start, the GTCR Group entered into a Professional Services Agreement with THI in July 1998, around the time THI was created. Under its agreement with THI, the GTCR Group was responsible for formulating THI's corporate strategy and corporate investments, including acquisitions, divestitures, and debt and equity financing.

The GTCR Group, as a result of its substantial investment in THI, also gained majority control of THI's Board of Directors. The GTCR Group placed two of its directors—Edgar Jannotta and Ethan Budin—on THI's three-member board of directors (the third member was

Anthony Mistano, THI's CEO). The GTCR Group also appointed those same two directors—Jannotta and Budin—to THMI's three-member board, as well. According to the Plaintiffs, the GTCR Group's management of THI and its subsidiaries—through the Professional Services Agreement and control of their boards of directors—was so pervasive that THI's vendors and customers dealt directly with the GTCR Group on routine matters, such as negotiating lease terms.

On top of that, the GTCR Group specifically held itself out to the public as being the operator of THI, THMI, and THI's other subsidiaries. As a general matter, the GTCR Group held itself out to its investors and others as being in charge of its portfolio companies. It was no different with THI. And, in fact, the GTCR Group made all the material financial decisions for THI and THMI and directed their business and corporate strategy.

<u>The GTCR Group restructures THI</u>

At some point in 2003, the GTCR Group decided to significantly grow its nursing home empire. At the time, Integrated Health Services, one of the nation's largest nursing home operators, was in bankruptcy in Delaware, and THI was looking to acquire Integrated Health Services' assets out of bankruptcy. In order to acquire Integrated Health Services' assets, the GTCR Group restructured THI.

First, the GTCR Group created THI Holdings, LLC. The GTCR Group, which had at the time held approximately 83% of the stock in THI, exchanged its stock in THI for an equal amount of stock in THI Holdings. Second, THI Holdings created two new subsidiaries: THI-Baltimore and THI of Baltimore Management, LLC ("THMI-Baltimore").

When the restructuring was complete, THI Holdings was the parent of two wholly owned subsidiaries: THI and THI-Baltimore. THI and THI-Baltimore, in turn, were each the parent of a

wholly owned subsidiary: THMI and THMI-Baltimore, respectively. The idea behind the restructuring, apparently, was to replicate the THI structure for the assets the GTCR Group was ultimately hoping to acquire. Under the restructuring, THI-Baltimore (similar to THI) would operate the nursing homes acquired from Integrated Health Services, and THMI-Baltimore (similar to THMI) would provide management services to the THI-Baltimore operated homes.

The GTCR Group attempts to expand its nursing home empire

Despite the restructuring, THI-Baltimore was unable to acquire the Integrated Health Services' homes. It turns out that THI-Baltimore was outbid by an entity called ABE Briarwood ("ABE"). ABE, according to the complaint, was created by Rubin Schron, Murray Forman, and Leonard Grunstein. An entity founded and controlled by Schron—Cammeby's Funding, LLC— provided the financing for ABE to acquire Integrated Health Services' homes. Although THI-Baltimore did not acquire the homes, as it intended, it was not completely cut out of the deal.

While ABE acquired Integrated Health Services' assets, it was not a licensed nursing home operator, and that is where THI-Baltimore comes back into the picture. ABE agreed to lease or sublease (ABE acquired a fee simple interest in some of the nursing homes and a leasehold interest in others) the Integrated Health Services homes to THI-Baltimore to operate. THMI-Baltimore then would provide the management services to the THI-Baltimore operated homes. Under the arrangement agreed to by THI-Baltimore and ABE, THI-Baltimore would use the income generated from operating the nursing homes to pay rent to ABE (for leasing the nursing homes) and management fees to THMI-Baltimore (for providing management services), presumably leaving a hefty profit afterwards.

Because THMI-Baltimore did not have any employees, however, it used THMI's employees and equipment (and other assets) to provide management services to the newly

6

acquired nursing homes. And even though the management contracts were held by THMI-Baltimore, THMI actually received the substantial revenues under those contracts because the services were provided using its employees and equipment.

The THI empire begins to crumble

Initially, it appeared that THI (and the deal with ABE) was successful. By mid-2003, THI was reporting gross annual revenues of $1 billion. For that year, it appears THI had reported $6 million in net income based on the $1 billion in revenue. In actuality, though, THI had suffered a $29 million loss. By September 2003, Ventas became aware that THI had materially misstated its financials, including overstating its income for 2003 by $10 million and understating its expenses by $25 million (resulting in $6 million in net income becoming a $29-million net loss), in connection with obtaining the $55 million term loan and $22 million mezzanine loan.

Ventas and GECC take advantage of THI

According to the complaint, GECC and Ventas were required by federal law to report THI's material (fraudulent) misstatements. Moreover, the Plaintiffs allege GECC (as a federally regulated bank) had a legal duty to refuse to do business with anyone who was profiting from illegal activity. But instead of complying with their obligation to report THI, GECC and Ventas (according to the complaint) used their knowledge of THI's potential criminal misconduct to their advantage.

First, the Plaintiffs say GECC and Ventas forced THI to enter into a series of onerous and unreasonable forbearance agreements. Under those forbearance agreements, GECC and Ventas were able to extract millions of dollars in interest and various fees from THI. And the Plaintiffs say the onerous fees GECC and Ventas extracted under the forbearance worsened THI's financial condition.

7

Second, GECC took control of THI's bank accounts. Under its loan agreement with GECC, THI's cash flowed through a series of lockboxes and sweep accounts. After GECC declared THI in default for making the material misrepresentations, GECC began "trapping cash" in THI's accounts. In particular, GECC instructed Bank of New York (THI's depository bank) to capture all of the money held in THI's accounts. Capturing THI's cash gave GECC control of a large portion of THI's assets, while, at the same time, depriving THI of its ability to pay bills as they became due, thereby jeopardizing patient care.

<u>The Wrongful Death and Other Actions</u>

According to the Plaintiffs, the substantial fees extracted by GECC and Ventas—while benefitting the lenders—only worsened THI's financial condition, which, in turn, led to a series of lawsuits against the GTCR Group, Jannotta, THI, and THMI. One of those lawsuits alleged that the GTCR Group, Jannotta, and THI were conspiring to divert money loaned to certain facilities to pay the obligations of other facilities. Also included among those lawsuits was a series of wrongful death and negligence claims against THI and THMI. Three of those lawsuits were filed by Plaintiffs in this proceeding—the Estates of Jackson, Nunziata, and Jones. In all, THI and THMI were facing over 150 lawsuits by early 2006.

<u>The GTCR Group orchestrates the "Bust Out" scheme</u>

All of this led THI to perform a bankruptcy liquidation analysis. In January 2005, the boards of directors for THI and THMI authorized those entities to file for bankruptcies. The boards of directors apparently determined, presumably based on the liquidation analysis, that filing for bankruptcy would be in the best interests of each of the companies, as well as their creditors, employees, and other interested parties. Despite the fact that the companies determined

filing for bankruptcy would be in their best interests, the GTCR Group and Jannotta instead opted to perpetrate a "bust-out" scheme.

The first phase of the bust-out scheme involved divesting THMI of its liabilities and then selling its assets for less than fair market value as part of two linked transactions in 2006. In the first transaction, THIH sold all of its stock in THI-Baltimore (which owned all of the stock in THMI-Baltimore) to FLTCH. At the time of the sale, THI-Baltimore held the right to operate a number of nursing homes, and THMI-Baltimore nominally held the right to provide management services to the homes operated by THI-Baltimore. In actuality, though, THMI was the entity that had been providing the management services and collecting the revenue. The assets that were transferred to FLTCH had been valued (on an enterprise value basis) at more than $183 million as of January 2006; yet, FLTCH only paid $9.9 million for them.

