UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 8:11-bk-22258-MGW
                                                          Chapter 7
Fundamental Long Term Care, Inc.,

      Debtor.

_____/

Estate of Juanita Jackson, *et al.*,                      Adv. No. 8:13-ap-00893-MGW

      Plaintiffs,

v.

General Electric Capital Corporation,
*et al.*,

      Defendants.

_____/

## <u>MEMORANDUM OPINION ON IN CAMERA EXAMINATION</u>

The Chapter 7 Trustee, one of the Plaintiffs in this adversary proceeding, has deposed

Kristi Anderson twice. During those depositions, Fundamental Administrative Services, LLC

("FAS")—Anderson's former employer—objected to thirty-five questions on the basis of

privilege. At the request of the parties, the Court examined Anderson in camera to determine

whether to sustain the thirty-five privilege objections asserted by FAS.

This Court, after examining Anderson in camera and reviewing FAS's post-examination

memorandum of law, concludes that each of the thirty-five objections should be overruled. There

is one common theme underlying FAS's privilege objections: communications, according to

FAS, are privileged so long they were made between FAS's in-house attorneys or conveyed

information Anderson learned while serving as in-house counsel for FAS. In actuality, not all

communications with or between in-house counsel are protected under the attorney-client privilege or work product doctrine. Only those communications made for the purpose of securing legal advice or made in anticipation of litigation are protected. Here, FAS has failed to demonstrate that any of the communications it objects to disclosing were made for either purpose. Accordingly, the Court will overrule FAS's privilege objections.

In doing so, the Court will deny FAS's request to seal its ruling pending any appeal FAS may take to the district court and, instead, will immediately release a transcript of the in camera examination. FAS's request really amounts to a request for a stay pending appeal. But FAS cannot satisfy the criteria for a stay pending appeal because (i) FAS does not have a substantial likelihood of success on any appeal; (ii) FAS will not be irreparably harmed since, as the United States Supreme Court has previously held, orders compelling alleged privileged information are effectively reviewable on appeal and any potential damage from disclosure can be mitigated by an appropriate protective order; (iii) the Trustee will be substantially burdened because she will effectively be denied discovery in this case and the ability to defend this Court's ruling on appeal; and (iv) continuing to maintain proceedings by this Court secret does not serve the public interest.

### Background

The Debtor in this bankruptcy case is the sole shareholder of Trans Health Management, Inc. ("THMI"). THMI was previously a wholly owned subsidiary of Trans Healthcare, Inc. ("THI"). THI and THMI were sued for negligence or wrongful death by the six probate estates that are plaintiffs in this proceeding (the "Probate Estates"). The Probate Estates—all of whom are creditors in this bankruptcy case—have obtained more than $2 billion in judgments against

THI and THMI.[1] The Debtor was added as a defendant to a $110 million judgment the Estate of Jackson—one of the Probate Estates—obtained against THI and THMI.

According to the complaint in this proceeding, THMI's assets—previously valued at more than $100 million—were fraudulently transferred to Fundamental Long Term Care Holdings ("FLTCH") and FAS (among others) for less than $10 million in an effort to defraud, hinder, or delay the Probate Estates from collecting on their judgments. The Probate Estates and Trustee also contend that FLTCH and FAS are liable on the judgments they obtained against THMI under a successor liability theory. From the outset, the Trustee has been seeking discovery from FAS and others that would establish the claims ultimately asserted in this proceeding.[2]

As part of those efforts, the Trustee sought the litigation files for THMI's defense of the state-court claims brought by the Probate Estates. It appears that THI (and later its state-court receiver) retained counsel to defend THMI in the state-court cases. The Trustee believes the litigation files will show that it was ultimately FAS that was orchestrating THMI's defense. The Trustee believes FAS's control of THMI's state-court defenses—if, in fact, that is the case—will support its fraudulent transfer and successor liability claims.

A number of parties—including THI's state-court receiver, the law firms that defended THMI in state court, Christine Zack (FAS's current in-house counsel), and Kristi Anderson (FAS's former in-house counsel)—objected to the production of the litigation files.[3] The THI

---

[1] The Estate of Juanita Jackson initially obtained a $110 million judgment against THI and THMI on July 22, 2010. The Estate of Elvira Nunziata then obtained a $200 million judgment against THMI on January 11, 2012. One month later, the Estate of Joseph Webb obtained a $900 million judgment against THI and THMI. So a total of $1.2 billion in judgments had been obtained (more or less) by the time the order for relief was entered in this case on January 12, 2012. More recently, the Estate of Arlene Townsend obtained a $1.1 billion judgment against THI. The Court understands that all but the *Jackson* judgment have been appealed and at least one of them has been overturned.

[2] *See, e.g.,* Doc. Nos. 14, 23, 34, 105, 244 & 286.

