UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                        Case No. 8:11-bk-22258-MGW
                                                              Chapter 7
Fundamental Long Term Care, Inc.,

      Debtor.
_____/

Estate of Juanita Jackson, *et al.*,                          Adv. No. 8:13-ap-00893-MGW

      Plaintiffs,

v.

General Electric Capital Corporation,
*et al.*,

      Defendants.
_____/

**MEMORANDUM OPINION ON PRIVILEGE OBJECTIONS TO
TESTIMONY AND PRODUCTION OF DOCUMENTS BY TROUTMAN SANDERS**

      The Plaintiffs have deposed a partner (formerly a senior associate) in a law firm about

two stock sale transactions he worked on. The partner refused to testify about or disclose (i) the

reasons the transactions were structured the way they were, (ii) the reason why the transactions

were required to be closed simultaneously, (iii) a junior associate's observations of (and concerns

about) what took place at the closing of one of the stock sales, and (iv) an e-mail the partner

(then a senior associate) sent to his own personal e-mail account memorializing his concerns.

The Court is asked to determine whether the communications or the e-mail are protected from

disclosure under the attorney-client privilege or work product doctrine.

      The Court concludes that the reasons why the sale transactions were structured the way

they were and closed simultaneously are, in fact, privileged. And the Plaintiffs cannot invoke

either the co-client or crime fraud exception to discover them. As for the junior associate's observations and concerns (which he expressed to the partner), those cannot be privileged because they involved objective facts or communications that took place in the presence of a third party. So the Plaintiffs are entitled to discover the junior associate's communications to the partner conveying his observations (and concerns). But, at this point, the Court cannot determine whether the e-mail is protected work product without first reviewing it in camera.

For those reasons, the Court will sustain the privilege objections, in part, and overrule them, in part.

## Background

The claims in this adversary proceeding principally arise out of two linked stock sale transactions that took place in March 2006.[1] In one of the sales, Fundamental Long Term Care Holdings, LLC ("FLTCH") acquired all of the stock in THI of Baltimore, LLC ("THI-Baltimore") and THI of Nevada ("THI-Nevada"). In the other sale, Trans Healthcare, Inc. ("THI") sold all of its stock in Trans Health Management, Inc. ("THMI") to the Debtor. According to the story laid out by the Plaintiffs in their complaint, the linked transactions were part of an elaborate "bust-out" scheme intended to divert all of THMI's assets to FLTCH (and others) and leave behind a liability-ridden shell to defraud, hinder, and delay THMI's creditors.[2]

There is a long list of characters in what this Court previously said has all of the makings of a legal thriller. For starters, there is Leonard Grunstein, a former partner at the law firm of Troutman Sanders, LLP, who owns a one-half interest in FLTCH (the entity that allegedly

---

[1] Adv. Doc. No. 109 at ¶¶ 261-394. References to filings in this adversary proceeding will be to "Adv. Doc. No. __." References to filings in the main bankruptcy case will be to "Doc. No. __."

[2] *Id.* As is well known in this case, six of the plaintiffs in this proceeding are probate estates, four of which have obtained more than $2 billion in judgment against THMI (although some of those judgments are on appeal and at least one has been overturned).

acquired all of THMI's assets).[3] There is Barry Saacks, an 80-year-old man currently living in a nursing home, who supposedly formed the Debtor back in 2005 so that he could acquire the stock in THMI.[4] But for purposes of this chapter in the story, the main character is Brett Baker.

Brett Baker—now a partner at Troutman Sanders—was a senior associate at the firm when it closed the two stock sale transactions that are the subject of this adversary proceeding.[5] Troutman Sanders designated Baker as its Rule 30(b)(6) representative with the most knowledge about the linked transactions. The Plaintiffs recently deposed Baker, and during his deposition, Baker testified at some length about a variety of topics related to the linked transactions.[6]

According to Baker, he began working on the linked transactions sometime in October or November 2005.[7] It appears from his deposition transcript that Baker knew he would be working on a transaction involving the sale of stock in THI-Baltimore, THI-Nevada, and THMI. But, at least at the outset, he was not aware who the buyer was going to be.[8] Apparently, the transaction (as originally conceived) was going to involve one entity acquiring stock in THI-Baltimore, THI-Nevada, and THMI.[9] Later, it was decided that the acquisition of the three entities would take place as part of two transactions (with two buyers).

---

[3] *Id.* at ¶¶ 69-73.

