UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                              Case No. 8:11-bk-22258-MGW
                                                                    Chapter 7
Fundamental Long Term Care, Inc.,

      Debtor.
_____/

Estate of Juanita Jackson, *et al.*,                                Adv. No. 8:13-ap-00893-MGW

      Plaintiffs,

v.

General Electric Capital Corporation,
*et al.*,

      Defendants.
_____/

### MEMORANDUM OPINION ON MOTIONS
### TO DISMISS SECOND AMENDED COMPLAINT

      This is the Plaintiffs' second attempt to state all of their claims for relief in this Court to

collect on more than $1 billion in judgments entered against Trans Health Management, Inc.

("THMI") and Trans Healthcare, Inc. ("THI") in state court.[1] The Court previously dismissed all

of the claims against three Defendants—General Electric Capital Corporation ("GECC"),

Ventas, Inc. ("Ventas"), and Rubin Schron ("Schron")—and some of the claims against the

remaining Defendants. In their latest effort, the Plaintiffs have made a second attempt at

repleading five claims this Court previously dismissed in their entirety. The Plaintiffs also

---

[1] The Plaintiffs in this proceeding are the Chapter 7 Trustee in this bankruptcy case and six probate estates that brought wrongful death (or negligence) claims against THI and THMI (the "Probate Estates"). THMI is the Debtor's wholly owned subsidiary; THI is THMI's former parent.

asserted four brand new claims. With the exception of the aiding and abetting breach of fiduciary duty claims realleged against GECC and Ventas, all of the remaining claims for relief in the second amended complaint will be dismissed.

## Background

The factual background of this dispute is set out in some length in the Court's memorandum opinion dismissing the Plaintiffs' amended complaint.[2] In short, the Plaintiffs allege that THI Holdings, LLC ("THIH") and its primary shareholder (a series of entities referred to as the "GTCR Group") conspired to allow GECC and Ventas (THI's two primary secured lenders) to loot THI to repay $75 million in loans before selling THMI's assets to a group of individuals and entities referred to as the "Fundamental Entities"—Fundamental Long Term Care Holdings, LLC ("FLTCH"), Fundamental Administrative Services ("FAS"), THI of Baltimore, Inc. ("THI-Baltimore"), Murray Forman, Leonard Grunstein, and Rubin Schron—for far less than their fair market value in order to preserve the substantial investment the GTCR Group made in THI and hinder the Probate Estates from collecting on their judgments.[3] To complete the alleged "bust-out scheme," THMI—which, at that point, was nothing more than a liability-ridden shell—was transferred to the Debtor (a sham entity created for the sole purpose of acquiring THMI's liabilities), and THI was allowed to slowly go out of business before being put into a state-court receivership. Based on those facts, the Plaintiffs asserted eight different claims for relief against sixteen Defendants in this Court.[4]

---

[2] *Estate of Jackson v. Gen. Elec. Capital Corp. (In re Fundamental Long Term Care, Inc.)*, 507 B.R. 359, 363-371 (Bankr. M.D. Fla. 2013).

[3] As the Court previously explained, these are only allegations in the complaint. The Court must accept all well-pled allegations of the complaint as true in ruling on a motion to dismiss. *Brooks v. Cnty. of Volusia*, 2014 WL 1047382, at *1 (M.D. Fla. Mar. 14, 2014) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).

[4] The Probate Estates initially filed a two-count complaint seeking a declaration that the Defendants were liable under alter-ego or veil-piercing theories for the judgments the Probate Estates obtained against THI and THMI. Adv.

The eight claims for relief in the amended complaint included one count for substantive consolidation by the Trustee, two counts for breach of fiduciary duty, four counts for aiding and abetting a breach of fiduciary duty, one count for successor liability, two counts for piercing the corporate veil, three counts for alter ego liability, seven counts for (actual or constructive) fraudulent transfer, and one count for conspiracy to commit a fraudulent transfer.[5] The Court dismissed the alter ego and veil piercing claims in their entirety, as well as the breach of fiduciary duty claims against the GTCR Group and THI Holdings; the aiding and abetting claims against FAS, Schron, GECC, and Ventas; the fraudulent transfer claims against the GTCR Group, Jannotta, Ventas, and GECC; the successor liability claims against Forman, Grunstein, and Schron; and the conspiracy claims against the GTCR Group, GECC, Ventas, and Schron.[6]

The Court dismissed those claims without prejudice and gave the Plaintiffs an opportunity to replead them. In dismissing the claims without prejudice, however, the Court cautioned the Plaintiffs to cure the numerous pleading deficiencies the Court identified in its memorandum opinion on the motions to dismiss the amended complaint. The Plaintiffs have now filed their second amended complaint. In their second amended complaint, the Plaintiffs:

- reasserted alter ego claims against FLTCH, Forman, Grunstein, and Schron (Count 23); aiding and abetting claims against Ventas (Count 24), GECC (Count 25), and Schron (Count 26); a

---

[5] Doc. No. 1. The Trustee then intervened and asserted a claim for substantive consolidation. Adv. Doc. Nos. 12 & 36. The Defendants moved to dismiss the original and intervention complaint. Before the Court ruled, the Plaintiffs sought leave to file a joint amended complaint. The amended complaint asserted the eight claims for relief (a total of twenty-two counts) against the sixteen Defendants. Adv. Doc. No. 109.

[5] Adv. Doc. No. 109.

