UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Fundamental Long Term        CASE NO: 8:11-bk-22258-MGW
Care, Inc.

    Debtor.                    Chapter 7
_____

Estate of Juanita Amelia Jackson, et al.,

    plaintiffs,

v.                             Adv. Pro. No. 8:13-ap-00893-MGW

General Electric Capital
Corporation, et al.,

    Defendants.
_____ /

DEPOSITION OF: STEVE OSCHER

DATE TAKEN:    June 10, 2014

TIME:          8:30 a.m. - 1:32 p.m.

TAKEN BY:      GREGORY MARTIN MCCOSKEY, ESQUIRE

PLACE:         Akerman, LLP
               401 East Jackson Street
               Suite 1700
               Tampa, Florida 33602

REPORTED BY:   LINDSEY ASHWORTH, Notary Public,
               State of Florida

**EXHIBIT B**

1  A P P E A R A N C E S :

2       ISAAC RAMON RUIZ-CARUS, ESQUIRE
        OF:  Wilkes & McHugh, P.A.
3            1 North Dale Mabry Highway
             Suite 800
4            Tampa, Florida 33609
             iruiz-carus@wilkesmchugh.com
5
                 Counsel for the Probate Estates.
6
        GREGORY MARTIN MCCOSKEY, ESQUIRE
7       OF:  Akerman, LLP
             401 East Jackson Street
8            Suite 1700
             Tampa, Florida 33602
9            greg.mccoskey@akerman.com

10               Counsel for Fundamental Administrative
                 Services, LLC, and THI Baltimore, Inc.
11
        ALEC SOLOTOROVSKY, ESQUIRE
12      OF:  Kirkland & Ellis, LLP
             300 North LaSalle
13           Chicago, Illinois 60654
             alec.solotorovsky@kirkland.com
14
                 Counsel for GTCR defendants, THI Holdings,
15               LLC, and Edgar Jannotta.

16      CAROL ANN LICKO, ESQUIRE
        OF:  Hogan Lovells US, LLP
17           600 Brickell Avenue
             Suite 2700
18           Miami, Florida 33131
             alec.solotorovsky@kirkland.com
19
                 Counsel for General Electric Capital Corp.
20
        JOSEPH H. VARNER, III, ESQUIRE
21      OF:  Holland & Knight, LLP
             100 North Tampa Street
22           Suite 4100
             Tampa, Florida 33602
23           joe.varner@hklaw.com

24               Counsel for Rubin Schron.

25

 1       HUNTER WYMAN CARROLL, ESQUIRE
         OF:   Matthews Eastmoore Hardy Crauwels & Garcia
 2             1626 Ringling Boulevard
               Suite 300
 3             Sarasota, Florida 34236
               hcarroll@matthewseastmoore.com
 4
                   Counsel for the Ventas Entities.
 5

 6       STEVEN MARK BERMAN, ESQUIRE
         SETH P. TRAUB, ESQUIRE (Appeared telephonically)
 7       OF:   Shumaker Loop & Kendrick, LLP
               101 East Kennedy Boulevard
 8             Suite 2800
               Tampa, Florida 33602
 9             sberman@slk-law.com
               straub@slk-law.com
10
                   Counsel for the Chapter 7 Trustee and Trans
11                 Health Management, Inc.

12       MARJORIE SALEM HENSEL, ESQUIRE
         OF:  Hinshaw Culbertson, LLP
13            100 South Ashley Drive
              Suite 500
14            Tampa, Florida 33602
              mhensel@hinshawlaw.com
15
                   Counsel for the Quinteros.
16

17

18   ALSO PRESENT:  Patrick Gannon, CPA, Representing Hogan
                     Lovells on behalf of GECC.
19                   (Appeared telephonically.)

20                   Dan Wise, from Ventas.
                     (Appeared telephonically.)
21
                     Beth Ann Scharrer, Trustee.
22                   (Appeared telephonically.)

23

24

25

1                           I N D E X

2   TESTIMONY OF STEVE OSCHER                           PAGE

3        Direct Examination by Mr. McCoskey.............. 7

4        Direct Examination by Mr. Solotorovsky.......... 100

5        Direct Examination by Ms. Licko................. 117

6        Direct Examination by Mr. Varner................ 120

7        Direct Examination by Mr. Carroll............... 121

8        Cross-Examination by Mr. Ruiz-Carus............. 123

9        Redirect Examination by Mr. McCoskey............ 126

10        Recross Examination by Mr. Ruiz-Carus........... 131

11   CERTIFICATE OF OATH................................. 134

12   CERTIFICATE OF REPORTER............................. 135

13   ERRATA SHEET........................................ 136

14   NOTIFICATION LETTER................................. 137

15

16                        * * * * * *
                          E X H I B I T S
17
     Exhibit No. 1....................................... 15
18   (A letter on the Wilkes & McHugh letterhead addressed to
     Steve Oscher dated March 28, 2014.)
19
     Exhibit No. 2....................................... 28
20   (Report issued by Steve Oscher in this case.)

21   Exhibit No. 3....................................... 67
     (E-mail followed by several pages typed with a heading
22   "Assignment for the Benefit of Creditors.")

23   Composite Exhibit No. 4............................. 85
     (Invoices that have been provided to the Wilkes & McHugh
24   firm.)

25   Exhibit No. 5....................................... 112

1    Fundamental.)

2    Exhibit No. 6....................................... 114
     (E-mail from Mary Anne Lubertine to Ken Tabler dated
3    October 1, 2012.)

