UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                          Case No. 8:11-bk-22258-MGW
                                                                Chapter 7
Fundamental Long Term Care, Inc.,

      Debtor.

_____/

Estate of Juanita Jackson, *et al.*,                            Adv. No. 8:13-ap-00893-MGW
                                                                (consolidated)
      Plaintiffs,

v.

General Electric Capital Corporation, *et al.*,

      Defendants.

_____/

**MEMORANDUM OPINION ON MOTION TO COMPROMISE[1]
AND MOTIONS FOR PERMANENT INJUNCTIVE RELIEF[2]**

"Everything has to come to an end, sometime."[3]After nearly 11 years of litigation,

including at least 27 lawsuits and 15 appeals before 13 different courts and 17 judges in 5 states,

this Court finally considered the merits of every claim for that relief six probate estates[4] and the

chapter 7 trustee in this case had against 16 defendants they claim are responsible for more than

$2 billion in empty-chair verdicts against Trans Health Management, Inc. ("THMI"), the

Debtor's wholly owned subsidiary, and THMI's former corporate parent, Trans Health Care, Inc.

---

[1] Doc. Nos. 1591, 1595 & 1596.

[2] Adv. Doc. Nos. 1052, 1055 & 1058.

[3] L. Frank Baum, The Marvelous Land of Oz (1904).

[4] The six probate estates are the Estate of Juanita Jackson, the Estate of Elvira Nunziata, the Estate of Joseph Webb, the Estate of James Jones, the Estate of Opal Sasser, and the Estate of Arlene Townsend (the "Probate Estates").

("THI").[5] At the conclusion of the trial on the merits of those claims, which involved nearly 100 hours of testimony and more than 3,000 exhibits, the Court tentatively ruled in favor of the Trustee and Probate Estates on one claim for successor liability and sent the Probate Estates, the Trustee, and the parties who were potentially liable on that claim (along with anyone else who was interested) to mediation.[6] The mediation in this case produced two separate compromises, which the parties have now asked the Court to approve, that will bring nearly $20 million into the bankruptcy estate.

But there is one catch: the only way the settlement works is if the Court puts an end to all the claims that were or could have been litigated here. The proposed settlement is conditioned on this Court entering an order barring the non-settling Defendants (who either prevailed at the dismissal or summary judgment stage or at trial) from suing the settling Defendants. That would not be fair and equitable to the non-settling Defendants because the Probate Estates intend on

---

[5] This bankruptcy case and the main adversary proceeding were exceedingly complex. The Court had nearly 80 days of hearings in this case. The issues raised in those hearings resulted in 18 reported decisions: *In re Fundamental Long Term Care, Inc.*, 2012 WL 4815321 (Bankr. M.D. Fla. Oct. 9, 2012); *In re Fundamental Long Term Care, Inc.*, 489 B.R. 451 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 492 B.R. 571 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 493 B.R. 613 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 493 B.R. 620 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 494 B.R. 548 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 500 B.R. 140 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 501 B.R. 770 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 501 B.R. 784 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 508 B.R. 224 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 509 B.R. 387 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 509 B.R. 956 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 512 B.R. 690 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 515 B.R. 352 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 515 B.R. 857 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 515 B.R. 874 (Bankr. M.D. Fla. 2014).

[6] The Probate Estates and Trustee named 16 defendants. One defendant—Rubin Schron—prevailed at the dismissal stage. Three more defendants—General Electric Capital Corporation ("GECC"), Ventas Realty Limited Partnership, and Ventas, Inc. (collectively, "Ventas")—prevailed on summary judgment. The Court tentatively ruled in favor of seven more defendants—Edgar Jannotta; GTCR Golder Rauner, LLC; GTCR VI Executive Fund, LP; GTCR Fund VI, LP; GTCR Partners, VI, LP; GTCR Associates VI, LP (collectively, the "GTCR Group"); and THI Holdings, LLC ("THI Holdings")—at trial. The Court will be entering a final judgment in favor of those seven defendants. The Court tentatively ruled that the remaining five defendants—Leonard Grunstein; Murray Forman; Fundamental Administrative Services, LLC ("FAS"); Fundamental Long Term Care Holdings, LLC ("FLTCH"); and THI of Baltimore, Inc. ("THI-Baltimore")—may be liable under a successor liability theory. That claim is resolved by one of the proposed compromises that is the subject of this opinion.

pursuing claims against them even though the non-settling Defendants ultimately prevailed in this proceeding, and the proposed bar order would preclude them from pursuing indemnification, contribution, or other claims against the settling Defendants. In the end, allowing the Probate Estates to relitigate claims arising out of the same nucleus of facts as those in this case would destroy the $20 million compromise, nullify the efforts by this Court and other courts over the last four years, and subject the non-settling Defendants to added cost and expense. Under the Anti-Injunction Act,[7] this Court has authority to enjoin the Probate Estates from pursuing claims against the non-settling Defendants in order to aid its jurisdiction and give finality to its orders and judgments in this case. Accordingly, the Court will approve the proposed compromises and bar orders conditioned on the entry of a final, nonappealable order enjoining the Probate Estates from pursuing any claims—whether in state court or federal court—arising out of the nucleus of facts set forth in the adversary complaint in this case.

## Background

Over ten years ago, the Estate of Juanita Jackson—one of the six Probate Estates—filed the first of six lawsuits against THI and THMI for negligence or wrongful death.[8] Two more cases—by the Estate of Nunziata and the Estate of Jones—were filed in late-2005 and early-2006.[9] Another two cases—by the Estate of Webb and the Estate of Sasser—were filed in mid- to late-2006. The sixth case—by the Estate of Townsend—was filed in January 2009. All six of the Probate Estates were represented by Wilkes & McHugh.

---

[7] 28 U.S.C. § 2283.

[8] Before March 2006, THI owned a number of subsidiaries that operated nursing homes throughout the United States. THMI, which was a THI subsidiary at the time, provided administrative support for the nursing homes operated by the other THI subsidiaries.

[9] Technically, THI was not named as a defendant in the *Nunziata* case.