In the second linked transaction, THI sold all of its stock in THMI to the Debtor for $100,000. The Debtor had been incorporated just months before the transaction by the law firm of Troutman Sanders, where Forman (one of FLTCH's owners) was a partner. The Debtor's sole shareholder is Barry Saacks, an elderly graphic artist who currently lives in a nursing home. Although Saacks has some recollection of being asked if he was interested in buying computer equipment, he was not aware that he owns the Debtor or that he acquired the stock in THMI. And, it turns out, Saacks (who did not have any money to buy any computer equipment in the first place) did not pay the purchase price—FLTCH apparently loaned him the $100,000—nor did he ever receive any of THMI's assets. In short, the complaint paints this as a sham transaction.

<u>FLTCH continues THI's and THMI's operations</u>

After the sale, FLTCH rebranded THMI assets and continued generating millions of dollars of profits, but without the millions of dollars in liabilities. Within six months, THMI-Baltimore changed its name to Fundamental Clinical Consulting ("FCC") and took over the operations and clinical support for the nursing homes, and FAS was created to take over the administrative services under the management contracts previously held (at least nominally) by THMI-Baltimore. All of THMI's employees became employees of either FCC or FAS, depending on whether the employee provided operational or clinical support (FCC) or administrative services (FAS). To this day, FLTCH, FCC, and FAS operate out of the same location—using the same employees and equipment—that THI and THMI did.

<u>The GTCR Group winds THI down</u>

While THMI and the Debtor quickly became defunct after the linked transactions, THI remained an active corporation for almost three years. Since THMI had been sold, however, THI no longer had a company that provided management services to the nursing homes it continued to operate. So THI created Pathway Health Management, Inc. ("Pathway") to provide those services. But Pathway was merely a shell entity with few or no employees. As a consequence, Pathway contracted with THMI-Baltimore, which, in turn, used the former THMI employees that had moved to FAS after the linked transaction in order to provide services for Pathway since THMI-Baltimore had few or no employees itself. Although THI would go on to operate for three years after the linked transactions, the GTCR Group began the second phase of the "bust-out" scheme in 2007: winding down THI.

In November 2007, the GTCR Group sold a THI entity known as THI of Ohio at Greenbriar South, LLC for $4.7 million. Three months later, the GTCR Group sold all the

remaining THI properties (except for one facility in Maryland) to Omega Healthcare Investors, Inc. and CommuniCare Health Services. As part of that same transaction, the GTCR Group sold THI's right to operate those properties to CommuniCare. THI received nearly $48 million from the February 2008 sale to Omega and CommuniCare.

After using the nearly $53 million in proceeds from the November 2007 and February 2008 sales to pay off its creditors, THI then sought appointment of a state-court receiver in Maryland in January 2009. Jannotta—THI's sole board member at the time—consented to the state-court receivership. According to the Plaintiffs, the only creditor that received notice of the receivership petition was GECC. So none of THI's creditors (other than GECC) had notice and an opportunity to object to the receivership. In fact, the Plaintiffs say THI presented the receivership petition to the Maryland state court ex parte and obtained a receivership order the same day.

The receivership order appointed Michael Sandnes—THI's former director of operations—as THI's state-court receiver. Sandnes was later replaced by Alan Grochal, an attorney at Tydings & Rosenberg, the firm that filed the receivership petition on THI's behalf and which previously represented GECC and Jannotta. Having obtained the receivership order, the GTCR Group was able to execute the third—and final—phase of the bust-out scheme: concealing the fraudulent linked transactions.

By filing for a receivership, rather than for bankruptcy, the GTCR Group, Jannotta, and THI—as well as the Fundamental Entities—were able to avoid the heightened scrutiny of a bankruptcy trustee, who undoubtedly would have examined the linked transactions closely. And they were able to avoid the scrutiny of THI's creditors, as well. Once the receivership was filed,

11

they simply had to conceal the linked transactions long enough for the statute of limitations to run on any fraudulent transfer or similar claims.

To do that, the GTCR Group and Fundamental Entities had to take control of the defense of THI and THMI in the state-court wrongful death (or negligence) actions. By the time THI filed for receivership, five of the six Probate Estates had filed wrongful death or negligence actions. The sixth Probate Estate filed a wrongful death action against THI and THMI three weeks after THI filed for receivership. If any of the Probate Estates had obtained a judgment against THI or THMI, it potentially could have pursued the Defendants on fraudulent transfer and other similar claims.

So the THI Receiver first obtained the right to defend THMI (which, by this time, was defunct) in the receivership order. Then the THI Receiver attempted to domesticate the receivership in Florida by filing an action in Miami-Dade County (even though none of the wrongful death cases were pending there) naming Bonnie Creekmore as a defendant (even though she had not sued THI and THMI yet). In that domestication action, the THI Receiver sought a stay of the six pending wrongful death cases. But the state court in Miami left the decision to stay the wrongful death actions up to each state court where the wrongful death or negligence claims were pending, and each of the courts declined to stay the actions. Even though the actions were not stayed, the THI Receiver (through the Fundamental Entities) began directing the lawyers it retained to defend THI and THMI to withdraw their representation in April 2010, just over four years after the linked transactions and sixteen months after the THI Receiver secured the right to defend THMI.

<u>This involuntary bankruptcy case is filed</u>

The decision to withdraw the representation of THI and THMI eventually led to more than $1 billion in empty-chair jury verdicts against THI and THMI and eventually this involuntary bankruptcy case. Specifically, three months or so after the lawyers for THI and THMI withdrew, the Estate of Jackson obtained a $110 million judgment against THI and THMI. The Estate of Jackson then added the Debtor's name to the judgment in post-judgment proceedings supplementary. After adding the Debtor to its judgment against THI and THMI, the Estate of Jackson filed this involuntary case. The day before the order for relief was entered, the Estate of Nunziata obtained a $200 million judgment against THMI. One month later, the Estate of Webb obtained a $900 million judgment against THI and THMI. So more than $1 billion in judgments were entered against THI and THMI around the time this bankruptcy case was filed.

## PROCEDURAL POSTURE

Before turning to the claims asserted in the complaint, it is useful to understand how the parties got to this point procedurally. Before this involuntary bankruptcy case was filed, the Probate Estates had been attempting to collect their judgments against THI and THMI from (most or all of) the Defendants in state-court proceedings supplementary. It is the Court's understanding that the claims being pursued in the proceedings supplementary included fraudulent transfer claims. After this bankruptcy case was filed, the Trustee indicated her intent—as THMI's sole shareholder—to pursue fraudulent transfer claims against some or all of the Defendants.

Before the Trustee could assert any claims in this case, however, FLTCH and FAS filed a declaratory judgment action against THMI in New York seeking a declaration that any fraudulent transfer (and other) claims against them were barred by the statute of limitations. This

Court, at the request of the Trustee, enjoined the New York declaratory judgment action because it impermissibly interfered with the Trustee's administration of this case. After the Court enjoined their declaratory judgment action, FLTCH and FAS sought to enjoin the Probate Estates from pursing their proceedings supplementary in state court.

Because the claims being pursued by the Probate Estates in state court appeared to overlap (at least to some extent) with the claims the Trustee intended to pursue in this case, the Court was concerned that allowing the Probate Estates to continue pursuing their state court claims would likewise interfere with the Trustee's administration of this bankruptcy estate. On top of that, a district court judge—in an order remanding an appeal of one of this Court's orders—directed this Court to determine whether the Debtor and THMI should be treated as the same entity, whether under an alter ego, substantive consolidation, or other legal or equitable theory. In order to comply with the district court's directive to determine whether the Debtor and THMI should be treated as the same entity, as well as to avoid any interference with the Trustee's administration of this estate, this Court enjoined the Probate Estates from pursuing their state court proceedings supplementary and ordered that any alter ego, veil piercing, fraudulent transfer, or other similar claims be litigated in one forum: this Court.