[3] Doc. Nos. 444, 451, 467, 472, 575, 591 & 631. The privilege issues were thoroughly briefed by the parties. In fact,

Receiver and law firms contended the litigation files were protected from disclosure by the attorney-client privilege. Zack and Anderson also claimed they were work product. The Trustee (who this Court previously ruled stands in the shoes of THMI) claimed she was entitled to the files under the co-client exception to the attorney-client privilege since the law firms had been retained to represent THI and THMI.

In a lengthy memorandum opinion, the Court primarily resolved the privilege issue in favor of the Trustee.[4] In particular, the Court ruled that the Trustee was entitled to invoke the co-client exception to obtain any communications between THI (or the THI Receiver) and the law firms representing THI and THMI—as well as any communications between those law firms and FAS—relating to the defense of the state-court cases.[5] The Court, however, ruled that the Trustee was not entitled to invoke the co-client exception to obtain communications unrelated to the state-court cases.[6]

The Trustee has since deposed Kristi Anderson twice in this proceeding. During her deposition, FAS objected to thirty-five questions based on the attorney-client privilege, work product doctrine, or related privileges.[7] The Trustee moved to overrule FAS's privilege objections.[8] In her motion, the Trustee asked this Court to examine Anderson in camera (with

---

the Trustee, THI Receiver, law firms, and creditors filed a total of 34 memoranda and cited over 80 cases for the Court's consideration.

[4] *In re Fundamental Long Term Care, Inc.*, 489 B.R. 451 (Bankr. M.D. Fla. 2013).

[5] *Id.* at 467-69.

[6] *Id.* at 469.

[7] Twenty-six of the objections were based on the attorney-client privilege, two were based on the co-client exception, two were based on the work product doctrine, and five were based on the pending proceeding rule. The Court need not address the pending proceeding objections since this Court has previously ruled that discovery is not barred simply because there is another adversary proceeding pending so long as the discovery sought is relevant to this proceeding.

[8] Adv. Doc. Nos. 147 & 227.

counsel for FAS and Anderson present) to determine the validity of FAS's privilege objections and then release the portion of the transcript of the in camera examination that the Court determined was not privileged.[9]

On March 28, 2014, the Court examined Anderson in camera. Before the in camera examination, the Trustee submitted proposed categories—and specific questions—for the Court's consideration. During the examination, the Court questioned Anderson using, in part, the topics and questions supplied by the Trustee. FAS, who was present for the in camera examination, had the opportunity to—and, in fact, did—cross-examine Anderson, as well as proffer the testimony of its current in-house counsel, Christine Zack.[10] After the in camera examination, FAS was given an opportunity to review the Transcript and file a legal memorandum raising privilege objections to specific questions.

In its post-examination memorandum, FAS objected to four categories of questions: (i) Christine Zack's authority to speak on behalf of THMI; (ii) FAS's production of documents relating to THMI; (iii) termination of services THMI provided to nursing homes; and (iv) the alleged transfer of THMI's defenses.[11] But FAS fails to identify any particular question that it believes is objectionable.[12] Instead of demonstrating that any of the testimony by Anderson revealed communications made to secure legal advice or made in anticipation of litigation, FAS relies on two propositions: (i) *all* communications to or from Anderson are privileged; and (ii)

---

[9] Adv. Doc. No. 147 at ¶ 8.

[10] *See* Transcript of March 28, 2014 in camera examination (the "Transcript"). The Court will release the Transcript consistent with its ruling in this Memorandum Opinion.

[11] FAS's Supplemental Submission Resulting from *In Camera* Testimony of Kristi Anderson at 5-14 ("Memorandum of Law"). Given that the Memorandum of Law potentially could have included privileged information, the Court directed FAS to submit it directly to chambers without filing it on the docket. Now that the Court has ruled on the privilege issues, the Court will docket the Memorandum of Law.

[12] *Id.*

Anderson's testimony—particularly her testimony concerning alleged Zack's authority to speak on THMI's behalf—is not credible.[13]

## Conclusions of Law

### FAS's privilege objections should be overruled

Before addressing FAS's contention that all communications between or materials generated by in-house counsel are privileged, the Court must first address FAS's contention that Anderson's testimony is not credible. The fact of that matter is that Anderson's credibility is really not an issue before the Court.[14] It appears FAS's real goal in raising Anderson's credibility is to have this Court determine now (on an incomplete record) a factual issue that will ultimately have to be decided at trial—i.e., whether Zack was acting on THMI's behalf. Even assuming Anderson's credibility is at issue, the Court finds FAS's argument that her testimony is not credible unconvincing for two reasons.[15]

First, Anderson's testimony during the in camera examination was not, as FAS suggests, based on hearsay. One of FAS's chief complaints is that Anderson's testimony about Zack's authority to speak on THMI's behalf is based on pure hearsay because her knowledge came from what other people told her. Specifically, FAS cites to Anderson's testimony during the in camera examination where she says "she was told" Zack had authority to speak on THMI's behalf or that

---

[13] *Id.* at 3-10.