[4] *Id.* at ¶¶ 309-14.

[5] The Court is aware there may be a dispute about whether Troutman Sanders "closed" the THMI stock sale. In fact, FLTCH objected to Baker answering questions about who "closed" the sale on the basis of privilege. But there is no question that Troutman Sanders obtained the signature from the Debtor for the closing.

[6] A copy of Baker's deposition transcript was attached to the Trustee's motion to overrule the privilege objections by Troutman Sanders and FLTCH. Adv. Doc. No. 340-1 & 340-2 (the "Baker Transcript")

[7] Baker Transcript at p. 90, l. 14 – p. 92, l. 7.

[8] *Id.* at p. 95, l. 21 – p. 96, l. 4.

[9] *Id.* at p. 105, l. 21 – p. 106, l. 18.

Once it was decided that the stock sales would take place as part of two transactions, Troutman Sanders incorporated FLTCH (the entity acquiring THI-Baltimore and THI-Nevada) and the Debtor (the entity acquiring THMI). Troutman Sanders apparently incorporated FLTCH at the request of Murray Forman (who, along with Grunstein, owns FLTCH).[10] And FLTCH, once it was formed and became a Troutman Sanders client, instructed the firm to incorporate the Debtor. Despite incorporating the Debtor, however, Troutman Sanders is adamant that the Debtor was never a firm client.

Notwithstanding that, Troutman Sanders concedes it did take some action on the Debtor's behalf based on instructions from FLTCH. For instance, FLTCH apparently asked Troutman Sanders to review and make comments to the documents for the THMI stock sale even though it was not a party to that transaction.[11] Baker says FLTCH also asked Troutman Sanders to obtain Saacks' signature (on behalf of the Debtor) when the THMI stock sale closed,[12] and it is what happened when Troutman Sanders obtained Saacks' signature that has really led to this discovery dispute.

As it turns out, Baker delegated the responsibility for obtaining Saacks' signature to a junior associate named Shawn Fischman (a second or third-year associate at the time).[13] On the day Saacks came into Troutman Sanders' office to sign the sale documents, Fischman met Saacks in a conference room.[14] Also in the conference room at the time was Grunstein.[15] What

---

[10] *Id.* at p. 130, ll. 4-14.

[11] *Id.* at p. 133, l. 20 – p. 134, l. 14.

[12] *Id.* at p. 128 ll. 15-21; p. 133, l. 20 – p. 134, l. 3; p. 139, ll. 5-17.

[13] *Id.* at p. 139, ll. 5-17; p. 185, ll. 11-18.

[14] *Id.* at p. 189, l. 1 – p. 194, l. 3; p. 199, l. 15 – p. 201, l. 6.

[15] *Id.*

Fischman observed at the signing apparently caused him some concern, so he shared his observations and concerns with Baker.[16]

According to Baker, Fischman expressed concerned about Saacks' appearance.[17] Fischman described Saacks, who Baker understood as living in the basement of someone's home, as being disheveled and having hygiene issues.[18] More significantly, Fischman was concerned about an interaction he observed between Grunstein and Saacks.[19] Baker, however, would not divulge what Fischman told him about the interaction between Saacks and Grunstein.[20]

All we know, at this point, is that Baker, based on his conversation with Fischman, became concerned about Saacks signing the sale documents on THMI's behalf.[21] So Baker shared his concerns with two partners at Troutman Sanders, neither of whom had any economic affiliation or stake in the stock sale transactions.[22] In addition to his conversation with the two Troutman Sanders partners, Baker apparently memorialized his concerns—albeit three years later—in an e-mail he sent from his work account to his personal account.[23]

---

[16] *Id.* at p. 194, l. 4 – p. 201, l. 2.

[17] *Id.* at p. 197, ll. 17-23.

[18] *Id.*

[19] *Id.*

[20] *Id.* at p. 197, l. 24 – p. 198, l. 2.

[21] *Id.* at p. 180, l. 2 – p. 182, l. 12; p. 186, l. 8 – p. 201, l. 2.

[22] *Id.* at p. 180, l. 2 – p. 182, l. 12.

[23] *Id.* at p. 218, l. 20 – p. 219, l. 15.