[6] *Fundamental Long Term Care*, 507 B.R. at 385-86. The Court, however, ruled that the Plaintiffs did state claims for relief against: (i) Jannotta for breach of fiduciary duty; (ii) GTCR, THIH, THI-Baltimore, FLTCH, Forman, and Grunstein for aiding and abetting a breach of fiduciary duty; (iii) THI-Baltimore, FLTCH, FAS, Forman, and Grunstein for fraudulent transfer; (iv) THI-Baltimore, FLTCH, and FAS for successor liability; and (v) THI-Baltimore, FLTCH, FAS, Forman, and Grunstein for conspiracy to commit a fraudulent transfer.

fraudulent transfer claim against Schron (Count 30); and a civil conspiracy claim against GECC (Count 31); and

- added new claims for abuse of process against all of the Defendants (Count 27), a conspiracy to commit an abuse of process claim against all of the Defendants (Count 28), a negligence claim by the Trustee against all of the Defendants (Count 29), and a claim to avoid a post-petition transfer (Count 32).[7]

The Defendants have moved to dismiss all of those claims.[8]

## Conclusions of Law[9]

### All of the claims for relief against Rubin Schron (Counts 23, 26, 27-30 & 32) should be dismissed with prejudice

The Plaintiffs attempt to assert seven claims against Schron: alter ego (Count 23), aiding and abetting a breach of fiduciary duty (Count 26), abuse of process (Count 27), conspiracy to commit abuse of process (Count 28), negligence (Count 29), constructive fraud (Count 30), and avoidance of a post-petition transfer (Count 32). For the reasons discussed below, the abuse of process, conspiracy to commit abuse of process, negligence, and post-petition transfer claims should all be dismissed for failure to state a claim for relief. So that leaves only the alter ego, aiding and abetting breach of fiduciary duty, and constructive fraud claims.

---

[7] Adv. Doc. No. 289. The way in which the Plaintiffs amended their complaint was extremely confusing. Rather than filing a completely new complaint, the Plaintiffs opted to simply pick up where the last complaint left off. The first paragraph of the Plaintiffs' second amended complaint realleges paragraphs 1-600, 653-747, 863-910, and 1188-1201 of the amended complaint, except to the extent those allegations were previously dismissed. *Id.* at ¶ 1202. The Plaintiffs then realleged Counts 2-8, 14, 15, and 22 of the amended complaint, again except to the extent those counts were previously dismissed. *Id.* The Plaintiffs did not, however, reallege Count 1 (substantive consolidation) apparently because none of the Defendants previously moved to dismiss it. Under the circumstances, the Court considers Count 1 to remain pending.

[8] Adv. Doc. Nos. 349, 350, 352, 354 & 356.

[9] The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Moreover, no party timely objected to this Court entering a final order or judgment in this case. An order objecting to the Court's authority to enter a final judgment was required to be filed by the deadline for responding to the complaint. Adv. Doc. No. 3 at ¶ 4. Accordingly, the parties are deemed to have consented to this Court entering a final order or judgment.

The alter ego and aiding and abetting claims must be dismissed for one simple reason: nowhere in the complaint, as far as the Court can tell, is Schron alleged to have committed *any* act individually. The Plaintiffs' second amended complaint—like the previous version—is somewhat unique in that the alter ego and aiding and abetting claims against Schron hinge entirely on acts committed by others—namely, Murray Forman and Leonard Grunstein. The Plaintiffs, however, fail to sufficiently allege the facts necessary to impute any knowledge by Forman and Grunstein to Schron or to bind him by their acts for purposes of their alter ego and aiding and abetting claims.

To be sure, it is hornbook law that a principal is bound by the acts of an agent taken within the scope of the agent's actual (and, in some cases, apparent) authority. The Plaintiffs attempt to shoehorn the facts of this case into a traditional agency relationship by alleging that (i) Grunstein was Schron's lawyer; (ii) Forman was Schron's banker; and (iii) Schron has conceded Forman and Grunstein were his "fiduciaries, trusted advisers, *faithless* servants and agents."[10] There are several problems, however, with the Plaintiffs' agency analysis in this proceeding.

To begin with, while it is true that Forman and Grunstein were Schron's banker and lawyer at some point, there is no allegation in the complaint that they were his banker or lawyer for any of the specific transactions giving rise to the Plaintiffs' alleged claims—i.e., the transactions in which THMI's assets were transferred to FLTCH. And even if they were, the Plaintiffs' own allegations make clear Forman and Grunstein were acting in their own interests— not Schron's. In fact, the basis of the Plaintiffs' claim that Schron concedes Forman and Grunstein were his "faithless servants" comes from a lawsuit Schron filed against Forman and

---

[10] *See, e.g.,* Adv. Doc. No. 289 at ¶¶ 1243, 1251, 1253, 1254, 1384, 1392, 1527 (emphasis added).

Grunstein for breaching the fiduciary duties they allegedly owed him.[11] Because the Plaintiffs cannot cite to any case law for the proposition that a principal is bound by the acts of an agent (or the knowledge of the agent is imputed to the principal) where the agent was acting for his own interests or adverse to the principal's, the Plaintiffs' alter ego and aiding and abetting claims against Schron must be dismissed.[12]

The Plaintiffs' constructive fraud claim against Schron likewise must be dismissed. The Plaintiffs' constructive fraud claim is based on two transfers: (i) the March 28, 2006 sale of THMI's assets to FLTCH; and (ii) a January 5, 2012 settlement agreement between the THI Receiver and Schron (and others). The Plaintiffs allege Schron benefitted from—although was not a recipient of—the March 2006 transaction. With respect to the January 5 agreement, the Plaintiffs allege Schron was an actual recipient of a transfer. In either case, the Plaintiffs cannot state a constructive fraud claim based on the March 2006 transaction or the January 5 settlement agreement.

The fraud claim based on the sale of THMI's assets to FLTCH as part of the March 2006 transaction is defective for the same reason the Plaintiffs' alter ego claim against Schron is defective: the Plaintiffs fail to allege that *Schron himself* benefitted from any fraudulent transfer. According to the Plaintiffs' theory, Schron benefitted from the March 2006 transaction because he received a one-third option in FLTCH. Putting aside the fact that the option apparently was

---

[11] *Id.* at ¶ 1392 & 1534. The Plaintiffs' use of the term "faithless servants" here is curious. The phrase undoubtedly comes from the complaint Schron filed against Forman and Grunstein. *Id.* But that lawsuit alleged Forman and Grunstein were acting in their own interests. Given that context, the use of the term "faithless," which means disloyal, makes sense in Schron's complaint. Here, it simply undermines the Plaintiffs' claims against Schron.

[12] Ordinarily, the knowledge or acts of an agent are not imputed to a principal where the agent acts in his own interests or where his interests become adverse to those of the principal. *Lang v. Koziarz*, 1989 WL 44029, at *1 (Del. Ch. May 2, 1989); *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 555 (D. Del. 2010). The Plaintiffs do not cite any legal authority to the contrary.

not given until months after the sale to FLTCH, the Plaintiffs' complaint is confusing, to say the least, regarding who actually received the one-third option.