4                      * * * * * *
                  S T I P U L A T I O N S
5
               It is hereby stipulated and agreed by and between
6
     counsel present for the respective parties, and THE
7
     WITNESS, that the reading and signing of the deposition
8
     are hereby reserved.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2    THEREUPON,
 3                         STEVE OSCHER,
 4    the deponent herein, being first duly sworn upon oath,
 5    was examined and testified as follows:
 6              MR. MCCOSKEY:  Why don't we take appearances
 7         on the phone first.
 8              MS. HENSEL:  I'm Marjorie Hensel on behalf of the
 9         Quinteros.
10              MR. TRAUB:  This is Seth Traub on behalf the
11         Chapter 7 Trustee and Trans Health Management, Inc.
12              MR. GANNON:  Again, Patrick Gannon, CPA,
13         representing Hogan Lovells on behalf of GECC.
14              MR. MCCOSKEY:  Anyone else on the phone?
15              (No verbal response.)
16              MR. MCCOSKEY:  Greg McCoskey on behalf of
17         Fundamental Administrative Services, LLC, and THI
18         Baltimore, Inc.
19              MR. SOLOTOROVSKY:  Alec Solotorovsky on behalf of
20         the GTCR defendants, THI Holdings, LLC, and Edgar
21         Jannotta.
22              MS. LICKO:  Carol Licko, L-i-c-k-o, from Hogan
23         Lovells, here on behalf of General Electric Capital
24         Corp.
25              MR. VARNER:  Joe Varner for Rubin Schron.
```

1          MR. CARROLL:  Hunter Carroll -- there's two Rs

2      and two Ls in Carroll -- on behalf of the Ventas

3      Entities.

4          MR. BERMAN:  Steve Berman on behalf of Beth Ann

5      Scharrer, the Chapter 7 Trustee, and Trans Health

6      Management, Inc.

7          MR. RUIZ-CARUS:  Isaac Ruiz-Carus on behalf of

8      the probate estates.

9                    DIRECT EXAMINATION

10  BY MR. MCCOSKEY:

11      Q    Mr. Oscher, good morning.  I believe you've given

12  depositions before in the past; is that correct?

13      A    Yes, sir.

14      Q    I will forgo most of my preliminary instructions,

15  then, other than just to let you know -- or ask you, if I

16  ask you a question and you don't understand it, will you

17  tell me?

18      A    Yes.

19      Q    If you answer one of my questions, I'm going to

20  assume that you understood the question.  Is that fair?

21      A    Yes.

22      Q    If you need a break or if there's any problem

23  during the course of the deposition, will you let me know?

24      A    Yes.

25      Q        At times during the deposition I may ask you

1    to estimate.  As an accountant, do you understand the

2    difference between an estimation and a guess?

3        A    I don't know.

4        Q    Okay.  If I ask you a question that involves

5    estimation, I'm asking you to use your experience and your

6    best judgment to arrive at an approximate answer.  I'm not

7    asking you to make an uninformed guess.  Is that fair?

8        A    That's fair.

9        Q    Okay.  Did you know you were designated as a

10   testifying expert in this case?

11       A    Yes.

12       Q    Are you billing for your time today?

13       A    Yes.

14       Q    Did you bring an invoice with you?

15       A    No.

16       Q    If you present an invoice to your counsel and

17   they present it to me and it gets paid within 15 days, will

18   that be acceptable to you?

19       A    Of course.

20       Q    Tell me what you know about this case generally.

21   What type of case is it?

22       A    It's a case that involves a business entity that

23   is in bankruptcy, and claims being made with regards to the

24   bankrupt entity, and the allegations that at a point in

25   time what was transferred to the bankrupt entity were

1    liabilities that they were not in a position to pay, and as

2    a result of that the litigation involves the transfer of

3    certain assets to the different corporation.

4        Q    And who do you understand to be the transferees

5    of assets of the corporation as you've just described it?

6        A    The transferees were an entity THI, THMI, and

7    another entity Trans Health -- Healthcare Holdings.

8        Q    Those were the recipient transferees of assets?

9        A    At different times, the answer is yes.  There's

10    also Trans Health -- Healthcare Baltimore, if I'm not

11    mistaken.

12        Q    You may be referring to my client, THI Of

13    Baltimore, Inc.?

14        A    Yes.

15        Q    If during the course of the deposition I refer to

16    THI of Baltimore, Inc., as THIB.  Will you understand what

17    I'm referring to?

18        A    I believe so, yes.

19        Q    Okay.  There are a lot of acronyms in this case,

20    so if you are ever unsure, please say so.  But we are

21    relying on witnesses' and counsels' proper use of acronyms.

22        A    Understood.

23        Q    So your understanding at -- in a general sense is

24    that this case is about liabilities that were transferred

25    to the debtor?  Do I have that right?

1        A      The overview is that -- that there was an issue

2   with regards to liabilities transferred, yes.

3        Q      And you've identified the transferees for me.

4   Who are the transferors, as you understand it?

5        A      The -- the names I gave I transposed it, it

6   appears from the question.  The people who transferred, I

7   believe, were the names I just gave you.  The recipients

8   were the individuals -- or was the debtor in this case,

9   Fundamental.  And then there was --

10       Q      Okay.  I'm sorry to interrupt you.  Let's start

11  over, okay?

12       A      Sure.

13       Q      My initial question was, who were the transferees

14  of what you described in your prior answers.  You gave me a

15  list of names, and I think we are going to start over now.

16  So tell me who you understand the transferees to be in this

17  case.

18       A      The transferees were the debtor in this case,

19  Fundamental.  The other was the -- the client THIB

20  Management, and another entity FAS, ultimately.

21       Q      Okay.  And tell me who you understand the

22  transferors to be.

23       A      It would have been the entities that I previously

24  identified.

25       Q      Okay.

1        A     THI, THIH.

2        Q     You identified THMI prior.  Is that still a

3   transferor, in your mind?

4        A     Yes, sir.

5        Q     And you identified THIB.  Is that a transferor,

6   in your mind?

7        A     Yes, sir.

8        Q     Okay.  Are there any others that you believe are

9   either transferees or transferors in the case as you

10  understand it?

11             MS. HENSEL:  Form.

12       A     If there are, I'm not recalling as I'm sitting

13  here with you now.

14       Q     Are you aware of any other claims that are at

15  issue in this litigation other than fraudulent transfer?

16       A     The -- there's an alter ego claim.  There's a

17  successor in interest claim.

18       Q     Do you distinguish between those two claims,

19  successor liability and alter ego, or do you consider them

20  the same?

21       A     I think the terms have been used, but it's my

22  understanding from a legal perspective they are different,

23  so there is a difference between the two.

24       Q     Okay.  Well, let's take successor liability first

25  then.  Who do you understand -- describe for me who you

1   understand to be the successor entities for that claim.

2        A    Those would be the --

3             MS. LICKO:  Objection to form.

4        A    -- THIB Management and FAS.

5   BY MR. MCCOSKEY.

6        Q    And who is the predecessor company in that

7   successor liability claim?

8        A    That would have been, if I'm not mistaken, the

9   THIH and THIB.

10       Q    And for the alter ego claim, as you understand

11  it, which company or companies are alleged to be the alter

12  ego of another?

13            MS. HENSEL:  Form.

14       A    I don't know.  I didn't focus on that issue.

15       Q    Okay.  When were you first contacted to serve as

16  an expert in this case?

17       A    Right around the first of the year.  2014.

18       Q    Can you be more specific by month?

19       A    It was either late December 2013, but I believe

20  it was early January 2014.

21       Q    Who contacted you?

22       A    Initially, I believe it was Steve Berman, but it

23  could have been Harley Riedel.

24       Q    And do you recall what they first told you about

25  the case in asking you to potentially serve as an expert?

1    A    They indicated -- Mr. Riedel indicated that he

2  was working in a bankruptcy matter on behalf of a creditor,

3  the Wilkes McHugh law firm.  He cleared conflicts, he

4  discussed a little bit about the background of the case,

5  and indicated that he would be recommending our employment

6  to the Wilkes McHugh law firm.

7         Subsequently, we had another discussion where he

8  indicated that we were going to be retained and that

9  he would send over some information.

10    Q    Do you recall speaking with Mr. Riedel on more

11  than those two occasions that you've just reflected, and,

12  of course, regarding this case?

13    A    I think there may have been a couple of

14  additional conversations over the next month or two, yes.

15    Q    Do you remember specifically speaking with Mr.

16  Berman at any point about this case?

17    A    Yes.

18    Q    On how many occasions?

19    A    I believe there was one.  There could have been

20  two, but there was definitely one.

21    Q    And where in the process was that?  Was that

22  before you were formally retained?

23    A    Yes.

24    Q    Okay.  For that conversation with Mr. Berman do

25  you recall anyone else being part of that conversation?

1       A    No, sir.

2       Q    And tell me as best as you recall what Mr. Berman

3    told you about the case.

4       A    Mr. Berman indicated that he was counsel for the

5    trustee and that -- he gave me background on the case at

6    the time, indicated that another CPA, Mr. Kapila, had been

7    engaged, and that it might be expected that Mr. Kapila and

8    myself might be in touch with each other to discuss aspects

9    of the case.

10      Q    Prior to your engagement, do you recall what Mr.

11   Riedel -- what documents Mr. Riedel sent to you?

12      A    The document I received was a complaint that had

13   been filed.

14      Q    And can you identify any more specifically

15   whether that was a complaint in a bankruptcy adversary

16   proceeding, and if so, which one?

17      A    I believe it was the Fundamental, the debtor's

18   case in this matter.  It was a very large document.

19      Q    Okay.  More than 200 pages?

20      A    It was more than 200 pages, yes, sir.

21      Q    That will help us identify it.

22           Were you presented with any other documents to review

23   prior to being retained other than that large complaint?

24      A    I don't think I received the complaint until I

25   had been retained, where he acknowledged they were moving

1   forward with the retention and at that point they were

2   sending the document.

3          MS. SCHARRER:  Beth Ann Scharrer, Trustee.

4   Q    Mr. Oscher --

5          MS. SCHARRER:  Excuse me.

6          MR. MCCOSKEY:  Yes, go ahead.

7          MS. SCHARRER:  I was wondering if we're starting

8       at 9:00?

9          MR. MCCOSKEY:  No, Beth Ann.  This is Greg.  We

10      started a few moments ago.  Mr. Berman is here, and

11      Mr. Traub is on the line with you.

12         MS. SCHARRER:  Thank you.

13         (Exhibit No. 1 was marked for identification.)

14  BY MR. MCCOSKEY:

15  Q    Mr. Oscher, I've marked as Exhibit 1 a letter on

16  Wilkes & McHugh letterhead, dated March 28, 2004.  Do you

17  see that?

18  A    Yes.

19  Q    Do you recognize that document?

20  A    Yes.

21  Q    What is Exhibit 1?

22  A    This is a document acknowledging the retention by

23  the Wilkes & McHugh firm.

24  Q    Is it accurate to say, then, that you were

25  retained as of March 28, 2014?

1        A       From my perspective it was that this was a formal

2    retention letter, but I had previously been told by Mr.

3    Riedel that I had been retained.

4        Q       Can you identify for me as best you can the time

5    when you believe you were retained via that oral

6    communication with Mr. Riedel?

7        A       My belief it was in a January, perhaps February

8    time period.

9        Q       In that -- going to the oral communication with

10   Mr. Riedel when you believe you were retained, what did you

11   understand your assignment to be at that time?

12       A       There were a number of issues that were

13   discussed.  I don't know that a specific assignment had

14   been clarified at that point, but there were discussions

15   with regards to successor liability, alter ego, fraudulent

16   transfers, successor in interest.  Those were things that

17   had been discussed in a general sense about the case, but

18   nothing specifically at that point had been identified.

19       Q       Did there come a point when you were given

20   specific instructions as to what your assignment would be

21   in this case?

22       A       Yes.

23       Q       When was that?

24       A       Probably in the last four weeks.

25       Q       So, doing the math, that would have been early

1    May?

2         A    Yes, sir.

3         Q    Okay.  So in early May you were given the

4    specifics --

5         A    It may have been at the end of April.  I mean, it

6    was sometime in that latter April, May time period.

7         Q    So late April, early May, you were given

8    instructions for your assignment in this case, and what

9    were those instructions?

10        A    The instructions or the direction was to focus my

11   work and attention on the successor in interest issues.

12        Q    From the time you were first advised or given

13   those instructions, have there been any changes to the

14   scope of your assignment as an expert in this case?

15        A    No, sir.

16        Q    And your retention in this case is by the Wilkes

17   & McHugh law firm; am I right about that?

18        A    Yes.

19        Q    Have you been retained by Mr. Berman on behalf of

20   the trustee?

21        A    No, sir.

22        Q    Do you know how the Wilkes & McHugh law firm

23   found you?

24        A    It was my understanding, through Mr. Riedel.

25        Q    Have you ever served as an expert for the Wilkes

1   & McHugh law firm or any of their clients in the past?

2      A    No, sir.

3      Q    Have you ever served as an expert for Mr. Riedel

4   or any of that firm's clients in the past?

5      A    I have.

6      Q    Approximately how many times?

7      A    Over the last 20-plus years, a half dozen, dozen

8   times now.

9      Q    When was the most recent?

10     A    I would have to look at the -- my client listing.

11  I'm not recalling specifically.  We have, I believe, a

12  couple matters that are ongoing right now where they've

13  involved us.  There's a matter that's still ongoing where

14  I'm the chief restructuring officer in a matter and the

15  Stichter Riedel firm is counsel.

16     Q    For any of those matters in which you've been

17  retained by the Stichter Riedel law firm currently or in

18  the past as an expert, can you tell me the subject matter

19  on which you were asked to opine as an expert in any of

20  those cases?

21     A    I would have to go back and take a look at the

22  file.  It may have been on issues on solvency; it may have

23  been issues on cash collateral.  Over the years I believe

24  there's a number of things that I've been retained for.

25  I'm just not recalling specifically.

1      Q     For this particular assignment we have seen

2  Exhibit 1, which was a letter sent to you by Mr.

3  Ruiz-Carus.  Did you receive anything else in writing from

4  the Wilkes & McHugh law firm related to your services as an

5  expert in this case?

6      A     I received documents from them.  I mean, if

7  that's...

8      Q     Okay.  Documents aside, let's talk about

9  correspondence first.  Do you recall any other written or

10  electronic correspondence from that firm relating to your

11  retention or assignment as an expert in this case?

12      A     There have been e-mails.  I think the only

13  subject matter on the e-mails had to do with scheduling

14  appointments or transfer of documents and information.

15  There was nothing related to my assignment or what I was

16  being asked to do specifically.

17      Q     So outside correspondence, then, you referenced

18  documents.  Did you receive documents either in paper or

19  electric form?

20      A     Yes, sir, I did.

21      Q     Okay.  We will talk about that later then.

22      Was there anything else that you may have

23  received from the Wilkes & McHugh law firm in the form

24  of information related to this case other than

25  correspondence or documents?

1      A     I had meetings with Mr. Ruiz-Carus and Mr.

2  Wilkes, and there was another attorney, a woman attorney,

3  whose name I'm not recalling, who was in one of the

4  meetings.

5      Q     Have you formed any final opinions in this case

6  on which you're prepared to testify?

7      A     I formed opinions.  I don't know whether there is

8  a final -- final opinion on issues related to the

9  underlying documents that I understand have been produced

10  but I haven't seen yet.  But I have had certain findings

11  and opinions related to those findings, yes, sir.

12     Q     As you sit here today, are you prepared to

13  provide testimony regarding any expert opinion in this

14  case?

15     A     Yes.

16     Q     And tell me, what is that opinion, as specific as

17  you can?

18     A     That the entities that I previously identified,

19  being that THIB Management and FAS, were successors in

20  interest to certain assets.  That there appears to have

21  been a fraud related to the transfer of those assets to the

22  debtor.

23     Q     Anything else?

24     A     Not that I can think of at this time.

25     Q     From what you've described, is it fair to say

1    those are two discrete opinions that you're prepared to

2    give at this point?

3        A    They're discrete in the sense that I think both

4    of them relate to the successor in interest liability, but

5    it is looking at two of the factors or two of the four

6    factors that were identified by Judge Williamson.

7        Q    When were those opinions formed?

8        A    During the course of the reading and reviewing of

9    the documents that we had been provided by counsel.

10       Q    You had identified for me a date of late April,

11   early May when you received your assignment -- final

12   assignment in this case.  Did you form your opinions before

13   or after that time?

14       A    No.  The opinions would have been after that

15   time.  But there was a body of information, and I know you

16   had the information that we had received, and we were

17   reviewing those documents after we started receiving them

18   and after the more specific identification of the

19   assignment was made, so that we were now targeting and

20   focusing our attention towards that objective.

21       Q    Were you ever given any limits on what you could

22   do to reach your opinion or your opinions?

23       A    Not that I'm aware of, no, sir.

24       Q    Were you requested to focus on any particular

25   documents or concepts as you formed your opinion?

1      A     No, sir.

2      Q     Were you given any limits on how much you could

3   bill or time you could spend to form your opinions?

4      A     No, sir.

5      Q     Was there ever anything that you asked for that

6   you were not provided during the course of your analysis?

7      A     There were those financial records that I

8   understood were up in Maryland, and I was waiting to get

9   those additional documents, which I understood Mr. Kapila

10  was charged by the court to go secure, and in

11  communications with Mr. Kapila, he too was waiting for

12  those documents.  So the underlying financial documents of

13  Baltimore Management and FAS were documents I was

14  interested in receiving.

15     Q     Other than underlying financial documents of THI

16  Baltimore Management and FAS, was there anything else that

17  you requested, any other information you requested to form

18  your opinion, that you never received?

19     A     I'm not aware of anything, no, sir.

20     Q     What pleadings from the court file did you review

21  in arriving at your opinion?

22     A     I don't know that I recall everything that I

23  received.  There was a large body of documents that were

24  sent over from the Wilkes & McHugh firm.

25     Q     Do you recall ever reviewing a motion to dismiss?

1     A     That was the comment -- that was the one that I
2     was going to indicate that was one of the documents that I
3     was using, was Judge Williamson's motion to dismiss.

4     Q     Judge Williamson issued an order on a motion to
5     dismiss.

6     A     Right.

7     Q     So that's a pleading that you reviewed and relied
8     on.  What about any of the parties', the defendants',
9     motions to dismiss?  Have you ever reviewed any of those?

10    A     Again, I'm not recalling with specificity.  If it
11    was on the listing for the information considered, I would
12    have looked at it, yes, sir.

13    Q     You provided a written report in this case.  Tell
14    me who all participated in the drafting of that report.

15    A     There was myself; there was a woman, Lisl
16    Unterholzner, an accountant in my office who also
17    participated.

18    Q     Anyone else?

19    A     Not in the drafting.

20    Q     Did you keep any drafts of your report?

21    A     I don't believe I did; no, sir.

22    Q     Do you -- as you prepare documents on your
23    system, your computer system, do you save subsequent
24    versions individualized and discrete from the prior
25    versions?

1      A      No, sir, not typically.

2      Q      Do you save hard copies of prior versions of any

3   report until it's issued?

4      A      No, sir.

5      Q      Did you distribute or provide the Wilkes firm