The lawsuits against THI and THMI were initially being defended by lawyers retained by THI under an indemnification agreement or what has been described as a "course of dealing."[10] Although THI filed for receivership in 2009, THI's state court receiver continued defending THMI against the claims filed by the Probate Estates. The THI Receiver believed it was necessary to defend THMI to keep the Probate Estates from obtaining a judgment against the company and then attempting to collect that judgment out of THI's receivership estate. But when Wilkes & McHugh advised the THI Receiver that its clients would not be pursuing claims in the receivership, the THI Receiver instructed counsel defending THI and THMI in the state court cases to withdraw their representation.[11]

About three months after the lawyers for THI and THMI withdrew, the Estate of Jackson obtained a $110 million empty-chair verdict against THI and THMI and then initiated proceedings supplementary against 16 parties—including the Debtor—to collect on that judgment.[12] In the proceedings supplementary, the Jackson Estate detailed an alleged bust-out scheme whereby all of the assets belonging to THI and THMI were fraudulently transferred to third parties.[13] The Debtor was allegedly one of the recipients of some of those assets. And

---

[10] Doc. No. 105 at 5; Doc. No. 109 at 17; Doc. No. 204 at 9–10; Doc. No. 318 at 27–29; Doc. No. 373 at 59; Doc. No. 402 at 127–29; Doc. No. 599 at 124.

[11] The facts surrounding the withdrawal of counsel for THI and THMI is set forth in more detail in this Court's memorandum opinion overruling the Debtor's objection to the Estate of Jackson's proof of claim. *In re Fundamental Long Term Care, Inc.*, 500 B.R. 140, 142-45 (Bankr. M.D. Fla. 2013).

[12] Initially, the Estate of Jackson moved to implead GECC and Schron. Later, the Jackson Estate moved to implead Ventas, Grunstein, Forman, FAS, FLTCH, THI-B, the GTCR Group, Jannotta, Troutman Sanders, LLP, and Concepion, Sexton & Martinez.

[13] Copies of the motions to implead the 16 parties were filed with the district court when a number of those parties attempted to remove the proceedings supplementary to district court. Dist. Ct. Case No. 8:10-cv-2937-VMC, Doc. No. 1-1; Dist. Ct. Case No. 8:11-cv-1314-SDM, Doc. No. 6-1.

because it failed to respond to the proceedings supplementary, a $110 million judgment was entered against the Debtor.[14]

At that point, the Jackson Estate made a strategic decision to force the Debtor into this involuntary chapter 7 bankruptcy case.[15] Presumably, the Jackson Estate figured the expansive powers of a chapter 7 trustee would aid it in identifying and recovering assets that had previously belonged to THMI. So the Jackson Estate filed its involuntary chapter 7 petition on December 5, 2011, and when the Debtor again failed to respond, an order for relief was entered on January 12, 2012.[16]

The Jackson Estate likewise opted, again for strategic reasons, not to force THMI—perhaps the more natural target—into bankruptcy. The strategic reason for not forcing THMI into bankruptcy was fairly apparent. Once THMI was put into bankruptcy, the automatic stay would preclude the five other Probate Estates, who were likewise represented by Wilkes & McHugh, from moving forward on their wrongful death claims. In fact, two of the cases filed by the other Probate Estates were set for trial just a couple of months after the Jackson Estate forced the Debtor into bankruptcy.[17] Surely, the other Probate Estates did not want a bankruptcy case to slow down any momentum that was building in state court.

By this time, the parties to the *Jackson* proceedings supplementary—who have at times been referred to as the "targets" by the parties to this case and the Court—could see the writing on the wall: the Probate Estates intended on obtaining large jury verdicts against THI and THMI and attempting to collect them from the targets, many of whom could be considered "deep

---

[14] Doc. No. 1; Claim No. 2-1.

[15] Doc. No. 1.

[16] Doc. No. 6.

[17] The *Nunziata* case was set for trial January 9, 2012. The *Webb* case was set for trial February 10, 2012.

pockets."[18] Complicating matters for the targets was the fact that the lawyers for THI and THMI in the actions brought by the Probate Estates had previously withdrawn. To make a long story short, the targets decided to provide a defense for THI and THMI as an outer firewall to any liability to the Probate Estates. In an effort to ensure the remaining cases did not go undefended, the targets entered into a settlement agreement with the THI Receiver on January 5, 2012.[19]

Under the January 2012 agreement, FAS—one of the targets—agreed to defend THI, the THI Receiver, and the THI receivership estate from any claims arising out of the negligence or wrongful death cases filed by the Probate Estates.[20] FAS agreed to deposit $800,000 in escrow to fund the costs of that defense. GECC—one of THI's lenders who was also a target—likewise agreed to contribute up to $200,000 toward the defense costs.[21] FAS fairly immediately delegated the duty to defend THI back to the THI Receiver, and the THI Receiver immediately set out to retain counsel for THI and THMI.

Newly retained counsel for THMI attempted to appear on the company's behalf on the morning of trial in the case filed by the Nunziata Estate.[22] But the court in that case would not let counsel appear. Likewise, the court in the case filed by the Webb Estate would not let newly retained counsel appear for either THI or THMI. Because the state courts would not let newly retained counsel appear on behalf of THI and THMI, both of those cases proceeded to empty-chair trials, and the juries ultimately returned more than $1 billion in verdicts combined.[23]

---

[18] The "targets" are all the Defendants in this proceeding.

[19] Doc. No. 1598-1.

[20] *Id.* at ¶ 9.1.

[21] *Id.*

[22] Again, THI was not a defendant in *Nunziata.*

[23] The verdict in *Nunziata* was $200 million; the *Webb* verdict was $900 million.

Armed with a $100 million claim against the Debtor, and more than a $1 billion in liability against THMI, the Chapter 7 Trustee began investigating and pursuing potential fraudulent transfer, alter ego, and other related claims against the targets arising out of a purported "bust-out" scheme. According to the Trustee, THI Holdings, LLC (THI's corporate parent) and its primary shareholder, the GTCR Group, conspired to allow THI's two primary secured lenders—GECC and Ventas—to loot THI and THMI to repay $75 million in loans before THMI's assets were transferred to the "Fundamental Entities"—which included FLTCH, FAS, THI-B, Forman, Grunstein, and Schron—for far less than their fair market value.[24] To complete the alleged bust-out scheme, THMI's liability-ridden shell was transferred to the Debtor (a sham entity created for the sole purpose of acquiring THMI's liabilities), and THI was allowed to slowly go out of business before being put into a state court receivership.[25]

Two of the targets—FAS and FLTCH—decided to take a proactive (perhaps aggressive) approach to the Trustee's strategy. In particular, FAS and FLTCH decided to file a declaratory judgment action in New York seeking a declaration that any fraudulent transfer or alter ego claims THMI may have against them were time barred and, in the event they were not, that they were not liable to THMI under either theory.[26] The Trustee immediately sought to enjoin the New York declaratory judgment action because it interfered with her administration of this bankruptcy estate. After the Court agreed with the Trustee's request and enjoined the New York

---

[24] The purported "bust-out" scheme is set forth in *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 367-71 (Bankr. M.D. Fla. 2014).