In response to this Court's order directing that all of the claims among the parties proceed in this Court, some of the Defendants filed adversary proceedings seeking a declaration that they were not liable under any alter ego, veil piercing, fraudulent transfer, or other theories. In turn, the Probate Estates filed a two-count complaint for declaratory judgment in this proceeding.[2] In Count I, the Probate Estates sought a declaration that THI and the Fundamental Entities were

---

[2] Adv. Doc. No. 1.

liable for the judgments against THI and THMI under a successor-liability theory.[3] In Count II, the Probate Estates sought a declaration that the Defendants were all liable for the judgments against THI and THMI under a veil-piercing theory.[4] The Trustee later intervened in that proceeding and added one count to substantively consolidate the Debtor and THMI.[5] The Probate Estates and the Trustee later sought leave to amend their complaint and intervention complaint, respectively, to file all of their claims together in one joint complaint.

It is that joint amended complaint that is the operative pleading.[6] That complaint—which is 228 pages long and contains 1,201 numbered paragraphs—includes twenty-two counts. The twenty-two counts in the complaint can be broken down into eight claims for relief: one count for substantive consolidation by the Trustee (Count I), two counts for breach of fiduciary duty (Counts II & III), four counts for aiding and abetting a breach of fiduciary duty (Counts IV-VII), one count for successor liability (Count VIII), two counts for piercing the corporate veil (Counts IX & X), three counts for alter-ego liability (Counts XI-XIII), eight counts for (actual or constructive) fraudulent transfer (Counts XIV-XXI), and one count for conspiracy to commit a fraudulent transfer (Count XXII).

The Defendants—in five separate motions to dismiss—have moved to dismiss twenty-one of the twenty-two counts: no Defendant moved to dismiss the count for substantive consolidation.[7] It would be impossible to succinctly summarize the various grounds asserted for

---

[3] *Id.*

[4] *Id.*

[5] Adv. Doc. No. 36.

[6] Adv. Doc. No. 109.

[7] Adv. Doc. Nos. 75, 76, 77, 78 & 79. The Plaintiffs jointly responded to those motions to dismiss. Adv. Doc. No. 99. And the Defendants filed five separate replies. Adv. Doc. No. 102, 104, 105, 106 & 107.

dismissing the twenty-one counts. Suffice it to say, the Defendants collectively assert that each of the counts (other than the one for substantive consolidation) fails to state a claim for relief. The Defendants also assert a variety of other grounds (i.e., statute of limitations, *in pari delicto*, etc.) they contend warrant dismissal even if the Plaintiffs could allege the elements of their claims. The Court will initially analyze the motions to dismiss by claim for relief, and in doing so, the Court will proceed somewhat out of order: first it will address whether any of the Defendants may be liable for the judgments against THI and THMI under an alter-ego or veil-piercing theory (Counts IX-XIII), next whether the GTCR Group, THIH, or Jannotta may be liable for breach of fiduciary duty (Counts II & III) and whether any of the remaining Defendants may be liable for aiding and abetting a breach of fiduciary duty (Counts IV-VII), then whether any of the Defendants may be liable under a fraudulent transfer theory (Counts XIV-XXI) or conspiracy to commit fraudulent transfer (Count XXII), and finally whether any of the Defendants that received THI's or THMI's assets may be liable as a successor entity (Count VIII). If the Court determines that any of the twenty-one counts state a claim for relief, the Court will then consider whether the Defendants' other defenses require dismissal.

## STANDARD ON MOTION TO DISMISS

Ordinarily, when ruling on a motion to dismiss, the Court eschews rehashing the all-too-familiar standard set forth by the United States Supreme Court in *Iqbal*[8] and *Twombly*.[9] But, in this case, it may actually be instructive, although the Court need not trace the history of pleading standards under Rule 8. It is enough to say that, as this Court explained in ruling on a motion to dismiss in a different adversary proceeding in this case, a plaintiff need only allege enough facts

---

[8] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[9] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

to nudge his or her claims for relief from the realm of conceivable to plausible.[10] So the question

here is whether the Plaintiffs have alleged enough facts to state plausible claims for relief for

alter-ego liability or piercing the corporate veil, breach of fiduciary duty, aiding and abetting a

breach of fiduciary duty, actual or constructive fraudulent transfer, conspiracy to commit a

fraudulent transfer, and successor liability.

### CONCLUSIONS OF LAW[11]

The Plaintiffs fail to state a claim
under any alter-ego or veil-piercing theories

In Counts IX through XIII of the complaint, the Plaintiffs have asserted alter-ego and

veil-piercing claims against all of the Defendants (other than Ventas). Specifically, the Plaintiffs

seek a declaration that the Defendants (other than Ventas) are liable for the debts of THI and

THMI under either an alter-ego or veil-piercing theory (Counts IX & XI-XIII). The Plaintiffs

also seek a declaration that the Fundamental Entities are liable for the Debtor's debts (Count X).

The complaint, however, fails to allege the required elements to state a claim for relief for alter-

ego liability or veil-piercing against any of the Defendants.

Initially, there appears to be some disagreement over which law applies. The Defendants

say that either Florida or Delaware law applies. The Plaintiffs say it could be Florida, Delaware,

Pennsylvania, or New York law that applies, depending on which Defendant the claim is asserted

against. All of the parties seem to agree, however, that the elements necessary to pierce the

corporate veil or establish alter-ego liability are essentially the same: (i) domination and control;

---

[10] *Scharrer v. THI Holdings, LLC (In re Fundamental Long Term Care, Inc.)*, 494 B.R. 548, 554 (Bankr. M.D. Fla. 2013).

[11] The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Moreover, no party timely objected to this Court entering a final order or judgment in this case. An order objecting to the Court's authority to enter a final judgment was required to be filed by the deadline for responding to the complaint. Adv. Doc. No. 3 at ¶ 4.

(ii) improper or fraudulent use of the corporate form; and (iii) injury to the claimant as a result of the fraudulent or improper use of the corporate form.[12]

Here, the only person or entity that plausibly had control over THI and THMI was the GTCR Group. The Plaintiffs allege, among other things, that the GTCR Group: owned nearly 83% of the shares of THI and THMI (through its ownership interest in THIH); placed its principals on the board of directors for THI and THMI; was responsible for the day-to-day operations of THI and THMI under a Professional Services Agreement (or otherwise) and made all material financial and strategy decisions for those entities; and held itself out as the operator of THI and THMI to those entities' vendors. The GTCR Group contends that the allegations in the complaint are consistent with a run-of-the-mill parent-subsidiary relationship, and it also notes the complaint lacks any allegations that the GTCR Group failed to observe the corporate formalities.

While the Court tends to agree with the GTCR Group that any one of facts alleged in the complaint (i.e., an 83% ownership interest, majority control of the board, day-to-day control over business operations, etc.), taken by itself, would not plausibly give rise to domination or control, all of the facts—when taken together—could. For that reason, GTCR's argument on that point is unavailing at the pleading stage and would be better raised on summary judgment. As to the other Defendants, the Plaintiffs fail to satisfy the domination and control element (at least with respect to THI).

The closest they come, in some respects, is Jannotta, a principal of the GTCR Group who served as a director for THI and THMI. Aside from his position as one of three board members,

---

[12] *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 468-69 (Bankr. M.D. Fla. 1994). In *Hillsborough Holdings*, Judge Paskay explained that the law with respect to veil piercing in Florida and Delaware are "functionally the same." *Id.* at 468 (citing *In re Rodriguez*, 895 F.2d 725 (11th Cir. 1990).

though, nothing else in the complaint plausibly demonstrates Jannotta dominated and controlled THI or THMI. As for Ventas and GECC, the facts of the complaint really allege nothing more than a lender-borrower relationship—albeit aggressive secured lenders. And the complaint does not allege any facts showing THI-Baltimore, FLTCH, FAS, Forman, Grunstein, or Schron exercised any control over THI and THMI before the March 2006 transaction. Because the complaint—at best—only alleges conceivable domination and control by entities or individuals other than the GTCR Group, the alter-ego and veil-piercing claims against all of the Defendants other than the GTCR Group must be dismissed.