[14] Whether a witness' credibility is an issue for purposes of determining the applicability of the attorney-client or other privilege depends on the circumstances. One trial court, for instance, determined that a witness' credibility was central in determining whether a communication was intended to be confidential. *United States v. Evans*, 113 F.3d 1457, 1462 (7th Cir. 1997). In another context, the crime-fraud exception, courts have said they do not assess the credibility of witnesses. *Jones v. Tauber & Balser*, 503 B.R. 162, 181 (N.D. Ga. 2013). Here, the Court does not believe it is necessary to assess Anderson's credibility in determining the applicability of the privilege.

[15] In fact, if it was necessary to assess Anderson's credibility, the Court would conclude that Anderson was credible.

she learned of that supposed authority from an e-mail.[16] Implicit in Anderson's testimony is that she was told about Zack's authority from FAS's employees, and statements made by FAS employees or agents, of course, are not hearsay.[17]

Second, it is not clear to the Court that Anderson's testimony is, as FAS argues, contradicted by her earlier testimony or testimony by others. In its memorandum, FAS cites testimony by Anderson, the THI Receiver, and the THI Receiver's counsel that it says contradicts Anderson's claim that Zack spoke on behalf of THMI.[18] Notably, though, none of the testimony cited by FAS actually states that Zack *did not speak* on THMI's behalf. Perhaps more significantly, when FAS proffered the testimony of Zack at the in camera examination, the proffer did not include any testimony by Zack that she was not authorized to—or, in fact, never did—speak on THMI's behalf.[19] Instead, the testimony cited by FAS in its memorandum merely indicates that, at some point in time, the THI Receiver directed THMI's defense.[20] The Court is not convinced that testimony is necessarily at odds with Anderson's testimony during the in camera examination.[21]

In any event, FAS's focus on Anderson's alleged lack of credibility reveals the critical flaw in its privilege analysis. FAS appears to believe that the Trustee's claim to communications to and from Anderson rests solely on the following syllogism: the Court ruled that the Trustee

---

[16] Memorandum of Law at 6.

[17] Fed. R. Evid. 801(d).

[18] Memorandum of Law at 6-9.

[19] Transcript at 107-09.

[20] Memorandum of Law at 6-9.

[21] At best or worst (depending on the parties' perspective), the testimony by Anderson and that offered by FAS in its Memorandum of Law presents the Court with a choice between two or more witnesses that have each told coherent and facially plausible stories that are not contradicted by the extrinsic evidence.

gets all communications between FAS (including its in-house lawyers) and THMI; Anderson

says that Zack was THMI for all intents and purposes; therefore, the Trustee gets all

communications between Anderson (FAS) and Zack (THMI).[22] In FAS's view, if Zack did not

speak on THMI's behalf, then the Trustee's argument falls apart because the Trustee is not

entitled to purely internal FAS communications under this Court's previous co-client exception

ruling.[23] The problem is that FAS's entire privilege argument hinges on a misunderstanding of

this Court's previous ruling.

This Court previously ruled that the Trustee (standing in the shoes of THMI) was entitled

to invoke the co-client exception to obtain any communications between THI, the THI Receiver,

and FAS, on the one hand, and the lawyers defending THI and THMI in the state-court lawsuits

brought by the Probate Estates, on the other hand.[24] One limitation on that ruling was the

communications had to relate to the defense of the state-court cases brought by the Probate

Estates.[25] The Court carved out from its ruling (i) communications between the THI Receiver

and counsel for the lawyers defending THI and THMI for matters unrelated to the defense of the

state-court cases, such as the strategy for retaining control of THMI's defense in those cases; and

(ii) communications between the THI Receiver and FAS.[26]

It appears FAS is relying on that "carve-out" in the Court's memorandum opinion as the

basis for its objection to disclosing communications between Anderson and Zack. According to

FAS, any communications between Anderson and Zack—the real focus of FAS's privilege

---

[22] Memorandum of Law at 5-6.

[23] *Id.*

[24] *In re Fundamental Long Term Care, Inc.*, 489 B.R. 451, 467-69 (Bankr. M.D. Fla. 2013).

[25] *Id.* at 469.

[26] *Id.* at 469-70.

objection—are solely internal communications between FAS's in-house lawyers relating to the defense of THMI at the behest of the THI Receiver under an administrative services agreement between FAS and the THI Receiver.[27] Those communications, however, are not necessarily protected from disclosure under the Court's previous memorandum opinion for two reasons.