The Plaintiffs now seek to discover the contents of Fischman's conversation with Baker about the closing, as well as the contents of the e-mail Baker sent to his own personal account.[24] The Plaintiffs also seek to discover certain communications between Troutman Sanders and Forman and other internal Troutman Sanders communications.[25] Troutman Sanders has objected to producing a copy of Baker's e-mail based on the attorney-client privilege and work product doctrine, while FLTCH initially objected to all of the other communications being disclosed also based on privilege.[26]

To its credit, though, FLTCH has since revisited some of its privilege objections. In doing so, FLTCH has agreed to withdraw its objections to questions about (i) whether the Debtor had any oral or written agreements with Forman, Grunstein, or FLTCH; (ii) whether Troutman Sanders had any discussions about its ongoing responsibilities for maintaining the Debtor's corporate status; (iii) who closed the THMI stock sale; (iv) who determined the $100,000 purchase price for the THMI stock sale; and (v) Fischman's observations at the closing (including any interaction between Grunstein and Forman) and his communications to Baker about them. FLTCH has also agreed to withdraw its privilege objections with respect to the

---

[24] Adv. Doc. No. 340 at ¶¶ 11 & 12.

[25] *Id.* at ¶ 9. The specific communications the Plaintiffs seek to recover are identified by page and line number in their motion. Those communications relate to, among other things: (i) the reason the stock sales were structured the way they were; (ii) who closed the THMI stock sale; (iii) the reason for Troutman Sanders reviewing the THMI documents; (iv) whether FLTCH communicated to the entities selling THI-Baltimore and THI of Nevada that it wanted that sale to close simultaneously with the THMI stock sale; (v) why an agreement to conduct simultaneous closings was included in a letter agreement rather than the stock sale agreements; (vi) whether Troutman Sanders ever represented Rubin Schron; (vi) the names of entities contained on a corporate structure diagram; (vii) the contents of a "side letter agreement" and the reasons why the transactions were required to close simultaneously; (viii) discussions about Troutman Sanders' ongoing obligations for the Debtor's corporate status; (ix) whether the Debtor had any oral or written contracts with Forman, Grunstein, or FLTCH; (x) Baker's understanding of who would own the company purchasing THMI; (xi) who determined the $100,000 purchase price for THMI; and (xii) why Baker told another Troutman Sanders attorney to name the company acquiring THMI's stock Fundamental Long-Term Care Management, Inc. Adv. Doc. No. 382 at 2-3.

[26] Adv. Doc. No. 377.

following topics provided the Trustee can establish Baker's knowledge comes from some source other than communications between the firm and FLTCH: (i) communications Forman may have had with a group referred to as the GTCR Entities; (ii) whether Forman and Grunstein were going to own the Debtor at some point in time; and (iii) the names of entities identified on a corporate structure diagram. But FLTCH contends that testimony about the reason the transactions were structured the way they were and the contents of a "side letter agreement"—and the reasons for that agreement—are absolutely privileged.

## Conclusions of Law

The communications relating to the reasons the transactions were structured the way they were and the contents of (and reasons for) the "side letter agreement" appear to be privileged on their face. After all, those communications (from the Court's review of Baker's deposition transcript) are unquestionably between a client (FLTCH) and an attorney (Troutman Sanders). And those communications undoubtedly involve legal advice. The Trustee's argument that those communications cannot constitute legal advice because, to some extent, they came about in connection with services being provided on the Debtor's behalf is simply unavailing.[27] There really is no question the attorney-client privilege applies to those communications. The only issue is whether the Trustee is entitled to those communications under the co-client or crime-fraud exceptions.

This Court addressed the co-client exception at great length in an earlier ruling in this case.[28] In that ruling, the Court recognized that two parties are not necessarily co-clients—for

---

[27] The Plaintiffs devote one sentence to the argument the attorney-client privilege does not apply. According to the Plaintiffs, Troutman Sanders could not have been doing legal work for FLTCH when it reviewed and commented on the THMI stock sale agreements. Adv. Doc. No. 340 at ¶ 14.

[28] *In re Fundamental Long Term Care, Inc.*, 489 B.R. 451, 463-70 (Bankr. M.D. Fla. 2013).

purposes of invoking the co-client exception—simply because they share the same lawyer.[29]
Instead, a party is entitled to invoke the co-client exception only where it would have been
reasonable—taking into account the relevant circumstances—for the person to infer it was, in
fact, a client of the lawyer. So the proper inquiry, under the Court's earlier ruling, is whether it
would have been reasonable for the Debtor (through Saacks) to have inferred it was a Troutman
Sanders client.