As best the Court can tell, the Plaintiffs allege that one of three different people or entities actually own the one-third option.[13] In one instance, the Plaintiffs allege that "[Grunstein] and Forman *agreed to give Schron* an option to buy one-third of FLTCH for a nominal amount," although they do not allege they actually gave Schron himself the option.[14] In other instances, the Plaintiffs allege that "Schron's entity"—SWC Property Holdings, LLC—received the option, without alleging whether Schron has any ownership interest in that entity.[15] If that is not confusing enough, the Plaintiffs allege in still other places that "Schron's entity"—presumably SWC Property Holdings—designated Quality Health Services, LLC to take title to the option. Again, there is no allegation regarding Schron's ownership interest—if any—in Quality Health Services. Trying to harmonize those seemingly contradictory allegations, it appears the Plaintiffs are alleging that Schron benefitted from the March 2006 transaction because Forman and Grunstein contracted with SWC Property Holdings to convey a one-third option to Quality Health Services. Without any allegation that Schron actually owns SWC Property Holdings or Quality Health Services, however, the Plaintiffs cannot plausibly state a claim that Schron personally benefitted from the March 2006 transaction.

That leaves the transfer under the January 5 settlement agreement. According to the second amended complaint, the THI Receiver entered into a settlement agreement with the

---

[13] It is these types of allegations that Judge Merryday likely had in mind when he observed about a different complaint involving similar parties: "Although alleging an encompassing, malevolent, and predatory scheme, the complaint provides to the disinterested reader little or nothing on which to conclude that the allegations arise from a sound factual basis or, more to the point, that the pleader has even the least notion that the allegations arise from a sound factual basis." *Jackson–Platts v. McGraw–Hill Cos.*, 2013 WL 6440203, at *4 (M.D. Fla. 2013).

[14] Adv. Doc. No. 289 at ¶ 1531 (emphasis added).

[15] *Id.* at ¶¶ 1248 & 1258.

Defendants whereby he assigned all claims the receivership estate had against any third parties to the Defendants (including Schron). Those claims would include any malpractice claim the THI Receiver may have against the lawyers that defended THI and THMI in wrongful death cases brought by the Probate Estates that resulted in more than $1 billion in judgments against THI and THMI. In exchange, the Defendants agreed to pay $700,000, with Schron contributing $200,000 towards the settlement amount. So the Plaintiffs allege that Schron received more than $1 billion (and possibly as much as $2 billion) in assets for $200,000.

As an initial matter, the Plaintiffs' complaint suffers from two errors—one legal; the other logical. First, the Plaintiffs' constructive fraud claim is premised on the notion that "reasonably equivalent value" means "dollar-for-dollar" equivalent. Courts have recognized, however, that the "concept of reasonably equivalent value does not require a dollar-for-dollar transaction."[16] Second, in performing their "reasonably equivalent value" analysis, the Plaintiffs only give Schron credit for paying a portion of the settlement amount ($200,000) but attribute to him the entire value of the claims received ($1-2 billion).[17] Schron should either be given credit for the entire $700,000 settlement amount or the value of the claims received under the agreement should be apportioned (in some amount) among the Defendants. In any event, regardless of those errors, the Plaintiffs fail to allege that the THI Receiver did not receive reasonably equivalent value for the settlement.

---

[16] *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1256 (11th Cir. 2013); *Advanced Telecommc'n Network, Inc. v. Allen (In re Advanced Telecommc'n Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007); *Xtra Petroleum Transp., Inc. v. Brad Hall & Assocs., Inc. (In re Xtra Petroleum Transp., Inc.)*, 2012 WL 1207406, at *6-7 (Bankr. D.N.M. Apr. 11, 2012) (explaining that "[a]lthough the minimum quantum necessary to constitute reasonably equivalent value is undecided, a debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value.") (quoting *In re Renaissance Hosp.*, 2011 WL 5240265, at *2 (Bankr. N.D. Tex. Nov. 1, 2011).

[17] Although not determinative, it is curious why the Plaintiffs failed to assert this constructive fraud claim against the remaining Defendants. After all, GECC only paid $300,000 and Ventas $200,000 for the same $1-2 billion in claims. And worse, from a fraudulent transfer perspective, none of the remaining Defendants paid anything for those claims.

In determining whether a party received reasonably equivalent value, bankruptcy courts should take into consideration the totality of the circumstances.[18] Here, the totality of circumstances reveal that the potential malpractice claims Schron and others received under the January 5 agreement were not plausibly worth $1-2 billion. In fact, the $1-2 billion valuation is the highest possible value of those claims. But that valuation fails to consider, among other things, that the more than $1 billion in judgments largely consist of punitive damages claims; all but one of those judgments is currently on appeal; and Schron's ability to prevail on the potential malpractice claims—which are based on the allegation that the lawyers for THI and THMI negligently withdrew their defenses of those entities in the state-court wrongful death cases—is seriously diminished because the lawyers took their direction from the THI Receiver (and Schron would be standing in the shoes of the THI Receiver pursuing the malpractice claims). On top of all of that, bankruptcy courts should take into account the strong public policy favoring settlements and the fact that the Maryland receivership court approved the settlement.[19] Given the totality of circumstances alleged in the complaint, the Court concludes that the Plaintiffs fail to state a plausible claim against Schron for constructive fraud based on the January 5 agreement.

The Plaintiffs' alter ego claim against Forman and
<u>Grunstein (Count 23) should be dismissed with prejudice</u>

The Court dismissed the Plaintiffs' previous attempt to assert that FLTCH, Forman, and Grunstein are the Debtor's alter ego because—while the Plaintiffs could show that those

---

[18] *In re Toy King Distrib.*, 256 B.R. 1, 133-34 (Bankr. M.D. Fla. 2000); *Watts v. Peachtree Tech. Partners, LLC (In re Palisades at West Paces Imaging Center, LLC)*, 2011 WL 4459778, at *8 (Bankr. N.D. Ga. 2011).