6   with any drafts of the report?

7      A      Yes, sir.

8      Q      On how -- approximately how many occasions?

9      A      There may have been two occasions.

10     Q      On those two occasions that you provided drafts

11   to the Wilkes firm, did you do so electronically with the

12   draft attached to an e-mail?

13     A      I'm not recalling whether it was in person or

14   electronically, but it may have been electronic.

15     Q      If it were electronically, would you have those

16   e-mails still on your system transmitting draft versions of

17   your report?

18     A      I'm sure we do.

19     Q      Did any of those drafts have any opinions that

20   differed from the opinions that are contained in your final

21   report?

22     A      No, sir.

23     Q      Did you receive back any comments from anyone at

24   the Wilkes firm relating to your opinion when you provided

25   drafts?

1     A     Relating to the opinion?

2     Q     No.  To the report.

3     A     Yes.

4     Q     As best as you can recall, what sort of comments

5     did you receive back on either of the drafts you provided

6     to the Wilkes firm?

7          MR. RUIZ-CARUS:  Here I'm going to interpose an

8          objection and an instruction not to answer except to

9          the extent that if you relied on some fact or data

10          that I told you in reaching your opinions or if I gave

11          you some sort of assumption that you relied on in

12          reaching your opinions, either of those two things.

13          Otherwise, I think that our communications are

14          privileged under Rule 26.

15     BY MR. MCCOSKEY:

16     Q     Subject to that instruction, can you answer the

17     question?

18     A     The best recollection I have is, there's nothing

19     related to the opinion.  There was issues or there was

20     comments that were made related to the parties, and I

21     believe that there might have been misstatement in one of

22     the drafts with regards to the acronym, and so it was for a

23     correction of the parties as opposed to anything related to

24     the opinion that I expressed.

25     Q     So in any of the comments that you received back

1    from either of the drafts from the Wilkes firm, nothing

2    changed your opinion; correct?

3        A    That's correct, yes, sir.

4        Q    Okay.  Let's focus, then, on the other types of

5    comments, whether it be it factual, legal, or otherwise,

6    outside of your opinion.  Were you provided any text,

7    specific text, to include in your report from the Wilkes

8    firm?

9        A    No, sir.  We -- no, sir.

10       Q    Were you provided any written revisions to any

11   report or either report that you provided to the Wilkes

12   firm?

13       A    No, sir.

14       Q    Were you provided any inserts or tables or charts

15   or anything else from the Wilkes firm to include in your

16   report?

17       A    No, sir.

18       I want to make a clarification, because you asked

19   about text, and I think that was your first question,

20   whether I had been provided, and I started to respond.  The

21   framework for our understanding and what was corrected was

22   the complaint, which in a sense is the text I've been using

23   as a template for my understanding, so that was the

24   understanding, and then it was the complaint that I was

25   using.

1      Q     Okay.  Thank you.  For right now I'm trying to

2   identify if you received back any written comments,

3   inserts, markups, or anything from the Wilkes firm relating

4   to either of the draft reports that you provided.  As I

5   understand it, your answer is no, you did not receive any

6   of those things.

7      A     That's correct.

8      Q     Okay.  If I were to show you a copy of your

9   report, could you identify for me those portions or any

10  language in your report that would reflect changes or

11  revisions suggested to you orally by the Wilkes firm?

12     A     I don't know at this point that I could.  They

13  really were not of any substance that was primarily -- not

14  so much wordsmithing as ensuring the context, the language,

15  as I had expressed it, where I had taken information from

16  the complaint.  Just to make it more readable as opposed to

17  anything specific with regards to, certainly, any of the

18  opinions.  I mean, it was just in the background

19  information.

20     Q     You identified one instance where you think you

21  had a party or an entity wrong.  Can you tell me about

22  that?  Which entity had you identified, and which entity

23  did the Wilkes firm correct for you?

24     A     I think there was a transposition of whether it

25  was THIMB or -- I mean, it was -- that's what I said.  It

1   was more making sure that the parties that were identified

2   were the correct parties.

3           MR. MCCOSKEY:  Okay.  I want to pause for just a

4       moment.  If you're on the phone and you joined us and

5       you did not enter an appearance, we would like to take

6       your appearance now, and then I would ask you to put

7       your phone on mute, please.  So if you joined us after

8       initial appearances, if you'd give them now.

9           MR. WISE:  Hey, Greg, this is Dan Wise from

10      Ventas.  I'm monitoring.

11          MR. MCCOSKEY:  Thank you.  Anyone else?

12          (No verbal response.)

13          MR. MCCOSKEY:  Okay.

14          (Exhibit No. 2 was marked for identification.)

15  BY MR. MCCOSKEY:

16      Q    Mr. Oscher, I'm marking a document as Exhibit 2,

17  and I'll ask you to take a look at that and tell me if you

18  recognize Exhibit 2.  It is dated May 23rd, 2014, and on

19  its face it says "Prepared by Oscher Consulting, P.A."  Do

20  you recognize that document?

21      A    Yes, sir.

22      Q    What is that document?

23      A    That's the report that I issued in this case.

24      Q    Have you made any additions or updates to the

25  report since May 23rd?

1     A     No, sir.

2     Q     Would you turn to page 11.  There's a section

3   that's highlighted as "Conclusion," and there are two

4   paragraphs.  Would you read aloud the second paragraph,

5   please?

6     A     "While my findings to date indicate that there is

7   a basis for determination by the Court of successor or

8   alter ego liability, I will reserve my conclusion until I

9   have received and reviewed the additional documentation."

10    Q     What does that mean?

11    A     What it meant was that what I had looked at to

12  date indicated and allowed me to conclude that there was a

13  determination or there could be determination by the court

14  of successor liability or alter ego liability, that -- what

15  I was trying to say was that my final conclusion, until

16  I've looked at all those additional documents that I

17  understand had started to be produced as my report was

18  being drafted but I had not reviewed, that I wanted to hold

19  on for any final opinions that I might have relative to

20  those documents.

21    Q     Through the date of -- with that qualification,

22  through the date of your report you are opining on the two

23  particular issues that you described for me earlier.  Is

24  that accurate?

25    A     Yes.

1    Q    And you're doing so on the basis of what you had

2  reviewed up through May 23rd, 2014; correct?

3    A    Yes.

4    Q    Are there any specific subject areas that you

5  were told you would not testify on?

6    A    The initial discussions that I had had related to

7  a lot of the discussions -- or a lot of the issues that I

8  mentioned earlier.  And when I asked if there would be

9  anything more other than the successor in interest issue, I

10  was informed that there were other experts who were going

11  to be providing testimony on those other issues.  So the

12  only thing I was told at that point was the successor in

13  interest issue was for me to do the work on.

14    Q    Would you turn to page 3 of Exhibit 2, your

15  report, and there's a heading there that says

16  "Understanding," and it's followed by two pages of text.

17  Can you tell me generally what this section of your report

18  is?

19    A    Yes, sir.  That's what I alluded to earlier that

20  was primarily constructed out of the complaint.

21    Q    And this was constructed out of the

22  200-or-more-page complaint?  Is that the one you're

23  referring to?

24    A    It was the initial complaint.  Then there was a

25  subsequent complaint that I received, and I believe --

1  whether the first was used as well as the second or it was

2  primarily the second complaint that we received that had

3  been pared down, I believe after some findings by the court

4  and another complaint was issued, I believe it was that

5  second one that we were primarily using as the basis for

6  our understanding at that point.

7       Q    And so the initial complaint and the subsequent

8  complaint that you're referring to, are both of those

9  complaints where the Wilkes clients and the trustee are

10  listed as plaintiffs?

11      A    I'm not recalling.

12      Q    Okay.  I guess, put another way, whose complaints

13  were they?  Who made the allegations in the complaint,

14  either or both that you reviewed?

15      A    I'm not recalling, as I sit here, specifically.

16      Q    Do you know whether complaints are facts or

17  allegations?

18      A    They're allegations.

19      Q    If you took those allegations and you used them

20  to provide this section of Understanding in your report, is

21  this section then made up of allegations from complaints?

22      A    Basically that's true, yes.

23      Q    You're not vouching independently for any of the

24  facts within this Understanding section of your report?

25      A    That's correct.

1      Q     Are you taking the allegations within this

2   Understanding section of your report as true?

3      A     No.  I'm taking them as a basis for the

4   allegations on which I'm going to conduct my investigation.

5      Q     So, in forming your opinion, are you relying in

6   any way on any of the statements within the Understanding

7   section of your report?

8      A     No, sir.

9      Q     Is there anything in this Understanding section

10  that you can think of that did not come from allegations in

11  one of the two complaints that you referenced earlier?

12     A     Not that I can see.

13     Q     Did you accept these allegations as true for

14  purposes of your report?

15           MR. RUIZ-CARUS:  Asked and answered.

16     A     No.

17     Q     Would you agree with me that an expert generally

18  has no specific firsthand knowledge of underlying facts in

19  a case?

20     A     I think that's a "depends" kind of answer.

21     Q     How about in this case?  Do you have any personal

22  firsthand knowledge of any of the underlying facts in this

23  case?

24     A     No, sir.

25     Q     Any facts that you were provided would have been

1   provided by the Wilkes & McHugh firm or Mr. Berman and his

2   firm; is that right?

3        A     You say facts.  I had a lot of documents that I

4   received that would have been considered facts.   The

5   information that I received would have been from the Wilkes

6   & McHugh firm.  I don't know that I received anything from

7   Mr. Berman or his firm.

8        Q     Were you required to make any assumptions for

9   purposes of arriving at your opinion in this report?

10       A     I'm not aware of any.

11       Q     So you have a section in your report starting on

12  page 5 with a header that says "Findings."  What is that

13  section?

14       A     That section is the indication of -- of the work

15  that I did based on the allegations as they had been made,

16  and the findings that I arrived at as a result of the work

17  that I did.

18       Q     Are these findings the complete documentation of

19  the information that you used to form your ultimate

20  conclusions in this case?

21       A     I missed the first part about --

22       Q     Let me ask it a different way.  If you made a

23  relevant finding to your ultimate conclusion in this case,

24  would it be included in this Findings section?

25       A     Yes.

1    Q    Put another way yet again, are all of the

2  relevant material findings that you made that support your

3  conclusions within this Findings section?

4    A    And that I don't know the answer to, because

5  contained within the depositions, contained within some of

6  the information, there were other instances similar to what

7  I had identified in the report, so that there may have been

8  other references to testimony from one of the parties that

9  I had indicated where they had made additional references

10  to transfers of assets or transfers of duties to the other

11  entities, but I just didn't incorporate them here because I

12  had already identified some.

13    Q    So for those items from depositions that may have

14  been material to you or relevant to your opinions, those

15  would be duplicative of what's in your Findings section;

16  correct?

17    A    Yes, sir, I believe so.

18    Q    Nothing new or additional relevant -- that you

19  found to be relevant that was not included in the Findings

20  section?

21    A    Not that I recall, sitting here.

22    Q    What is successor liability?

23    A    It is, I guess, a legal term that relates to an

24  issue of a subsequent entity or entities assuming the same

25  structure, either through its business formation or through

1    its business conduct, as a predecessor company.

2        Q    And what, if anything, do you understand is the

3    result or legal effect of a finding of successor liability?

4        A    My understanding is it essentially suggests that

5    the successor entity is really the predecessor entity.

6        Q    Are you relying on any particular definition of

7    successor liability to arrive at your opinions?

8        A    I don't believe so.

9        Q    What is the import of including the excerpt from

10    Judge Williamson's memorandum opinion on motions to dismiss

11    on page 6 of your report?

12            MR. RUIZ-CARUS:  Form.

13        Q    You can answer.

14        A    The importance for me was that it was Judge

15    Williamson that laid the foundation for the issues that

16    needed to be identified or should be looked at with regards

17    to successor liability, so it was on that basis that I used

18    his findings and his determination of the factors, or the

19    grounds, as the basis for the work that I would be doing.

20            MR. BERMAN:  Greg, whenever it's convenient, can

21        we take a comfort break?

22            MR. MCCOSKEY:  Yeah, let's go ahead.  We're at a

23        good point now.  Let's do that.  We'll take 10

24        minutes, for those on the phone.  We'll say five, but

25        we know it's 10.

1          (Brief recess was taken.)

2          MR. MCCOSKEY:  For those of you on the phone,

3      we're going to pick up in just a moment.  If anyone

4      joined since the last portion of the deposition, you

5      can enter your appearance now.

6  BY MR. MCCOSKEY:

7      Q    Mr. Oscher, are you ready?

8      A    Yes, sir, I am.

9      Q    You understand you're still under oath.

10     A    Yes, sir.

11     Q    We were looking at page 6 of your report, which

12  we marked as Exhibit 2 prior to the break, and we were

13  looking at the four bullet points that you identified in

14  the middle, and I believe you described the purpose of

15  including them in your report.  Is it fair to say that this

16  was your starting point for your successor liability

17  analysis?

18     A    That's correct.

19     Q    Tell me about the first bullet point.  Does that

20  play in part in your opinion in this case?

21     A    No, sir, it doesn't.

22     Q    How about the second bullet point, "The

23  transaction was a de facto merger"?

24     A    No, sir.

25     Q    And the first bullet point, for completeness,

1   was, "The successor corporation expressly or impliedly

2   assumed the obligations of the predecessor."  That's not a

3   portion of your opinion?

4        A    Correct.

5        Q    How about the third bullet point, that "The

6   successor corporation is a mere continuation of the

7   predecessor corporation"?  Is that part of your opinion?

8        A    It is.

9        Q    And how about the fourth, that "The transaction

10  was a fraudulent effort to avoid the liabilities of a

11  predecessor corporation"?

12       A    It is.

13       Q    And so as you described to me early in your

14  deposition when I asked you for your -- the opinions you

15  were rendering, you gave me two separate opinions, what I

16  took to be two separate opinions, leading to a conclusion

17  of successor liability.  Are those two opinions similar to

18  the two bullet points -- the last two bullet points we just

19  looked at?

20       A    Yes, they are.

21       Q    If we were to break down your report, then, at

22  the bottom of page 6 there's a heading that says "Successor

23  corporation is a mere continuation of the predecessor

24  corporation."  Do you see that?

25       A    I do.

1        Q       What follows on pages 7, 8, 9, and 10, is that

2    the bases for your opinion rendered on that bullet point

3    that the successor corporation is a mere continuation?

4        A       Yes.

5        Q       And then if we were to look at page 11 of your

6    report, there is a heading, "The transaction was a

7    fraudulent effort to avoid the liabilities of a predecessor

8    corporation."  Is that section that follows through to the

9    Conclusion heading, is that the support for your opinion as

10   to the final bullet point on page 6?

11       A       Yes.

12       Q       Is it okay with you if I refer to your first

13   opinion as the "mere continuation theory" or "mere

14   continuation opinion"?

15       A       Yes.

16       Q       You'll understand what I'm talking about?

17       A       I believe so, yes.

18       Q       You described for me earlier that the -- in your

19   opinion, the successor entities are THI of Baltimore

20   Management and FAS.  Is that correct?

21               MR. RUIZ-CARUS:  Form.

22       A       I believe so, yes.

23       Q       Is it your opinion that Fundamental Long Term

24   Care Holdings, LLC, is a successor corporation under the

25   mere continuity theory?

1    A    I don't know.  I mean, from a legal standpoint I

2    don't know.  I mean, because they were the holding entity

3    for those other entities that you've described, so...

4    Q    Well, sir, I'm asking you about the extent of

5    your expert opinion as to which companies are potentially

6    successor -- have successor liability, and you've

7    identified two, and I'm asking now whether FLTCH, in your

8    opinion, is a successor entity subject to successor

9    liability.

10                MR. RUIZ-CARUS:  Form.

11    A    Again, it would seem that it's a legal question

12    that you've asked.  FLTCH is the entity that I believe owns

13    the two entities to which assets were transferred, so...

14    Q    If, as you say, that's a legal determination,

15    then someone else will make that determination.  You're not

16    opining on that.  Is that correct?

17    A    That's correct.  I don't believe so.

18    Q    Do you identify or opine that Murray Forman is a

19    successor to or has successor liability under the mere

20    continuation theory?

21                MR. RUIZ-CARUS:  Form.

22    A    I think the answer is the same.  That seems to be

23    a legal determination by someone else, not myself.

24    Q    You are not opining that Murray Forman has

25    successor liability or is a successor as part of your

1   expert opinion, are you?

2       A    That's correct.

3       Q    The same question for Len Grunstein?

4            MR. RUIZ-CARUS:   Form.

5       A    Same answer.

6       Q    And the same question for THI Of Baltimore, Inc.

7   You're not opining that THI of Baltimore, Inc., is

8   successor corporation, are you?

9       A    Same answer.

10      Q    You are not?

11      A    I am not.

12      Q    What about Fundamental Clinical Consulting, LLC?

13      A    Same answer.

14      Q    You are not opining that that is a entity that

15   would have -- that is a successor?

16      A    I'm not providing an opinion.  I don't know.

17   That seems to be a legal question.

18      Q    Can you summarize for me the facts that you

19   relied upon to conclude that THI Baltimore Management and

20   FAS are the successors of THI Holdings and THI of

21   Baltimore, Inc.?

22           MR. RUIZ-CARUS:   Form.

23      A    And by "summarize," can you help -- can you be a

24   little more clear?

25      Q    Well, perhaps -- and you've told me that all of

1    your relevant factual findings are identified in the

2    report.  We can walk through that item by item, if that's

3    easier.

4        A    It might be easier, yes.

5        Q    Okay.  And that would cover all of your relevant

6    material facts that you used to support your ultimate

7    opinions?

8        A    That's true.

9        Q    Okay.  On page 7 in the first paragraph, tell me

10   about that.  You are summarizing deposition testimony of

11   Mark Fulchino and Sean Nolan.  How does that support your

12   ultimate mere continuation opinion?

13       A    Their testimony was that the former -- as I state

14   here, that the employees, officers, of THMI and the service

15   that had been provided previously were now the same

16   services that are being provided by THMI of Baltimore and

17   then subsequently in the fall of 2006 by FAS.

18       Q    And what services are you referring to?  Those

19   that are identified in that paragraph on page 7?

20       A    Yes, sir.

21       Q    Aren't those services essential to any operator

22   in the industry?

23            MR. RUIZ-CARUS:  Form.

24       A    I would think that was true, yes.

25       Q    You've identified accounting, payroll, finance,

1    tax, accounts payable, treasury, and legal support as those

2    similar services that led to your ultimate conclusion.

3    There's nothing exotic in that list as to any operating

4    entity, is there?

5              MR. RUIZ-CARUS:   Form.