[25] Technically, the claims the Trustee was pursuing belonged to THMI, which was not in bankruptcy. But the Court had ruled that the Trustee, as the representative of THMI's sole shareholder (the Debtor), had the right to control THMI. *In re Fundamental Long Term Care, Inc.*, 2012 WL 4815321, at *8 (Bankr. M.D. Fla. Oct. 9, 2012). District Judge James S. Moody, Jr., who presided over one of the appeals in the main bankruptcy case, ordered this Court to determine whether the Debtor and THMI should be treated as the same entity under any legal or equitable theory. Doc. No. 1291.

[26] Adv. No. 11-ap-01198, Adv. Doc. No. 1, Ex. 1.

declaratory judgment action, FAS and FLTCH asked the Court to enjoin actions taken by the

Probate Estates outside of bankruptcy court based on what could loosely be described as a "what

is good for the goose is good for the gander" theory.

It turns out, while this bankruptcy case had been pending, the Probate Estates had been

pursuing fraudulent transfer and alter ego claims—claims virtually identical to those being

pursued by the Trustee in this case—in state court proceedings supplementary. The Estate of

Jackson, of course, had initiated its proceedings supplementary before this case was filed. But it

continued to litigate the fraudulent transfer claims against the targets after the order for relief was

entered. More than seven months after the order for relief in this case, the Webb and Nunziata

Estates moved to implead Rubin Schron, among others, and actually obtained a default judgment

against him in the *Nunziata* case. All of the proceedings supplementary being pursued by the

Probate Estates arose out of the alleged bust-out scheme.

FLTCH and FAS argued persuasively that the actions by the Probate Estates interfered

with the Trustee's administration of the estate as much as their New York declaratory judgment

action did. And in fact, the Trustee acknowledged that any recoveries by the Probate Estates on

any judgment against THI—including in the proceeding supplementary—should flow through

the bankruptcy estate:

> What [the Fundamental entities] are really driving at is a
> substantive determination by this Court that funds collected by the
> creditors in their pursuit of claims against THI are property of the
> estate. It's a 541 declaratory judgment action.
>
> I don't conceptually have a problem with that result because I
> think it's the best thing for the estate for all the money to flow
> through to the bankruptcy estate. It's my belief that that's what
> should happen, it's my belief that's what will happen, but if this
> Court wants absolute certainty with that issue, the way to tee it up
> properly, without making sort of an off-the-cuff decision, is to
> require someone to file a dec. action.

> If you want me to file it, I'll file it. If you want the targets to file it,
> they can file it. But the real question is not whose court should
> things be litigated in. The real question is whose funds are they?
> Are they property of the estate or are they non-property of the
> estate? And that determination requires an adversary proceeding, I
> believe, and requires the creditors to be joined to that adversary
> proceeding.[27]

The Court agreed that all of those issues needed to be hashed out in one proceeding involving all of the parties. And the Court concluded that proceeding could only take place in this Court, which has jurisdiction over property of the estate wherever located,[28] because the proceeding necessarily involved property of the estate or the question of whether certain property belongs to the estate. Besides, the district court had instructed this Court to determine whether the Debtor and THMI should be treated as the same entity. Not to mention, it was the Probate Estates that chose this forum in the first place. So the Court required a single proceeding— involving the Trustee, the creditors, and the targets—for resolving any fraudulent transfer, alter ego, and other related claims.

To accomplish that goal, the Court enjoined the Probate Estates from pursuing any proceedings supplementary or other collection efforts that implicated property conceivably belonging to the bankruptcy estate.[29] The Probate Estates had also filed a civil rights claim against some of the targets. Since that action did not involve the recovery of property of this estate, the Court had no basis for enjoining that action, although it did direct the Probate Estates to request that action be stayed because it involved similar factual issues. In fact, all of the

---

[27] Adv. No. 11-ap-01198, Adv. Doc. No. 62 at 42–43.

[28] 28 U.S.C. § 1334(e).

[29] *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147, 160 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 501 B.R. 770, 784 (Bankr. M.D. Fla. 2013).

proceedings outside of this Court remained stayed pending the outcome of the main adversary proceeding ultimately filed by the Probate Estates.

The main adversary proceeding was initiated when the Probate Estates filed a two-count complaint for declaratory judgment in this proceeding.[30] In Count I, the Probate Estates sought a declaration that THI and the Fundamental Entities were liable for the judgments against THI and THMI under a successor liability theory. In Count II, the Probate Estates sought a declaration that the Defendants were all liable for the judgments against THI and THMI under a veil-piercing theory. The Trustee later intervened in that proceeding and added one count to substantively consolidate the Debtor and THMI.[31] The Probate Estates and the Trustee later sought leave to amend their complaint and intervention complaint, respectively, to file all of their claims together in one joint complaint.

The initial joint complaint (really an amended complaint)—which was 228 pages long and contained 1,201 numbered paragraphs—included 22 counts.[32] The 22 counts in the complaint could be broken down into 8 different claims for relief: one count for substantive consolidation by the Trustee, two counts for breach of fiduciary duty, four counts for aiding and abetting a breach of fiduciary duty, one count for successor liability, two counts for piercing the corporate veil, three counts for alter-ego liability, eight counts for fraudulent transfer, and one count for conspiracy to commit a fraudulent transfer. Some of the claims in the adversary complaint were brought solely by the Probate Estates,[33] while others were brought by the Probate

---

[30] Adv. Doc. No. 1.

[31] Adv. Doc. Nos. 12, 16 & 36.

[32] Adv. Doc. No. 109.

[33] For example, the amended complaint included claims by the Probate Estates for breach of fiduciary duty (Count III), aiding and abetting breach of fiduciary duty (Counts V & VII), and fraudulent transfer (Count XIV & XV). Adv. Doc. No. 109.

Estates and Trustee collectively.[34] The Probate Estates and Trustee later amended their complaint to reassert claims that had been dismissed and assert new claims for abuse of process, conspiracy to commit abuse of process, negligence, and to avoid a post-petition transfer.[35]

The parties ultimately went to trial on claims for substantive consolidation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, successor liability, fraudulent transfer, and conspiracy to commit fraudulent transfer,[36] and after the conclusion of two weeks of live testimony and hours of reviewing deposition videos and transcripts in chambers, the Court announced tentative findings of fact and conclusions of law.[37] As part of those tentative findings of fact and conclusions of law, the Court announced that it would likely enter final judgment against the Trustee and Probate Estates on all of their claims except for the substantive consolidation and successor liability claims.[38] The Court announced that it was inclined to substantively consolidate the Debtor with THMI and rule that the Trustee and Probate Estates were entitled to recover on the judgments against THMI from one or all of FLTCH, FAS, Forman, and Grunstein under a successor liability theory.[39]

---

[34] *Id.* For example, the Probate Estates and Trustee jointly asserted claims for successor liability (Count VIII), piercing the corporate veil (Counts IX-XIII), and fraudulent transfer (Counts XVI-XXII)

[35] Adv. Doc. 289.