That leaves for consideration whether the Plaintiffs have sufficiently alleged the second element to state a claim for alter-ego liability or veil-piercing against the GTCR Group: creation or use of the corporate form for an improper purpose.[13] A close reading of the complaint reveals it is devoid of any allegations that the *corporate form* of THI or THMI was used for an improper purpose. The allegations in the complaint recognize THI and THMI were initially created for a legitimate purpose. And there is no question—based on a review of the allegations of the complaint—that THI and THMI were used for the legitimate purpose of operating nursing homes for years. The only alleged improper or fraudulent conduct is that the GTCR Group (along with others) concocted a "bust-out" scheme that would ultimately put the assets of THI and THMI out of reach of their creditors—thereby protecting the GTCR Group's investment.

While that may be improper or fraudulent conduct (assuming the allegations are true), it does not involve the improper use of THI's or THMI's corporate form. For instance, the GTCR Group did not create THI or THMI for the purpose of receiving a fraudulent transfer. Nor was either THI or THMI the recipient of a fraudulent transfer. Instead, the Plaintiffs simply allege

---

[13] *Hillsborough Holdings*, 166 B.R. at 468-69.

that the GTCR Group fraudulently transferred corporate assets or a corporation to a third party. The only real allegation involving an improper or fraudulent use of the corporate form involves the Debtor's creation.

The complaint does plausibly allege that the Debtor was essentially created as a sham corporation. According to the complaint, the Debtor was formed for the sole purpose of receiving THMI's liabilities, while its assets were secreted away to FLTCH. But there is no allegation that the GTCR Group had any actual involvement in the Debtor's creation or that GTCR had any control over the Debtor. The Court is unaware of any theory whereby a creditor of THI or THMI could pierce the corporate veil or hold the shareholders of THI and THMI (or its upstream parents) liable under an alter-ego theory because a third party created a sham corporation to house fraudulently transferred assets. To the extent the theory is that the GTCR Group misused the corporate form by knowingly transferring liabilities to a sham corporation, that is not what caused the loss. It is the transfer of the assets from THI or THMI that caused the loss. So, even if the second element is satisfied, the third element is not, and as a consequence, the Plaintiffs cannot state a claim against the GTCR Group under any alter-ego or veil-piercing theories.

Nor do they state an alter-ego or veil-piercing claim against the Fundamental Entities (FAS, THI-Baltimore, FLTCH, Forman, Grunstein, and Schron). As just discussed, the Plaintiffs have plausibly alleged the second element (i.e., fraudulent or improper use of the corporate form) against some of the Fundamental Entities. After all, there are sufficient facts alleged that would demonstrate the Debtor is a sham entity created solely to house THMI's liabilities. Surely that is an improper or fraudulent purpose. But the Plaintiffs cannot satisfy either the first or third elements. Taking the third element first, the transfer of THMI's liabilities to the Debtor did not cause Plaintiffs' loss. More importantly, the Plaintiffs have not alleged that any of the

Fundamental Entities dominated and controlled the Debtor. Short of incorporating the Debtor, the Plaintiffs do not allege how the Fundamental Entities controlled the Debtor. The real allegation is that the Fundamental Entities (or at least some of them) controlled THMI after the March 2006 linked transactions. Because the Plaintiffs cannot satisfy the first or third elements for state a claim for alter-ego or veil-piercing liability, Count X must be dismissed.

The Plaintiffs state a claim for relief<br>against Jannotta for breach of fiduciary duty

The complaint asserts two counts of breach of fiduciary duty against the GTCR Group, Jannotta, and THIH. In Count II of the complaint, the Trustee (on behalf of THMI) alleges that the GTCR Group, Jannotta, and THIH breached their fiduciary duties to THMI. In Count III, the Probate Estates allege those same defendants breached their fiduciary duties to THMI's creditors. There is no disagreement over the required elements for a breach of fiduciary duty claim: the Plaintiffs must allege the existence of a duty and breach of that duty to state a claim for relief.[14]

Naturally, the starting point for analyzing a motion to dismiss a breach of fiduciary duty claim is the existence of a fiduciary relationship. Here, the GTCR Group and THIH say they did not owe THMI a fiduciary duty because they were merely "upstream parents of or investors in THMI's own parent." According to the GTCR Group and THIH, a direct parent does not owe a fiduciary duty to a wholly owned subsidiary, nor do more remote corporate parents. Since none of the Defendants dispute that Jannotta (a director of THI and THMI) owed a fiduciary duty to those entities, the only question is—at least as far as the existence of a fiduciary duty goes— whether the GTCR Group and THIH owes THI and THMI a fiduciary duty.

---

[14] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013).

The Court concludes they do not. The Court finds the court's reasoning in *Asarco, LLC v. Americas Mining Corp.*[15] persuasive on this point. There, Asarco asked the district court to hold that a parent corporation owes a fiduciary to duty to its wholly owned subsidiary (and any creditors of the subsidiary) if the subsidiary is insolvent.[16] Initially, the court noted that Asarco's argument was essentially a hybrid of two principles: (i) a parent owes a fiduciary duty to a subsidiary's minority shareholder; and (ii) directors owe fiduciary duties to an insolvent subsidiary (or a subsidiary operating in the zone or vicinity of insolvency).[17] But the problem with that hybrid approach, according to the court, is that it creates a new fiduciary duty where none previously existed. The court observed that the principle that a director of an insolvent corporation owes a duty to the corporation's shareholders does not create a new duty; it simply adds beneficiaries of that duty (creditors in addition to shareholders). By contrast, finding the existence of a duty owed by a corporate parent would actually impose a new duty. This Court, like the court in *Asarco*, is unwilling to impose a new fiduciary duty where one did not previously exist.

It is worth mentioning—as the *Asarco* court did—that there is no need to impose a new duty on corporate parents of wholly owned subsidiaries.[18] To the extent the corporate parent was involved in a breach of fiduciary duty, Delaware law recognizes claims for aiding and abetting a fiduciary duty.[19] That claim can "fill the gap" where a fraudulent transfer or other claim may not be cognizable. Below, the Court will discuss whether the Plaintiffs have stated a claim against

---

[15] 396 B.R. 278 (S.D. Tex. 2008).

[16] *Id.* at 415.

[17] *Id.*

[18] *Id.* at 415-16.

[19] *Id.*

the GTCR Group or THIH for aiding and abetting a fiduciary duty. For now, the Court concludes that only Jannotta owed a fiduciary duty to THI and THMI, so it will consider whether the Plaintiffs have alleged sufficient facts to show that Jannotta plausibly breached his fiduciary duty.

Jannotta argues that the Plaintiffs fail to make the required showing for five reasons: First, the Plaintiffs improperly lump Jannotta together with the GTCR Group and THIH, without ever specifying which Defendant committed which act. Second, the breach of fiduciary duty claim is based on eleven wrongful decisions, but according to Jannotta, the Plaintiffs fail to allege that THMI (the company whose board he sits on) made any of those decisions. Third, the Plaintiffs fail to allege any conflict of interest that could give rise to a breach of the duty of loyalty. Fourth, the Plaintiffs fail to allege any harm to THMI. Fifth, the Plaintiffs fail to allege sufficient facts to overcome the business judgment rule. While those arguments have some appeal, at least initially, they are ultimately unavailing at this stage.

There is no question that the Plaintiffs' pleading is unwieldy and confusing, thanks in no small part to the Plaintiffs' practice of lumping Defendants together in groups without differentiating the conduct of each specific Defendant. It is also true that, at times, that poor pleading practice obscures the nature of the Plaintiffs' claims. But, with respect to the fiduciary duty claims, it is possible to discern the substance of the claims.