*The Court's previous ruling only addressed the co-client exception*

The impetus for the court's previous memorandum opinion was the Trustee's claim she was entitled to any litigation files from lawyers defending THMI in the state-court cases.[28] The THI Receiver claimed those files were privileged since he retained those lawyers to represent THI (although they did technically defend THMI, too).[29] The narrow issue before the Court was whether THMI was also a "client" of the law firms defending THI where THI or the THI Receiver retained the law firms; either THI or the THI Receiver paid the legal bills; and nobody was around from THMI to consent to the law firms defending it.[30] When the Court carved out communications between FAS and the THI Receiver, it was not ruling that those communications were absolutely privileged, but rather that the Trustee was not entitled to them under the co-client exception.

That does not mean that the Trustee would not be entitled to those communications for some other reason—such as that they are not privileged in the first place. On that point, the Court observes that, contrary to FAS's argument, not all internal communications with in-house counsel are privileged. Of course, the Supreme Court, in *Upjohn Co. v. United States*, recognized

---

[27] Transcript at 100.

[28] *Fundamental*, 489 B.R. at 456-60.

[29] *Id.* at 460.

[30] *Id.*

that the attorney-client privilege applies in the corporate context.[31] While there has been some uncertainty about the test courts should employ in determining the applicability of the attorney-client privilege in the corporate context since *Upjohn*, there is no disagreement that a communication must have been made for the purpose of securing legal advice for it to be privileged.[32]

FAS, which bears the burden of proving the applicability of the attorney-client privilege,[33] has utterly failed to demonstrate how any of the communications it claims are privileged were made for the purpose of securing legal advice. For one thing, FAS does not even identify in its memorandum any specific testimony it finds objectionable.[34] Instead, FAS merely objects to topics or categories of questions, although even then it does not identify how the testimony within those topics (as a general matter) was made as part of securing legal advice. FAS, for example, made no attempt to elicit from Anderson during cross-examination her purpose in having any particular communication. Nor did FAS do so during its proffer of Zack's testimony. It goes without saying that it is not the Court's job to make the case for FAS that the communications are privileged.

Having said that, it does not appear from the Court's own review of Anderson's testimony that the communications she testified about were made for the purpose of securing legal advice. For instance, Anderson testified that Toni Jean Lisa (FAS's former general counsel)

---

[31] 449 U.S. 383, 394-97 (1981).

[32] *Id.* at 394; *In re Seroquel Prods. Liability Litig.*, 2008 WL 1995058, at *4 (May 7, 2008) (explaining that "[t]here is general agreement that the protection of the privilege applies only if the primary or predominate purpose of the attorney-client consultation is to seek legal advice or assistance") (quoting Paul R. Rice, Attorney-Client Privilege in the United States § 7:5).

[33] *Bradfield v. Mid-Continent Cas. Co.*, 2014 WL 1622794, at *4 (Apr. 21, 2014). Importantly, blanket assertions of privilege will not suffice. *In re Grand Jury Subpoena*, 831 F.2d 225, 226-27 (11th Cir. 1987).

[34] Memorandum of Law at 5-15.

indicated Zack frequently back-dated documents to correct testimony she had previously given in cases. There is no indication in the record—including during FAS's cross-examination of Anderson—that this statement was made while Anderson or Lisa was securing legal advice. As far as the record goes, it simply could have been an offhand comment. The same is true about statements by others that Zack had authority to speak on THMI's behalf. While it is true that some of the communications Anderson testified she had with Zack did relate to ongoing THMI litigation, those communications appear to be the type of communications that were intended on being conveyed back to THMI's state-court lawyers and would, therefore, fall within the Court's earlier co-client exception. Because FAS fails to demonstrate that any of the communications it objects to disclosing were made for the purpose of securing legal advice, its attorney-client privilege objection should be overruled for that reason alone.

FAS cannot overcome the failure to meet its privilege burden by simply claiming that some (or all) of the communications—even if not made for the purpose of securing legal advice—convey the in-house lawyers' mental impressions. Perhaps they do. And the work product doctrine, while ordinarily protecting materials prepared by or at the direction of a lawyer, has been construed to protect communications.[35] But a lawyer's mental impressions are not protected work product unless they were made in anticipation of litigation.[36] Once again, the

---

[35] The plain text of Federal Rule of Civil Procedure 26(b)(3) refers to the disclosure of "documents and tangible things that are prepared in anticipation of litigation." *Id.* Courts, however, have extended the work product protection to mental impressions even if they have not been memorialized in a document. *See, e.g., SEC v. Gupta*, 281 F.R.D. 169, 171 (S.D.N.Y. 2012); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 4 (D.D.C. 2004).