The Court concludes the Trustee has failed to make that showing here. In reality, there
are only two facts that suggest any attorney-client relationship between Troutman Sanders and
the Debtor: First, Troutman Sanders incorporated the Debtor. Second, Troutman Sanders
reviewed the THMI sale documents and provided comments on them. Neither of those facts
alleged by the Trustee—by themselves—demonstrates that it would have been reasonable for the
Debtor to have inferred it was a Troutman Sanders client.

The facts of this dispute are distinguishable from those giving rise to the Court's earlier
co-client ruling. There, the Court concluded it was reasonable for THMI to have inferred it was a
client of law firms retained by its former parent to defend itself and THMI in six wrongful death
(or negligence) cases because (i) the parties believed (or acted as if) THMI's former parent was
obligated to indemnify and defend THMI in the six wrongful death (or negligence) cases; (ii) the
engagement letters specifically provided that the law firms were retained to represent THMI; (iii)
the law firms actually made appearances in the cases—and coordinated legal strategy—on
THMI's behalf; (iv) the duty to defend (or actual defense of) THMI would have given rise to a

---

[29] *Id.* at 464-65.

fiduciary duty; and (v) the indemnity agreement the parties were acting under gave THMI a contractual right to access the litigation files.[30]

Here, none of those (or similar) facts are present. FLTCH did not have—nor was it acting under—some contractual obligation to provide counsel for the Debtor. There is no evidence that Troutman Sanders' engagement letter provides that the firm is representing the Debtor. At best, Troutman Sanders assumed a fiduciary duty to the Debtor by reviewing the THMI sale documents. But the Court is not convinced that the Debtor was a client of the firm simply because Troutman Sanders reviewed sale documents on THMI's behalf.

In fact, this Court previously ruled—on basically the same facts—that the Debtor was not a Troutman Sanders client.[31] The Trustee previously sought to compel documents from Troutman Sanders relating to the linked transactions.[32] In order to defeat Troutman Sanders' assertion that those documents were protected by its attorney-client privilege with FLTCH, Forman, and Grunstein, the Trustee contended that the Debtor was a co-client.[33] This Court, however, rejected the argument that the co-client exception applied back then. And it rejects it again now. That is not to say, however, that the Trustee would not be able to present additional facts entitling her to invoke the co-client exception in the future, only that those facts are not in the record as of now, and as a consequence, the Trustee cannot invoke the co-client exception to obtain communications between FLTCH and Troutman Sanders.

Nor can the Trustee invoke the crime-fraud exception to discover those communications. It is well known that the attorney-client privilege does not protect communications made in

---

[30] *Id.* at 463-70; *In re Fundamental Long Term Care, Inc.*, 493 B.R. 620, 626-28 (Bankr. M.D. Fla. 2013).

[31] Doc. No. 752.

[32] Doc. No. 631.

[33] *Id.* at ¶¶ 7-9.

furtherance of a crime or fraud.[34] In order to avail themselves of the crime-fraud exception, the Plaintiffs must demonstrate (i) a prima facie showing that FLTCH was engaged in (or planning) criminal or fraudulent conduct when it sought legal advice from Troutman Sanders; and (ii) that Troutman Sanders' assistance was obtained in furtherance of the criminal or fraudulent conduct.[35] The Court concludes that the Trustee has failed to demonstrate a prima facie showing of criminal or fraudulent conduct by FLTCH.

To be sure, the THMI stock sale, on its face, raises a number of questions. The Court understands the theory—as it has been presented at various points in the main bankruptcy case and other proceedings—is that Saacks incorporated the Debtor to acquire THMI's computer equipment, which he intended to lease to Fundamental Administrative Services (a newly created entity that provided administrative services to the nursing homes acquired by FLTCH). But why would Saacks—an elderly graphic designer—acquire *the stock* in a company that was subject to millions of dollars in liability simply to obtain some computer equipment? Why not simply enter into an asset purchase agreement? And how is it, assuming the allegations of the Plaintiffs' complaint are true, that Saacks never paid the $100,000 purchase price, never received the computer equipment, and apparently has never received any lease payments from FAS? Having said all of that, all of those questions—other than the one about why Saacks would enter into a stock sale agreement rather than an asset sale agreement—are based on mere allegations at this point.

---

[34] *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987).