[19] Schron argues that the Full Faith and Credit Clause bars the Court from considering whether the January 5 settlement agreement is a fraudulent transfer since that transfer was approved by the Maryland receivership court. This Court is not entirely convinced that is correct. Bankruptcy courts, for instance, have considered whether marital settlement agreements constituted a fraudulent transfer even where the marital settlement agreement was approved as part of a court order. *See, e.g., In re Kimmel*, 480 B.R. 876, 890-03 (Bankr. N.D. Ill. 2012). But the Court should certainly consider the fact that the Maryland court approved the settlement as part of the totality of the circumstances in its "reasonably equivalent value" analysis.

Defendants created the Debtor for an improper purpose—they could not show that they dominated or controlled the Debtor or that the transfer of the liability-ridden THMI shell to the Debtor caused their loss. In their second amended complaint, the Plaintiffs attempt to cure those pleading defects.

According to the Plaintiffs, the only time the Debtor engaged in any business was the March 28, 2006 linked transactions, and the Plaintiffs say that FLTCH (at the direction of Forman) dominated and controlled every aspect of that transaction.[20] Specifically, the Plaintiffs allege that Forman (i) directed Troutman Sanders, LLP to incorporate the Debtor, (ii) represented to the IRS that he was an officer or owner of the Debtor when he applied for an FEIN number, (iii) "took the Debtor off the shelf" for the March 2006 transactions, and (iv) negotiated the March 2006 transaction on the Debtor's behalf. The Plaintiffs also allege that FLTCH paid Troutman Sanders' legal bills. After this case was filed, Forman and Grunstein went to Barry Saacks' nursing home (Saacks is the Debtor's sole shareholder) to have him execute a power of attorney in favor of Abe Backenroth allowing Backenroth to make decisions for the Debtor. The Court concludes that those allegations give rise to a plausible claim that FLTCH, Forman, and Grunstein dominated and controlled the Debtor.

Nevertheless, the Plaintiffs' alter ego claim still fails because they cannot show they were harmed by the improper use of the corporate form. In their reprised alter ego claim, the Plaintiffs claim they were harmed by the fact that the March 2006 transaction "as papered" would lead the unsuspecting reader to think that THMI's assets—including its computer equipment, software, employees, and contracts—were being transferred to the Debtor. That may very well be the case. But the fact that the March 2006 transaction would lead the unsuspecting reader to believe that

---

[20] The Plaintiffs presumably contend Grunstein is an alter ego of the Debtor since he is a part owner of FLTCH.

the Debtor acquired all of THMI's assets, in reality, has nothing to do with the damages the Plaintiffs are claiming.

This is illustrated by a simple hypothetical. As the Court explained in dismissing the Plaintiffs' previous complaint, there appears to be no logical explanation why the Debtor would have acquired THMI's stock if its goal was to acquire THMI's computer equipment. But assume that an unsophisticated businessman who owned a legitimate business that leased computer equipment to health care companies (but lacked the assistance of competent counsel) decided to do exactly that. And assume, unbeknownst to the unsophisticated businessman, all of the valuable assets (other than the computers) had been transferred to FLTCH as part of a linked (and fraudulent) transaction. In that hypothetical scenario, where THMI was acquired by a legitimate corporation, the Plaintiffs would have suffered the exact same loss. The Plaintiffs would have been led to believe that the unsophisticated businessman acquired the valuable assets (the THMI employees and contracts) along with the computer equipment when, in reality, he had not.[21] That hypothetical illustrates that it was not the improper use of the corporate form that caused the Plaintiffs' loss but rather the alleged fraudulent transfer of assets that did.

It may seem unsettling or inequitable, at first glance, that the Plaintiffs do not have a cause of action for alter ego where this Court concludes there is a plausible case that FLTCH, Forman, and Grunstein used a sham corporation for an improper purpose. Not every wrong, however, gives rise to a legal remedy. "The rule, that for every right or wrong there is a remedy, is restricted to those rights and wrongs which the law recognizes as legal, in the sense of giving rise to a cause of action, and does not apply to every species of loss or injury that an individual

---

[21] The key to his hypothetical scenario is that THMI's employees (and management contracts) were transferred to FLTCH. And those are the facts of this case as alleged in the complaint. Surely, the Plaintiffs are not contending that the $180 million in value in the "THI Enterprise" came from the computer equipment.

may sustain by the act of another."[22] While the alleged bad acts by FLTCH, Forman, and

Grunstein may give rise to some legal remedy (i.e., fraudulent transfer), they do not give rise to

an alter ego claim.

The Plaintiffs state a plausible claim for aiding and
abetting against Ventas and GECC (Counts 24 and 25)

This Court previously ruled that the Plaintiffs stated a claim for breach of fiduciary duty

against Edgar Jannotta.[23] Jannotta is a principal in the GTCR Group, a venture capital firm that

sought to build a nationwide nursing home empire for the purpose of securing a financial benefit

for its principals. When THI and THMI, two companies that the GTCR Group invested over $40

million into, ran into financial problems, the GTCR Group allegedly conspired to allow THI's

two primary secured lenders (GECC and Ventas) to loot THI to repay their loans before

ultimately selling it (as well as THMI's assets) to FLTCH for far less than fair market value in an

effort to preserve at least some of its substantial investment in THI. Jannotta served as a director

for THI and THMI while all of that was happening. The Court concluded that those facts—

assuming they were true—more than met the pleading standard for stating a claim for breach of

fiduciary duty.

At a minimum, those facts gave rise to a plausible conflict of interest: Jannotta—a

principal of a company that invested over $40 million in THI and a board member of THI and

THMI—was more interested in preserving GTCR's investment in THI rather than preserving

THI's going concern for the benefit of its creditors. And Jannotta allegedly benefitted from

allowing THI to be looted and its assets (along with those of THMI) sold—even at less than fair

---

[22] *Stafford v. Alcatel USA, Inc.*, 2001 WL 34084368, at *5 n.15 (E.D. Tex. Dec. 20, 2001) (quoting 1A CJS *Actions* §11 (1985)).

[23] As set forth above, the Court dismissed the breach of fiduciary duty claims against THIH and the GTCR Group.

market value—because the sales proceeds were used to resolve litigation pending against the

GTCR Group, as well as himself personally. Had THI filed for bankruptcy (rather than allowing

THI to be looted and then sold off), the claims against Jannotta and the GTCR Group may not

have gone away.