6    A     No.

7    Q     Any operating business would need those services

8    in some form or fashion, for the most part; correct?

9    A     I agree.

10   Q     So, what is it about the provisions of these

11   services that supports your mere continuation theory?

12   A     The fact that it's the same individuals who had

13   previously been there for THMI are now essentially doing

14   the same operation for THMI Baltimore.

15   Q     So it's not the specific services themselves that

16   lead you to the conclusion; it's the parties that are

17   performing them?

18   A     Absolutely.

19   Q     And if we look forward on page 7, there's a

20   paragraph referencing Ken Tabler's deposition.  The

21   following paragraph references an examination of employee

22   rosters.  Is that the same thing that we were just

23   discussing?  The identity of the parties providing services

24   is what leads you to your conclusion?

25   A     Yes.

1      Q     And is that the same for the balance of this

2   section other than the bullet points on the top of page 9?

3      A     That's true.

4      Q     So all of that other information, in summary is,

5   the parties performing the services led you to your

6   conclusion; correct?

7      A     Yes.  And there is another component at the

8   bottom of page 9, where there's a chart of certain

9   individuals, as well, from the management.

10     Q     And tell me about that.  That is similar to what

11  we have been talking about.  Your chart identifies who were

12  officers of THI Baltimore Management; right?

13     A     Right.

14     Q     So the identify of the persons performing the

15  services is still what led you to your conclusion on

16  successor liability?

17          MR. RUIZ-CARUS:   Form.

18     A     Yes, sir.  I was only commenting to that because

19  -- about the way your last question was asked.  The issue

20  on personnel ended at the top of page 9.  I just wanted for

21  clarification that the bottom half of page 9 also had some

22  issues with regards to management.

23     Q     Okay.  I think we were saying the same thing.  My

24  question was, for everything in this section other than the

25  bullet points on the top of page 9, which would have been

1    inclusive of that chart on the bottom of page 9, all of

2    that could be summarized as the identity of the persons

3    performing the services.  That's what supports your

4    conclusion; correct?

5        A    Yes.

6        Q    Tell me about the three bullet points on the top

7    of page 9.  How do they support your ultimate opinion?

8        A    These are indicia with regards to the

9    continuation of the business.  The fact that the first

10   bullet point references the location, that there was never

11   a change in location from what previously had existed for

12   THMI.  The office furniture was still being used; the

13   computers were still in use; the accounting software

14   remained in use.

15       Q    Anything else?

16       A    No, sir.

17       Q    All right.  So let's break those down.  On the

18   first bullet point the same office buildings at Ridgebrook

19   Road in Sparks, Maryland, how do you know that?

20       A    From the deposition of -- it may have been all

21   three, but Mr. Tabler's testimony related to those three

22   areas, and I believe Mr. Nolan and Mr. Fulchino also

23   acknowledged that the location and furniture and fixtures

24   and software were all still being used.

25       Q    Do you know whether THMI was ever the lessee of

1    that office space?

2         A    If I know, I don't recall.

3         Q    Would it make a difference to your opinion if you

4    were to learn that THMI never was the lessee of that office

5    space?

6              MR. RUIZ-CARUS:  Form.

7         A    I don't believe it changes the opinion.

8         Q    If I told you that THI of Baltimore, Inc., was

9    the lessee of that office space, would that change your

10   opinion?

11             MR. RUIZ-CARUS:  Form.

12        A    I don't believe so, no, sir.

13        Q    If THIB and affiliated companies of it after

14   March 2006 occupied space in which THIB was the lessee,

15   would that change your opinion?

16        A    No, sir, I don't believe so.

17        Q    If THIB were the lessee of that Sparks, Maryland,

18   office space, wouldn't it be perfectly reasonable for THIB

19   and its affiliates to occupy that space after the March

20   2006 transaction?

21             MR. RUIZ-CARUS:  Object to the form.

22             MR. CARROLL:  Form.

23             MR. BERMAN:  Form.

24        A    It's possible, sure.

25        Q    If THIB was the lessee before and after the

1   transaction and THIB and its affiliates occupied the space

2   after the transaction, wouldn't that be expected?

3           MR. RUIZ-CARUS:   Form.

4       A   It could be.  Sure.

5       Q   Assuming those facts that I just gave you are

6   true, why would THIB as the lessee holding the space before

7   and after 2006 be an indicia of successor liability as

8   you've outlined it here?

9       A   Mine is merely -- using the term "mere" for the

10  continuation -- that they have continued to occupy the same

11  space that THMI previously occupied.  It's just one of a

12  number of indicia.  And the fact that there may be other

13  legal points that you're raising doesn't change the overall

14  conclusion.

15      Q   You haven't investigated any of the underlying

16  legal facts or conclusions that I've been asking you about,

17  have you?  Beyond what's in your report?

18          MR. RUIZ-CARUS:   Form.

19      A   I have not researched any legal facts.  That's

20  correct.

21      Q   So your opinion is merely based on the extent of

22  the statement in this first bullet point that the same

23  office buildings were occupied, irrespective of any legal

24  entitlement before or after 2006.  Is that right?

25      A   That's true.  And it's --

1              MR. BERMAN:  Objection.  Form.

2        A    And it's based on the testimony of Mr. Tabler,

3    Mr. Nolan.

4        Q    When you say it's based on the testimony, limited

5    to the fact that you've identified in the first bullet

6    point; right?  And nothing beyond that?

7              MR. RUIZ-CARUS:  Form.

8        A    That's true.

9        Q    The second bullet point, "The offices, office

10   furniture, and substantially the same computers remained in

11   use."  Do you know whether THMI ever owned any of those

12   items?

13       A    I'm not recalling from the records that I've

14   seen.  I'm not sure whether the records that I might

15   receive when they're produced might not give some

16   indication.

17       Q    But you've already expressed an opinion based

18   upon this statement in this bullet point, and as you sit

19   here today, you don't know whether THMI ever actually owned

20   any of that property.  Is that right?

21       A    Again, I've expressed an opinion based on the

22   testimony of the individuals working for the company.

23       Q    Was that testimony as to ownership that you're

24   relying on?

25       A    Well, as it relates to the computers, my

1  recollection is that those were computers that had been

2  sold to the debtor in this case, but were left at the

3  location at Sparks and were being used at the location at

4  Sparks.  So there seemed, at least from my recollection, to

5  be corroboration that in order to sell it, they must have

6  owned it.  But have I seen the documents?  The answer is

7  no.

8      Q    Do you know specifically what computer equipment

9  THMI is alleged to have owned in 2006?

10     A    No, sir, I don't.

11     Q    Do you know anything other than generically

12 computer equipment as a description of what THMI might have

13 owned in 2006?

14     A    No, sir, I don't.

15     Q    Do you know whether THMI owned any office

16 furniture in 2006?

17     A    Again, if I saw documents, I'm not recalling as I

18 sit here with you.

19     Q    Is the full extent of the support for your

20 opinion regarding the use of offices, office furniture, and

21 computers limited to that of this second bullet point on

22 page 9?

23     A    It's limited to my knowledge based on the

24 testimony.  If that was your question, the answer is yes.

25     Q    Okay.  But that testimony didn't relate to

1   ownership, is what I'm trying to understand.  Are you

2   suggesting that you're relying on testimony of anything

3   beyond the fact that's stated in this second bullet point?

4        A    I don't believe so, other than my comment that I

5   made with regards to it was my understanding that the

6   computers that had been sold were, in fact, still being

7   used in Sparks, Maryland.

8        Q    But you don't know the extent of what the

9   computer equipment may have been that was sold; correct?

10       A    That's correct.

11       Q    How about the third bullet point, the accounting

12  software?  How is that -- strike that.

13       Do you know whether THMI ever owned PeopleSoft or

14  other accounting software?

15       A    Not specifically, no, sir.

16       Q    Would it make a difference to your opinion if

17  THMI -- if you were to learn that THMI never owned the

18  PeopleSoft accounting software?

19       A    I don't believe so, no, sir.

20       Q    Well, let me give you a hypothetical.  If THI of

21  Baltimore, Inc., owned the accounting software, the

22  PeopleSoft accounting software, and THMI was permitted to

23  use it up until the point that it was sold, but THI of

24  Baltimore, Inc., and its affiliates continued to use the

25  accounting software after THMI were sold, would that be

1    material to your ultimate opinion?

2         MR. RUIZ-CARUS:  Form.

3    A    Again, I don't believe so.  I think even within

4    your question they continued to use it.  The issue has to

5    do with the continuation of the business and the

6    identification of the various indicia.  The location is an

7    indication of continuation; the software is a continuation;

8    the computers and furniture is a continuation of the

9    business.  These are merely the indication of what that

10   continuation might have been.

11   Q    And you are using these factors as indicia of

12   continuation without any investigation into the underlying

13   legal ownership of these assets; correct?

14   A    Yes, sir.

15   Q    So far, for your mere continuation opinion,

16   starting on page 6 and through the bottom of page 9, we

17   have identified as the bases for your opinion the personnel

18   that performed services and these three bullet points as

19   the factors that lead to your conclusion; is that right?

20   A    Yes.

21   Q    Okay.  On page 10, tell me about the information

22   on page 10 and how that leads to your ultimate opinion.

23   A    The testimony by Ms. Anderson with regards to the

24   transactions and the fact that THMI was being supported,

25   after the sale had taken place, by Baltimore THIBM and

1   subsequently FAS was what's at the heart of her testimony,

2   from my perspective.

3       Q       And is that within primarily the first paragraph

4   of this page 10?

5       A       That they continued to act on behalf of THMI?

6   That's correct, yes.

7       Q       And insofar as you're relying on the testimony of

8   Christy Anderson, is that limited to the provision of legal

9   services, as you identify in the first paragraph of page

10  10?

11      A       Yes.

12      Q       What is the termination and assumption agreement

13  that you reference in the second paragraph on page 10?

14      A       There was an agreement that had been referred to

15  with regards to, if I'm not mistaken, THMI in a matter that

16  was in litigation in New Mexico.  And it had been

17  represented to the Court that there had been a termination

18  and assumption agreement that was in effect.  And Ms.

19  Anderson testified that she was aware that that had been a

20  fabrication, that it wasn't until sometime later that year,

21  if I'm not mistaken, in November of 2006, that the

22  termination and assumption agreement was actually drafted.

23      Q       Those facts, if true, how do they support your

24  ultimate conclusion of mere continuation?

25      A       That probably might have raised more with regards

1    to the second area, which is with regards to the fraudulent

2    activity, but I included it here simply because of the

3    issues surrounding the continuation of THMI and the fact

4    that the other business entities were essentially taking

5    care of the legal work for THMI subsequently.

6              MR. MCCOSKEY:   I'm sorry.   Can you read back that

7         answer?

8              (Requested answer was read back.)

9    BY MR. MCCOSKEY:

10        Q     Do you know who was the ultimate owner of the

11   Vida Encantada entity that's referenced in the excerpt of

12   testimony that you have on page 10?

13        A     If I knew, I don't recall here.

14        Q     I believe you said that you relied upon Ms.

15   Anderson's testimony that a prior representation had been

16   made to the Court that this agreement, this termination and

17   assumption agreement, existed before it was prepared; is

18   that correct?

19        A     Yes.

20        Q     You relied on that testimony from Christy

21   Anderson; right?

22        A     Yes.

23        Q     If that testimony turns out to be false, would

24   that change your opinion or your reliance on her testimony?

25        A     It would change as it relates to the fraud aspect

1   of it to the extent that she was part of the litigation

2   group -- the attorney group at FAS or at Baltimore.  The

3   fact that they were continuing to provide services after

4   the sale of THMI to the debtor, it would still go along the

5   support for the continuation of business by Baltimore and

6   FAS.

7        Q    If I ask you to assume several facts, that the

8   Vida Encantada entity that is identified as a party to this

9   termination and assumption agreement was an indirect

10  subsidiary of THI Baltimore, Inc., and further assume that

11  FAS had an administrative services agreement with the Vida

12  Encantada entity to provide legal support services to the

13  Vida Encantada entity, and further assume that FAS retained

14  outside counsel to prepare the termination and assumption

15  agreement on behalf of the Vida Encantada entity; if you

16  assume those three facts are true, what to you find

17  fraudulent in the transaction that's described in Ms.

18  Anderson's deposition?

19             MR. RUIZ-CARUS:  Form.

20       A    I think the fraud, as I understood it, had to do

21  with the timing of the fact that it was prepared after a

22  declaration had been made to the court that such a document

23  existed.

24       Q    You don't know one way or the other whether such

25  a representation had been made to the court that the

1    document existed; correct?

2            MR. RUIZ-CARUS:   Form.

3        A    I wasn't there.   It's my understanding that Ms.

4    Anderson testified that Marsha Rydberg had made such

5    representation, but I was not there.   I'm not specifically

6    knowledgeable.   I know what Ms. Anderson had testified to.

7        Q    The basis for your statement that a court had

8    been provided with a fraudulent document -- strike that.

9    The basis for your understanding that a representation had

10   been made to the court that the document existed before its

11   preparation is solely from Ms. Anderson's deposition; is

12   that right?

13       A    I think that's correct, yes, sir.

14       Q    And if her testimony turned out to be false,

15   would you have grounds to reevaluate your reliance upon it?

16           MR. RUIZ-CARUS:   Asked and answered.

17       A    Of course.

18       Q    So for this portion on page 10 beginning on the

19   second paragraph relating to the termination and assumption

20   agreement, you've told me there are two aspects of that

21   that you're relying on.   First, the continued provision of

22   legal services as you identified in the first paragraph,

23   and second, also as to your second opinion on fraud.   Is

24   that right?

25       A    Yes.

1      Q     Is there anything else that this portion -- this

2    last portion on page 10 that we've been talking about, is

3    there any other application of this information to your

4    opinions?

5      A     No, sir.

6      Q     Would you turn to page 11 of your report, please.

7      A     Yes, sir.

8      Q     And I think we have identified in your prior

9    testimony that this section on the top half of page 11 is

10   the factual basis and support for your fraud opinion;

11   correct?

12     A     Yes.

13     Q     And when I say "your fraud opinion," is that an

14   appropriate shorthand for the second opinion that you've

15   rendered, the fraudulent avoidance of liabilities?

16     A     Yes.

17     Q     Okay.  I just -- there may be a technical

18   difference, but I want to talk to you about it in general

19   terms, and you're okay with that?

20     A     I am, yes.

21     Q     All right.  Tell me about the facts that you've

22   relied upon here relating in this section that refers to

23   Mr. Saacks, how that leads to your conclusion that there

24   was a fraudulent effort to avoid liabilities of a

25   predecessor corporation?

1      A      It is my understanding that Mr. Saacks was made

2    the director of the debtor, that he had ostensibly

3    purchased THMI and was made the debtor by Mr. Forman and

4    Mr. Grunstein, as I understood it; that he had no knowledge

5    of the purchase; that he had testified that he had not been

6    aware of the fact that he was the director, that he was the

7    owner; that there had been two payments that he had

8    received for $2,000 each to sign his name on two documents.

9      Q      And from what information do you derive the

10   information you just recited to me?  That's not your

11   personal firsthand knowledge; right?

12     A      My knowledge came through his own testimony from

13   his deposition.  There was a memo that -- well, I received

14   the documents that I've referenced here, the Bates-numbered

15   documents related to the amounts paid to Mr. Saacks, and

16   then subsequently an invoice for reimbursement that I

17   believe Mr. Forman requested or Mr. Grunstein requested.

18   There was also an e-mail, a memorandum that I had that was

19   drafted by, I believe, someone at the law firm of Mr.

20   Baker, that made reference to the use of Mr. Saacks and the

21   payment for his signatures and some concerns related to

22   that.  There was issues that had been raised with regards

23   to Mr. Saacks by Ms. Anderson.

24            So there was several indicia that I had from the

25   various documents that I had been provided that gave me the

1    knowledge I had about the fraudulent issues surrounding Mr.

2    Saacks's involvement.

3        Q    The sources that you've identified were Mr.

4    Saacks' testimony, Mr. Baker's e-mail, the documents

5    Bates-stamped and referenced in your report, and Ms.

6    Anderson's testimony that you relied upon as the basis for

7    this section.  Is there anything else?

8        A    There may have been.  I'm just not recalling, as

9    I'm sitting here with you now.

10       Q    You make the statement -- and I'm paraphrasing --

11   in the first sentence, it appears that Mr. Saacks had no

12   idea he purchased THMI.  What's the basis for your -- for

13   making that statement?

14       A    Mr. Saacks.

15       Q    Have you ever personally observed Mr. Saacks?

16       A    No, I've never observed Mr. Saacks.

17       Q    You've never met him?

18       A    No, sir.

19       Q    You've never talked to him on the phone?

20       A    No, sir.

21       Q    So the basis of Mister -- when you say Mr.

22   Saacks, is it a reading of his deposition testimony?

23       A    Yes.

24       Q    Do you know when that testimony was given?

25       A    I don't recall the date.

1      Q      Do you have any basis to conclude what Mr.

2  Saacks' mental state was in 2006 as opposed to the time he

3  gave his deposition?

4      A      No, sir.

5      Q      You have no idea what he knew or did not know in

6  2006 at the time; correct?

7      A      Correct.

8      Q      If Mr. Saacks received payments to sign documents

9  and acquire THMI, what's the -- describe the fraud for me

10  as it relates to that fact.

11      A      I think it is an indicia of what might be

12  construed to be the fraudulent conduct of the parties to

13  have somebody as a strawman signing for an entity that he

14  did not know he owned or was acquiring.  That why you would

15  pay an owner for his signature on a document that as an

16  owner he would provide without compensation.  As a business

17  transaction, it doesn't make any sense.

18      Q      Your opinion is that the transaction was a

19  fraudulent effort to avoid the liabilities of a predecessor

20  corporation; correct?

21      A      My opinion is that it is the use of Mr. Saacks

22  and the indicia that I just indicated to indicate that it

23  was a fraudulent effort to avoid the liabilities.

24      Q      Okay.  Whose fraudulent efforts were they, in

25  your opinion?

1        A      Well, I believe it -- I don't know who ultimately

2    it might be.  I'm aware that the prior owners who had set

3    up the corporation that eventually was acquired was Mr.

4    Forman and Mr. Grunstein, and that they transferred

5    essentially the ownership of that entity to Mr. Saacks.

6    But who ultimately would be liable, I don't know, sir.

7        Q      Okay.  But in reaching a conclusion that there

8    was fraud relating to the transfer of assets to the debtor,

9    you can't identify any party who committed the fraud?

10               MR. RUIZ-CARUS:  Form.

11       A      To the extent that it is a -- the parties who set

12   up the transfer, who made the purchase of THMI available to

13   Fundamental, to Mr. Saacks, I believe would be the parties

14   who would be liable.

15       Q      And as -- as you -- in forming your opinion, who

16   is it that you believe set up the transfer and made the

17   debtor available to Mr. Saacks?

18       A      Who set it up was the law firm, the Troutman