[36] After the Court dismissed the claims set forth in the second amended complaint filed by the Probate Estate and the Trustee, the parties filed a restated second amended complaint that included only the counts that remained pending after the Court's rulings on the various motions to dismiss. Adv. Doc. No. 620.

[37] Adv. Doc. No. 1019.

[38] *Id.*

[39] *Id.*

The Court then ordered the Probate Estates, Trustee, FLTCH, FAS, Forman, and Grunstein to mediation. The Court also permitted others to participate in mediation.[40] The mediation apparently took place over several days during the early part of February 2015. And as it turns out, the mediation was successful, resulting in two compromises totaling nearly $20 million: an $18.5 million compromise among the Trustee, Probate Estates, and the "Fundamental Parties"[41] and a $1.25 million compromise between the Trustee and Quintairos, Prieto, Wood & Boyer.[42]

On February 23, 2015, the Trustee filed an expedited motion to approve the compromise with the Fundamental Parties.[43] Under the terms of that compromise, the Fundamental Parties will pay the Trustee $18.5 million.[44] Of that amount, $14.5 million will be paid within ten days of the compromise being approved.[45] The remaining $4 million will be paid over time, with the final payment due on July 1, 2018.[46] In exchange, the Trustee and Probate Estates will dismiss all of the pending claims or actions against the Fundamental Parties and give the Fundamental

---

[40] It appears that Christine Zack, the law firm of Quintairos, Prieto, Wood & Boyer, and Kristi Anderson all participated in the mediation in some respect.

[41] The "Fundamental Parties" refers to FLTCH, THI-B, FAS, Forman, Grunstein, Zack, and Fundamental Clinical Consulting.

[42] The Trustee had sued the Quintairos firm for malpractice and breach of fiduciary duty in state court. That action was removed to federal court. The Trustee later filed an adversary complaint against the Quintairos firm in this Court.

[43] Doc. No. 1591, Ex. 1.

[44] *Id.* at ¶ 1.

[45] *Id.*

[46] *Id.*

Parties a general release.[47] As is common in bankruptcy, the settlement agreement also contains a bar order.[48]

Under the terms of the bar order, third parties—such as the non-settling Defendants that prevailed in this proceeding—are barred from asserting claims against the Fundamental Parties that arise out of or relate to the claims the Fundamental Parties were released from. In particular, the bar order would bar claims by other Defendants in this adversary proceeding—namely, the GTCR Group, GECC, Ventas, and Rubin Schron—for indemnification and contribution. The parties' compromise is expressly conditioned on entry of the proposed bar order.

A week later, the Trustee filed a supplemental term sheet setting forth the terms of the compromise with the Quintairos firm.[49] Under the Quintairos settlement, the law firm agrees to pay the Trustee $1.25 million within 14 days.[50] As with the Fundamental Parties' settlement, the Trustee and Probate Estates will dismiss all of the pending claims or actions against the Quintairos firm and give the firm a general release.[51] Also like the settlement with the Fundamental Parties, the Quintairos settlement includes a proposed bar order precluding any third parties from suing the firm.[52]

The GTCR Group, GECC, Ventas, THI Receiver, and Schron have all objected to the proposed compromises.[53] The primary thrust of those objections relates specifically to entry of

---

[47] *Id.* at ¶¶ 3 & 5-8.

[48] *Id.* at ¶ 13.

[49] Doc. No. 1596, Ex. 1.

[50] *Id.* at ¶ 1.

[51] *Id.* at ¶¶ 2 & 3.

[52] *Id.* at 5.

[53] Doc. Nos. 1598, 1600, 1601, 1602 & 1606.

the proposed bar order in favor of the Fundamental Parties.[54] The objecting parties all point out

that the proposed compromise expressly contemplates that FAS, one of the settling parties, will

abandon its defense of the pending state court cases and that the Trustee and Probate Estates will

continue pursuing claims against them, either in this forum or another one. The end result of this

compromise, according to the objecting parties, will be that the Probate Estates will seek to hold

the objecting parties liable for billions of dollars of unjust (and essentially undefended) jury

verdicts, and the objecting parties will lose their only recourse in case that happens—an

indemnification or contribution claim against FAS. Three of the objecting parties—the GTCR

Group, GECC, and Ventas—say that their objections to the proposed compromise (really the bar

order) would become moot if the Court enjoined the Probate Estates from pursuing claims

against them outside of this forum.[55]

## Conclusions of Law

### The *Justice Oaks* factors are likely met

The Court should only approve a compromise if it is fair and equitable and in the best

interests of the estate.[56] In considering whether that is the case, the Court looks to the *Justice

Oaks* factors.[57] Those factors are: (i) the probability of success in the litigation between the

settling parties; (ii) the difficulties, if any, to be encountered in collection; (iii) the complexity of

the litigation involved and the expense, inconvenience, and delay necessarily attending it; and,

---

[54] The objections are principally directed at the compromise with the Fundamental Parties. But the arguments raised by those objections seem to apply to the compromise with the Quintairos firm. And at a March 4, 2015 hearing on the proposed compromises, the GTCR Group alluded to the fact that it objects to the Quintairos compromise for the same reasons it objects to the settlement with the Fundamental Parties.

[55] Adv. Doc. Nos. 1052, 1055 & 1058.

[56] *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1990).

[57] *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir.1990).

(iv) the paramount interests of the creditors and a proper deference to their reasonable views.[58] None of the objecting parties have really argued that the proposed compromises with the Fundamental Parties and Quintairos do not satisfy *Justice Oaks*.

In fact, all of the factors weigh in favor of approving the compromises. The first factor is not particularly relevant as to the compromise with the Fundamental Parties because the Court has already tentatively ruled that at least some of the Fundamental Parties will be liable under a successor liability theory. Of course, there is still an open question of which Fundamental Parties will be liable and for how much. The real issue as to the Fundamental Parties is the extraordinary difficulty of collecting on any final judgment this Court enters and the litigation involved and the expense and delay necessarily attending those collection efforts. The settlement with the Fundamental Parties avoids all of that and brings $18.5 million into the estate—$14.5 million immediately, and the rest within three years. While the Probate Estates and Trustee likely would not face the same collection problems on their claims against the Quintairos firm, the claims themselves are much more uncertain.[59] Plus, all of the creditors in this case (really the Probate Estates) approve of both compromises, which the Court must give deference to. The only question is whether the Court should approve the bar order, which both compromises are conditioned on.