According to the Plaintiffs, Jannotta is a principal in the GTCR Group, a venture capital firm that sought out to build a nationwide nursing home empire for the purpose of securing a financial benefit for its principals. When THI and THMI, two companies that the GTCR Group invested over $40 million into, ran into financial problems, the GTCR Group conspired to allow THI's two primary secured lenders (GECC and Ventas) to loot the company to repay their loans

before ultimately selling it (as well as THMI's assets) to FLTCH for far less than fair market value in an effort to preserve at least some of its substantial investment in the company (and that of its principals). Along the way, Jannotta served as a director for THI and THMI. Those facts—assuming they are true—more than meet the pleading standard for stating a claim for breach of fiduciary duty.

At a minimum, those facts give rise to a plausible conflict of interest: Jannotta—a principal of a company that invested over $40 million in THI—was more interested in preserving any portion of GTCR's investment than preserving THI's going concern for the benefit of its creditors. The complaint also alleges that Jannotta benefitted from allowing THI to be looted and its assets (along with those of THMI) sold—even at less than fair market value—because the sales proceeds were used to resolve litigation pending against the GTCR Group and Jannotta personally. And the complaint alleges that the GTCR Group opted not to have THMI file for bankruptcy and instead allowed its assets to be looted for the benefit of GTCR and its principals, so the complaint does allege potential harm to THMI and its creditors.

Does the complaint lack specifics regarding who made which of the wrongful decisions? It does. Could the complaint have alleged more facts to overcome the business judgment rule? Most likely. But those questions misunderstand the Plaintiffs' burden at the pleading stage. The Plaintiffs need not prove their claims in their pleadings. The Plaintiffs only need to allege enough facts to nudge the claim for relief from the realm of conceivable to plausible, and because they have done that here with respect to Jannotta, the motion to dismiss with respect to the breach of fiduciary duty claims against Jannotta should be denied (while the motions to dismiss with respect to the GTCR Group and THIH should be granted).

The Plaintiffs state a claim for relief against GTCR, THIH, THI-Baltimore,
FLTCH, Forman, and Grunstein for aiding and abetting a breach of fiduciary duty

In addition to alleging that the GTCR Group, Jannotta, and THIH breached their
fiduciary duties to THMI and its creditors, the Plaintiffs allege those Defendants and the
remaining Defendants (GECC, Ventas, THI-Baltimore, FLTCH, FAS, Forman, Grunstein, and
Schron) are liable for aiding and abetting any alleged breach of fiduciary duty. The Court's
conclusion that the Plaintiffs state a claim for relief against Jannotta for breach of fiduciary duty
resolves a threshold argument by the Defendants that a plaintiff cannot state a claim for aiding
and abetting a breach of fiduciary duty if there is no underlying breach in the first place.[20] That
leaves for the Court's consideration whether the remaining Defendants actually aided and abetted
Jannotta's breach.

The parties, again, largely agree on the elements of a claim for aiding and abetting a
breach of fiduciary duty. To state a claim for aiding and abetting, the Plaintiffs must allege that
the remaining Defendants knowingly participated in Jannotta's breach of fiduciary duty.[21] More
specifically, the Plaintiffs must allege that the remaining Defendants knew that Jannotta's
conduct constituted a breach of a fiduciary duty and that they gave substantial assistance or
encouragement to him in committing the breach.[22] The primary disagreement appears to be with
the specificity of the allegations against the remaining Defendants.

---

[20] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (holding that a plaintiff must allege the existence of a
fiduciary a duty and breach of that duty in order to state a claim for aiding and abetting a breach of fiduciary duty).

[21] *Id.*

[22] *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *2 (Del. Nov. 30, 2004). In *Anderson*, the Delaware Supreme
Court distinguished between aiding and abetting and conspiracy. A conspiracy, the court observed, involves an
agreement to participate in wrongful activity. Aiding and abetting simply requires a defendant to knowingly give
substantial assistance to someone who performs wrongful conduct. *Id.*

The remaining Defendants say any allegations regarding their alleged knowing participation in any breach are, at best, generalized and conclusory. GECC, for instance, argues that the complaint is completely devoid of any specific allegations regarding how GECC became aware of Jannotta's alleged wrongful actions. The Plaintiffs, however, contend that the remaining Defendants are overstating their pleading burden: according to the Plaintiffs, they need only allege facts from which the remaining Defendants' knowing participation can be reasonably inferred.

The Court agrees with the Plaintiffs that they need only plead enough facts for the Court to be able to infer the remaining Defendants' knowing participation.[23] And, while the Plaintiffs' complaint is not a model of clarity, it does allege enough facts for the Court to infer—for purposes of ruling on a motion to dismiss—whether or not the Plaintiffs sufficiently alleged that the remaining Defendants knowingly participated in Jannotta's alleged breach of fiduciary duty. Based on the Court's reading of the complaint, the Plaintiffs have met that burden with respect to some of the remaining Defendants and have failed to meet it with respect to others.

The Plaintiffs' complaint centers around the alleged "bust-out" scheme: the GTCR Group invested millions into THI and THMI. Starting in 2003, it became apparent that the GTCR Group's investment was at risk when THI is discovered to have falsified its financial statements (overstating its income and understating its expenses by millions). And the situation only worsened when THI and THMI became the subject of numerous negligence actions. So the GTCR Group, in an effort to save some of its investment, hatched a scheme whereby it allowed THI's primary lenders (GECC and Ventas) to siphon millions from the company in the form of interest and fees only to later sell the company to the Fundamental Entities for far less than fair

---

[23] *Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Business Fin. Servs., Inc.)*, 362 B.R. 135, 145 (Bankr. D. Del. 2007); *In re Shoe-Town, Inc. Stockholders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990).

market value, with the end result that THI-Baltimore, FLTCH, FAS, Forman, and Grunstein get a company worth—when stripped free from its liabilities—over $100 million for less than $10 million, the GTCR Group pockets $10 million for a company whose assets would have gone to pay hundreds of millions (if not billions) of dollars in judgments, and the Debtor ends up with a liability-ridden shell company.

From those facts, the Court can reasonably infer that the GTCR Group and THIH knowingly participated in Jannotta's alleged breach of fiduciary duty. After all, Jannotta is a principal of the GTCR Group and sat on the board of directors for THIH, THI, and THMI all the way up to the linked transactions in March 2006. The GTCR Group also placed another one of its principals (Ethan Budin) on the board of directors for THIH, THI, and THMI, although Budin only served on the THIH board through June 2004 (which was still during the time it was discovered that THI falsified its financials). And the GTCR Group, which invested millions of dollars in THI, was intimately involved in the day-to-day management of THI. Plus, the scheme, as alleged, would have inured to GTCR's benefit. Given all of that, the Court concludes the Plaintiffs state a claim against GTCR and THIH for aiding and abetting a breach of fiduciary duties.

The Court can likewise infer that the some of those referred to in the complaint as "the Fundamental Entities" knowingly participated in Jannotta's alleged breach of fiduciary duty. According to the complaint, FLTCH paid less than $10 million for $100 million in assets (in some sense, it could be said that THMI's assets went to THI-Baltimore first, which was then sold to FLTCH). More important, Forman and Grunstein, who own FLTCH and would benefit from FLTCH's receipt of THMI's assets, created the Debtor solely for the purpose of housing THMI's liabilities as part of the March 2006 linked transactions. From those facts, the Court can

reasonably infer—at least at the pleading stage—that THI-Baltimore, FLTCH, Forman, and Grunstein knowingly participated in Jannotta's breach of fiduciary duty. So the Plaintiffs state a claim for aiding and abetting a breach of fiduciary duty against THI-Baltimore, FLTCH, Forman, and Grunstein, as well.

But the Plaintiffs fail to state a claim for relief for aiding and abetting against FAS and Schron. With respect to FAS, it was not even in existence at the time the "bust-out" scheme took place. It was not created until six months after the March 2006 linked transactions. The complaint does not allege that Jannotta breached any fiduciary duty after that point in time. And a close reading of the complaint is for the most part silent (or certainly nonspecific) about Schron's role—other than conclusory allegations (which the Court need not, and does not, accept) that Forman and Grunstein were acting as Schron's agents.