[36] *F.H. Krear & Co. v. 19 Named Trustees*, 90 F.R.D. 102, 103-04 (S.D.N.Y. 1981) (recognizing that an investigation is not merely privileged because it was performed by a lawyer and holding that lawyer's investigation was not privileged because nothing in the record indicated it was performed in anticipation of litigation); *In re Fischel*, 557 F.2d 209, 212-13 (9th Cir. 1977) (holding that summaries of client's financial transactions were not protected where summaries were not prepared in anticipation of litigation); *In re Penn Cnt. Commercial Paper Litig.*, 61 F.R.D. 453, 468 (S.D.N.Y. 1973) (recognizing that a document is not protected work product simply because its author was a lawyer and holding that offering circulars were not work product because they were not prepared in anticipation of litigation).

record is completely devoid of any evidence that the mental impressions were formulated or conveyed in anticipation of litigation, and as a consequence, FAS is not entitled to invoke the work product doctrine to prohibit disclosure of Anderson's testimony.

*The testimony FAS objects to does not fall within*
*the "carve-out" in the Court's previous ruling*

In its previous memorandum opinion, the Court "carved out" two types of communications from its ruling: communications between the THI Receiver and FAS; and communications about the control of THMI's defenses.[37] Here, the testimony at issue does not involve communications with the THI Receiver. So that part of the carve-out does not apply. As for the part about THMI's defenses, the Court was not carving out any internal communications about THMI's defenses. Instead, it was addressing the strategy behind the first major issue this Court had to resolve: whether the Trustee or the THI Receiver had the right to control THMI's defense in the state-court cases. FAS has failed to demonstrate that any of the testimony it objects to falls within that part of the "carve-out." As a result, even if this Court had to look to its previous privilege ruling, it would still overrule FAS's objections.

### The Court will not seal its ruling pending appeal

At the conclusion of the in camera examination, the Court indicated it would take FAS's privilege objections under advisement and ultimately unseal any portions of the examination transcript the Court concluded were not privileged. Both at the conclusion of the in camera examination and in its memorandum of law, FAS made an unusual request—namely, asking this Court to allow FAS to review the Court's ruling before the Court unseals the transcript so that FAS can decide whether it wants to appeal the ruling.[38] And FAS wants the Court to keep the

---

[37] *In re Fundamental Long Term Care, Inc.*, 489 B.R. 451, 467-69 (Bankr. M.D. Fla. 2013).

[38] Memorandum of Law at 1-3; Transcript at 110-15.

transcript sealed pending any appeal of this ruling.[39] In other words, FAS wants—although it does not call it this—a stay pending appeal.

So this Court will analyze FAS's request under the standard for stays pending appeal. A motion for stay pending appeal is an extraordinary remedy and requires a substantial showing by FAS.[40] To obtain a stay pending appeal, FAS must demonstrate that (i) it has a substantial likelihood of success on the merits of its appeal, (ii) it will be irreparably harmed if the stay is not granted, (iii) granting the stay will not substantially harm any other parties, and (iv) granting the stay will serve the public interest."[41] FAS can meet its burden only by showing satisfactory evidence on all four criteria, and the failure to satisfy any one of the criteria is fatal to its request for a stay.[42] Here, FAS fails to satisfy any of the four criteria for a stay pending appeal.

*FAS does not have a substantial likelihood of success on the merits*

To demonstrate it has a substantial likelihood of success on the merits, FAS must show that it has "raised 'questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate inquiry.'"[43] FAS raises no such questions here. In fact, its entire argument in its memorandum of law really boils down to two propositions: (i) Anderson's testimony was untruthful; and (ii) everything Anderson learned in her role as in-house counsel for FAS—other than perhaps some trivial information—is privileged either under the attorney-client privilege or as work product.[44] But that is not the

---

[39] Memorandum of Law at 1-3; Transcript at 110-15.

[40] *In re Lickman*, 301 B.R. 739, 742-43 (Bankr. M.D. Fla. 2003).

[41] *Id.* at 743.

[42] *Id.*

[43] *Id.*

[44] Memorandum of Law at 5-15.

standard. FAS, as the party asserting the privilege, was required to demonstrate that Anderson's

knowledge came from communications made to her in connection with an employee seeking

legal advice or during the course of another lawyer sharing his or her mental impressions in

anticipation of litigation. The Court acknowledges that application of the attorney-client

privilege and work product doctrine in the corporate context can involve thorny issues, but none

of those issues are raised in FAS's memorandum of law. Because FAS does not raise any serious

questions in its memorandum of law, the Court concludes it does not have a substantial

likelihood of success on the merits.

*FAS will not be irreparably harmed if the Court does not stay its ruling*

The Court can envision two potential harms that might result if it declines to stay its

ruling only to later be overturned on appeal. First, disclosure of privileged information may

ultimately undermine the privilege's goal of encouraging full and frank conversations between

the attorney and client.[45] Second, the Plaintiffs here will potentially use any privileged

information they obtain against FAS in this or some other proceeding. Curiously, FAS does not

cite a single case for the proposition that disclosure of privileged information constitutes an

irreparable harm. Instead, FAS relies on the Florida Supreme Court's decision in *Martin-

Johnson, Inc. v. Savage* to argue that a stay is necessary to avoid the second harm—i.e., that the

Plaintiffs will use the privileged information against FAS.[46]

The Court does not find FAS's reliance on *Savage* persuasive for a variety of reasons.