[35] *Id.*

In the end, there is not sufficient record evidence for the Plaintiffs to meet their prima facie showing. Given that, the Court is uncomfortable invoking the crime-fraud exception. For starters, the criminal or fraudulent conduct that would give rise to the exception happens to be one of the ultimate issues this Court must decide at trial. Moreover, invoking the crime-fraud exception would have wide-ranging ramifications on discovery in this case. For all of those reasons, the Court concludes the Trustee is not entitled to invoke the crime-fraud exception.

That leaves for consideration the contents of Fischman's conversation with Baker about the closing, as well as the contents of the e-mail Baker sent to his own personal account. The privilege analysis with respect to the contents of Fischman's communications with Baker appears relatively straightforward.[36] Those communications center on an interaction between Grunstein and Saacks. Ordinarily, resolution of whether Fischman's communications to Baker about Grunstein's interactions with Saacks are privileged would rise or fall on the reason Saacks was in the room—i.e., whether Saacks was in the room as a client or third party.

But, in this case, the interaction between Grunstein and Saacks cannot be privileged regardless of what Saacks' (legal not mental) capacity was. As far as the Court can tell, Saacks was in the room to sign the THMI sale documents. That means he was there in his capacity as an officer or shareholder of the Debtor. Troutman Sanders has adamantly insisted neither the Debtor nor Saacks was its client. And the Court has agreed, at least at this stage of the proceeding, that there is insufficient evidence to demonstrate that the Debtor was a firm client. Because Saacks (as the Debtor's representative) was not present in the room as a Troutman Sanders client, any

---

[36] At the May 5, 2014 hearing on these privilege issues, FLTCH said it does not have any privilege to assert with respect to the communications between Fischman and Baker about Fischman's observations and concerns. So any privilege would belong to Troutman Sanders. But Troutman did not—nor, for that matter, did anyone else—argue at the May 5 hearing that those communications were privileged. So it appears any privilege objection has been withdrawn. Nonetheless, the Court addresses the issue in an abundance of caution.

statements made by Grunstein to Saacks (or, for that matter, others) cannot be privileged since the presence of a third party destroys the confidential nature of the communication.[37]

FLTCH cannot overcome that fatal defect by claiming that it is unclear whether Saacks was a Troutman Sanders client: assuming Troutman Sanders did represent Saacks at some point, nobody has argued that any interactions or communications between Grunstein and Saacks were in their capacity as attorney and client.[38] That alone defeats any privilege claim. Nor can FLTCH shield the conversation between Baker and Fischman from discovery by claiming, as it appears to, that "there was confidential client information divulged by Mr. Grunstein to Troutman Sanders at that meeting in the context of the deal."[39]

That argument simply begs the question.[40] In other words, FLTCH's argument hinges on the assumption that the information conveyed by Grunstein was "confidential"; yet, that is ultimately the conclusion that needs to be proven. And FLTCH cannot prove the communication was confidential since it was communicated in the presence of a third party.[41] So the communications between Fischman and Baker about Fischman's observations at the closing cannot be privileged.

The e-mail that Baker sent to his own personal account presents a more challenging question. After Baker disclosed the existence of the e-mail for the first time during his

---

[37] *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 294 (4th Cir. 2004); *Jackson v. Deen*, 2013 WL 2027398, at *8 (S.D. Ga. Apr. 3, 2013).

[38] During Baker's deposition, FLTCH raised the possibility that Saacks was a Troutman Sanders client. Baker Transcript at p. 206, l. 1 – p. 207, l. 12. But at the May 5 hearing on these privilege issues, neither FLTCH nor Troutman Sanders raised this issue. The Court assumes their failure to raise that issue is basically a concession the attorney-client privilege does not apply to those communications. Again, the Court will briefly address this specific argument in an abundance of caution.

[39] Baker Transcript at p. 202, ll. 15-21.

[40] *In re Stanton*, 503 B.R. 760, 764 & n.23 (Bankr. M.D. Fla. 2014).

[41] *Hanson*, 372 F.3d at 294; *Deen*, 2013 WL 2027398, at *8 (S.D. Ga. Apr. 3, 2013).

deposition, the firm amended its privilege log to claim the e-mail was privileged because it disclosed the legal advice he provided to FLTCH. Now Troutman Sanders is claiming it is entitled to assert its own attorney-client privilege and work product doctrine to shield the e-mail from disclosure.