The Court also concluded there were sufficient facts for it to reasonably conclude that

THIH and the GTCR Group knowingly participated in Jannotta's alleged breach of fiduciary

duty. After all, Jannotta is a principal of the GTCR Group and sat on the board of directors for

THIH (as well as THI and THMI) all the way up to the linked transactions in March 2006. And

the GTCR Group, which invested millions of dollars in THI, was intimately involved in the day-

to-day management of THI. Plus, the scheme, as alleged, would have inured to GTCR's benefit.

The Court likewise inferred that FLTCH, THI-Baltimore, Forman, and Grunstein aided and

abetted Jannotta's breach of fiduciary duty since, among other things, they are alleged to have

orchestrated and benefitted from the sham transaction.

But the Court concluded that the Plaintiffs failed to state claims for aiding and abetting

against GECC and Ventas. Neither of the alleged acts giving rise to the purported aiding and

abetting claim against them—i.e., participating in onerous forbearance agreements with THI and

giving their blessing to the linked transactions in March 2006—were sufficient to state a claim

for relief. To begin with, the Court agreed with Ventas and GECC that they were not liable for

aiding and abetting a fiduciary duty simply because they were counterparties to forbearance

agreements. Moreover, the Court could not reasonably infer from the facts of the complaint that

GECC and Ventas knowingly participated in that breach because the Plaintiffs' theory—i.e., that

THI's primary secured lenders knowingly signed off on THI fraudulently transferring away all of

its (or THMI's) revenue-generating assets to third parties—was not at all plausible.

The Plaintiffs have attempted to cure the pleading deficiencies with respect to GECC and Ventas. Instead of lumping GECC and Ventas together in one count, they have now separated them into two counts. And the Plaintiffs make a point about the fact that they have alleged fifty-four allegations against GECC and Ventas each rather than the eight allegations in the original complaint.

Of course, the Court was concerned with the quality of the allegations—not the quantity of them. The Court did not dismiss the previous aiding and abetting claims because the Plaintiffs only alleged a total of sixteen paragraphs. Instead, the Court explained that the Plaintiffs failed to allege that GECC and Ventas actually knew about Jannotta's alleged breach of fiduciary duty. And the Court could not infer that they did simply because GECC and Ventas allegedly entered into onerous forbearance agreements and consented to the THI restructuring. The missing allegation was that GECC and Ventas knew that the GTCR Group was transferring all of THMI's assets to FLTCH for less than fair market value—at the expense of THI's and THMI's creditors—simply to preserve GTCR's investment and personally benefit its principals.

While the Court is sympathetic to the claim by GECC and Ventas that the allegations in the second amended complaint are simply a rehash of the ones in the previous version (many of them are), the Court is nevertheless persuaded that the Plaintiffs (barely) cured their pleading defect. As Ventas points out, the Plaintiffs alleged in their prior complaint that the GTCR Group transferred THMI's assets—namely its employees and contracts—to FLTCH for less than fair market value.[24] Noticeably missing from the previous complaint was any allegation that Ventas knew of that fact. In the second amended complaint, however, the Plaintiffs allege that Ventas was apprised of the details of the March 2006 transactions (and, in particular, that a new

---

[24] Adv. Doc. 109 at ¶¶ 304-06.

management company was going to take THMI's employees) and that the GTCR Group was

entering into those transactions to preserve its own investment.[25] The Plaintiffs similarly allege

that GECC had full knowledge of the structure of the linked transactions, that GECC knew that

THMI's employees were being transferred to FLTCH, and that GECC specifically agreed to that

happening.[26] And Plaintiffs allege GECC was aware the GTCR Group was entering into the

March 2006 transaction to generate proceeds to settle claims against it and its principals.[27] Those

facts are enough to give rise to an aiding and abetting claim.

What about the Court's plausibility concerns? In dismissing the Plaintiffs' previous

aiding and abetting claims, the Court explained that it did not seem plausible that GECC and

Ventas would consent to THI's sole revenue generating asset being transferred away. It is

important to note that the lack of a facially apparent (and rational) economic motivation for

GECC and Ventas to consent to THMI's assets being transferred prevented the Court from

inferring their knowing participation in a breach of fiduciary duty absent some allegation they

had actual knowledge of that breach. Now that the Plaintiffs have alleged that GECC and Ventas

had actual knowledge of the breach and actively participated in it by facilitating the March 2006

transfer, the still apparent—albeit less so—lack of a rational economic motivation for the

transaction goes to the ultimate merits of the claim—not the Plaintiffs' ability to state a claim for

relief.

It almost goes without saying, although it is worth mentioning, that the Court is not ruling

in any way on the merits of the aiding and abetting claims. For purposes of a motion to dismiss,

---

[25] Adv. Doc. No. 289 at ¶¶ 1299, 1303 & 1304.

[26] *Id.* at ¶¶ 1350 & 1353-55.

[27] *Id.* at ¶ 1351.

the Court need only determine whether the Plaintiffs alleged enough facts to nudge their claim from the realm of conceivable to plausible.[28] It is unclear whether the Plaintiffs will be able to marshal enough facts to survive a motion for summary judgment or ultimately prevail at trial. But for purposes of ruling on the motions to dismiss, the Court concludes that the Plaintiffs' new allegations regarding GECC's and Ventas' knowledge—even if somewhat conclusory—is enough to nudge their aiding and abetting claim from the realm of conceivable to plausible.

The abuse of process claims (Counts 27-28)
should be dismissed with prejudice

The abuse of process claims—abuse of process (Count 27) and conspiracy to commit abuse of process (Count 28)—are brand new. Both claims—alleged against all of the Defendants—center on the January 5, 2012 settlement agreement among the Defendants and the THI Receiver. According to the Plaintiffs, the January 5 settlement agreement purported to transfer control of THMI's defense from the THI Receiver to FAS even though THMI was not part of the THI receivership estate. The Plaintiffs say the purpose of the agreement was to give FAS some reason to defend THMI since THI had no duty or right to defend it. Once the January 5 agreement was executed, the Defendants presented a defense for THMI in the Nunziata, Webb, and Townsend cases claiming THI was authorized to defend THMI.[29] The lawyers defending THMI never disclosed to the state courts that they were actually counsel to the Defendants (not THMI) and that they were protecting the Defendants' (not THMI's) interests. The Plaintiffs contend that the Defendants' presentation of an unauthorized defense on THMI's behalf

---

[28] *Scharrer v. THI Holdings, LLC (In re Fundamental Long Term Care, Inc.)*, 494 B.R. 548, 554 (Bankr. M.D. Fla. 2013) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2009) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

[29] The Plaintiffs say the Defendants' presentation of a defense on behalf of THMI included developing and implementing a litigation strategy, filing pleadings, and making legal arguments. Adv. Doc. No. 289 at ¶¶ 1443-47.

constitutes an abuse of process and that the Defendants' agreement to do so constitutes a conspiracy to commit an abuse of process.