19   Sanders law firm, but it was done at the request of Mr.

20   Grunstein and, I understood, Mr. Forman.

21       Q      Anyone else?

22       A      Again, I'm imagining the parties who controlled

23   the transaction that -- that allowed the transfer, which as

24   I think I had previously indicated, would have been the

25   FLTCH, the Holdings, the Baltimore, and FAS.

1    Q    You've identified the fraudulent efforts in

2    setting up the transaction as being the Troutman law firm,

3    Grunstein, Forman, FLTCH, FAS, Holdings, and then you

4    referred to a Baltimore entity.  Are you referring to THI

5    Baltimore, Inc., or THI Baltimore Management?

6         MR. SOLOTOROVSKY:  Objection.  Form.

7    A    Again, I believe it may have been Management, but

8    who was ultimately responsible, like I said, I believe to

9    be a legal determination.

10   Q    So for purposes of your expert opinion are you

11   extending the opinion that there was fraud related to the

12   transfer of assets to the debtor to any particular party?

13        MR. RUIZ-CARUS:  Form.

14   A    The parties who were involved in the transfer,

15   whoever that is determined to be by the court.

16   Q    Okay.  But you're not going to opine as an expert

17   that there was fraud and the fraud was committed by party X

18   or Y; is that right?

19        MR. RUIZ-CARUS:  Form.

20   A    I don't believe I'm going to identify who the

21   liability would go to.  The fact that it was a -- the

22   appearance of a fraudulent transaction, that's what I will

23   testify to.

24   Q    But you're not going to testify as to the parties

25   that conducted the transfer that you consider to be

1    fraudulent; is that right?

2              MR. RUIZ-CARUS:  Asked and answered.

3        A    Again, I'm not recalling specifically who those

4    parties are, but whoever those parties are are the ones who

5    I would be testifying to allowed this transfer to take

6    place.

7        Q    Mr. Oscher, here is the difficulty I'm having, is

8    that there could be two potential applications of your

9    opinion.  There could be, for example, you opining that

10   this transaction had indicia of fraud surrounded by it.

11   Alternatively, there could be your opinion that parties X,

12   Y, and Z committed a fraud through this transaction.  Do

13   you see the difference between the two?

14       A    I'm understanding what you're saying as to why,

15   and I'm speaking to the transaction as a -- what I believe

16   to be a fraudulent transaction.  I am not speaking to the

17   liability specifically as to who would be -- who would be

18   the grieving party, if you will.

19       Q    So just to be clear, you are not -- your opinion

20   is not tying any particular actor to fraudulent

21   liabilities; your opinion is limited to a description of

22   the transaction itself --

23             MR. RUIZ-CARUS:  Form.

24       Q    -- is that fair?

25       A    It's fair in the sense that -- to the extent that

1    it would be whoever it was who allowed the transfer to take

2    place would be that party.  I'm not specifically

3    identifying who those are, to answer your question, because

4    I'm just not recalling specifically.  But whoever allowed

5    the transfer, whoever allowed Mr. Saacks to become a party

6    to this transaction and what I believe to be fraudulent

7    effort, I mean, that's where the liability would go.

8         Q    You've described your fraud opinion as that there

9    appears to have been fraud related to the transfer of

10   assets to the debtor.  That's what you told me at the

11   outset of the deposition.  Does that sound right?

12        A    What was transferred, it was a stock purchase.

13   Supposedly certain assets and liabilities were transferred

14   as a result of that, so it's the entire business of THMI

15   and the stock associated with it that was at the heart of

16   the fraudulent transfer.

17        Q    Okay.  We talked about fraudulent transfer, and

18   we talked about your two separate opinions on successor

19   liability.

20        A    Right.

21        Q    Excuse me.  I'm still referring to your second

22   opinion on successor liability related to fraud.

23        A    Right.

24        Q    Okay.  You say on page 11 of your report that the

25   transaction was a fraudulent effort to avoid the

1    liabilities of a predecessor corporation.

2        A    Right.

3        Q    Is that your opinion?

4        A    Yes.

5        Q    Who is the predecessor corporation, in your

6    opinion?

7        A    The predecessor would have been the -- the THMI

8    entity and the owner of THMI before it was sold.

9        Q    And which liabilities do you opine were sought to

10   be avoided?

11       A    There were liabilities related to litigation that

12   had -- and judgments associated with that litigation that

13   were being avoided.

14       Q    Which judgments were sought to be avoided?

15            MR. RUIZ-CARUS:  Form.

16       A    There were three or four pieces of litigation

17   that awards of -- or judgments had been entered into or

18   that were under appeal, that formed the basis of the

19   litigation liabilities that existed.  I don't specifically

20   recall all the different pieces that made up.  It was over

21   a billion dollars of litigation.

22       Q    And who or which entities were potentially liable

23   for those litigation liabilities?

24            MR. RUIZ-CARUS:  Form.

25       A    At the time it was my understanding it was, you

1  know, the THMI or the entity that was owning THMI.

2      Q    At the time of the 2006 stock transaction was FAS

3  potentially liable for any of those litigation or judgment

4  claims from THMI?

5          MR. RUIZ-CARUS:  Form.

6      A    I don't know the answer.  I don't even know that

7  FAS was even formed until after that time.

8      Q    How about FLTCH?  Do you know whether FLTCH at

9  the time of the transaction was potentially liable for any

10  of those claims that you suggest were avoided?

11          MR. RUIZ-CARUS:  Form.

12     A    Again, I don't even know that they were in

13  existence at the time.  But you've asked me a legal

14  question.  I don't know the answer to that.

15     Q    And I expect your answer would be the same if I

16  asked you about Mr. Forman, Mr. Grunstein, or THI

17  Baltimore, Inc.?

18     A    The answer would be the same.

19     Q    Okay.  Are you opining on any measure of damages

20  in this case?

21     A    No, sir.

22     Q    Is there any other opinion that you are expected

23  to provide testimony in support of other than what we have

24  just reviewed in your report and discussed in the balance

25  of your deposition?

1              MR. RUIZ-CARUS:   Form.

2       A     There hasn't been anything else discussed, but

3  there is still documents that I anticipate receiving,

4  that's just what I referred to have been recently produced.

5  To the extent that they provide additional information,

6  there may or may not be comments or opinions that I have as

7  it relates to those documents.

8       Q     Are you expressing any expert opinion on

9  fraudulent transfer?

10      A     No, sir.

11      Q     You're not opining on solvency or reasonably

12  equivalent value in this case?

13      A     No, sir.

14      Q     Your opinions are limited to the two aspects of

15  successor liability that we have identified and discussed?

16      A     Yes, sir.

17      Q     Sir, in your report that's Exhibit 2 in front of

18  you, Exhibit C has several pages attached to it, and the

19  heading on that is "Information Considered," and it's pages

20  1 through 13.   Do you see that?

21      A     Yes, sir.

22      Q     Is this a comprehensive list of all of the

23  documents that you reviewed in connection with your service

24  as expert in this case?

25      A     Yes.

1      Q     Are there any documents that you reviewed that
2    are not listed on this Exhibit C?  And to be fair, I'll say
3    that your counsel sent yesterday, which we'll mark in a
4    moment, an Assignment for the Benefit of Creditors summary
5    or presentation, which we'll talk about in a moment.  But I
6    want to be clear on what documents you reviewed, so let me
7    start over.
8            Is there any information or any documents
9    that you received and reviewed other than those listed
10   on Exhibit C?
11     A     I don't believe so.
12     Q     And of those items listed on Exhibit C, are there
13   any here that you considered to be the most relevant to
14   your ultimate opinions?
15     A     The ones that were the most relevant is what I've
16   included as references in my report.
17     Q     Are there -- is there information or documents
18   identified on this Exhibit C that you didn't review, or
19   have you reviewed them all?
20     A     Either I or Lisl Unterholzner, who I indicated
21   earlier had looked at the documents as well.
22     Q     And were all of these documents reviewed by you
23   or Lisl prior to March 23rd, 2014?
24     A     Yes, sir.
25     Q     How were these documents provided to you?

1      A      I believe some may have come in hard copy, some

2  were provided electronically, and some may have been

3  provided by delivery.

4      Q      Who prepared this Exhibit C?

5      A      My administrative assistant in the office.

6            (Exhibit No. 3 was marked for identification.)

7  BY MR. MCCOSKEY:

8      Q      And just to be complete, I have marked a document

9  as Exhibit 3 that I would ask you to take a look at.  It's

10 an e-mail followed by several pages typed with a heading

11 "Assignment for the Benefit of Creditors."  Do you see

12 that?

13     A      Yes.

14     Q      I'll represent to you this was an e-mail that

15 was --

16            MR. BERMAN:  Do you have copies?

17            MR. MCCOSKEY:  I do and --

18            MR. BERMAN:  It wasn't part of the packet you

19      gave us.

20            MR. MCCOSKEY:  That's it.

21            MR. BERMAN:  The whole paper-clipped document

22      you're going to mark as 3?

23            MR. MCCOSKEY:  Yes, it's 3.  If there was one

24      that you didn't get, I'm sorry.  If you want to look

25      at the witness's, that's fine.  I apologize.

1  BY MR. MCCOSKEY:

2      Q      Mr. Oscher, the -- I'll represent to you that

3  through the first page, the cover e-mail, this is a

4  document that Mr. Ruiz-Carus sent to me yesterday, and the

5  remaining portion of Exhibit 3 was attached to it.

6  Do you recognize the document that's attached to the

7  e-mail?

8      A      I've seen this e-mail before.

9      Q      You've seen the document attached to the e-mail

10  before?

11      A      Yes, sir.  I'm sorry.  That's what I meant.

12      Q      And what is that document?

13      A      It is a memo.  It is something that was prepared

14  some time back by Judge Williamson.

15      Q      Is it something that you reviewed and relied upon

16  in reaching your opinions in this case?

17      A      The simple answer is no.

18      Q      Okay.  Were you provided with any attorney work

19  product from Mr. Ruiz-Carus in arriving at your opinions?

20      A      No, sir.

21      Q      Any --

22      A      Not that I'm aware of, no, sir.

23      Q      Any memos?

24      A      No, sir.

25      Q      Any summaries?

1     A     No, sir.

2     Q     Did you rely on any treatises for your ultimate

3     opinions in this case?

4     A     No, sir.

5     Q     Other than meetings with representatives of the

6     Wilkes & McHugh law firm, did you consult with or interview

7     anyone else in arriving at your opinions in the case?

8     A     No, sir.

9     Q     As you were reviewing the documents that you

10    identified on Exhibit C, did you find any document or did

11    you review any document that's contrary to your ultimate

12    opinion in the case?

13    A     I don't believe so, no, sir.

14    Q     There is nothing you've seen or reviewed to date

15    that was provided on Exhibit C that would be contrary to

16    your opinions in the case.  Is that your testimony?

17    A     My testimony, if there is, I'm not recalling it.

18    Q     Did you ever ask anyone what the view of the

19    other side was on the defense side of the case?

20          MR. BERMAN:  Objection to form.

21    A     I think that the way the pleadings were struck,

22    or what I reviewed, indicated that the position of the

23    other side was that it was not a fraudulent transfer, that

24    it was a transfer that was conducted in the ordinary course

25    of business.

1      Q     Did you ever ask anyone at the Wilkes & McHugh

2   firm to explain those theories to you so you could

3   understand and have a complete picture of the differing

4   views on successor liability in the case?

5          MR. RUIZ-CARUS:   Before you answer, I'll

6          interpose an instruction not to answer to the extent

7          that it's a communication you had with me or another

8          attorney at the firm, except to the extent it may have

9          been a fact or some data or some assumption you relied

10         on in coming to one of your conclusions in this case.

11         MR. MCCOSKEY:   Before you answer, I want to make

12         clear, Mr. Ruiz-Carus, I'm asking whether a

13         communication existed, and I'm not asking for the

14         substance of the communication.   I'm simply asking

15         whether Mr. Oscher sought to obtain --

16         MR. RUIZ-CARUS:   I'm fine with that question.

17         MR. MCCOSKEY:   Okay.

18         MR. RUIZ-CARUS:   I think the way you phrased it

19         before suggested that we actually communicated with

20         him the substance of what the defense was.

21         MR. MCCOSKEY:  Fair enough.

22   BY MR. MCCOSKEY:

23         Q     Do you understand the distinction of what we're

24   discussing, Mr. Oscher?

25         A     I do.

1     Q     Okay.  Without getting into any protected areas,

2  did you have communications with Wilkes & McHugh, seeking

3  to understand the defendants' positions or theories on

4  successor liability in the case?

5     A     There may have been in a general sense early in

6  the discussions.

7     Q     And other than what you've testified to a moment

8  ago, do you recall anything else as it relates to the

9  defendants' positions on successor liability?

10    A     No, sir.

11    Q     Did you ever ask anyone for any documents that

12  the defendants were relying on in defense of the successor

13  liability counts?

14    A     There was no specific request, no, sir.

15    Q     Sir, would you turn to Exhibit A of your report.

16  It appears to be a one-page document.  Is this a current CV

17  of yours?

18    A     Yes.

19    Q     Do you know approximately when the last change

20  was made to this document?

21    A     No, sir.

22    Q     Has it been more than a year since any change has

23  been made to this document?

24    A     It might have been changed -- or it might have

25  been less than a year, but I see something that -- I'm no

1    longer a part of the National Roster of Neutrals for the

2    American Arbitration Association.  But I believe everything

3    else is complete.

4        Q    Okay.  You've anticipated my next question.  Is

5    there anything on here that needs to be changed, updated,

6    or that is incorrect?  You've identified that you are no

7    longer a part of the National Roster of Neutrals for the

8    American Arbitration Association.  Other than that?

9        A    It's not on here.  I was notified a week ago that

10   I had been elected to the Hillsborough County Bar

11   Association Foundation Board.

12       Q    Okay.  You haven't made any updates to your CV

13   since May 23rd, 2014, have you?

14       A    No, sir, I haven't.

15       Q    Is there anything on the CV that you believe

16   would be misleading to an objective reader of it?

17       A    I would hope not.

18       Q    The Association of Certified Fraud Examiners that

19   you identify here, what are the requirements for membership

20   in that association?

21       A    There is a background of work, there's an

22   examination, and there is continuing professional

23   education.

24       Q    What about the National Association of Forensic

25   Economists?  What's required for membership in that

1   association?

2       A      Paying a fee.

3       Q      Anything else?

4       A      I don't believe so, no, sir.

5       Q      You identify a publication, "Preparation of a

6   Case, Inception to Trial," published in the Florida CPA

7   Today.  Do you have an approximate date of when that

8   appeared?

9       A      That was, I believe, something that was produced

10  in the late '90s or early 2000 period.

11      Q      Have you had any notable publications since?

12      A      No, sir.

13      Q      Are you current on all of your continuing

14  education requirements for each of the professional

15  certifications you've identified?

16      A      Yes.

17      Q      Are you current all on requirements for any

18  licenses that you hold?

19      A      Yes.

20      Q      Tell me what licenses you hold.

21      A      I'm licensed by the State of Florida as a

22  certified public accountant.

23      Q      Is that the only state that you've ever been

24  licensed as a CPA in?

25      A      No.

1      Q      What other states have you been licensed in?

2      A      Minnesota.

3      Q      And how did that license terminate?

4      A      When I moved to Florida.

5      Q      Were there ever any disciplinary actions against

6  you in Minnesota?

7      A      No.

8      Q      Have you had any disciplinary actions against you

9  as a CPA in Florida?

10     A      No.

11     Q      Fair to say your Minnesota license, you let it

12  lapse?

13     A      Yes.

14     Q      In the education section of Exhibit A you

15  reference graduate studies at the University of South

16  Florida.  Did those studies end with a graduate degree?

17     A      No.

18     Q      Approximately how many credit hours of graduate

19  studies are you referring to with respect to the USF

20  coursework?

21     A      I recall that I was 15 hours shy of finishing.

22     Q      And that was 15 hours shy of finishing to what

23  degree?

24     A      The MBA.

25     Q      Sir, would you turn to page -- to Exhibit B of

1   your report, and tell me what Exhibit B to your report

2   represents.

3       A    Exhibit B is the listing of matters under Rule

4   26, the last four years or five years of testimony at

5   deposition or trial that I provided.

6       Q    And is this inclusive of all of your testimony at

7   deposition or trial in the last five years or four years?

8       A    I believe it is.  I'm not aware of anything

9   that's missing in that time period.

10      Q    Have you ever testified as expert on successor

11  liability?

12      A    I believe I have, yes, sir.

13      Q    Okay.  Can you identify for me where in Exhibit B

14  or which case you've testified as an expert for successor

15  liability in the past?

16      A    I don't know that it -- it was in the last four

17  or five years that that testimony has been provided.

18      Q    Okay.  Exhibit B aside, let's talk about your

19  prior experience testifying as an expert on the topic of

20  successor liability.  How many occasions do you recall

21  you've provided such expert testimony or served as an

22  expert, whether providing testimony or not?

23      A    Again, I'm not recalling with specificity, but

24  maybe two or three times.

25      Q    Okay.  When you say you're not recalling with

1    specificity, can you give me the attorney that you worked

2    with in any of those two or three instances?

3        A    It may have been the Stichter Riedel firm I'm --

4    would be one.

5        Q    Do you know that, or are you guessing?

6        A    I'm guessing at this point.  That's what I'm

7    saying; I'm not able -- I'm not recalling.

8        Q    Of the two or three instances you believe you may

9    have served as an expert on successor liability, do you

10   remember the case names?

11       A    No, sir.

12       Q    Do you remember the jurisdictions where the cases

13   were pending?

14       A    No, sir.  But I imagine it would be here in the

15   Middle District.

16       Q    Would you have records at your office of

17   instances where you have served as -- or provided expert

18   testimony on the topic of successor liability?

19       A    I'm not sure if it goes back a number of years.

20   Those records may have -- they may no longer exist.

21       Q    Can you think of any instance in the last five

22   years where you've served as an expert on successor

23   liability?

24       A    I'm not recalling, as I'm sitting here with you.

25       Q    If I asked you on a break to take a look at the

1    cases listed on Exhibit B, would you be able to do that and

2    tell me whether any of those were cases in which you

3    provided testimony as an expert on the topic of successor

4    liability?

5        A    For what's listed here, yes.

6        Q    Okay.  I will ask you to do that at some point

7    when we take our next break, if you don't mind.

8        A    Sure.

9        Q    Are you familiar with what is generally referred

10   to as the Daubert standard for experts?

11       A    Yes.

12       Q    Have you ever been the subject of a Daubert

13   challenge in any court proceeding in which you were

14   identified as an expert?

15       A    Not that I'm aware of, no, sir.

16       Q    Generally speaking, have you ever been identified

17   as an expert in a case in which the court did not allow you

18   to provide testimony at trial?

19       A.   At trial?

20       Q    Yes, sir.

21       A    I'm not aware of any case.

22       Q    Do you recall any case where you were prepared

23   to provide expert testimony at trial, where you were

24   challenged as an expert?

25       A    I think that there have been cases over the years

1    where there have been motions in limine.  I'm not aware of

2    any that have been successful.

3        Q     Can you recall the last instance in which a

4    motion in limine was filed challenging your testimony as an

5    expert?

6        A     Last week.