---

[58] *Id.*

[59] This Court recently dismissed negligence (legal malpractice) and breach of fiduciary duty claims against the Quintairos firm. Adv. No. 8:13-ap-01176, Adv. Doc. No. 90 at 106-08. That ruling is subject to a pending motion for reconsideration. Adv. No. 8:13-ap-01176, Adv. Doc. No. 89. The Court is aware that District Judge Mary S. Scriven denied the Quintairos firm's motion to dismiss legal malpractice and breach of fiduciary duty claims by THMI in a removed state court case. Dist. Ct. Case No. 8:12-cv-1854-MSS, Doc. No. 82 at 8-11.

<u>The bar order is only fair and equitable if
the Court grants the permanent injunctive relief</u>

As this Court has explained before in this case, bar orders are permissible under appropriate circumstances. The Eleventh Circuit has expressly held that Bankruptcy Code § 105, which provides that bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, is ample authority for entry of a bar order.[60] Numerous courts have recognized that bar orders are generally permitted where they are fair and equitable.[61] But as the Court pointed out in refusing to approve a bar order as part of a previous settlement in this case, the Court must consider whether the bar order is fair and equitable *to the parties being enjoined*.[62]

Standing alone, the proposed bar order in this case is not fair and equitable to the parties being enjoined (principally the objecting parties). The compromise expressly states that the Probate Estates intend to pursue claims against the enjoined parties in the state court actions. Making matters worse, at least from the enjoined parties' perspective, the proposed compromise expressly contemplates that FAS will withdraw from and refuse to defend the state court actions, as it is required to do under the January 2012 settlement agreement. And now, the enjoined parties will be barred from suing FAS for breaching its obligations under the January 2012 agreement or seeking indemnification or contribution from FAS in the event they are somehow found liable in the state court actions. In fact, the bar order here is virtually identical to one this Court rejected last year in this case.[63]

---

[60] *Munford v. Munford, Inc. (In re Munford)*, 97 F.3d 449, 454-55 (11th Cir. 1996).

[61] *See, e.g., In re GunnAllen Fin., Inc.*, 443 B.R. 908, 915 (Bankr. M.D. Fla. 2011) (discussing factors to be considered in entering bar orders).

[62] *In re Fundamental Long Term Care, Inc.*, 515 B.R. 352, 359 (Bankr. M.D. Fla. 2015).

[63] *Id.* at 357-59.

Last year, the Trustee entered into a proposed compromise with the THI Receiver.[64] As part of that compromise, the THI Receiver would pay the Trustee $750,000 and withdraw its defense of the state court actions on behalf of THI and THMI, and in exchange, the Trustee would release the THI Receiver from any claims and seek a bar order prohibiting any parties from suing the THI Receiver, the receivership estate, and certain law firms retained by the THI Receiver for claims arising out of or related to this bankruptcy case and the negligence cases.[65] FAS, along with the other enjoined parties here, vehemently objected to the bar order.[66]

According to FAS, the THI Receiver would have breached his obligations under the January 2012 agreement by withdrawing his defense of THI and THMI in the negligence cases.[67] Withdrawal of THI's defense—indeed withdrawing its appeal in one of the cases alone—would have resulted in more than $1 billion in liability against the company, which, in turn, would have been used as a starting point to pursue FAS and the other enjoined parties. Absent the bar order, FAS and the other enjoined parties would have been able to look to the THI Receiver in the event they were held liable for the billions of dollars of judgments against THI. Because of the

---

[64] *Id.* at 357-58.

[65] *Id.*

[66] Doc. Nos. 1490, 1506, 1509, 1511, 1512 & 1513. FAS characterized that settlement as

> merely a continuation of the [Probate Estates'] strategy to obtain massive judgments against undefended entities, with the object of collecting these judgments from innocent third parties that lack an initial voice in the contest on the merits. In this instance, the Trustee is willingly along for the ride, despite a clear conflict in purportedly "representing" THMI's interests, not because the Trustee has any facts or information that THMI or THI should actually be saddled with massive judgments for underlying tort claims (when all objective evidence is to the contrary), but instead merely to enhance potential litigation damages for those very same creditors.

Doc. No. 1512 at 1-2.

[67] To his credit, counsel for FAS, in arguing for the bar order here, acknowledged arguing against the previous bar order in favor of the THI receiver. ("In fact, I think I may have spoken eloquently on that issue myself in opposition to that compromise. The irony is not lost on me, Your Honor.")

bar order, however, FAS and the other enjoined parties, some of whom had contributed more than a million dollars to THI's defense, would be precluded from looking to the THI Receiver.

This Court ruled that the bar order was not fair and equitable to the enjoined parties because it deprived FAS and the enjoined parties of a right they specifically bargained for—namely, the right to defend THI as an outer "firewall" to protect against their own liability to the Probate Estates.[68] The liability of the enjoined parties was necessarily contingent on THI's liability. If THI was not liable, then the enjoined parties could not be. That is why the enjoined parties bargained for the THI Receiver to assign the duty to defend THI to FAS and agreed to advance $1 million in defense costs. Under the earlier compromise, the THI Receiver had essentially agreed to unilaterally destroy the outer "firewall" by withdrawing THI's defenses.[69]

How is this compromise and bar order any different? At least under the earlier compromise, FAS had the right to argue to the state courts that it had the right to defend those cases under the January 2012 agreement even if the THI Receiver refused to.[70] But under the January 2012 agreement, only FAS has the right to defend the state court actions.[71] None of the other enjoined parties has the right to do so. So the enjoined parties here will lose the outer firewall just like they would have under the earlier compromise.

To be sure, nothing under the new compromise would prevent the enjoined parties from defending themselves on direct claims against them. For instance, the GTCR Group, GECC, Ventas, and Schron could defend themselves if the Probate Estates sought to add them as the real party in interest in any of the state court cases. The problem, from the enjoined parties'

---

[68] *In re Fundamental Long Term Care, Inc.*, 515 B.R. at 360-61.

[69] *Id.*

[70] Doc. No. 1598-1 at ¶ 9.1.

[71] *Id.*

perspective though, is that they will barred from bringing an indemnification or contribution claim against FAS, the only party that arguably engaged in wrongful conduct.

If this Court were considering the bar order in isolation, it cannot conceive of any reason to deviate from its prior ruling. And that could potentially doom both compromises because they are contingent on entry of a bar order (although the wording of the compromise allows the Fundamental Parties to waive the bar order requirement on their own behalf). But this Court is not considering the bar order in isolation. As part of their objections, three of the enjoined parties—the GTCR Group, GECC, and Ventas—have argued that their objections to the bar order would be moot if the Court essentially made permanent its temporary injunction.[72] If this Court granted the request for permanent injunction, the bar order would, in fact, be fair and equitable.