The Plaintiffs likewise fail to state a claim for relief for aiding and abetting against GECC and Ventas. Distilled to their essence, the aiding and abetting claims against GECC and Ventas stem principally from two acts: (i) participating in the onerous loan agreements with THI; and (ii) giving its blessing to the linked transactions in March 2006. Neither of those acts gives rise to a breach of fiduciary duty claim. To begin with, the Court agrees with Ventas that it—as a commercial lender—is not liable for aiding and abetting a fiduciary duty simply because it is a counterparty to the forbearance agreements.[24]

As for the allegations that GECC and Ventas signed off on the March 2006 linked transactions, the Court cannot reasonably infer from the facts of the complaint that GECC and Ventas knowingly participated in that breach. The Court understands the Plaintiffs' argument that it is not up to the Court at the pleading stage to determine whose theory of the case—the

---

[24] *McGowan v. Ferro*, 2002 WL 77712 (Del. Ch. Jan. 12, 2002).

Plaintiffs' theory or that of GECC and Ventas—is more plausible. The problem here is that the Plaintiffs' theory—THI's primary secured lenders knowingly signed off on THI fraudulently transferring away all of its revenue-generating assets to third parties—is not at all plausible. Accordingly, the aiding and abetting claims against GECC and Ventas must be dismissed.

The Plaintiffs state a claim for relief against THI-Baltimore,
<u>FLTCH, FAS, Forman, and Grunstein for fraudulent transfer</u>

In the Court's view, the main thrust of this case is the Plaintiffs' claims for fraudulent transfer. In all, the Plaintiffs allege a total of eight counts for fraudulent transfer against the Defendants (Counts XIV - XXI). Four of those counts are for actual fraud, and four are for constructive fraud. It does not appear that the elements to state a claim for relief for fraudulent transfer—whether actual or constructive—are subject to much dispute.

To state a claim for actual fraudulent transfer, the Plaintiffs must allege that THI or THMI made a transfer (during the relevant time period) with the actual intent to hinder, delay, or defraud its creditors.[25] Since a defendant rarely admits actual intent (and actual intent is otherwise difficult to prove), courts traditionally look to the badges of fraud that everyone is familiar with to determine the existence of actual intent.[26] By comparison, the pleading burden is reduced for constructive fraudulent transfer claims. For constructive fraud claims, the Plaintiffs need not prove an actual intent to defraud. Instead, constructive fraud claims are based on the transferor's financial condition at the time of the transfer and the adequacy of consideration for

---

[25] *Mukamal v. Am. Express Co. (In re Arrow Air, Inc.)*, 2012 WL 6561313, at *4 (Bankr. S.D. Fla. Dec. 14, 2012). There appears to be a dispute about which law applies to the Plaintiffs' fraudulent transfer claims. According to the Plaintiffs, the law of Delaware, Florida, Maryland, and New York apply. But the Plaintiffs acknowledge the laws of those states contain substantially similar elements. So the Court will, as Ventas suggests, analyze the claims under Florida law.

[26] *Dev. Specialists, Inc. v. Hamilton Bank (In re Model Imperial, Inc.),* 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000); *see also* § 726.105(2)(a)-(k), Fla. Stat. (listing the "badges of fraud").

the transfer.[27] To prove a claim for constructive fraudulent transfer, the Plaintiffs need only allege the amount of transfer by THI or THMI, that THI and THMI were insolvent, and that THI and THMI did not receive reasonably equivalent value for the transfer.[28]

The Court concludes that the Plaintiffs easily satisfy their pleading burden for stating a claim for relief against THI-Baltimore and FLTCH. The complaint alleges a deliberate scheme to transfer the assets of THI and THMI to FLTCH (really through THI-Baltimore) in order to put them out of the reach of creditors. According to the Plaintiffs, those assets were worth over $100 million three months before the transfer to FLTCH. Yet, FLTCH only paid $9.9 million for those assets. And the complaint includes a number of other facts satisfying several of the badges of fraud: the transfer was concealed; before the transfer was made, THI and THMI had been sued; the transfer was of all of THMI's assets; and THMI (and THI) became insolvent shortly after the transfer. The complaint unquestionably states claims for fraudulent transfer against THI-Baltimore and FLTCH.

The same is true for Forman and Grunstein, but for a slightly different reason. According to the complaint, the transfer was not made directly to Forman or Grunstein. But under section 550, the Trustee may recover the value of a transfer from the entity for whose benefit the transfer was made. The Court concludes that the facts of the complaint plausibly allege that the transfer of THMI's assets to FLTCH was for the benefit of Forman and Grunstein since they owned FLTCH—a closely held company.

---

[27] *Court-Appointed Receiver for Lancer Mgm't Group, LLC v. 169838 Canada, Inc.*, 2008 WL 2262063, at *3 (S.D. Fla. May 30, 2008).

[28] *Id.*; *see also Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 735 (Bankr. S.D.N.Y. 2008).

Rubin Schron is a different story. Like Forman and Grunstein, there is no allegation in the complaint that he was the direct recipient of THMI's assets. By the plain terms of the relevant stock purchase agreement, FLTCH was the recipient. Instead, Schron allegedly benefitted from the transfer because of his connection to FLTCH. But a fair reading of the allegations of the complaint—and the Court concedes the allegations appear contradictory at times—reflects that Schron did not own FLTCH. The Plaintiffs cannot overcome that defect by simply alleging in conclusory fashion—as they do—that Forman and Grunstein were acting as Schron's agents. Nor is the allegation that Schron concocted some mortgage-backed securities scheme, which as far as the Court can tell is largely irrelevant, sufficient to overcome that defect either. Because Schron had no ownership interest in FLTCH, the complaint does not plausibly allege that the transfer of THMI's assets was for his benefit.

As for the GTCR Group and Jannotta, the only alleged transfers they received is fees and interest from THI for loans the GTCR Group made to or procured for THI. Those transfers, however, were made one or two years before THI even defaulted on its loans with Ventas and GECC and before the various lawsuits were filed against THI. So those transfers do not give rise to a plausible claim for actual fraud, nor do they give rise to a claim for constructive fraud since the complaint does not allege that those transfers were made while THI was insolvent or in the zone of insolvency or that THI did not receive reasonably equivalent value.

That leaves THI's secured lenders: Ventas and GECC. The only transfer Ventas and GECC allegedly received is millions of dollars in fees and interest under the terms of certain forbearance agreements. There is one fatal defect in their claims against Ventas and GECC. The Plaintiffs fail to plausibly allege that THI did not receive reasonably equivalent value for the payments of millions of dollars of interest and fees to Ventas and GECC.

There, of course, is nothing unusual about a borrower who is in default entering into a forbearance agreement and paying increased fees and interest to avoid default. In those cases, the lender's forbearance is the consideration for the fees and costs. What makes it appear potentially fraudulent from the complaint is the fact that it was millions of dollars in fees and interest. To be sure, the payment of millions of dollars in fees and interest does potentially raise a red flag. But the complaint does not say how many millions. And according to the complaint, Ventas and GECC held $75 million in outstanding loans. So even a one-percent increase in the interest rate could generate millions in additional interest over time. Plus, avoiding a default had real value to THI since, as the Plaintiffs allege in the complaint, THI's business would have been crippled had it been declared in default. Absent some facts regarding the amount of interest and fees received by Ventas and GECC, any fraudulent transfer claim is, at best, merely conceivable—not plausible—and therefore must be dismissed.