Notably, although the *Savage* court does state that "discovery of certain types of information

may reasonably cause material injury of an irreparable nature," it did not deal with the discovery

---

[45] In its memorandum of law, FAS only raises the second potential harm—i.e., "the cat out of the bag" harm.

[46] 509 So. 2d 1097, 1100 (Fla. 1987).

of privileged information. The examples the *Savage* court gives in support of that statement was

the publication of a libelous statement and the disclosure of information from a police

investigation, although the court does go on to point out that it was not dealing with any

privileged information in that case. In any event, this Court is persuaded by the United States

Supreme Court's decision from five years ago in *Mohawk Industries v. Carpenter*.[47]

In *Mohawk Industries*, the Supreme Court considered whether a pre-trial order requiring

a party to disclose privileged information qualified for immediate appeal under the collateral

order doctrine.[48] An order qualifies for immediate review under the collateral order doctrine only

if it involves a right that cannot be adequately vindicated on appeal or if the order is effectively

unreviewable.[49] That determination depends on whether delaying review until after final

judgment "'would imperil a substantial public interest' or 'some particular value of a high

order.'"[50] Ultimately, the Supreme Court held that an order requiring the disclosure of potentially

privileged information is *not* "effectively unreviewable" on appeal.[51]

While acknowledging at the outset that the attorney-client privilege serves an important

public interest, the Court observed that the critical inquiry was not whether the interest was

important, but rather whether deferring review of an order implicating privilege issues would so

imperil that interest as to require immediate review.[52] The Court went on to note that courts

routinely require litigants to wait until after a judgment has been entered to vindicate crucial

---

[47] 558 U.S. 100 (2009).

[48] *Id.* at 103.

[49] *Id.* at 107.

[50] *Id.*

[51] *Id.* at 108.

[52] *Id.* at 108-09.

rights, such as a party's right to counsel, because those rights could be vindicated on appeal.[53]

According to the Supreme Court, the attorney-client privilege could be vindicated on a post-

judgment appeal for two reasons.

First, deferring review until final judgment would not meaningfully reduce the incentives

for full and frank discussions between a client and its counsel.[54] As the Court pointed out, clients

are unlikely to focus on the remote prospect of an erroneous privilege ruling—much less the

timing of a possible appeal of such a ruling—in deciding whether to disclose information to their

counsel.[55] On top of that, lingering in the background of any attorney-client communication is

the possibility that the privilege will be waived somehow or fall within some exception, such as

the crime-fraud exception. The Court reasoned that it is the breadth of the privilege and the

narrowness of its exceptions—not the risk of an erroneous privilege ruling—that will impact a

client's decision to disclose information to its counsel.[56]

Second, collateral review of an order is not the only remedy available to a party facing an

adverse privilege ruling.[57] A party could, for instance, avail itself of other discretionary review

mechanisms, such as seeking certification of an interlocutory appeal to the court of appeal or

petitioning for a writ of mandamus.[58] A party could also defy the court's privilege ruling and

seek immediate appeal of any order striking its pleadings or entering a default based on its

---

[53] *Id.* at 109.

[54] *Id.* at 109-10.

[55] *Id.* at 110.

[56] *Id.*

[57] *Id.*

[58] *Id.* at 110-11.

noncompliance.[59] That would allow effective review without disclosure. Perhaps the easiest option available to the client, however, would be to seek a protective order limiting the spillover effect of disclosing any privileged information.[60]

It is true that, in *Mohawk*, the Court was concerned with a class of orders—i.e., orders requiring disclosure of potentially privileged information. So the Court was doing a cost-benefit analysis of allowing immediate review of privilege orders as a rule. It was not focused on the specific harms the party in that particular case may have suffered. But the Court's reasoning in *Mohawk* applies with equal force here.

For starters, FAS never raised any concern that the Court's ruling would have a chilling effect on its communications with its counsel.[61] And it is not clear to the Court, in any event, how disclosing communications almost exclusively involving THMI in some fashion—most of them from years ago—would discourage FAS from having ongoing communications with counsel regarding its defense of this proceeding or matters relating to this bankruptcy case. FAS did raise some concern that any potentially privileged information would be used against it in other actions.[62] But FAS's concern that it will be harmed by use of the information in other cases could be remedied by entry of a protective order in this case (or FAS could seek entry of a protective order in other cases).

*Entry of a stay will substantially burden other parties*

If the Court seals its ruling pending an appeal, the Trustee would be substantially burdened in two respects—one obvious, the other less so. The trial in this proceeding is currently

---

[59] *Id.*

[60] *Id.*

[61] Memorandum of Law at 1-3.