Troutman Sanders principally relies on the Ninth Circuit Court of Appeals' decision in *United States v. Rowe* in support of its argument.[42] In *Rowe*, Charles Rowe (a senior partner in a law firm) asked two of his young associates to investigate the conduct of another attorney (W. Lee McElravy) who was suspected of mishandling client funds. A grand jury investigating McElravy later subpoenaed the associates who investigated him. The issue in *Rowe* was whether the results of the investigation the senior partner tasked the junior associates with was protected under the attorney-client privilege or work product doctrine.[43]

The Ninth Circuit concluded the investigation was privileged.[44] The court reasoned that the associates were effectively serving as in-house counsel to the firm when Rowe tasked them with the investigation.[45] And according to the court, a factual investigation by an attorney constitutes the rendition of legal services under *United States v. Upjohn*.[46] Because a factual investigation constitutes the rendition of legal services, the court concluded the investigation was just as much protected under the attorney-client privilege as it would have been had a company—like the one in *Upjohn*—been the one that asked its attorneys to conduct the investigation.

---

[42] 96 F.3d 1294 (9th Cir. 1996).

[43] *Id.* at 1295-96.

[44] *Id.* at 1296.

[45] *Id.* at 1296-97.

[46] *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390-91 (1981)).

On its face, the facts of this case appear to be distinguishable from *Rowe* in one crucial

respect: this case does not appear to involve any investigation by a firm associate. Unlike the law

firm in *Rowe*, Troutman Sanders does not contend it asked Baker to investigate Grunstein.

Instead, Troutman Sanders says it prepared the e-mail after receiving communication from the

firm's general counsel:

> Mr. Baker prepared the e-mail after Troutman Sanders' general
> counsel advised his client, the partners of the firm, regarding a
> newly unsealed *Qui Tam* proceeding involving Mr. Grunstein, and
> others, and regarding Mr. Grunstein going on leave of absence
> from Troutman Sanders to address that matter.[47]

Simply memorializing thoughts about a prior questionable deal involving one of your

colleagues in response to a communication from a senior partner that the colleague has

potentially been involved in other questionable deals does not convert otherwise non-privileged

communications into privileged ones. And the Court cannot infer that Baker's e-mail was in

response to a firm request for him to investigate Grunstein considering he sent the e-mail (what

would presumably be the results of his "investigation") to his own personal e-mail account.

Because it does not appear that Baker prepared the e-mail at the request of the firm as part of an

investigation, then the e-mail likely would not be work product.

The Court, however, is reluctant to compel discovery on that basis alone for two reasons.

First, while it appears *Rowe*—or at least its analysis—does not dictate the result in this case, that

is not altogether clear without seeing the e-mail. Second, Troutman Sanders raises the issue that

the e-mail may contain the advice the firm gave FLTCH, which, again, this Court cannot know

without seeing the e-mail. For those reasons, the Court believes it is appropriate for it to review

the e-mail in camera to determine whether it should be produced at all and, assuming it should be

---

[47] Adv. Doc. No. 377 at ¶ 13.

produced, whether portions of it need to be redacted. If, after reviewing the e-mail in camera, the Court determines any portion of the e-mail is not privileged, the Court will deliver the e-mail to the parties with such redactions as are appropriate for use in the rescheduled deposition of Baker.

### Conclusion

The central focus of the Plaintiffs' discovery request is the facts and circumstances surrounding the closing of the THMI stock sale. The Plaintiffs are entitled to discover the communications between Fischman and Baker regarding what Fischman observed at the closing (i.e., Saacks' appearance and Grunstein's interaction with him) because Saacks' presence at the closing—by itself—defeats the privilege. At this point, however, the Court is unable to determine whether the e-mail is (or portions of it are) discoverable until it reviews it in camera. And the Court concludes the Trustee is not entitled to testimony about the reason the transactions were structured the way they were or the contents of a "side letter agreement." The Court will enter a separate order consistent with this Memorandum Opinion.

**DATED**: __ May 06, 2014 _____.

_____
Michael G. Williamson
United States Bankruptcy Judge


Attorney Steven M. Berman is directed to serve a copy of this Memorandum Opinion on interested parties and file of proof of service within 3 days of entry of this Opinion.

**Steven M. Berman, Esq.**
**Seth P. Traub, Esq.**
**Shumaker, Loop &Kendrick, LLP**
*Counsel for the Chapter 7 Trustee*

**James Sottile, Esq.**
**Zuckerman Spaeder, LLP**
*Counsel for Fundamental Long Term Care Holdings, LLC*

**Dennis P. Waggoner, Esq.**
**Hill, Ward & Henderson, P.A.**
*Counsel for Troutman Sanders, LLP*