As a threshold matter, the Plaintiffs' abuse of process claim is barred by the litigation privilege. The Plaintiffs' abuse of process claim is based entirely on the Defendants' presentation of an unauthorized defense on behalf of THMI. Twenty years ago, however, the Florida Supreme Court expressly held that absolute immunity shall be afforded to any act occurring during the course of a legal proceeding so long as it has some relation to the legal proceeding.[30] More recently, the Florida Supreme Court has explained that the litigation privilege is a broad grant of immunity that applies to statutory and common law causes of action alike.[31] And Florida federal and state courts have routinely held that the litigation privilege applies to claims for abuse of process where the basis of the claim is an act that took place during—and was related to—a judicial proceeding.[32]

The Plaintiffs say the litigation privilege here cannot apply because presenting a defense without authority is tantamount to an act having no relation to a judicial proceeding. The Plaintiffs really only cite one case for that proposition: *Atico International USA, Inc. v. LUV N' Care, Ltd.*[33] In *Atico*, the court held that the litigation privilege does not apply if the underlying litigation is a "sham." So the Plaintiffs' argument that the Defendants' defense of THMI has no

---

[30] *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994).

[31] *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 380–81 (Fla. 2007).

[32] *LatAm Inv., LLC v. Holland & Knight, LLP*, 88 So. 3d 240, 242-43 (Fla. 3d DCA 2011); *see also Acosta v. Gustino*, 2013 WL 6069862, at *4 (M.D. Fla. 2013); *EMI Sun Village, Inc. v. Catledge*, 2013 WL 5435780, at *3 (S.D. Fla. 2013); *Suchite v. Kleppin*, 2011 WL 1814665, at *3-4 (S.D. Fla. 2011).

[33] 2009 WL 2589148, at *3 (S.D. Fla. Aug. 19, 2009). In fairness, the Plaintiffs also cite *Levin*, 639 So. 2d at 608. But that case, as set forth above, provides that the litigation privilege applies only where the act at issue relates to a judicial proceeding.

relation to a judicial proceeding hinges on its argument that the Defendants' defense was a "sham."

This Court, however, concludes that the Plaintiffs fail to plead a plausible claim that the Defendants' defense of THMI was a "sham." In *Atico*, the case relied on by the Plaintiffs, the court explained that the litigation at issue was a "sham" if it was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."[34] The Plaintiffs' own allegations defeat a claim that the Defendants' defense of THMI was a "sham."

For instance, the Plaintiffs allege in their complaint that the January 5 agreement purports, on its face, to assign the right to defend THMI to the Defendants. The Plaintiffs also allege the January 5 agreement imposed a duty on the Defendants to defend THMI. Moreover, the Maryland receivership court approved the January 5 agreement. Finally, the First District Court of Appeal recently reversed the $900 million final judgment against THI and THMI based on its failure to allow counsel to appear on behalf of those entities, and counsel was attempting to appear based on the authority granted under the January 5 agreement.[35] Those facts demonstrate that the Defendants' alleged representations that they had the authority to defend THMI—even if not meritorious—were not a "sham."

Even if the litigation privilege does not apply, however, the Plaintiffs still fail to state a claim for abuse of process because, as the Defendants correctly point out, an abuse of process claim does not exist where a party uses a judicial process for its intended purpose.[36] For instance,

---

[34] *Atico*, 2009 WL 2589148, at *3 (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 408 U.S. 49, 57 (1993)).

[35] *Trans Health Mgmt., Inc. v. Webb*, 132 So. 3d 1152, 1153-55 (Fla. 1st DCA 2013).

[36] *Bothmann v. Harrington*, 458 So. 2d 1163, 1169 (Fla. 3d DCA 1984).

in *Crackel v. Allstate Ins. Co.*[37]—a case relied on by the Plaintiffs for the proposition that a party may commit an abuse of process merely by defending an action—the court explained that a party uses a judicial process for an improper purpose when it uses the process to coerce the other party to gain a collateral advantage.[38] In that case, Allstate was alleged to have directed its adjusters and insurers to handle certain claims in a way that would make it almost impossible financially for claimants to pursue litigation. By contrast, the Defendants here used the defense of THMI in the wrongful death cases for its proper purpose—defeating liability for the wrongful death claims.

In fact, there is no allegation that the Defendants asserted the allegedly unauthorized defense for any purpose other than that. It would be one thing if the Plaintiffs were alleging an abuse of process claim based on FAS allegedly orchestrating a defense on THMI's behalf before THMI's counsel withdrew in 2010. At least there, the Plaintiffs would have a plausible claim that FAS (or some of the other Defendants) were not using the defense of THMI to avoid liability but rather to stall the litigation long enough for the statute of limitations to run on any fraudulent transfer claim arising out of the March 2006 transaction. That would arguably be an improper purpose. But asserting a defense on THMI's behalf for the purpose of avoiding liability—which is all that is alleged here—cannot give rise to an abuse of process claim.

<u>The Trustee's negligence claim (Count 29) should be dismissed</u>

The negligence claim—like the abuse of process claims—is brand new. In her negligence claim, the Trustee alleges all the Defendants assumed the defense of THMI—albeit without authority—under the January 5 settlement agreement. By doing so, the Trustee says the

---

[37] 92 P.3d 882, 888 (Ariz. Ct. App. 2004).

[38] *Id.* at 888-90.

Defendants assumed a duty of reasonable care. The Trustee says the Defendants breached that duty by having their lawyers misrepresent their authority to represent THMI to the state courts in the wrongful death cases. The Trustee says THMI has suffered reputational harm and had a $200 million judgment entered against it as a result of the Defendants' breach of the duty they assumed.