7        Q     Okay.  And in what case?

8        A     It's a state case, and the objection is -- or the

9    motion in limine was with regards to providing certain

10    information in a beer distributor case with regards to

11    damages after the trial date.

12        Q     Now, for purposes of the motions in limine that

13    I'm asking you about, I want to limit it to those instances

14    where the issue, as you recall it, was your qualification

15    as an expert rather than some other technical aspect of the

16    case.  Okay?

17        A     Yeah.  I'm sorry.

18        Q     And that's fine.  Do you recall any -- do you

19    recall the last instance where a motion in limine has been

20    filed challenging your credentials as an expert to provide

21    expert testimony?

22        A     No, sir.

23        Q     And the motion in limine that you were referring

24    to just a moment ago, that did not challenge your

25    credentials?  Is that right?

1        A    No, sir.

2        Q    As we look at Exhibit B, there are page numbers

3    on the bottom.  Would you turn to page 5 for me, please.

4    The second case there is identified as a case where you

5    were retained by the Shumaker firm in a case called

6    American Color Graphics; is that right?

7        A    Yes.

8        Q    Generally speaking, what was the nature of your

9    testimony or in what form were you proposed to be an expert

10   in that case?

11       A    It was a damages case.  There were certain issues

12   of a contract and the amount of production for certain

13   advertising, if I recall.  And it was a damages case.

14       Q    Okay.  Would you turn the page.  There is a case

15   identified for Edward Peterson of the Stichter Riedel firm,

16   Blue Stone Real Estate Construction and Development.  Do

17   you see that?

18       A    Yes.

19       Q    Can you describe for me what aspect of expertise

20   you were asked to apply in that case?

21       A    I was selected as the chief restructuring officer

22   in Blue Stone.

23       Q    So this was not an expert testimony or

24   deposition, necessarily?

25       A    No, sir.

1        Q      Would you turn to page 8 for me, please.  There's

2   a case identified for Philip Campbell at the Shumaker firm,

3   James R. Wilson, MD.  Can you tell me what your role in

4   that case was?

5        A      It was a damages case.

6        Q      As an expert?

7        A      Yes.

8        Q      Would you turn the page.  On page 9 there is a

9   case identified for Mindy Richter of the Shumaker firm,

10  Alps South, LLC.  Can you tell me what your role was in

11  that case?

12       A      As an expert.

13       Q      And as an expert opining on what?

14       A      Damages associated with a patent infringement.

15       Q      Would you turn the page to page 10.  The first

16  case is identified for Mr. Berman of the Shumaker firm, In

17  re North Bay Village.  Would you tell me what your role was

18  in that case?

19       A      I'm forgetting the specifics.

20       Q      Do you know whether it was as an expert or

21  otherwise?

22       A      Yes, sir, it was as an expert.  All these relate

23  to expert testimony.

24       Q      Okay.

25       A      But the entity was in bankruptcy, and I'm just

1    not recalling the specifics of what the testimony related

2    to.

3        Q    Okay.  The next item, Philip Campbell of the

4    Shumaker firm, Alejandro Robles and Francisco Robles. What

5    was your role in that case?  You've said as an expert;

6    correct?

7        A    Yes, sir.

8        Q    And on what topic?

9        A    This was a -- it was a damages case.

10       Q    Your role was to provide expert testimony on

11   damages?

12       A    Yes.

13       Q    Anything else in your role as an expert?

14       A    On this case?

15       Q    On that case.

16       A    There was a subcomponent that was a forensic

17   accounting component because of certain activities that

18   related to the damages, but there is really kind of a

19   bifurcation of those issues.

20       Q    Anything other than forensic accounting and

21   damages?

22       A    No, sir.

23       Q    There's a case identified on the bottom of page

24   10 for Jamie Austrich of the Shumaker firm, Wacker Chemical

25   Corporation.  In what capacity were you an expert in that

1    case?

2        A    It was contract damages.

3        Q    On the top of the next page you were identified

4    as an expert for Philip Campbell of the Shumaker firm in a

5    Patel case; plaintiff is Patel.  Can you tell me what

6    expert -- what your expert role was in that case?

7        A    That was a damages case.

8        Q    On page 15 there is a listing for Todd Timmerman

9    of the Shumaker firm, Yellow Pages Photos, Inc.  Can you

10   tell me what your role as an expert was in that case?

11       A    As a damages expert.

12       Q    And on the bottom of that page there is another

13   case for Mr. Timmerman at the Shumaker firm, SuperMedia,

14   LLC.

15       A    Yes.

16       Q    What was your role as an expert in that case?

17       A    On damages.

18       Q    And for those items that we've identified as your

19   expertise on damages, that's primarily based on accounting?

20       A    Accounting or finance, yes.

21       Q    When is the last time you've testified in court

22   as an expert?

23       A    I believe it was in the last couple months.

24       Q    Do you recall the case?

25       A    It -- I believe it was the case you identified

1    earlier on page 15, the Yellow Page Photos matter with Mr.

2    Timmerman as attorney.

3         Q    Do you -- were you provided with a copy of your

4    transcript of your testimony in that case?

5         A    No, sir.

6              MR. MCCOSKEY:  If we can take a quick break right

7         now.  We can go 10 minutes again.

8              I would ask you over this break -- I'm going

9         to ask you when we return, having reviewed

10        Exhibit B over the break, if you can identify for

11        me any case listed on Exhibit B where you were

12        retained or testified as an expert on the topic

13        of successor liability.

14             THE WITNESS:  Yes, sir.

15             MR. MCCOSKEY:  Okay.  We will take a break now.

16        We'll maybe pick up at 11:30.

17             (Brief recess was taken.)

18   BY MR. MCCOSKEY:

19        Q    Mr. Oscher, you realize you're still under oath?

20        A    I do.

21        Q    I asked you before the break to review your

22   Exhibit B and identify for me any cases in which you have

23   served as an expert on the topic of successor liability.

24   Did you have a chance to review Exhibit B over the break?

25        A    Yes.

1      Q      Can you identify for me any case in Exhibit B
2  where you've served as an expert on the topic of successor
3  liability?

4      A      There was nothing in Exhibit B.

5      Q      And Exhibit B, to the best of your knowledge, is
6  a summary of all of the cases for which you have served as
7  expert in the last five years.

8      A      Yes -- no.  In which I provided testimony in the
9  last five years.

10     Q      Okay.  Fair enough.      Is there any case in the
11 last five years where you've served as an expert on the
12 topic of successor liability?

13     A      I may.  That's what I was saying.  I could not
14 recall without looking at the list.

15     Q      Now that you've looked at the list, you can not
16 identify for me any case in which you've served as an
17 expert on the topic of successor liability; correct?

18     A      The list that you're referring to is my testimony
19 list.  This is not all the cases that over the last five
20 years that we've been involved with.  To the extent that
21 there may be other cases where I was asked to look at
22 successor liability as an issue, there may be other cases
23 I'm just not recalling, and I don't have that list of other
24 cases that I've been involved with.

25     Q      Do you maintain a list of other cases that you've

1   been involved with as an expert but not in a testifying

2   capacity?

3       A    I don't maintain it like I maintain the testimony

4   list.  I'm sure there's documents in the office related to

5   my prior case involvements.

6           (Composite Exhibit No. 4 was marked for

7       Identification.)

8   BY MR. MCCOSKEY:

9       Q    Sir, I'm marking as Composite Exhibit 4 a

10  three-page document.  Would you take a look at that for me

11  and tell me if you recognize those documents of Composite

12  Exhibit 4?

13      A    Yes.

14      Q    What is Composite Exhibit 4?

15      A    Those are the invoices that have been provided to

16  the Wilkes & McHugh firm.

17      Q    The last -- well, the third page of Composite

18  Exhibit 4 appears to be an invoice date of June 3rd, 2014.

19  Do you see that?

20      A    Yes.

21      Q    Since issuing this invoice, have you issued any

22  other invoices to the Wilkes & McHugh firm for this case?

23      A    No, sir.

24      Q    What is your hourly rate?

25      A    395.

1    Q    Have you been paid for all of your invoices that

2    are represented here on Exhibit 4?

3    A    I believe we have been paid for our first

4    invoice.  I think we've been paid for the second invoice.

5    I don't believe we've been paid for the third invoice.

6    Q    Is the payment of any of your fees contingent

7    upon any particular result in this case?

8    A    No.

9    Q    Is the payment of any of your fees contingent

10   upon the substance of your testimony in any way?

11   A    No.

12   Q    If you would look at the first page of Exhibit 4

13   for me, please.  There are particular entries, I suppose,

14   where a date is identified, hours are identified, there are

15   initials, and there's a description of the work performed.

16   Is that how you typically summarize on your invoices?

17   A    Yeah.  Yes.

18   Q    I see the first entry is January 26, 2014.  Does

19   that refresh your recollection at all as to when you first

20   were contacted in this case?

21   A    Yes.

22   Q    And is that -- is that the first that you recall

23   performing any services in this case, on the 26th?

24   A    That would be the first time that I reviewed

25   documents, yes.

1    Q    Okay.

2    A    But as I said and testified earlier, the contact

3   had occurred before then.

4    Q    The first two entries, January 26th and February

5   1st, are both for -- identified as for document review.

6   Can you recall which documents you reviewed at that initial

7   stage?

8    A    My recollection was that first document was the

9   complaint that we discussed.

10    Q    So to the best of your recollection, these two

11   entries relate to your review of that 200-plus-page

12   complaint that you referred to earlier?

13    A    Yes.

14    Q    And nothing else?

15    A    There may have been.  I don't recall what else

16   might have been there.

17    Q    Who is the person identified by the initials

18   T.P.?

19    A    Tara Puigdomenech, which is my assistant.

20    Q    And there is an entry here on March 26th for

21   research and document review.  What research was performed?

22    A    As I sit here with you right now, I'm not

23   recalling specifically.

24    Q    Do you know -- other than a general topic of

25   successor liability, can you pin it down any more specific

1   than that?

2      A     No, sir.

3      Q     If you'd turn the page, please.   There are

4   entries for April 3rd and 4th for meetings with Mr. Wilkes

5   on the 3rd and others, and meeting with Mr. Ruiz-Carus and

6   others on the 4th.   As to the first item, was there anyone

7   at that meeting on April 3rd other than Mr. Wilkes and Mr.

8   McHugh and yourself?

9      A     I'm not recalling that there was, no, sir.

10     Q     And generally speaking, what was the substance of

11  that meeting with Mr. Wilkes and Mr. McHugh -- or strike

12  that.

13           What was the purpose of the meeting?

14     A     Just to go over background information.

15     Q     And was all of that background information

16  necessary for you to perform your expert analysis?

17     A     It was all part and parcel of the work I was

18  asked to do.

19     Q     Do you recall any specifics of that meeting, what

20  information Mr. Wilkes provided you?

21     A     Not specifically, no, sir.

22     Q     Generally, do you recall what background

23  information you obtained during the course of this meeting

24  on April 3rd?

25     A     Mr. Wilkes talked about the parties, and the

1    litigation, and the amount of time and the efforts that

2    everybody has been going to to get documents produced.

3    Again, as I said, it was just background information.

4        Q    Did he tell you anything about the personalities

5    involved in the case?

6        A    Not that I specifically recall, no.

7        Q    Did he tell you anything of his personal opinions

8    on owners and operators of nursing homes?

9        A    I don't think we had that specific discussion.

10       Q    Did he communicate at all to you his

11   relationships or prior interactions with Mr. Forman or Mr.

12   Grunstein?

13       A    Not that I recall, no, sir.

14       Q    How about the meeting on April 4th with Mr.

15   Ruiz-Carus and others?  Do you recall that meeting?

16       A    Not specifically, no, sir.

17       Q    Do you recall any topics that were discussed at

18   that meeting?

19       A    No.  Again, my meetings, I think you can

20   generally say that they were just for background

21   information as I was reviewing documents or had documents

22   available.  It was as it related to the case in general.

23       Q    April 23rd you have a time entry for a discussion

24   with Mr. Wilkes.  Was that telephonic or face-to-face?

25       A    It was probably telephonic, the way I've

1    described it.

2        Q    Do you recall any particulars of that discussion

3    with Mr. Wilkes on the 23rd?

4        A    No, sir.

5        Q    How about on the 28th?  You have a listing for a

6    discussion with Mr. Ruiz-Carus.  Was that telephonic or in

7    person?

8        A    Again, by the description, I would say telephone.

9        Q    Do you remember any particulars of a telephonic

10    discussion you had with Mr. Ruiz-Carus in late April?

11        A    No, sir.

12        Q    Would you turn the page for me, please.  And

13    there is a entry on April -- or excuse me -- May 13 with

14    initials L.A.U.  Who is that?

15        A    That is -- it's indicated at the bottom.  That's

16    Lisl Unterholzner.

17        Q    And what is Lisl's position at your firm?

18        A    She is an accountant.  She's staff and has been

19    working with me on the review of the documents.

20        Q    She's a staff accountant at your firm?

21        A    Yes.

22        Q    Is she a CPA?

23        A    She will be in a few more days.  She's passed the

24    exam and has been waiting for a period of employment to

25    elapse before officially getting her certificate.

1    Q    Do you know whether she holds any graduate

2    degrees?

3    A    I believe she holds a couple of degrees.  But the

4    accounting and her degree in accounting is the last degree

5    she has.

6    Q    Do you know when that degree in accounting was

7    obtained?

8    A    I want to say in the last year and a half.

9    Q    To your knowledge, has she had any prior work

10   experience in between the pursuit of any of her degrees

11   prior to the accounting degree?

12   A    Yeah.  She had been employed for a number of

13   years.  She had -- her original degree was, if I'm not

14   mistaken, in architecture.

15   Q    So she has worked for you for approximately a

16   year and a half since obtaining her degree in accounting?

17   A    It isn't quite a year and a half.  She's coming

18   up, I believe, on one year with me now.

19   Q    On April -- or excuse me -- May 20th, there is an

20   entry for a discussion with Mr. Kapila.  Do you see that?

21   A    Yes.

22   Q    Do you recall that discussion?

23   A    In a general sense, yes, I do.

24   Q    Was that telephonic?

25   A    Yes.

1      Q      And tell me everything you can recall about that

2  discussion with Mr. Kapila on the 20th.

3      A      It was with regards to the documentation that I

4  understood had come in, and his indication that he had not

5  received -- or that he had not received some information,

6  and some of what he had received he had not reviewed,

7  himself, at that point in time.

8      Q      Do you recall whether he identified specifically

9  what information he had not received at that point?

10     A      No, sir.

11     Q      Do you recall whether he had identified

12  specifically what information he had received but not

13  reviewed as of that point?

14     A      I think whatever documents had been provided to

15  him he was -- and I don't know what that is, but there had

16  just been a recent production, and he was indicating that

17  he had not -- he was now starting to look at it but had not

18  finished his review, and would not be turning it over to us

19  or to me any time soon.

20     Q      Did you ask him for those materials that he had

21  just recently received?

22     A      I don't know whether I asked him or asked

23  counsel, but the indication was that I would not be getting

24  them.

25     Q      Did he give you a reason?  Did Mr. Kapila give

1   you a reason why you would not be getting the materials

2   that he had at that point?

3       A    I don't recall asking.  Not that I recall.

4       Q    Did you ask for those materials either directly

5   or through counsel more than once?

6       A    I think I just indicated to counsel that I was

7   aware that they had been received and I didn't have time to

8   look at the information anyhow, so it actually became a

9   nonissue.

10      Q    Your entry on May 20th also indicates "Draft

11  expert report."  Do you see that?

12      A    Yes.

13      Q    That's the first reference to the report that I

14  see in your time records.  Is that the first day that you

15  would have started the preparation of your report?

16      A    Yes.

17      Q    So you started preparing the report on the 20th

18  of May, and it was issued on the 23rd?  Is that right?

19      A    Yes.

20      Q    Each of the entries beginning May 20th through

21  23rd that reference preparation of the expert report, is

22  that a true and accurate representation of what would have

23  been the services that would have been performed?

24      A    Yes.

25      Q    So your entries for preparing the expert report

1  were on May 20 and May 22nd; right?

2      A    Yes.

3      Q    The total combined time for those entries, seven

4  and a half hours?

5      A    Yes.

6      Q    And it may have been less than seven and a half

7  hours if you performed some of the other tasks that are

8  described in each of those entries.  Is that right?

9      A    That's correct.

10     Q    So at most you spent seven and a half hours on

11  your expert report.

12     A    Yes.

13     Q    And your assistant, Ms. Unterholzner, spent the

14  sum total of her entries, which I have at 23.94 hours.  If

15  you accept my math, is that correct based on these time

16  records?

17     A    Based on the time records, yes.

18     Q    What did she do with respect to preparing your

19  expert report?

20     A    The work that she was doing was, we were

21  constructing the manner in which the report was going to be

22  written.  We were identifying the documents and pulling

23  those documents together for purposes of reference in the

24  final report.

25     Q    Did she prepare an initial draft of your report?

1      A      The initial framing and draft was done by myself.

2   The subsequent after that initial draft -- and I think you

3   saw the initial entry where I had identified at the very

4   beginning on the 20th.   What then subsequently happened

5   was, within the framework of what I had identified, Ms.

6   Unterholzner was putting together the information and

7   helping to draft up the report, and during that time period

8   I had my input, but it was primarily her construct of the

9   information as I had identified it for her.

10      Q      Do you use Microsoft Word at your office?

11      A      We do.

12      Q      Was your report prepared as a Word document?

13      A      Probably.

14      Q      Was Ms. Unterholzner ever -- when you say she

15   assisted in the preparation of the expert report, did she

16   access and provide information within the Word document

17   that became your report?

18      A      Is that any -- I indicated that she drafted the

19   report.  Are you asking me a different question?

20      Q      No, I'm not.  I'm trying to ascertain and be

21   clear whether she provided you with information for the

22   report and in background and in support of the report, or

23   whether she participated in the drafting of the report.

24      A      She participated in the drafting of it.

25      Q      Okay.  Are there any particular sections of the

1    report that she drafted to the exclusion of you?

2        A    No.

3        Q    Can you -- are there any particular sections of

4    the report that you drafted to the exclusion of her?

5        A    Perhaps those two concluding paragraphs on the

6    last page.

7        Q    Did you and Ms. Unterholzner in this three-day

8    window exchange drafts of this report via e-mail and e-mail

9    attachments?

10       A    No.

11       Q    On May 23rd, the last item for your time, the

12   last entry is, "Issue related to the expert report."  Can

13   you tell me what that issue related to the expert report

14   is?

15       A    I don't recall, sitting here.

16       Q    Was there a problem that you recall, on the day

17   your report was due, in getting the report issued?

18       A    No.  No, sir, not that I recall.

19       Q    Were you informed of any problem with your report

20   on the day it was due as to the substance of the report?

21       A    No, sir, not at all.

22       Q    You have no recollection what this issue refers

23   to.

24       A    Not as I sit here with you, no.

25       Q    Other than the additional documents that you