The reason for that is plain: if the Probate Estates cannot continue pursuing the enjoined parties, then it makes no difference whether the outer firewall remains in place. Likewise, the enjoined parties have no need to assert indemnification or contribution claims against FAS or the other Fundamental Parties. So the Court concludes the existence of the permanent injunction would save the proposed bar order. Because the Trustee and Probate Estates object to the permanent injunction, however, the question this Court must really decide is whether it has the authority to grant that relief.

<u>The Court concludes it has authority to grant permanent injunctive relief</u>

As an initial matter, the Court cannot help but note the seeming irony in the Probate Estates' argument that this Court lacks jurisdiction to grant permanent injunctive relief.[73] The

---

[72] Adv. Doc. Nos. 1052, 1055 & 1058.

[73] The Trustee has also forcefully argued in opposition to the injunction. Adv. Doc. No. 1059. The Trustee's objection, however, is somewhat curious. It is unclear why the Trustee objects to the proposed injunctive relief. It

Probate Estates raised a jurisdictional objection to the temporary injunctive relief previously sought by the GTCR Group and others. That objection was not so much that this Court did not have jurisdiction over enjoining the Probate Estates' proceedings supplementary, although, in fairness, the Probate Estates did raise concerns that the Court did not have jurisdiction over actions to remedy individual rights. Rather, when it came to the proceedings supplementary, the Probate Estates were concerned that subject-matter jurisdiction would be used by the targets as a "get out of jail free" card to avoid an unsuccessful outcome in the adversary proceeding here:

> As subject-matter jurisdiction can never be conferred by agreement or waived, the [Probate Estates] have concerns that the targets, who since their first appearance have done nothing but delay the progression of this bankruptcy case, will raise a lack of subject-matter jurisdiction after this Court's resolution of the [Probate Estates'] state and federal actions.[74]

In many respects, that is precisely what the Probate Estates are doing now. On the one hand, this adversary proceeding has been successful for the Probate Estates. Because of the compromises, $20 million will be coming into the bankruptcy estate. On the other hand, this proceeding at one point involved over 30 counts against 16 different Defendants and ended with a tentative finding in the Probate Estates' favor on 1 count. Counsel for the Probate Estates opened his closing argument by saying that, to paraphrase, his fear was ending up with a judgment against only FAS—and that is essentially what happened.[75]

---

would seem the Trustee has no interest in whether the Probate Estates are permitted to pursue claims in state court. If anything, the Trustee presumably should support the request for injunctive relief if it would resolve the only objections to the nearly $20 million in settlements. In any event, the Court will focus on the Probate Estates' objection since they are the parties who will potentially be enjoined.

[74] Adv. No. 8:13-ap-00929, Doc. No. 7 at ¶ 2.

[75] Adv. Doc. No. 1011 at 9-10 (". . . in spite of the fear I have that we're going to get a judgment against FAS and not anyone else . . . .").

It appears that the Probate Estates would now like to disregard all of the unfavorable rulings along the way to that less-than-desirable outcome. They would like to be free to pursue claims this Court has already adjudicated after a two-week trial. They also would like to be free to pursue claims against parties that were disposed of at the pleading or summary judgment stage. But the Probate Estates' arguments that this Court lacks jurisdiction to prevent them from relitigating those (and other) claims are misplaced.

The Probate Estates spend the bulk of their time refuting this Court's jurisdiction under § 105.[76] For starters, they argue the Court cannot enjoin them from pursuing claims outside of this Court under § 105 because those claims are not property of the estate.[77] After all, THI has not been substantively consolidated into the Debtor, nor has THI been determined to be the alter ego of or successor to the Debtor.[78] Putting aside that substantive objection, the Probate Estates argue the request for permanent injunction is not procedurally proper because GTCR and GECC failed to file a separate adversary proceeding seeking permanent injunctive relief or satisfy the traditional non-bankruptcy requirements for injunctive relief.[79] But this Court's authority to enter permanent injunctive relief does not derive solely from § 105.

Instead, this Court has authority to issue injunctive relief under the All Writs Act.[80] Under the All Writs Act, federal courts—including this one—"may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

---

[76] Adv. Doc. No. 1060.

[77] *Id.* at 1-2.

[78] *Id.*

[79] *Id.* at 5-9.

[80] 28 U.S.C. § 1651(a).

law."[81] Although the All Writs Act, by its terms, only refers to "writs," the Eleventh Circuit has recognized that it "codifies 'the long recognized power of courts of equity to effectuate their decrees by injunctions or writs of assistance.'"[82] The Court's authority under the All Writs Act, however, is circumscribed by the Anti-Injunction Act.[83]

The Anti-Injunction Act prohibits a federal court from enjoining state court proceedings except in three specific instances:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.[84]

If an injunction falls within one the three exceptions set forth in the Anti-Injunction Act, then it is authorized under the All Writs Acts.[85] So this Court may enjoin any state court proceedings if it has expressly been authorized by Congress, if it is necessary to protect this Court's jurisdiction, or if it is necessary to protect or effectuate this Court's judgment.

The Probate Estates argue, with some persuasiveness, that the injunction proposed here has not been expressly authorized by Congress. While the Probate Estates rightfully concede that § 105 is express authorization by Congress for this Court to enjoin a state court proceeding under the right circumstances, they argue that the authority under § 105 has never been extended to bar a claim that did not have a direct and immediate connection to property of the estate or the

---

[81] *Id.*

[82] *Burr & Forman v. Blair*, 470 F.3d 1019, 1026 (11th Cir. 2006); *see also Wesch v. Folsom*, 6 F.3d 1465, 1470 (11th Cir. 1993) (explaining that the All Writs Act "also empowers federal courts to issue injunctions to protect or effectuate their judgments").

[83] 28 U.S.C. § 2283.

[84] *Id.*

[85] *Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 701 F.3d 669, 675 (11th Cir. 2012); *Burr & Forman*, 470 F.3d at 1027-28.

estate's administration.[86] But after confidently declaring that none of the three exceptions under

the Anti-Injunction Act apply, they only address the first one and ignore the second two.[87]

### *The proposed injunction is necessary to aid this Court's jurisdiction*

Over twenty years ago, the Eleventh Circuit explained that an injunction is necessary to

aid a federal court's jurisdiction when a state court's exercise of jurisdiction over a case would

"seriously impair the federal court's flexibility and authority to decide that case."[88] Generally, a

federal court's flexibility and authority would be seriously impaired in only one of two

situations: in a state court proceeding removed to federal court or in an in rem proceeding where

the federal court obtains jurisdiction before the state court does.[89] But the Eleventh Circuit has

recognized a third situation where federal courts may issue an injunction to aid its jurisdiction:

when a federal court has retained jurisdiction over complex, in personam lawsuits.