The Plaintiffs state a claim for relief against
THI-Baltimore, FLTCH, and FAS for successor liability

In Count VIII of the Complaint, the Plaintiffs assert a claim against THI-Baltimore, FLTCH, FAS, Forman, Grunstein, and Schron for successor liability. The gravamen of that claim is that FLTCH received all of THMI's assets and continued operating the same nursing homes out of the same location using the same management, employees (performing essentially the same job function), equipment, and logos. According to the Plaintiffs, FLTCH and FAS took numerous actions on THMI's behalf, including emptying its bank accounts, holding themselves out as the THMI's decision-makers, and controlling THMI's litigation. THMI, of course, went out of business after the March 2006 linked transactions. The Defendants say the Plaintiffs fail to state a successor liability claim because the Plaintiffs are unable to allege a continuity of ownership between THMI, on the one hand, and THI-Baltimore, FLTCH, and FAS, on the other

(and Schron says there is no legal basis for holding an individual liable under a successor liability theory).

The Plaintiffs, however, argue that successor liability can be established on any of four grounds: (i) the successor corporation expressly or impliedly assumed the obligations of the predecessor corporation; (ii) the transaction was a *de facto* merger; (iii) the successor corporation is a mere continuation of the predecessor corporation; or (iv) the transaction was a fraudulent effort to avoid the liabilities of a predecessor corporation.[29] The Plaintiffs do not argue there was an express or implied contract in this case. And despite their best efforts to shoehorn this case into the second exception, it is not clear to the Court that the *de facto* merger exception applies. It appears the Plaintiffs come closer to alleging facts sufficient to fall within the "mere continuation" exception, but the Court need not address that issue because the Plaintiffs unquestionably allege enough facts to fall within the final exception (i.e., the transaction was a fraudulent effort to avoid THMI's liabilities).

The entire theory of the complaint is that FLTCH, Forman, and Grunstein created the Debtor as a sham corporation to acquire all of THMI's liabilities, while FLTCH received all of THMI's assets (through its acquisition of THI-Baltimore, which, in some sense, could be plausibly viewed as having received THMI's assets first). And according to the complaint, FLTCH paid less than fair market value for the assets it acquired. Because the complaint sufficiently alleges that the linked transactions were fraudulent, the Plaintiffs have sufficiently alleged successor liability against THI-Baltimore, FLTCH and FAS, which, according to the complaint, are carrying on the business of THMI (and THI) under a new name.

---

[29] *In re DESA Holdings Corp.*, 353 B.R. 419, 420 n.2 (Bankr. D. Del. 2006) (citing *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006)).

But what about Forman, Grunstein, and Schron? Schron argues that the successor liability theory cannot be applied against an individual. Schron says only a company can be held liable under a successor liability theory. The Plaintiffs say the case law relied on by Schron does not support that proposition. To support their contention that an individual can be held liable under a successor liability theory, the Plaintiffs rely on *Battino v. Cornelia Fifth Avenue*.[30]

That case, however, does not support the Plaintiffs' proposition. For starters, the court in *Battino* held—applying New York law—that neither the *de facto* merger nor the mere continuation exception applied in that case.[31] The court went on to apply a broader test for "substantial continuity" used by federal courts in the labor and employment context.[32] When analyzing the individual defendant's liability, the Court specifically noted it was not considering whether he was a "successor," but rather whether he was deemed an employee under the Fair Labor Standards Act.[33] So *Battino*—the sole legal support for the Plaintiffs' contention—does not support holding Schron (and, by extension, Forman and Grunstein) liable under a successor liability theory.

The Plaintiffs state a claim for civil conspiracy
against THI-Baltimore, FLTCH, FAS, Forman, and Grunstein

The Plaintiffs allege that all of the Defendants are liable for conspiracy to commit a fraudulent transfer under Illinois (the GTCR Group), Maryland (GECC and Ventas), and New York (THI-Baltimore, FLTCH, FAS, Forman, Grunstein, and Schron). It does not appear from any of the cases cited by the Plaintiffs, however, that non-transferors or non-transferees that

---

[30] 861 F. Supp. 2d 392 (S.D.N.Y. 2012).

[31] *Id.* at 400-01.

[32] *Id.* at 401-02.

[33] *Id.* at 408.

34

neither control nor benefit from fraudulently transferred assets—regardless of which state's law applies—can be held liable for civil conspiracy. For that reason, the conspiracy claims against the GTCR Group, GECC, Ventas, and Schron must be dismissed. But New York does recognize a conspiracy claim where the recipient of a fraudulent transfer commits an overt act in furtherance of that transfer,[34] and the Plaintiffs have alleged THI-Baltimore, FLTCH, FAS, Forman, and Grunstein committed an overt act in furtherance of a fraudulent transfer they received, so the conspiracy claims against them stand.

The Court will not dismiss the Plaintiffs'
claims based on the statute of limitations

A number of Defendants claim that the Plaintiffs' claims for aiding and abetting a breach of fiduciary duty and fraudulent transfer are barred by the statute of limitations. According to the Defendants, the last act giving rise to the Plaintiffs' claims occurred in 2006—over seven years before this proceeding was filed. Even if the filing of the THI receivership triggered the statute of limitations, the Plaintiffs' claims still would be time barred, regardless of whether a two-year, three-year, or four-year statute of limitation applied.

The Plaintiffs, however, contend that any applicable statute of limitations has been tolled because the Defendants have concealed the facts giving rise to the claims in this proceeding. They also argue that the statute of limitations has not yet run on the fraudulent transfer claim against the Fundamental Entities (FLTCH, FAS, THI-Baltimore, Forman, Grunstein, and Schron) because all of the various phases of the "bust-out scheme" can be collapsed into a single transaction under New York law, with the Defendants entering into a settlement agreement in January 2012—well within the statute of limitations. The Defendants say the Court must reject

---

[34] *In re Allou Distrib., Inc.*, 379 B.R. 5, 36 (Bankr. E.D.N.Y. 2007). It does not appear from the filings that THI-Baltimore, FLTCH, FAS, Forman, or Grunstein dispute that New York law applies or that a civil conspiracy claim exists. They simply allege it was not properly alleged. Adv. Doc. No. 79 at 17-18 & Adv. Doc. No. 106.

the Plaintiffs' equitable tolling argument because the Plaintiffs fail to allege any facts supporting the application of that doctrine.

The Court disagrees. As set forth above, the Plaintiffs allege—even if not in the most clear and concise manner—that the Defendants (at least the GTCR Group, FLTCH, Forman, and Grunstein) hatched a scheme to sell THMI's assets to FLTCH for less than fair market value and then conceal that transfer (first by having THI file for receivership rather than bankruptcy and later by having FAS taking control of THMI's state-court litigation) until after the limitations period had expired. It is certainly true that the Plaintiffs have not proven that equitable tolling (or any other equitable doctrine) applies, but that is not the standard.

Two different standards are at play here. The first one is the general pleading standard—i.e., that the Plaintiffs need only allege enough facts to nudge their claim from the realm of conceivable to plausible.[35] The second, and more relevant standard, is that an affirmative defense ordinarily is not a basis for a motion to dismiss unless the defense is clear on the face of the pleadings.[36] Here, there are enough facts of a possible concealment that the Defendants' statute of limitations defense is not clear on the face of the pleadings.

So the Court will not dismiss the Plaintiffs' claims on that basis at this stage of the proceeding. Denial of the motions to dismiss on that basis is without prejudice. The Defendants are free to raise the statute of limitations as an affirmative defense, which is better suited for summary judgment.

---

[35] *Scharrer v. THI Holdings, LLC (In re Fundamental Long Term Care, Inc.)*, 494 B.R. 548, 554 (Bankr. M.D. Fla. 2013).

[36] *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993).

<u>The doctrine of *in pari delicto* does not
bar the Plaintiffs' claims at the pleading stage</u>

THI-Baltimore, FLTCH, FAS, Forman, and Grunstein argue that the Court must dismiss the aiding and abetting (and conspiracy to commit) breach of fiduciary duty claims against them based on the doctrine of *in pari delicto*. Under the equitable doctrine of *in pari delicto*, a plaintiff is barred from asserting a claim if the plaintiff participated in the wrongdoing that was a substantial cause of the alleged damages.[37] Here, the Defendants contend that, according to the complaint, THMI is alleged to have participated in every step of the fraudulent "bust-out" scheme, and even if the bad conduct was by THMI's directors, the bad conduct of a director can be imputed to THMI.