[62] *Id.*

scheduled for September 22, 2014.[63] The deadline for completing oral discovery has been

extended to May 2, 2014.[64] Summary judgment motions are due in July.[65] If this Court seals its

ruling pending an appeal, the Trustee will have been denied an opportunity to conduct critical

discovery before the summary judgment deadline and likely before trial. FAS's efforts at

impeding or thwarting discovery in this proceeding are well chronicled.

But perhaps nothing makes the point better than what has transpired in the last month. At

a March 26, 2014 hearing, the Court ordered FAS to produce a privilege log and certain non-

privileged documents to the Trustee by April 14, 2014.[66] At a hearing one week later (on another

discovery issue), the Court expressed its frustration with the fact that FAS has not been taking its

discovery obligations seriously and instead has simply been making excuses—for two years—

why it has not produced all of its documents.[67] The Court alluded to the fact that it may end up

imposing severe sanctions against FAS if it failed to comply with future discovery orders.[68] The

Court was hopeful FAS would get the message.

Apparently it has not. Despite the Court's admonition, FAS recently filed another motion

offering various excuses why it could not completely comply with the Court's March 26

discovery ruling requiring documents to be produced by April 14.[69] Worse, rather than provide a

---

[63] Adv. Doc. No. 336 at 4.

[64] *Id.* at 3.

[65] *Id.*

[66] Adv. Doc. No. 265 at 24.

[67] Adv. Doc. No. 302 at 160-62.

[68] *Id.*

[69] Adv. Doc. No. 317. In its motion, FAS says it would require "virtually impossible time and effort to be applied in order to obtain full compliance by April 14, 2014." *Id.* at ¶ 2. It is worth noting that FAS suggested the April 14 deadline for production. Adv. Doc. No. 265 at 12.

specific date that it will comply by, FAS simply left it open ended, promising bi-weekly production until its production is complete—whenever that may be.[70] Against this backdrop, the Court can only assume FAS's request to seal its ruling is another attempt to delay discovery, which—whether or not it is intentional—will unquestionably burden the Trustee by denying her the right to discovery in this proceeding.

The Trustee is also burdened in one other—substantial but less obvious—respect: how will the Trustee defend the almost certain appeal of this Court's ruling? Because the Court is granting the Trustee the relief sought in her motion, she has an obvious interest in the outcome of the appeal. Despite her obvious interest in the appeal, however, the Trustee would have no ability to meaningfully participate in it if she could not see this Court's ruling or the material that is allegedly privileged. If the Trustee could not see the Court's ruling, she would not even know what it was (other than some part of it must have been adverse to FAS) or the reasoning behind it.

Even if the Trustee could see the Court's ruling but not the unredacted transcript, it would still be a one-sided appeal. For instance, without Anderson's testimony, the Trustee would have no ability to argue to the district court that certain communications made to or by Anderson were not made for the purpose of securing legal advice. In fact, the Trustee would be unable to demonstrate that FAS failed to make any showing that the communications it seeks to protect were made for the purpose of securing legal advice. So sealing the Court's ruling would deprive the Trustee of her right to defend FAS's appeal and, in some sense, force the district court into a position of having to advance arguments on behalf of the Trustee to avoid a completely one-sided affair.

---

[70] Adv. Doc. No. 317 at ¶ 13.

*Sealing the transcript will not promote the public interest*

The attorney-client privilege is unquestionably an important public interest. But, as discussed above, the Supreme Court has already explained that interest can be fully vindicated on appeal. In fact, the Supreme Court, in *Mohawk*, expressly contemplated that privilege orders as a class are not entitled to immediate review. Given the Supreme Court's ruling in *Mohawk*, sealing the Court's ruling is not necessary to promote the public's interest in the attorney-client privilege.

Nor is it necessary for the Court to seal its ruling to, as FAS suggests, promote the public's interest in having the Court serve as a "gatekeeper."[71] In fact, the Court's ruling is the result of it performing its "gatekeeping" function. It has decided the gate should be opened. In reality, FAS's argument is not that disclosure of its ruling keeps the Court from serving its "gatekeeping" function; instead, FAS's argument is that this Court should not have opened the gate in the first place. But there is another gatekeeper—the district court—to review this Court's ruling, and if the district court ultimately determines this Court was wrong in opening the gate, then the gate can be closed: this Court can exclude that evidence at trial or, if the trial has already taken place, the ruling at trial could potentially be vacated.

On the other hand, sealing the ruling would disserve the public's interest in open proceedings. The United States Supreme Court has long recognized a constitutional right of access to criminal trials.[72] The Eleventh Circuit has similarly recognized that constitutional right (or the common law right of access) extends to certain civil proceedings.[73] Any denial or

---

[71] FAS argues in its memorandum of law that there is no "gatekeeper" function this Court could serve if it released its ruling and transcript before any ruling on appeal. Memorandum of Law at 2.