The idea that all the Defendants assumed a duty to defend THMI based on the January 5 agreement is flatly contradicted by the language of the agreement itself. Under the terms of the January 5 agreement, only one Defendant—FAS—even arguably assumed a duty to defend THMI:

> *FAS* shall defend the Receiver, the Estate, the THI Entities, their professionals, their agents and the successors and assigns of the foregoing from and against any and all actions, suits and claims of any kind or nature whatsoever . . . relating to or arising out of the Wilkes Litigation.[39]

Paragraph 10.1 later clarifies that FAS is only obligated to defend its own interests and the interests of the THI Receiver, which are construed to include the interests of THMI.[40] The agreement, however, specifically provides that none of the other Defendants have any obligation to defend THMI:

> Notwithstanding any other term of this Agreement, Ventas, Ventas Realty, Schron, GTCR, GTCR Fund, GTCR Partners, GTCR Executive Fund, GTCR Associations, Jannotta, and THI Holdings shall have no obligation to the Receiver, the Estate, the THI Entities, or to any of the Parties pursuant to paragraphs 9, 10.1, or 11.1-11.5 of this Agreement.[41]

---

[39] Agreement, ¶ 9.1 (emphasis added).

[40] Paragraph 11.3 of the agreement also provides that FAS would ask the Maryland receivership court to declare that the THI Receiver had assigned its duty to defend THMI to FAS.

[41] Paragraphs 9 and 10.1 are the specific paragraphs dealing with the duty to defend THMI.

Even if FAS did have a duty and breached it (and the Court is not concluding whether or not it did), the Trustee nevertheless fails to allege any plausible damages. The Trustee has other claims pending against FAS (and others) for malpractice based on the allegation that FAS breached its duty to THMI by instructing THMI's counsel to withdraw their defense in the six wrongful death cases. At least there, the Trustee could plausibly link the entry of astronomical jury verdicts after empty-chair trials to the alleged breach. But here, the Trustee cannot seriously contend the $200 million judgment in Nunziata was the result of FAS's alleged misrepresentation that it was authorized to defend THMI.[42]

How could that even be? FAS is somehow responsible for a $200 million judgment because it attempted—albeit unsuccessfully—to provide a defense to THMI where one was not otherwise being provided? Surely FAS cannot be responsible for the $200 million judgment if it was not even successful in asserting a defense for THMI—particularly where the Probate Estates successfully prevented FAS from doing so. Because she cannot plausibly allege she has suffered any damages as a result of any alleged breach by FAS, the Trustee cannot state a claim for negligence against FAS (or any other Defendant).

The Plaintiffs fail to state a claim against
GECC for civil conspiracy (Count 31)

The Court previously dismissed the Plaintiffs' civil conspiracy (to commit a fraudulent transfer) claim against GECC because a non-transferor or non-transferee that neither controls nor benefits from fraudulently transferred assets cannot be held liable for civil conspiracy. The Court concluded that the Plaintiffs previously failed to allege that GECC was a recipient of or benefitted from any fraudulent transfer. In its second amended complaint, the Plaintiffs

---

[42] The Trustee also alleges that THMI suffered "reputational harm from the entry of an order of fraud against it." The Court is not even sure what that means. How was a defunct entity (with no officers, directors, employees, assets, etc.) harmed by a finding by a trial court that it committed a fraud?

acknowledge a non-transferor or non-transferee must benefit from a fraudulent transfer to be liable for civil conspiracy. The Plaintiffs now allege that GECC benefitted from the fraudulent transfer of THMI's assets to FLTCH and, in fact, received a fraudulent transfer itself.

The Plaintiffs allege GECC benefitted from the fraudulent transfer to FLTCH because it received (as part of the March 28 transactions) a security interest in a new company—one that was free of any "legacy" liability—that was created to provide administrative services to THI after the sale. The Plaintiffs also say GECC received a fraudulent transfer under the January 5 settlement agreement because it paid $500,000 in exchange for receiving $1-2 billion in potential claims against third parties from the THI Receiver. Contrary to the allegations in the second amended complaint, there is no plausible claim that GECC benefitted from any fraudulent transfer.

The claim that GECC benefitted from the March 2006 transaction is not plausible for two reasons. First, GECC was a secured creditor, and as a consequence, any claim it had to THMI's assets would have been superior to any claim by THMI. Second, THMI's assets must have been worth far more than those of Pathcare (the entity that GECC received a security interest in). So it would make no sense that GECC benefitted from exchanging its security interest in THMI for a security interest in Pathcare. And for the reasons set forth above, the Court concludes GECC did not receive a benefit under the January 5 agreement—if it received one at all—sufficient to impose liability for conspiracy. Accordingly, the Plaintiffs cannot state a claim for conspiracy.

<u>The Trustee's post-petition transfer claim should be dismissed</u>

Although not alleged in the initial complaint, the Trustee's post-petition transfer claim is not new. The Trustee previously filed a separate adversary proceeding alleging that the THI Receiver transferred the right to defend THMI to the Defendants under the January 5 settlement

agreement. The Court entered a final judgment in that action based on the Defendants' representations that THMI's rights were not transferred under the January 5 agreement. But the Court recently vacated that final judgment at the request of the Trustee. The Trustee has now included its post-petition transfer claim in the second amended complaint.

According to the second amended complaint, the January 5 agreement assigned the right to defend THMI to one or more of the Defendants for $700,000. According to the Trustee, the right to defend the "Wilkes Litigation" was assigned to FAS under the January 5 agreement. The agreement, in turn, defined "Wilkes Litigation" to include the six wrongful death (or negligence) cases that are the subject of this proceeding. One of those cases was *Nunziata*, where only THMI was a defendant. The Plaintiffs say the Defendants entered into the January 5 settlement specifically for the purpose of seizing the right to defend THMI.

Even assuming there was a transfer under the January 5 agreement, the Trustee cannot allege a plausible claim for damages. According to the complaint, the Defendants took control of THMI's defense on January 5, 2012. Ten months later, this Court ruled unequivocally that the Trustee had the right to control THMI's defense.[43] So, in essence, that transfer has been avoided to the extent it was made. Because the complaint fails to allege how the Trustee was damaged by a ten-month transfer of that defense, the Trustee's post-petition transfer claim should be dismissed.