1    reference in the Conclusion section of your report, as you

2    sit here today is there anything else that you wish you had

3    reviewed or that you would have wanted to do to issue your

4    final report?

5        A    The accounting information that I made reference

6    to a few times.

7        Q    Other than that.  Is there anything else that you

8    would like to have done differently in arriving at your

9    report on May 23rd, other than reviewing that additional

10   information that you've referred to?

11       A    I'm not aware of anything, as I sit here.

12       Q    How much of your income derives from expert work,

13   on a percentage basis?

14       A    From testimony?

15       Q    Or from either supporting -- as a supporting

16   nontestifying expert or as a testifying expert.  For those

17   two combined versus the rest of the work you perform at

18   your firm, what percentage, approximately, would you

19   estimate relates to expert work?

20       A    At the present time maybe 30 to 40 percent.

21       Q    And of that 30 to 40 percent, what percent would

22   you break down your expert work in testifying expert work

23   versus nontestifying expert work?

24       A    There is only a few cases where we're contacted

25   for potential testimony where I'm not a -- where I'm a

1    consulting expert and not a testifying expert.

2        Q    That's a small portion of your expert work, is

3    the nontestifying?

4        A    Pretty much, yes, sir.

5        Q    In the expert work that you do, what would you

6    estimate the breakout is between plaintiff versus

7    defendant?

8        A    We don't keep a percentage per se.  I'll tell you

9    it's 50-50, but there may be certain months that there

10   seems to be more work in a plaintiff's case than on the

11   defense side.  And then a number of cases we're involved

12   with there's a plaintiff/counterdefendant component or

13   defendant/counterplaintiff component.

14       Q    Have you prepared any exhibits or other

15   demonstrative documents in the course of your services as

16   an expert in this case?

17       A    No specific demonstratives, no, sir.

18       Q    Other than reviewing the accounting information

19   from Mr. Kapila that you've referenced, is there any other

20   additional work you plan to do before the trial in this

21   case?

22       A    That I plan, no, sir.  I'm not aware of anything.

23       Q    What is it that you expect to receive and review

24   from Mr. Kapila that would be relevant to the opinions

25   you're expressing in this case?

1    A    I don't know what the underlying accounting

2  information is or what it might show.  To the extent that

3  it has information related to successor issues or might

4  relate to transactions or relate to additional documents

5  that might need to be looked at as a result of those

6  entries, I don't know.  I don't have any knowledge of

7  what's in those records.

8    Q    Do you have anything in mind that you're

9  expecting to see in these additional documents, that you

10  need for your opinions?

11    A    No, sir.  I mean, other than from what I've heard

12  or seen or where there's been testimony that there was a

13  continuation of what we've talked about earlier, the

14  continuation of activities, I don't know what they might

15  show.

16    Q    Have you been told by anyone what to expect in

17  these additional documents that you would like to review?

18    A    No, sir.

19    Q    Did Mr. Kapila tell you what he thought the

20  additional documents would show?

21    A    No, sir.

22    Q    You testified earlier this morning about some

23  meetings that you had with Mr. Wilkes, Mr. Ruiz-Carus, and

24  a woman attorney.  Can you identify for me whether those

25  are the same meetings on your time records which are

1    Exhibit 4, or were you referring to something else?

2        A    That's what I was referring to on my time

3    records.

4        Q    On March 25th there's a reference to a meeting

5    with Mr. Wilkes, Mr. Ruiz-Carus, and Ms. Gisclar?

6        A    Yes, sir.

7        Q    Is that who you were referring to?

8        A    It is.

9        Q    Were there any other ones from the Wilkes Firm,

10   other than those identified in your records, that you met

11   with?

12       A    No, sir, not that I recall.

13            MR. MCCOSKEY:  Why don't we go off the record

14       just for a moment to talk about scheduling, if that's

15       all right.

16            (Recess was taken.)

17                    DIRECT EXAMINATION

18   BY MR. SOLOTOROVSKY:

19       Q    Good afternoon, Mr. Oscher.  My name is Alec

20   Solotorovsky.  I represent the GTCR defendants, THI

21   Holdings, LLC, and Edgar Jannotta.

22            Now, you testified this morning that about 30 to

23   40 percent of your work relates to expert projects and

24   litigation; is that correct?

25       A    Yes.

1   Q    What does the balance of your work consist of?

2   A    I serve as a receiver or trustee or other

3   court-appointed positions, or there's work that's not

4   litigation.

5   Q    What is the work that is not litigation?

6   A    Business valuation work, primarily.

7   Q    What percentage of your time is business

8   valuations?

9   A    It depends.  I would probably say no more than 5

10  to 10 percent.

11  Q    So other than that 5 to 10 percent, all of your

12  work relates in one way or another to court proceedings?

13  A    Pretty much, yes.

14  Q    Take a look at page 4 of your report, if you

15  wouldn't mind.  At the bottom it says, "Counsel for the

16  plaintiffs has engaged Oscher Consulting, P.A., and Steven

17  S. Oscher to review and analyze the financial records of

18  THI, THMI, and any other evidence related to the plaintiffs

19  claim of successor liability against FAS, FLTCH, and THI

20  Baltimore, and to prepare a conclusion on his findings."

21  Do you see that, sir?

22  A    I do.

23  Q    Is that an accurate statement of your mission in

24  this case?

25  A    I believe so, yes.

1      Q      You were not asked to evaluate any of the

2  plaintiffs claims against the GTCR entities; right?

3      A      No.

4      Q      You were not asked to evaluate any of the

5  plaintiffs claims against THI Holdings, LLC; right?

6      A      Correct.

7      Q      You were not asked to evaluate any of the

8  plaintiffs claims against Edgar Jannotta; correct?

9      A      Correct.

10     Q      And just because you said no to the first of

11  these three questions, is it correct that you were not

12  asked to evaluate any of the plaintiffs claims against the

13  GTCR entities?

14     A      That is correct.

15     Q      And you don't have any opinions related to the

16  conduct of the GTCR entities, THI Holdings, LLC, or Edgar

17  Jannotta; right?

18     A      Correct.

19     Q      You understand that there were two transactions

20  that closed on March 28th, 2006; right?

21     A      Yes.

22     Q      In the first of those transactions THI sold THMI

23  to the debtor, Fundamental Long Term Care Incorporated;

24  right?

25     A      THI sold --

1      Q      THMI --

2      A      Yes.

3      Q      -- to -- let me start over.  In the first

4  transaction on March 28th, 2006, THI sold THMI to the

5  debtor; right?

6      A      Yes.

7             MR. BERMAN:  Objection to form.

8      Q      In the second transaction THI Holdings sold THI

9  of Baltimore and THI Of Nevada to Fundamental Long Term

10  Care Holdings, LLC; right?

11             MR. BERMAN:  Objection to form.

12      A      Yes.

13      Q      THI of Baltimore Management wasn't a party to

14  either of those transactions; correct?

15      A      I don't believe they were a direct party, no,

16  sir, if that's your question.

17      Q      They weren't listed as a buyer on either of the

18  stock purchase agreements; right?

19      A      I don't believe so, no, sir.

20      Q      Fundamental Administrative Services wasn't a

21  buyer in either of those contracts, was it?

22      A      No, sir.

23      Q      You understand that THI of Baltimore Management

24  received the operations of THMI from the debtor,

25  Fundamental Long Term Care, Incorporated; right?

1           MR. MCCOSKEY:  Object to form.

2     A     That's my understanding, I believe, yes.

3     Q     As you understand it, THMI is sold to Fundamental

4  Long Term Care, Incorporated?

5     A     Yes, sir.

6     Q     And then it transfers THMI's operations to THI

7  Baltimore Management; right?

8           MR. MCCOSKEY:  Object to form.

9     A     Yes.

10    Q     And as you understand it, in that second

11 transaction between Fundamental Long Term Care,

12 Incorporated, and THI of Baltimore Management, the debtor

13 is left with the liabilities of THMI while THI of Baltimore

14 Management gets the assets of THMI?

15          MR. MCCOSKEY:  Object to form.

16    A     That was my understanding, yes.

17    Q     And that, in your view, was the fraud?

18          MR. RUIZ-CARUS:  Form.

19    A     That ultimately will be what the court will

20 decide may or may not be the fraud.  What I was saying was

21 that the setup of the corporate entity that Barry Saacks

22 acquired and was the sole director for was the fraudulent

23 conduct or the transaction.

24    Q     And in your view, whoever brought Mr. Saacks into

25 the transaction is the one responsible for the fraud.

1            MR. MCCOSKEY:  Object to form.

2       A    Again, I think ultimately the liability will be

3   determined by the court.  I'm just understanding what the

4   transaction was.

5       Q    I'm just trying to understand what you believe

6   the fraud was.

7       A     I just told you that I believe it was the setup

8   of the corporate entity that Mr. Saacks became the sole

9   director for.

10      Q    And that corporate entity was the debtor,

11  Fundamental Long Term Care, Incorporated?

12      A    That was the -- yes, that's the debtor in this

13  case.

14      Q    You testified that THMI had some big liabilities

15  as of 2006; is that right?

16           MR. RUIZ-CARUS:  Form.

17      A    That's my understanding, yes.

18      Q    You testified that THMI had over a billion

19  dollars in liabilities?

20      A    That's my understanding, yes.

21      Q    And as you understand it, those were judgments

22  obtained by the claimants in this adversary proceeding?

23      A    That's my understanding, yes.

24      Q    If those judgments didn't exist as of 2006, would

25  that change your opinion about fraud?

1              MR. RUIZ-CARUS:   Form.

2      A    Not about the fraud, no, sir.

3      Q    If it turned out that none of the claimants in

4    this case obtained a judgment against THMI until 2011 at

5    the earliest, would that affect any of your opinions in

6    this case?

7              MR. RUIZ-CARUS:   Form.

8      A    No.

9      Q    Sir, you have a lot of experience in bankruptcy

10   matters.  Is that true?

11     A    Yes.

12     Q    And you have been an expert and a consultant in

13   bankruptcy cases?

14     A    Yes.

15     Q    And you've been a trustee in bankruptcy cases?

16     A    Yes.

17     Q    You know that in many bankruptcy cases unsecured

18   creditors don't get any cash recovery; right?

19     A    That's occurred, yes.

20     Q    And you know that in many cases if an unsecured

21   creditor does get a recovery it's often just pennies on the

22   dollar; right?

23     A    That's the case, yes.

24     Q    Based on your experience in bankruptcy matters,

25   what would you say is the typical percentage recovery for

1    unsecured creditors?

2         MR. RUIZ-CARUS:  Form.

3    A    It's all over the board.  It depends on the type

4    of bankruptcy; it depends on the period of time that the

5    bankruptcy is taking place, the economic condition.  I

6    mean, there's so many factors.  I don't know that I --

7    maybe somebody had done the study.  I wouldn't be the right

8    person to answer that question.  I distributed 72 percent

9    not too long ago in a bankruptcy that I was involved as a

10   trustee.

11   Q    What kind of case was that?

12   A    It was a fraud.

13   Q    I would like you to assume a health-care company

14   that's been defaulted by its secure lenders after a

15   financial restatement, it's got major liquidity

16   constraints, and it's got very aggressive and demanding

17   secure creditors.  In a situation like that what would you

18   expect unsecured creditors to get?

19        MR. RUIZ-CARUS:  Objection to form.

20        MR. BERMAN:  Form.

21   A    I have no basis to answer your question.

22   Q    You would be speculating?

23   A    I would be speculating.

24   Q    You understand what a liquidation analysis is;

25   right, sir?

1       A       Of course.

2       Q       What is it?

3       A       It's an analysis with regards to the value on it

4   of the assets and liabilities on a liquidated basis of the

5   corporation.

6       Q       Given financial information about a company at a

7   particular point in time, you could calculate the recovery

8   that its different creditors might get in a liquidation;

9   right?

10              MR. RUIZ-CARUS:   Form.

11      A       It's possible.

12      Q       You were not asked to do that in this case;

13  right?

14      A       Correct.

15      Q       You haven't done any analysis of what, if

16  anything, THMI's unsecured creditors would have recovered

17  if THMI was filed for bankruptcy in 2006 instead of being

18  sold to the debtor; right?

19      A       Correct.

20      Q       You know how to calculate whether or not a

21  company is profitable; right, sir?

22      A       Your question confuses me.  Do I know how to

23  calculate whether a company is profitable?

24      Q       Given financial information about a company at a

25  given point in time, you can determine whether its revenues

1    exceed its expenses; right?

2        A    Yes.

3        Q    And if its revenues exceed its expenses, you

4    would say it was profitable in that period?

5        A    If that's the only criteria for profitability,

6    then the answer is yes.

7        Q    You were not asked to calculate whether THMI was

8    profitable at any given point in time; right?

9        A    That's correct.

10        Q    And you haven't done that?

11        A    That's correct.

12        Q    You know how to value a business; right, sir?

13        A    Yes.

14        Q    You've been called upon to do that as an expert

15    in litigation before; right?

16        A    Yes.

17        Q    Nobody asked you to value THMI as of March 2006;

18    right?

19        A    That's correct.

20        Q    And you haven't done that?

21        A    I have not.

22        Q    You haven't calculated a value of THMI as of any

23    point in time; right?

24        A    That's correct.

25        Q    You know how to evaluate whether or not a company

1    is insolvent; right?

2        A    I do.

3        Q    You're occasionally called upon to conduct

4    solvency analysis in litigation?

5        A    I am.

6        Q    Nobody has asked you to analyze whether or not

7    THMI was insolvent at any given point in time; right?

8        A    That's correct.

9        Q    And you haven't done that?

10       A    That's correct.

11       Q    Nobody has asked you to evaluate whether THI was

12   insolvent at any point in time; right?

13       A    That's correct.

14       Q    And you haven't done that?

15       A    That's correct.

16       Q    Sir, you understand that THMI had employees prior

17   to being sold on March 28, 2006; right?

18       A    Yes.

19       Q    You understand THMI had executives prior to being

20   sold only March 28, 2006; right?

21       A    Yes.

22       Q    You understand that those employees and

23   executives transferred to THI of Baltimore Management after

24   the transaction closed; right?

25           MR. RUIZ-CARUS:  Form.

1      A      Yes.

2      Q      I want you to look at page 9 of your report,

3  please.   You can see there's a chart at the bottom; right?

4      A      Yes.

5      Q      And that chart lists six executives who were

6  previously with THMI and then went to THI of Baltimore

7  Management after the closing of the transaction; right?

8      A      Yes.

9      Q      All of those executives started with THI of

10  Baltimore Management on March 29, 2006; right?

11     A      Yes.

12     Q      That's the day after the transaction closed;

13  right?

14     A      That's my understanding.

15     Q      And in the next column you list a resignation

16  date for all of those executives; right?

17     A      Yes.

18     Q      That's the date that they resigned from THMI;

19  right?

20     A      Yes.

21     Q      The date for all of those executives is July 6th,

22  2006; right?

23     A      Yes.

24     Q      And the source of that information is

25  resignations forms that you've seen in your work on this

1   case?

2       A   Yes.

3       Q   I would like to show you what we will mark as

4   Exhibit 5.

5           (Exhibit No. 5 was marked for identification.)

6   BY MR. SOLOTOROVSKY:

7       Q   Sir, do you recognize Exhibit 5?

8       A   Yes.

9       Q   This is a document that you relied on in

10  preparing your report; right?

11      A   Yes.

12      Q   This document is cited in your report in the

13  middle of page 8; right?

14      A   Yes.

15      Q   This is a memo from Bradley Bennett to all

16  employees of Fundamental; right?

17          MR. MCCOSKEY:  Object to form.

18      A   Yes.

19      Q   It's dated March 30, 2006; right?

20      A   Yes.

21      Q   That's two days after the transaction we've been

22  discussing closed; right?

23      A   Yes.

24      Q   He's writing on Fundamental letterhead; right?

25          MR. MCCOSKEY:  Object to form.

1       A       Yes.

2       Q       And he signs his letter as president and CEO;

3    right?

4               MR. MCCOSKEY:  Object to form.

5       A       Yes.

6       Q       You can see in paragraph 4 he describes the sale

7    transactions that we've been discussing; right?

8               MR. MCCOSKEY:  Object to form.

9       A       Yes.

10      Q       And then in the fourth paragraph down from the

11   top he says, "All employees of the corporation, i.e.,

12   Sparks-based personnel and the division staff of Division 1

13   and 2, will be employees by a newly formed entity, THI of

14   Baltimore Management, LLC."  Do you see that?

15              MR. MCCOSKEY:  Object to form.

16      A       Yes.

17      Q       In the next paragraph he tells all employees that

18   they're going to receive two form W-2s at the end of the

19   year; right?

20              MR. MCCOSKEY:  Object to form.

21      A       Yes.

22      Q       One W-2 is going to reflect earnings from January

23   1, 2006, to March 28, 2006, under Trans Health Management;

24   right?

25      A       That's what it says.

1    Q    And the second W-2 is going to reflect wages

2  earned from March 29, 2006, to December 31, 2006, under THI

3  of Baltimore Management, LLC; right?

4    A    Yes.

5    Q    And based on this document, you understand that

6  THMI's employees transferred to THI of Baltimore Management

7  effective March 29th, 2006?

8         MR. RUIZ-CARUS:  Form.

9         MR. MCCOSKEY:  Object to form.

10   A    Yes.

11   Q    I'd like to show you what we'll mark as Exhibit

12  6.

13         (Exhibit No. 6 was marked for identification.)

14  BY MR. SOLOTOROVSKY:

15   Q    Sir, do you recognize Exhibit 6?

16   A    Yes.

17   Q    This is a document that you relied on in

18  preparing your report; right?

19   A    Yes.

20   Q    You've actually footnoted this document at page

21  9, Note 14; right?

22   A    Yes.

23   Q    And this is an e-mail from Mary Anne Lubertine to

24  Ken Tabler dated October 1, 2012; right?

25         MR. MCCOSKEY:  Object to form.

1    A    Yes.

2    Q    You understand that Ms. Lubertine is the payroll

3    supervisor at FAS?

4    A    Not sure that I recall that, sitting here, but...

5    Q    You have no reason to disagree with that?

6    A    I have no reason to disagree, no, sir.

7    Q    And you believe that she knew what she was

8    talking about in this e-mail, because you cited in your

9    report?

10    MR. MCCOSKEY:  Object to form.

11    A    Yes.

12    Q    And she tells Mr. Tabler that "All the

13    announcements I have regarding the transition have an

14    effective date of March 29, 2006, as the first day of

15    employment under THI Baltimore Management, LLC."  Do you

16    see that?

17    MR. MCCOSKEY:  Object to form.

18    A    Yes.

19    Q    In the last line of that paragraph she refers to

20    March 29th as the transition date.  Do you see that?

21    MR. MCCOSKEY:  Object to form.

22    A    Yes.

23    Q    And you relied on this e-mail for your finding

24    that THMI's former executives began employment at THMI of

25    Baltimore on March 29, 2006; right?

1    A    Yes.

2    Q    Sir, take a look at page 7 of your report, if you

3  wouldn't mind.  In the last sentence of the second full

4  paragraph you write, "Exhibit 21 from Mr. Tabler's

5  deposition indicates monthly salaries paid by THMI

6  Baltimore of approximately 20,000 in March 2006 compared to

7  more than 1.9 million for April 2006."  Do you see that?

8    A    Yes.

9    Q    As you understand it, THI of Baltimore Management

10  only paid salaries of about 20,000 in March 2006; right?

11    A    Yes, sir.

12    Q    And the following month their salaries increased

13  to more than 1.9 million; right?

14    A    Yes.

15    Q    As you understand it, that increase reflects the

16  transition of employees from THMI to THI Baltimore

17  Management; right?

18    A    Yes.

19    Q    And you would agree that in April 2006 and every

20  month after that THMI saved at least 1.9 million in salary

21  costs?

22    A    I'm not sure what their salary costs were after

23  that.  I do know what the salary cost that I showed for

24  Baltimore Management was.

25    Q    You would agree that if THI of Baltimore

1    Management is paying someone's salary because they've come

2    over to THI Baltimore Management, then THMI isn't paying

3    that person anymore?

4         A    Right.