The Eleventh Circuit first recognized this "complex litigation" scenario in *Battle v.*

*Liberty National Life Insurance*.[90] That case involved complicated and protracted class-action

litigation between a funeral insurance provider and certain policy holders. The parties litigated

the case for seven years—in state and federal court—before reaching a settlement that affected

the rights of 300 funeral home owners and 1 million policyholders.[91] After the district court

entered a final judgment under the settlement, three sets of policy holders filed class-action

---

[86] Adv. Doc. No. 1060 at 10 (citing *In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 827-28 (Bankr. S.D. Ohio 1998); *In re Cont'l Airlines*, 203 F.3d 203, 217 (3d Cir. 2000)).

[87] *Id.* (arguing that "[n]one of the exceptions to the Anti-Injunction Act apply here").

[88] *Wesch*, 6 F.3d at 1470.

[89] *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233 (11th Cir. 2006).

[90] 877 F.2d 877 (11th Cir. 1989).

[91] *Id.* at 880.

lawsuits in state court based on claims involving the same issues that were resolved as part of the settlement.[92] The district court in *Battle* enjoined the plaintiffs from pursuing claims that were substantially similar to those that were settled as part of the federal court action.[93]

On appeal, the Eleventh Circuit upheld the district court injunction under the "in aid of jurisdiction" exception to the Anti-Injunction Act. In doing so, the *Battle* court rejected the notion that the "in aid of jurisdiction" exception applies only to in rem cases.[94] According to the *Battle* court, that in rem requirement is not binding because it was only the opinion of three justices in *First Vendo Co. v. Lektro-Vend Corp.*[95] Even if the "in aid of jurisdiction" requirement only applied to in rem proceedings, the Eleventh Circuit reasoned that the litigation in that case was virtually equivalent to an in rem proceeding.[96]

In particular, the *Battle* court noted that the district court judgment resolved seven years of litigation over complicated antitrust issues.[97] The case involved several weeks of court hearings, 2,300 pages of hearing transcripts, 200 exhibits, and 200 depositions (totaling 18,000 pages of deposition transcripts).[98] And resolution of the case affected 1 million policyholders and 300 funeral home owners.[99] More importantly, allowing the plaintiffs to pursue nearly identical

---

[92] *Id.*

[93] *Id.*

[94] *Id.* at 881-82.

[95] *Id.* (discussing *First Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977)).

[96] *Id.*

[97] *Id.* at 880-81.

[98] *Id.*

[99] *Id.*

claims in state court would have destroyed the settlement and threatened to waste the years of

time and effort the district court devoted to the case:

> Any state court judgment would destroy the settlement worked out
> over seven years, nullify this court's work in refining its Final
> Judgment over the last ten years, add substantial confusion in the
> minds of a large segment of the state's population, and subject the
> parties to added expense and conflicting orders. This lengthy,
> complicated litigation is the "virtual equivalent of a res."[100]

Four years later, the Eleventh Circuit reached a similar conclusion in *Wesch v. Folsom.*[101]

*Wesch* involved an Alabama congressional redistricting plan administered by a three-judge court.

After the three-judge court entered a final judgment approving a redistricting plan, a class-action

lawsuit was filed in Alabama state court asserting substantially the same claims as those asserted

in district court.[102] The *Wesch* Court upheld a district court injunction barring the plaintiffs from

pursuing substantially similar redistricting claims in state court because the district court had

"invested a great deal of time and other resources in the arduous task of reapportioning

Alabama's congressional districts," and all of that effort would have been wasted if the state

court redistricting case was allowed to proceed.[103]

Although it does not involve a class action lawsuit, the facts of this case are highly

analogous to those in *Battle*. Here, what started off as 6 negligence or wrongful death lawsuits

has morphed into 25 lawsuits (including adversary proceedings) and 15 appeals before 11

different courts and 17 judges in 5 states over a total of 11 years. In this Court, alone, there have

been at least 78 days of hearings resulting in at least 18 reported decisions. The main adversary

---

[100] *Id.* at 882 (quoting *Battle v. Liberty Nat'l Life Ins. Co.*, 660 F. Supp. 1449, 1457 (N.D. Ala. 1987)).

[101] 6 F.3d 1465, 1470-72 (11th Cir. 1993).

[102] *Id.* at 1468-69.

[103] *Id.* at 1471.

complaint filed by the Trustee and Probate Estates, which was nearly 300 pages and more than 1,200 numbered paragraphs, alleged more than 30 claims for relief against 16 parties,[104] and the trial in that proceeding involved nearly 100 hours of testimony (live or video deposition testimony submitted for review in chambers) and more than 3,000 trial exhibits.

All of that led to basically a $20 million settlement that hinges on one thing: finality. The Court cannot approve the compromise if the Probate Estates are allowed to continue pursuing claims—many of which have already or could have been litigated here—against GTCR, GECC, Ventas, Schron, and the other objecting parties because the objecting parties will be barred from seeking indemnification or contribution from FAS and the other Fundamental Parties under the compromise. But FAS and the other Fundamental Parties understandably will not agree to the compromise if they do not get a bar order. The only way the settlement works is if the Court puts an end to all the claims that were or could have been litigated here.

For all of those reasons, this case falls squarely within the Eleventh Circuit's decision in *Battle*. This Court and others have devoted years of time and effort to exceedingly complex litigation that has resulted in a $20 million settlement. Allowing the Probate Estates to go back to state court or elsewhere to litigate claims arising out of the same nucleus of acts threatens to destroy the $20 million compromise (there will be none without the injunction), nullify the efforts by this Court and other courts over the last four years, and subject parties who have prevailed in this proceeding to added cost and expense. Accordingly, this Court has the authority to enter an injunction to aid its own jurisdiction.

---

[104] Adv. Doc. Nos. 1, 289 & 620.

*The proposed injunction also is necessary to protect this Court's prior judgments*

An injunction is appropriate under the "relitigation exception" to the Anti-Injunction

Act—i.e., to protect this Court's prior judgments—where state law claims would be precluded by

the doctrine of res judicata:

> In a sense, the relitigation exception empowers a federal court to
> be the final arbiter of the res judicata effects of its own judgments
> because it allows a litigant to seek an injunction from the federal
> court rather than arguing the res judicata defense in state court.[105]

But for the "relitigation exception" to apply, the objecting parties must make a strong and

unequivocal showing that the Probate Estates are seeking to relitigate claims that would be

barred by the doctrine of res judicata.[106]

To determine whether res judicata bars the claims the Probate Estates seek to relitigate,

the Court must look to Florida law.[107] Under Florida law, res judicata bars subsequent litigation

where there is an identity of (i) the thing sued for; (ii) the cause of action; (iii) the persons and

parties to the actions; and (iv) the quality or capacity of the person for or against whom the claim

was made.[108] Ordinarily, res judicata would bar the Probate Estates from relitigating any claims

that were actually litigated and any claims that could have been litigated but were not.