The Plaintiffs principally raise three reasons why the *in pari delicto* defense, at least from their perspective, does not bar their claims. First, they say the defense is not absolute; a court can decline to apply it where the plaintiff's culpability is far less than that of the defendant's. Second, the "adverse interest exception" provides that an agent's conduct is not imputed to the corporation if the agent was acting in his or her own self-interest. Third, they say fraud cannot be imputed to a chapter 7 trustee. For those three reasons, the Plaintiffs say it would be inappropriate to dismiss their claims based on the *in pari delicto* defense at this stage.

The Court agrees. As mentioned above, an affirmative defense is an appropriate basis of a motion to dismiss only where it is clear on the face of pleadings.[38] Here, the Court is not persuaded the *in pari delicto* defense is clear. At a minimum, there is a question—even assuming an agent's conduct can be imputed to the corporation—whether the adverse interest exception

---

[37] *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001).

[38] *Fortner*, 983 F.2d at 1028.

applies. Because the *in pari delicto* defense is not clear on its face, it is not grounds for dismissing Counts VI, VII, and XXII at this stage.

The Plaintiffs have standing to assert their claims
<u>that are not derivative of the Debtor, THI, or THMI</u>

FLTCH, FAS, Forman, and Grunstein all contend the Probate Estates must be dismissed from this complaint because they lack standing. That standing argument is premised on three assumptions: (i) only the Trustee has standing to pierce the Debtor's corporate veil, assert breaches of a fiduciary duty owed to the Debtor, or avoid any fraudulent transfer by the Debtor; (ii) only the Trustee has standing to assert claims through THMI; and (iii) none of the parties have standing to assert claims through THI. Even if all three assumptions underlying their standing argument are true, it does not lead to the conclusion they urge.

To begin with, the Probate Estates assert a number of claims that are not derivative of the Debtor, THI, or THMI. They have their own breach of fiduciary duty claims—based on a breach of fiduciary duty owed to THI's creditors—against many of the Defendants, as well as claims for aiding and abetting breaches of that fiduciary duty. They also have alter ego claims and veil piercing claims against entities and individuals other than the Debtor (the Court already dismissed the veil piercing claim against the Debtor). So it is not appropriate to dismiss the Plaintiffs from this proceeding in its entirety.

There are a handful of claims—i.e., namely, the fraudulent transfer claims—that are derivative of either THI or THMI. But the Trustee is a party to those claims. For that reason, those claims should not be dismissed. The Probate Estates, however, can be dismissed from those counts since the Trustee is the proper party with standing to assert those claims. Other than the fraudulent transfer claims, the Plaintiffs shall remain party to the remaining counts.

38

**CONCLUSION**

The Defendants are right to complain about the Plaintiffs' pleading practices in this case. In fairness, the Plaintiffs are in somewhat of a "catch-22": if they do not allege enough facts, the Defendants will claim it is because they do not exist; if they allege too many, the Defendants will say it is a sign the Plaintiffs are desperately taking an "everything but the kitchen sink" approach. Nevertheless, the Court shares the frustration Judge Merryday expressed in a case the Probate Estates filed in district court:

> In sum, the complaint is a confusing, ambiguous, generalized, conclusory, and uninformative (and intermittently melodramatic) paper. The complaint requires considerable energy to read with patience and to attempt to understand with confidence.[39]

The complaint in this case, unfortunately, shares many of the same pleading deficiencies Judge Merryday complained of. Most problematic, the complaint here repeatedly attributes acts to entire groups of individuals and entities—i.e., "the THI Enterprise," "the Fundamental Enterprise," etc. As Judge Merryday observed, the constant attribution of individual acts to groups can—and, in that case, did—disguise much of the information necessary to glean the meaning of the critical allegations.[40] Having said that, this Court (particularly given the two years it has spent dealing with all of these parties in the main bankruptcy case) is able to glean the meaning of the critical allegations—albeit not without considerable energy.

And in doing so, the Court concludes (for the reasons set forth above) the Plaintiffs fail to state a claim for relief under any alter-ego or veil-piercing theories but that they do state causes of action against (i) Jannotta for breach of fiduciary; (ii) GTCR, THIH, THI-Baltimore, FLTCH, Forman, and Grunstein for aiding and abetting a breach of fiduciary duty; (iii) THI-Baltimore,

---

[39] *Jackson-Platts v. McGraw-Hill Cos.,* 2013 WL 6440203, at *4 (M.D. Fla. 2013).

[40] *Id.*

FLTCH, FAS, Forman, and Grunstein for fraudulent transfer; (iv) THI-Baltimore, FLTCH, and

FAS for successor liability; and (v) THI-Baltimore, FLTCH, FAS, Forman, and Grunstein for

conspiracy to commit a fraudulent transfer. So the motions to dismiss will be denied with respect

to those claims. The remaining claims will be dismissed without prejudice. The Court will enter

a separate order granting the motions to dismiss (without prejudice), in part, and denying them,

in part.

It is worth saying a word about the decision to dismiss the remaining claims without

prejudice. Ordinarily, dismissal of a complaint (or individual claims for relief) should be without

prejudice. Several of the Defendants, however, claim the dismissal should be with prejudice,

either because the Plaintiffs could never state a claim for relief given the facts of this case or

because the Plaintiffs have already had several attempts to plead these same claims. At this point,

the Court is not ready to conclude that the Plaintiffs could not allege additional facts that may

potentially give rise to the causes of action the Court is dismissing, nor does this Court hold

previous dismissals (in different courts) against the Plaintiffs because, while those claims may

have involved many of the same operative facts, they involved different causes of action. But the

Court cautions the Plaintiffs that any future pleadings should cure the pleading defects in this

complaint (and the types of defects Judge Merryday complained of).

**DATED**: __ March 14, 2014 ____.

_____
Michael G. Williamson
United States Bankruptcy Judge


Attorney Steven Berman is directed to serve a copy of this order on interested parties and file a
proof of service within 3 days of entry of the order.

**Steven M. Berman, Esq.**
**Seth P. Traub, Esq.**
**Shumaker, Loop &Kendrick, LLP**
*Counsel for the Chapter 7 Trustee*

**Jeffrey W. Warren, Esq.**
   **Bush Ross, P.A.**
**Gabor Balassa, Esq.**
   **Kirkland & Ellis LLP**
*Counsel for GTCR Associates, VI; GTCR Fund VI, LP; GTCR Golder Rauner, LLC; GTCR Partners VI, LP; GTCR VI Executive Fund, LP; Edgar D. Jannotta, Jr.; THI Holdings, LLC*

**Carol A. Licko, Esq.**
**Hogan Lovells US LLP**
*Counsel for General Electric Capital Corporation*

**Gregory M. McCoskey, Esq.**
   **Akerman Senterfitt**
**Paul V. Possinger, Esq.**
   **Proskauer Rose LLP**
*Counsel for Fundamental Administrative Services, LLC; Fundamental Long Term Care Holdings, LLC*

**Harley E. Riedel, Esq.**
**Daniel R. Fogarty, Esq.**
   **Stichter Riedel Blain & Prosser, P.A.**
**Isaac R. Ruiz-Carus, Esq.**
   **Wilkes & McHugh PA**
*Counsel for the Estates of Juanita Jackson, Elvira Nunziata, Joseph Webb, Opal Lee Sasser, Arlene Townsend, and Francina Spivery-Jones*

**Rod Anderson, Esq.**
   **Holland & Knight LLP**
**Steven Engel, Esq.**
   **Dechert LLP**
*Counsel for Rubin Schron*

**Daniel J. Weiss, Esq.**
**Jenner & Block LLP**
*Counsel for Ventas, Inc. and Ventas Realty Limited Partnership*