[72] *Globe Newspaper Co. v. Superior Court for the Cty. of Norfolk*, 457 U.S. 596, 604-05 (1982).

[73] *See Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983) (recognizing constitutional right to access to civil trials pertaining to the release or incarceration of prisoners); *Wilson v. Am. Motors Corp.*, 759 F.2d 1568, 1570 (11th

limitation on the openness of civil proceedings must be narrowly tailored to serve a compelling government interest.[74]

Here, sealing the Court's ruling would limit the public's right to access any appeal to the district court. But it would not be narrowly tailored to serve a compelling interest since the Supreme Court has already recognized that the interest involved (i.e., the attorney-client privilege) can be effectively vindicated on appeal. Worse, sealing the Court's ruling would undermine the public's interest in maintaining an adversarial system since any appeal would, as discussed above, effectively be an "empty chair" appeal if the Trustee does not, at a minimum, have access to Anderson's testimony.

The Trustee may reexamine Anderson

Now that the Court has ruled on FAS's privilege objections, the question is where do the parties go from here? At a recent hearing, the Trustee inquired about concluding Anderson's deposition once the Court ruled on FAS's privilege objections. FAS strenuously objects to any further examination of Anderson. According to FAS, this Court indicated during the in camera examination that it would release a redacted transcript of the examination based on its privilege ruling and that the release of the transcript would conclude "this portion of" Anderson's deposition.[75] Notwithstanding any previous statement by the Court, it is appropriate to allow the Trustee to examine Anderson.

To be sure, FAS will point out that the Court had the opportunity to—and, for the most part, did—ask the questions proposed by the Trustee. But it is important not to overlook the

---

Cir. 1985); *see also Gilliam v. HBE Corp.*, 2000 WL 33996253, at *3 (M.D. Fla. Oct. 25, 2000). Other circuits have recognized a constitutional right to access to civil proceedings. *Publicker Indus. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178-79 (6th Cir. 1983).

[74] *Wilson*, 759 F.2d at 1571.

[75] Memorandum of Law at 2 (citing Transcript at 104).

Court's role in the process. The Court's role was to ask the minimum number of questions necessary to determine the applicability of the privilege. Its role was not to follow up with Anderson in the same manner the Trustee may have done had the privilege objections not been raised. That would have, in some sense, compromised the role of the Court in this case. Because the Trustee's ability to ask follow-up questions should not be denied based on privilege objections that were ultimately overruled, the Court concludes that Anderson's deposition should be re-opened for the limited purpose of allowing the Trustee to conclude the lines of questioning that FAS's privilege objections prevented the Trustee from pursuing.

The Court, having reviewed the transcripts from Anderson's prior depositions, would like to make three comments about the conduct of the continued examination. First, the parties should be mindful of the rulings in this opinion, as well as the Court's prior privilege rulings. Second, any objection based on privilege should be specific. Third, the Trustee should be permitted to— and, in fact, should—ask the necessary foundational questions to allow this Court to rule on any further privilege objections. The parties are cautioned to conduct themselves in a manner that does not require the Court to have to repeatedly conduct in camera examinations of witnesses.

**Conclusion**

FAS—as the party asserting the attorney-client privilege and work product doctrine— bears the burden of proving all of the essential elements of their applicability. And, as the United States Supreme Court has recognized, the burden to sustain a claim of privilege is heavy because privileges are "not lightly created nor expansively construed, for they are in derogation of the search for truth."[76] FAS, however, has completely failed to meet its burden here. Rather than

---

[76] *United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also United States v. Bryan*, 339 U.S. 323, 331 (1950); *Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1287 (S.D. Fla. 2012) (quoting *United States v. Nixon*).

demonstrate the communications made by or to Kristi Anderson (to or from Christine Zack or others) were for the purpose of securing legal advice or made in anticipation of litigation, FAS simply relies on the mistaken premise that any communications between two in-house lawyers are absolutely privileged. Because that premise is contrary to well-settled law, and the record is completely devoid of any other basis for its objections, FAS's privilege objections must be overruled. The Court will enter a separate order consistent with this Memorandum Opinion.

**DATED**: April 30, 2014
_____.

_____
Michael G. Williamson
United States Bankruptcy Judge

Attorney Steven M. Berman is directed to serve a copy of this order on interested parties and file of proof of service within 3 days of entry of this order.

**Steven M. Berman, Esq.**
**Seth P. Traub, Esq.**
**Shumaker, Loop &Kendrick, LLP**
_Counsel for the Chapter 7 Trustee_

**Gregory M. McCoskey, Esq.**
  **Akerman Senterfitt**
_Counsel for Fundamental Administrative Services, LLC_

**Steven N. Leitess, Esq.**
**Leitess & Friedberg, P.C.**
_Counsel for Kristi Anderson_