### Conclusion

The Plaintiffs have now had two opportunities to plead all of the claims that could plausibly arise out of the alleged "bust out" scheme. The Court previously ruled the Plaintiffs stated claims against: (i) Jannotta for breach of fiduciary duty; (ii) GTCR, THIH, THI–

---

[43] *In re Fundamental Long Term Care, Inc.*, 2012 WL 4815321, at *7-8 (Bankr. M.D. Fla. Oct. 9, 2012).

Baltimore, FLTCH, Forman, and Grunstein for aiding and abetting a breach of fiduciary duty; (iii) THI–Baltimore, FLTCH, FAS, Forman, and Grunstein for fraudulent transfer; (iv) THI–Baltimore, FLTCH, and FAS for successor liability; and (v) THI–Baltimore, FLTCH, FAS, Forman, and Grunstein for conspiracy to commit a fraudulent transfer. The Court now concludes that the Plaintiffs also state claims against GECC and Ventas for aiding and abetting. But the remainder of the reprised and new claims in the second amended complaint—other than the aiding and abetting claims—should be dismissed.

And the Court concludes it is appropriate to dismiss those claims with prejudice. The Court previously dismissed the Plaintiffs' claims without prejudice because it ordinarily would be an abuse of discretion to dismiss a complaint (or individual claims) with prejudice without first giving a party an opportunity to amend. The Eleventh Circuit, however, has expressly recognized that dismissal with prejudice is warranted where future amendments would be futile or unfairly prejudicial.[44] The Court concludes that any further attempts by the Plaintiffs to amend their complaint would be futile or unfairly prejudicial to the Defendants.

Future attempts at amendment would be futile for two reasons. First, the Plaintiffs have had numerous attempts at pleading all of the claims they have against the Defendants arising out of the "bust out" scheme. While it is true this is only the Plaintiffs' second attempt in this case, the Plaintiffs have attempted to plead—with varying degrees of success—numerous claims in other cases pending in state and federal court. Second, unlike most plaintiffs, the Plaintiffs here have had the benefit of almost complete discovery before filing their second amended

---

[44] *Carvel v. Godley*, 404 Fed. Appx. 359 (11th Cir. 2010) (explaining that "[w]hile leave to amend should ordinarily be freely given, clear or explicit justifications, such as "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of amendment, [and] futility of amendment," can justify dismissal with prejudice").

complaint.[45] During the course of discovery, the Plaintiffs have received hundreds of thousands of pages of documents from the Defendants. Moreover, the Probate Estates previously received significant discovery in other pending state and federal court cases before this case was even filed. The Plaintiffs also had the opportunity to conduct 30 depositions (most of which had been completed by the time the second amended complaint had been filed). That discovery—even if not complete—should have been more than enough to allege whatever claims the Plaintiffs had at the time they were drafting the second amended complaint.[46] The simple fact is that if the Plaintiffs had the ability to plead claims against Schron or claims against other Defendants for alter ego liability, constructive fraud, abuse of process, or negligence, they would have been able to do so by now.

And in any event, it would be unfairly prejudicial to allow the Plaintiffs another attempt to reassert the dismissed claims given the circumstances of this case. At some point, the Defendants have the right to have some certainty regarding the claims they are defending against. The Defendants' expert disclosures are only a week away. Summary judgment motions are due one month from now. And trial is basically three months away. The Court concludes it is only fair to the Defendants to close the pleadings. Accordingly, dismissal of the Plaintiffs' claims

---

[45] The Plaintiffs filed their second amended complaint on April 4, 2014. By the time, written discovery had closed, and the close of oral discovery was less than a month away.

[46] The Court understands the Trustee has expressed frustration with what she believes is an attempt by at least one of the Defendants—FAS—to thwart discovery. The Court is mindful of that fact. And any failures to provide discovery may impact the Plaintiffs' ability to put on their case at trial. But, as noted, the Plaintiffs had more than enough discovery to allege all of their plausible claims.

is with prejudice. The Court will enter a separate order consistent with this Memorandum

Opinion.

**DATED**: _____.    June 17, 2014

_____
Michael G. Williamson
United States Bankruptcy Judge


Attorney Steven M. Berman is directed to serve a copy of this order on interested parties and file proof of service within 3 days of entry of this order.

**Rod Anderson, Esq.**
  **Holland & Knight LLP**
**Steven Engel, Esq.**
  **Dechert LLP**
*Counsel for Rubin Schron*

**Jeffrey W. Warren, Esq.**
  **Bush Ross, P.A.**
**Gabor Balassa, Esq.**
  **Kirkland & Ellis LLP**
*Counsel for GTCR Associates, VI; GTCR Fund VI, LP; GTCR Golder Rauner, LLC; GTCR Partners VI, LP; GTCR VI Executive Fund, LP; Edgar D. Jannotta, Jr.; THI Holdings, LLC*

**Gregory M. McCoskey, Esq.**
  **Akerman Senterfitt**
*Counsel for Fundamental Administrative Services, LLC and THI of Baltimore, Inc.*

**James Sottile**
  **Zuckerman Spaeder, LLP**
**Paul V. Possinger, Esq.**
  **Proskauer Rose LLP**
*Counsel for Murray Forman, Leonard Grunstein, and Fundamental Long Term Care Holdings, LLC*

**Carol A. Licko, Esq.**
**Hogan Lovells US LLP**
*Counsel for General Electric Capital Corporation*

**Daniel J. Weiss, Esq.**
**Jenner & Block LLP**
*Counsel for Ventas, Inc. and Ventas Realty Limited Partnership*

**Steven M. Berman, Esq.**
**Seth P. Traub, Esq.**
**Shumaker, Loop &Kendrick, LLP**
*Counsel for the Chapter 7 Trustee*

**Harley E. Riedel, Esq.**
**Daniel R. Fogarty, Esq.**
   **Stichter Riedel Blain & Prosser, P.A.**
**Isaac R. Ruiz-Carus, Esq.**
   **Wilkes & McHugh PA**
*Counsel for the Estates of Juanita Jackson, Elvira Nunziata, Joseph Webb, Opal Lee Sasser, Arlene Townsend, and Francina Spivery-Jones*