5         Q    So if 1.9 million of employee salary costs has

6    been transitioned to THI Baltimore Management, that's 1.9

7    million in costs that THMI isn't paying anymore; right?

8         A    Yes.

9         Q    Sir, do you expect to do any more work on this

10   case other than reviewing the documents that have recently

11   been collected by Mr. Kapila?

12        A    I think that's the same question that I was asked

13   earlier, and the answer is still no.

14        Q    Let me take a minute and review my notes.

15        A    Yes, sir.

16             MR. SOLOTOROVSKY:  Okay.  I am done, although I

17        reserve the right to conduct some further questioning

18        if I need to follow up on what other counsel ask you.

19                       DIRECT EXAMINATION

20   BY MS. LICKO:

21        Q    Mr. Oscher, good afternoon.  My name is Carol

22   Licko.  I'm an attorney for General Electric Capital Corp.

23   I would like to ask you just a couple questions.

24             Mr. Oscher, I would like you to look at your

25   report, which has been marked as Exhibit No. 2.  On page 5

1    you've identified several findings in your report.  Do you

2    see that?

3         A    In the section under findings?

4         Q    Correct.

5         A    Yes.

6         Q    Do you have any findings in this report as to

7    General Electric Capital Corp.?

8         A    No, ma'am.

9         Q    I would like you to look at the last page of your

10   report, which sets forth your conclusions on page 11.  Do

11   you see that, sir?

12        A    Yes, ma'am.

13        Q    Do you have any conclusion as to General Electric

14   Capital Corp.?

15        A    No, ma'am.

16        Q    Have you been asked by anyone to render an

17   opinion with respect to General Electric Capital Corp. in

18   this case?

19        A    No, ma'am.

20        Q    Do you intend to render any sort of opinion with

21   respect to General Electric Capital Corp. in this case?

22        A    As I sit here with you, I'm not aware that I'm

23   going be asked to, no, ma'am.

24        Q    Have you reviewed the allegations made in the

25   plaintiff's complaint against General Electric Capital

1   Corp.?

2       A    At one point, yes, ma'am.

3       Q    Did you form any opinions as to those

4   allegations?

5       A    No, ma'am.

6       Q    Are you aware of the damages that are claimed by

7   the plaintiffs against the defendants in this case?

8       A    No, ma'am.

9       Q    Are you aware of the damages that are claimed by

10  the plaintiffs against General Electric Capital Corp. in

11  this case?

12      A    No, ma'am.

13      Q    Then you haven't played any role the calculation

14  of those damages, have you?

15      A    No, ma'am.

16      Q    You're not going to be asked to render an opinion

17  with respect to those damages either, are you?

18      A    I would not expect so.

19      Q    Did you have any discussions with anyone from the

20  Wilkes firm regarding General Electric Capital Corp. and

21  its role in this case?

22      A    I'm sorry.  Which firm?

23      Q    With the Wilkes firm, Wilkes & McHugh.

24      A    Oh, Wilkes.  I'm sorry.  And please ask the

25  question again.  I'm sorry.

1     Q     Did you have any dissuasions with anyone from the

2  Wilkes & McHugh firm regarding General Electric Capital

3  Corp.?

4     A     I think their name was mentioned in whatever

5  background discussions I had about the case.

6     Q     What do you recall about that?

7     A     Just that they were lenders.

8     Q     Anything else you can recall as you sit here

9  today?

10    A     No, ma'am.

11    Q     Did you have any discussions with anyone from

12  Steve Berman's firm or Steve Berman regarding General

13  Electric Capital Corp.?

14    A     I think the same answer.  In discussion the name

15  was mentioned as background.

16    Q     And what do you recall about those discussions?

17    A     It was background.

18          MS. LICKO:  I have no other questions for you.

19          THE WITNESS:  Thank you, ma'am.

20                    DIRECT EXAMINATION

21  BY MR. VARNER:

22    Q     Mr. Oscher, I just have a couple questions

23  for you.  We know each other.  For the record, I'm Joe

24  Varner.  I represent Rubin Schron in this mater.

25          As I heard your testimony earlier, you testified,

1    I believe, to two opinions in this matter, one being

2    that THIB Management and FAS have successor liability

3    as the mere continuation of THMI.  Is that accurate?

4         A    That is accurate, yes.

5         Q    And the other opinion you had is that the March

6    2006 transactions were fraudulent and it will be up to the

7    court to determine who, if anyone, should be held liable as

8    a result of those fraudulent transactions.

9         A    I think that's fair, yes.

10        Q    I did not see in your report or hear you testify

11   as to any opinions regarding Rubin Schron.  Do you have any

12   opinion regarding Mr. Schron?

13        A    No, sir.

14             MR. VARNER:  Thank you.  Those are all my

15        questions.

16                      DIRECT EXAMINATION

17   BY MR. CARROLL:

18        Q    Hello, sir.  Again, Hunter Carroll on behalf of

19   the Ventas entities.  My questions are going to be very

20   similar to the last two questions.

21        Have you formed any conclusions regarding any of the

22   Ventas entities?

23        A    No, sir.

24        Q    Were you asked to come to any opinions with

25   respect to the Ventas entities?

1    A    No, sir.

2    Q    In your Findings section on page 5 of your

3 report, which is Exhibit 2 to this deposition, there was no

4 reference to Ventas.  Is there any findings that you're

5 relying on anywhere about Ventas?

6    A    No, sir.

7    Q    In any discussion that you had with the Wilkes &

8 McHugh law firm, has the name Ventas come up?

9    A    Yes, sir.

10    Q    In what context?

11    A    The same as I previously testified with General

12 Electric.  They were a lender, and it was given to me as

13 part of the background information.

14    Q    Was that favorable or unfavorable as far as the

15 nature of Ventas' involvement?

16        MR. RUIZ-CARUS:  Form.

17    A    It was background information.

18    Q    Same question with regard to the Shumaker Loop

19 firm.  Any discussion with the Shumaker Loop firm in

20 regards to Ventas?

21    A    It would be the same answer.  Mr. Berman may have

22 mentioned it in the background information when he

23 discussed the background of the case.

24    Q    Was that discussion favorable or unfavorable to

25 Ventas?

1      A      I don't believe it was either way.   It was just

2   background information.

3      Q      Are you aware of any of the damages being claimed

4   against Ventas in this lawsuit?  And when I say "this

5   lawsuit," I'm talking about all the adversaries in this

6   case.

7      A      No, sir.

8      Q      Are you anticipating having to make any opinions

9   about Ventas or damages about Ventas?

10     A      There's been no discussion, so the answer is no.

11           MR. CARROLL:   I do not have any other

12     questions.

13           (Off the record.)

14                    CROSS-EXAMINATION

15   BY MR. RUIZ-CARUS:

16     Q      Mr. Oscher, I just want to be clear.  Nothing

17   about the examination by anyone on that side of the table

18   has caused you to change any of your opinions you expressed

19   in your report.  Is that right?

20     A      That's right.

21           MR. SOLOTOROVSKY:  Objection to form.

22     Q      And the opinions you've expressed in your report

23   under the Findings section, that's what you would

24   anticipate testifying to at trial?

25           MR. SOLOTOROVSKY:  Objection to form.

1          MR. VARNER:  Object to form.

2          MR. CARROLL:  Objection to form.

3    BY MR. RUIZ-CARUS:

4      Q    You were asked some questions on page 9 of your

5    report.  If you could turn to page 9 of your report.  Mr.

6    McCoskey asked you some questions about the three bullet

7    points that you see that appear there on page 9.  He asked

8    you about the first ones, the office buildings.  He asked

9    about the second one, the office -- offices, office

10   furniture, and substantially the same computers.  And then

11   with the third bullet point he asked you about that first

12   sentence about the accounting software of PeopleSoft, but

13   you weren't asked any questions about the last sentence of

14   that bullet point.  "We have examined records produced

15   noting that approximately 720 general ledger journal

16   entries for the THMI business unit were posted on or after

17   April 1st, 2006."  Do you see that?

18     A    Yes.

19          MR. SOLOTOROVSKY:  Objection to form.

20          Isaac, will you just agree to preserve all

21     objections to leading?

22          MR. RUIZ-CARUS:  Yeah, that's fine.

23          MR. SOLOTOROVSKY:  Okay.

24

25   BY MR. RUIZ-CARUS:

1      Q      Did you rely on that statement or the records

2  that you examined with respect to that statement in coming

3  to your opinions with respect to the continuation of the

4  business?

5      A      Yes.

6      Q      Can you explain to me the significance of there

7  being general ledger entries for THMI after April 1st of

8  2006?

9      A      The business was sold.  To the extent that they

10  were continuing entries, it just indicated that there was

11  some type of continuation of business that was being

12  conducted.  So we noted the entries.  We don't know the

13  background.  That's part of the information that we're

14  still waiting for.

15      Q      The last question I have for you is -- Exhibit 6,

16  do you have that in front of you?

17      A      Yes, sir.

18      Q      Do you see the date this e-mail was sent from Ms.

19  Lubertine to Ken Tabler?

20          MR. MCCOSKEY:  Object to form.

21      A      Yes.

22      Q      What is the date that that e-mail was sent?

23      A      October 1st, 2012.

24      Q      So over six years after the transition in the

25  payroll system was when this e-mail was sent?

1             MR. MCCOSKEY:  Object to form.

2        A    Yes.

3        Q    And as you understand it, this was after the

4   bankruptcy had been filed.  Is that right?

5        A    That's my understanding, yes.

6             MR. RUIZ-CARUS:  I have no further questions.

7             MR. MCCOSKEY:  Steve?

8             MR. BERMAN:  I don't have any questions.

9                     REDIRECT EXAMINATION

10  BY MR. MCCOSKEY:

11       Q    Just few follow-ups, Mr. Oscher.  Mr. Ruiz-Carus

12  just asked you about a statement on page 9 reflecting -- or

13  regarding general ledger journal entries for THMI.

14       A    Yes, sir.

15       Q    Have you personally reviewed those general ledger

16  journal entries?

17       A    I saw the general ledger -- I mean, I saw the

18  statement, because I referenced, I believe, the document

19  that I looked at.  And I saw the -- I think there's a dozen

20  pages of entries, so that's what I looked at.  I don't know

21  anything behind the entries.

22       Q    So, for example, if I asked you if those were

23  closing entries to close the books of THMI, would you know

24  one way or the other?

25       A    No, sir.

1     Q     If I asked you whether those entries had anything

2  to do with ongoing business operations of THMI, you

3  wouldn't know one way or the other, would you?

4     A     That's correct.

5     Q     Do you recall reviewing the document that is

6  referenced on page 9, or are -- or were you relying on

7  someone telling you that there were approximately 720

8  general ledger journal entries?

9     A     I looked at the document.

10    Q     And if you would just look at the report on page

11  9, I want to be clear.  The document that you believe you

12  looked at is the one that's identified as Footnote 12?

13    A     There was -- the answer is, I believe so.  I

14  don't remember the exact citation.  What I remember is the

15  11,000 ledger being the document related to THMI, but the

16  Bates number sequence is 32,400 documents, and I don't

17  think I saw that many documents -- I mean, I know I didn't

18  review that many documents, so there were a dozen, 13,

19  which is what I quantified for those, the amount.  But it

20  may have been within the Bates range that's identified

21  here.

22    Q     Okay.  How did you come up with the number 720?

23    A     That was the total number that appeared after the

24  April 1st.

25    Q     Did you count them individually, or was there

1   another way you arrived at that number?

2       A    I'm trying to remember whether there was a number

3   that was on there when we went through it, but it was

4   pretty -- that's what I said; I recall there were 12 or 13

5   pages, and there were 15 -- or there were 50 to a page, if

6   I'm not mistaken.

7       Q    Do you know the source of the documents that are

8   identified in Footnote 12 that start "TEEDOC" and then

9   numbers?

10      A    The source?

11      Q    Yes, sir.

12      A    Off the top of my head, I don't.  It was produced

13  to us in the documents we received.

14      Q    Would you look at Exhibit C to your report, which

15  is the information considered, and tell me if you see

16  reference to any documents that are similarly Bates-stamped

17  by TEEDOC.

18      A    I'm not seeing it specifically laid out.

19      Q    Did you receive any documents in preparation for

20  your expert testimony or your expert analysis, that came

21  from any source other than the Wilkes & McHugh firm?

22      A    No.

23      Q    Did you receive any documents from the Shumaker

24  firm directly?

25      A    No.

1        Q      Did you receive any documents from Mr. Kapila

2    directly?

3        A      No.

4        Q      You were asked earlier about your opinions, by a

5    couple of my colleagues here, and I want to be as clear and

6    specific as we can.  I believe that in answer to one of Mr.

7    Solotorovsky's questions regarding your second opinion,

8    what we've referred to as the fraud opinion, I believe you

9    said that the setup of the corporate entity is the fraud.

10   Is that accurate to your opinion?

11       A      The setup -- what I intended was that it's the

12   setup in which the fraud -- or in which Mr. Saacks became

13   involved with the entity.  When it was originally

14   established by Mr. Forman and Mr. Grunstein, I don't know

15   that there was any fraud there.  It was the subsequent

16   involvement with Mr. Saacks that I was making reference to.

17       Q      Okay.  And the reason that I'm asking is, I want

18   to be clear.  I think Mr. Varner asked you a question about

19   your fraud opinion suggesting that your fraud opinion went

20   to the 2006 stock purchase or sale transactions, and I did

21   not understand from my earlier deposition in questioning of

22   you that your opinion extended quite so far.  Does your

23   opinion on fraud extend beyond the Saacks discussion that's

24   on page 11 of your report?

25              MR. SOLOTOROVSKY:  Objection to form.

1      A     What is stated in my opinion is the extent to

2    which the fraud, from my perspective, has taken place.  If

3    there is additional information that becomes available

4    through other documents, but for now all I'm aware of is

5    Mr. Saacks's involvement.

6      Q     As of today you're not providing any opinion,

7    expert or otherwise, about the 2006 stock purchase or sale

8    of the stock of THMI?

9      A     That's correct.

10     Q     How did establishing or setting up the debtor as

11   a company change the liabilities within THMI?

12           MR. BERMAN:  Objection to the form.

13     A     I don't believe it changed the liabilities.

14     Q     Did setting up or establishing FLTCI, the debtor

15   in this case, make the debtor liable for the debts of THMI?

16     A     First, I think you have asked me a legal

17   question.

18     Q     Okay.

19     A     And so, to the extent that the THMI liabilities

20   by the acquisition of the stock was transferred to the

21   debtor, that would seem to be a logical assumption that

22   they were transferred.

23     Q     Is it your opinion, either as an expert or is it

24   your understanding as a matter of fact leading to your

25   opinions, that THMI's liabilities were transferred to the

1  debtor?

2          MR. RUIZ-CARUS:    Form.

3     A    That was my understanding, yes.

4     Q    And on what do you base that understanding?

5     A    The allegations in the case.

6     Q    Beyond allegations, is there any factual material

7  that you've reviewed to satisfy yourself that allegation is

8  true?

9     A    If I did in the body of documents, I'm not

10  recalling as I sit here with you.

11     Q    Is it fair to say you are accepting as a fact the

12  allegation that's been made by the plaintiff that THMI's

13  liabilities were transferred to the debtor?

14     A    Yes.

15          MR. MCCOSKEY:    Okay.    Thank you.    That's all I

16     have.

17          MR. RUIZ-CARUS:    I just have a couple of

18     questions.

19                    RECROSS EXAMINATION

20  BY MR. RUIZ-CARUS:

21     Q    Your report, Exhibit C, could you turn to page

22  11.    Do you see the entry near the bottom that says

23  "general ledger activity"?

24     A    Yes.

25     Q    Do you think that's the entry that you were

1  referring to in Footnote 12 when you talked about this

2  ledger file that you were looking at?

3          MR. MCCOSKEY:  Object to form.

4      A    It could.  But Mr. McCoskey's question I was

5  answering -- he asked about Bates number, did I see any

6  Bates number on here.

7      Q    Sure.  But you have included in Exhibit C, to the

8  best of your ability, all the documents that you were

9  provided and that you reviewed in reaching your findings in

10  this case?

11     A    Of course.

12     Q    Did you review the stock purchase agreement for

13  the sale of THMI to FLTCI?

14     A    I had that, yes, so I reviewed it.

15     Q    And is that part of the facts that you reviewed

16  in coming to your conclusion with respect to the transfer

17  of the assets and liabilities of THMI?

18          MR. MCCOSKEY:  Object to form.

19          MR. SOLOTOROVSKY:  Objection to form.

20     A    Yes.

21          MR. RUIZ-CARUS:  Okay.  I have no further

22     questions.

23          MR. MCCOSKEY:  You know the drill on read or

24     waive.

25          THE WITNESS:  Yes.  I will read.

1           (Deposition concluded at 1:32 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

STATE OF FLORIDA

3

COUNTY OF HILLSBOROUGH

4

5

       I, Lindsey Ashworth, Shorthand Reporter and Notary

6

Public, State of Florida, certify that STEVE OSCHER,

7

personally appeared before me and was duly sworn.

8

       Witness my hand and official seal this 10th day

9

of June, 2014.

10

11

12

13

14

15

16
                          _____
17                        Lindsey Ashworth, Notary Public
                          State of Florida, My Commission:
18                        EE862359, Expires: Jan.02, 2017

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6        I, LINDSEY ASHWORTH, Shorthand Reporter and

7    Notary Public, State of Florida, Certify that I was

8    authorized to and did stenographically report the

9    deposition of Steve Oscher; that a review of the

10   transcript was requested; and the foregoing transcript,

11   pages 6 through page 132, is a true and accurate record of

12   my stenographic notes.

13       I FURTHER CERTIFY that I am not a relative, employee,

14   attorney, or counsel to any of the parties, nor am I a

15   relative or employee of any of the parties' attorney or

16   counsel connected with the action, nor am I financially

17   interested in the action.

18             Dated this 18th day of June, 2014.

19

20

21

22                         _____

                           Lindsey Ashworth
23

24

25

1                          ERRATA SHEET

2    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES ON THIS PAGE

3    IN RE:      Fundamental Long Term Care, Inc.
                 Estate of Juanita Amelia Jackson, et al v.
4                General Electric Capital Corp., et al.
     CASE NO:  8:11-bk-22258-MGW ☐
5    DATE:     June 10th, 2014
     DEPONENT: Steve Oscher
6
     PAGE    LINE                    CORRECTION & REASON
7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22
     Under penalties of perjury, I declare that I have read the
23   foregoing document and that the facts stated in it are
     true.
24   _____        _____
     DATE                    DEPONENT NAME
25

June 18th, 2014

2   Steve Oscher
    C/O ISAAC RAMON RUIZ-CARUS, ESQUIRE
3   1 North Dale Mabry Highway
    Suite 800
4   Tampa, Florida 33609

5   RE: Fundamental Long Term Care, Inc.
        Estate of Juanita Amelia Jackson, et al v.
6       General Electric Capital Corp., et al.

7   Dear Sir:

8       This letter is to advise that the transcript of the
    above-referenced deposition has been completed and is
9   available for review.  Please contact our office at
    (813) 272-2720 to make arrangements to read and sign or
10  sign below to waive review of this transcript.

11      It is suggested that the review of this transcript be
    completed within 30 days of your receipt of this letter, as
12  considered reasonable under Federal Rules*; however, there
    is no Florida Statute to this regard.
13
        The original of this transcript has been forwarded to
14  the ordering party and your errata, once received, will be
    forwarded to all parties.
15
                                    Sincerely,
16
                                    LINDSEY ASHWORTH
17                                  Anthem Reporting

18  CC:  Isaac Ramon Ruiz-carus, Esquire; Gregory Martin
    Mccoskey, Esquire; Alec Solotorovsky, Esquire; Carol Ann
19  Licko, Esquire; Joseph H. Varner, III, Esquire; Hunter
    Wyman Carroll, Esquire; Steven Mark Berman, Esquire;
20  Seth P. Traub, Esquire; Marjorie Salem Hensel, Esquire

21  WAIVER:
    I,_____, hereby waive the reading & signing
22  of my deposition transcript.

23  _____       _____
    Deponent Signature           Date
24
    *Federal Civil Procedure Rule 30(e)/Florida Civil
25  Procedure Rule 1.310(e)