But this Court's authority to issue an injunction under the "relitigation exception" is

slightly narrower that traditional notions of res judicata. In *SFM Holdings, Ltd. v. Banc of

America Securities*, the Eleventh Circuit held that the broad view of res judicata—i.e., res

judicata bars claims that were actually litigated or could have been—is not consistent with the

---

[105] *Burr & Forman v. Blair*, 470 F.3d 1019, 1030 (11th Cir. 2006); *Wesch*, 6 F.3d at 1470.

[106] *Burr & Forman*, 470 F.3d at 1030 & n.30.

[107] *Id.* (explaining that "[w]hen determining whether claim preclusion is appropriate, federal courts employ the law of the state in which they sit").

[108] *Heney v. Windsor Corp.*, 777 F. Supp. 1575, 1576-77 (M.D. Fla. 1991).

Anti-Injunction Act.[109] Under the "relitigation exception," only claims presented to and decided by this Court may be enjoined. So this Court can only enjoin the Probate Estates from pursing the same claims they alleged in the complaint and that the Court disposed of at the dismissal or summary judgment stage or at trial.

### Conclusion

Under the Eleventh Circuit's binding precedent in *Battle* and *Wesch*,[110] it is unmistakable that this Court has the authority to enjoin the Probate Estates from future litigation either to aid its jurisdiction or to protect its judgments. The "relitigation exception" to the Anti-Injunction Act only authorizes this Court to enjoin the Probate Estates from pursuing any claims that were actually litigated in this adversary proceeding. But the Court's authority under the "in aid of jurisdiction" exception is broader, permitting this Court to enjoin any litigation arising out of the nucleus of facts set forth in the adversary complaint in this proceeding. If the Court does not enjoin the Probate Estate from relitigating those claims, the Trustee will lose a $20 million compromise, the efforts of this Court and others over the last four years will be nullified, and the non-settling Defendants will be forced to incur added cost and expense litigating claims they already prevailed on.

Early on in this proceeding, this Court observed that the facts alleged in the Probate Estates' adversary complaint had all the making of a "legal thriller" and that it was ultimately up to this Court to determine whether the allegations were mostly the work of fact or fiction.[111] Well, after hearing hundreds of hours of testimony and reviewing thousands of exhibits, the

---

[109] 764 F.3d 1327, 1336 (11th Cir. 2014).

[110] The Eleventh Circuit's decision in *Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012) likewise supports the Court's decision here.

[111] *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 365 (Bankr. M.D. Fla. 2014).

Court tentatively made that determination. This Court will approve the proposed compromises and bar orders conditioned on the entry of a final, nonappealable order enjoining the Probate Estates from pursuing any claims arising out of the nucleus of facts set forth in the adversary complaint in this proceeding.[112] The Probate Estates are free to appeal any of this Court's orders. They are likewise free to litigate their negligence claims against the THI Receiver in the *Jones* and *Sasser* cases and complete the new trial in *Webb*. But they are enjoined from (i) pursuing any pending proceedings supplementary; (ii) litigating their civil rights claim against the GTCR Group, GECC, and Ventas; and (iii) pursuing any claims against the GTCR Group, GECC, Ventas, and Schron as "real parties in interest" in the *Townsend*, *Jones*, or *Sasser* cases.[113] In short, there will be no sequel.

**DATED**: _March 20, 2015_____.


_____
Michael G. Williamson
United States Bankruptcy Judge


Attorney Gabor Balassa is directed to serve a copy of this order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the order.

---

[112] The scope of that injunction will not preclude the Probate Estates (or any other party) from prosecuting an appeal of any order entered by this Court.

[113] In *Townsend*, the Townsend Estate obtained a $1.1 billion verdict against THI. After the trial, the Townsend Estate attempted to add the non-settling Defendants to the judgment as the "real parties in interest." The Sasser and Jones Estates similarly attempted to add the non-settling Defendants as defendants in those state court actions—albeit before judgment—based on the same "real party in interest" theory. All three of those cases have been removed to this Court. In the Court's view, the "real party in interest" theory, which is based on the January 5 settlement agreement, is completely without merit. In any case, it is essentially the same as several of the claims asserted here just recast under a different name, and even if it is somehow distinct, that claim could have been litigated here.

**Gabor Balassa, Esq.**
**Matthew E. Nirider, Esq.**
  **Kirkland & Ellis LLP**
**Jeffrey W. Warren, Esq.**
  **Bush Ross, P.A.**
*Counsel for GTCR Associates, VI; GTCR Fund VI, LP; GTCR Golder Rauner, LLC; GTCR
Partners VI, LP; GTCR VI Executive Fund, LP; Edgar D. Jannotta, Jr.; THI Holdings, LLC*

**Daniel J. Weiss, Esq.**
  **Jenner & Block LLP**
*Counsel for Ventas, Inc. and Ventas Realty Limited Partnership*

**Carol A. Licko, Esq.**
  **Hogan Lovells US LLP**
*Counsel for General Electric Capital Corporation*

**Patricia A. Redmond**
  **Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**
*Counsel for Alan M. Grochal*

**Gregory M. McCoskey, Esq.**
  **Akerman Senterfitt**
*Counsel for Fundamental Administrative Services, LLC*

**James Sottile, Esq.**
  **Zuckerman Spaeder, LLP**
*Counsel for Fundamental Long Term Care Holdings, LLC, Murray Forman, and Leonard
Grunstein*

**Marjorie Salem Hensel, Esq.**
**Ruel W. Smith, Esq.**
  **Hinshaw & Culbertson LLP**
*Counsel for Quintairos, Prieto, Wood, and Boyer, P.A.*

**Steven M. Berman, Esq.**
**Seth P. Traub, Esq.**
  **Shumaker, Loop &Kendrick, LLP**
*Counsel for the Chapter 7 Trustee*

**James Wilkes, Esq.**
**Isaac R. Ruiz-Carus, Esq.**
**Bennie Lazzara, Jr., Esq.**
  **Wilkes & McHugh PA**
**Harley E. Riedel, Esq.**
**Daniel R. Fogarty, Esq.**
  **Stichter Riedel Blain & Prosser, P.A.**
*Counsel for the Estates of Juanita Jackson, Elvira Nunziata, Joseph Webb, Opal Lee Sasser,
Arlene Townsend, and Francina Spivery-Jones*