ORDERED.

Dated:  May 05, 2016

Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                              Case No. 8:11-bk-22258-MGW
                                                                    Chapter 7
Fundamental Long Term Care, Inc.
and Trans Health Management, Inc.,

        Debtors.
_____/

Estate of Juanita Jackson, et al.,                              Adv. No. 8:13-ap-00893-MGW

        Plaintiffs,

v.

General Electric Capital Corporation,
et al.,

        Defendants.
_____/

### MEMORANDUM OPINION ON PERMANENT INJUNCTION

Phil:    *What would you do if you were stuck in one place and every day*
         *was exactly the same, and nothing that you did mattered?*

Ralph: *That about sums it up for me.*

In the 1993 movie classic, Groundhog Day, Phil Connors, a Pittsburgh television

weatherman played by Bill Murray, finds himself living the same day over and over again. After

begrudgingly making the trip from Pittsburgh to Punxsutawney, Pennsylvania to cover the

annual Groundhog Day festivities, Connors gets stuck in a blizzard on his way out of town and is

forced to stay the night in Punxsutawney. When Connors awakens the next day, it is Groundhog

Day again, which he is forced to relive over and over. The rest of the movie finds Connors

desperately trying to break the Groundhog Day time loop:[1] he kidnaps the groundhog and ends

up dying during his getaway attempt; he electrocutes himself; he lets himself get hit by a truck;

he jumps from a tall building. Not even death, however, can break the time loop. No matter what

he does, Connors is stuck living the same day over and over.[2] At times, Rubin Schron, a wealthy

real estate investor from New York, must feel like Phil Connors in Groundhog Day.

Nearly six years ago, Schron woke up to find himself ensnared in state court proceedings

supplementary that three probate estates initiated to collect on billions of dollars of empty-chair

verdicts against Trans Health Management, Inc. ("THMI"), one of the Debtors in this case.[3] For

the past six years, Schron has desperately tried to extricate himself from the Probate Estates'

collection efforts.[4] He obtained an injunction enjoining the state court claims against him and

requiring all of those claims to be litigated in this proceeding so they could be resolved in a

single forum; when the Probate Estates attempted to continue their collection efforts against him

in state court while this proceeding was pending, Schron obtained an order preventing the

---

[1] A "time loop" is a "plot device in which periods of time are repeated and re-experienced by the characters, and there is often some hope of breaking out of the cycle of repetition." https://en.wikipedia.org/wiki/Time_loop.

[2] Although the movie is deliberately vague about how long Connors is stuck in this time loop, it has been suggested it was years. According to the Internet Movie Database, one pop culture blog (Wolf Gnards) speculated Connors was trapped in Groundhog Day for eight years, eight months, and sixteen days; another pop culture website (Obsessed with Film) suggests it was nearly 34 years (12,403 days to be precise). *See* Internet Movie Database, http://www.imdb.com/title/ tt0107048/trivia?ref_=tt_trv_trv (last visited May 5, 2016).

[3] This involuntary bankruptcy case was initially filed against Fundamental Long Term Care, Inc. ("FLTCI"). The Court later substantively consolidated THMI into FLTCI. Doc. No. 1724.

[4] The Probate Estates are the Estate of Juanita Amelia Jackson, the Estate of Joseph Webb, the Estate of Elvira Nunziata, the Estate of Arlene Townsend, the Estate of Opal Lee Sasser, and the Estate of James Henry Jones.

Probate Estates from circumventing this Court's injunction by recasting their claims under a different theory; and once all the claims against him were brought in this forum, Schron obtained a dismissal of those claims with prejudice. But not even dismissal of all of the Probate Estates' claims against Schron with prejudice is enough to break the litigation loop. No matter what he does—whether obtain an injunction or prevail on the merits—Schron finds himself defending the Probate Estates' efforts to go back to state court to pursue their proceedings supplementary.

The only way for the Court to break this loop is to enjoin the Probate Estates from pursuing claims that were or could have been litigated against Schron in this Court. An injunction is necessary to protect this Court's final judgment in Schron's favor. Absent an injunction, the Probate Estates will ignore this Court's rulings and use repetitious state court litigation against Schron to extract a settlement out of him. Moreover, the injunction was an integral part of the Court's finding that nearly $24 million in settlements—which brought an end to exceedingly complex litigation that has involved 25 lawsuits (including adversary proceedings) and 15 appeals before 11 courts and 17 judges in five states over 11 years—are fair and equitable. Accordingly, for the reasons discussed below, the Court has enjoined the Probate Estates from pursuing any claims against Schron arising out of the same nucleus of facts in their adversary complaint in this proceeding.

## BACKGROUND

Rubin Schron is, by all accounts, an extremely wealthy real estate investor from New York. In 2002, Schron's lawyer (Leonard Grunstein) and investment banker (Murray Forman) convinced Schron to fund the acquisition of 120 nursing homes from Integrated Health Services ("IHS"), which was in chapter 11 bankruptcy in Delaware. Abe Briarwood, the entity that actually acquired the IHS homes, leased them to THI of Baltimore, Inc. In March 2006, Forman

and Grunstein devised a scheme that allowed them to acquire the former IHS homes from THI Baltimore, as well as the assets of THMI, a nursing home management company that managed the THI Baltimore homes, without acquiring THMI's liabilities.[5] There is no evidence Schron had any involvement in the March 2006 transaction that allowed Forman and Grunstein to divest THMI of its assets.[6]

### Schron finds himself trapped in proceedings supplementary.

The Probate Estates claim the March 2006 transaction was an elaborate "bust-out" scheme intended to thwart their efforts to collect on personal injury claims they had filed against THMI. At the time of the March 2006 transaction, three of the Probate Estates had sued THMI and its former corporate parent, Trans Healthcare, Inc. ("THI"), for injuries that allegedly occurred at nursing homes THI owned and THMI managed.[7] According to the Probate Estates, the March 2006 transactions resulted in hundreds of millions of dollars of THMI's assets being transferred in exchange for $100,000. As a result of the transaction, THMI was left a liability-ridden shell with no assets to satisfy the Probate Estates' claims.

---

[5] The March 2006 transaction is described in great detail in the Court's memorandum opinion dismissing the Probate Estates' initial complaint in this proceeding. Adv. No. 13-ap-893, Adv. Doc. No. 204 at 3-13. For purposes of this opinion, the March 2006 transaction can be summarized as follows: THI Holdings wholly owned Trans Healthcare, Inc. ("THI") and THI Baltimore. THI, in turn, owned THMI. In March 2006, THI Holdings sold THI Baltimore to Fundamental Long Term Care Holdings, LLC ("FLTCH"). So as a result of the transaction, FLTCH ended up with the right to operate the former THI Baltimore homes. At the same time, THI sold THMI to FLTCI. Forman and Grunstein, who had incorporated FLTCI, gave ownership of FLTCI to an elderly man living in a basement in New York. It is fair to say the elderly man (Barry Saacks) had no idea he owned FLTCI or that FLTCI acquired THMI's stock. The Probate Estates contend that FLTCH, owned by Forman and Grunstein, looted the assets from THMI without FLTCH's knowledge.

[6] As discussed in more detail below, the Court conducted a two-week trial in this adversary proceeding. The March 2006 transaction was front and center at that trial. Yet, there was no evidence at trial that Schron played any role in the March 2006 transaction.

[7] The Jackson Estate sued THI and THMI on July 30, 2004; the Nunziata Estate sued THMI on December 23, 2005; and the Jones Estate sued THI and THMI on March 20, 2006. In addition to those three lawsuits, more than 150 other lawsuits were pending against THMI at the time of the March 2006 transaction.

After three of the Probate Estates obtained $1.2 billion in default judgments against THI and THMI,[8] they initiated proceedings supplementary against Schron in state court to collect those judgments because THMI no longer had any assets and Schron was a "deep pocket."[9] The case against Schron was, to say the least, flimsy. It hinged on the allegation that he owned the two entities—Fundamental Long Term Care Holdings ("FLTCH") and Fundamental Administrative Services ("FAS")—that acquired or ultimately ended up with THMI's assets for far less than they were worth as a result of the March 2006 transaction.[10] But the exhibits the Probate Estates attached to their impleader motions to support that allegation, in fact, showed that (1) Forman and Grunstein—not Schron—owned FLTCH and FAS; and (2) Forman and Grunstein were acting in their own self-interest—not on behalf of Schron—in attempting to acquire THMI's assets.[11] Although the Probate Estates presented no evidence in the proceedings supplementary that Schron actually received or benefitted from the transfer of THMI's assets, Schron was nonetheless ordered to show cause why assets in his possession should not be used to

---

[8] The three Probate Estates that obtained the judgments totaling more than $1.2 billion were the Jackson, Webb, and Nunziata Estates. The Jackson Estate obtained a $110 million judgment against THI and THMI on July 22, 2010. On January 11, 2012, the Nunziata Estate obtained a $200 million judgment against THMI. One month later, the Webb Estate obtained a $900 million judgment against THI and THMI. All three judgments were the product of empty-chair verdicts in which neither THI nor THMI was defended by counsel at trial.

[9] A copy of the impleader motion filed in state court in *Jackson* was later filed with the district court when that impleader action was removed to the United States District Court for the Middle District of Florida, Tampa Division. *Jackson-Platts v. Trans Health Management, Inc., et al.*, Case No. 8:10-cv-02937-VMC-TGW, Doc. No. 22-1. The Probate Estates also initiated proceedings supplementary against others involved in the March 2006 transactions.

[10] *Id.* at ¶¶ 21-35.

[11] *Id.* at Exs. B & D. Exhibits B & D can be found at Case No. 10-cv-2937, Doc. No. 23-2 and Doc. No. 23-4.

satisfy one of the judgments (a $110 million judgment in the *Jackson* case)[12] and added as a

defendant to the second judgment (a $200 million judgment in the *Nunziata* case).[13]

**Schron obtains an injunction
enjoining the proceedings supplementary.**

After this involuntary bankruptcy case was filed, the Court enjoined the Probate Estates

from pursuing their state court proceedings supplementary to collect the THI and THMI

judgments from Schron.[14] In the Court's view, the proceedings supplementary affected property

conceivably belonging to the bankruptcy estate because the Probate Estates acknowledged that

the assets they were seeking to recover under fraudulent transfer and alter ego theories in state

court belonged to THMI.[15] But even if the assets did not belong to THMI, continuation of the

proceedings supplementary interfered with the Trustee's administration of the estate because the

claims the Probate Estates were pursuing were identical to the claims the Trustee announced she

would be pursuing in this case, raising the possibility of inconsistent results. This Court

ultimately ordered the Trustee and Probate Estates to bring any claims they had against Schron

(and the others involved in the March 2006 transaction) here so all the claims could be resolved

in a single proceeding:

> Ideally, all of the fraudulent transfer and alter ego claims should be
> heard in one forum. The bankruptcy court is suited for exactly that
> purpose. And that process has already begun. Moreover, one of the
> purposes of the bankruptcy court is to provide a centralized place

---

[12] Case No. 10-cv-2937, Doc. No. 22-2.

[13] Adv. No. 13-ap-893, Adv. Doc. No. 237-5.

[14] The injunction was entered in an adversary proceeding filed by the GTCR Group, styled *GTCR Golder Rauner, LLC, et al. v. Scharrer*, Adv. No. 8:13-ap-00928-MGW, Adv. Doc. No. 35. A similar order was also entered in the main bankruptcy case. Doc. No. 1272. The Court's reasoning was set out in two reported memorandum opinions. *Scharrer v. Fundamental Long Term Care Holdings, LLC (In re Fundamental Long Term Care, Inc.)*, 500 B.R. 147 (Bankr. M.D. Fla. 2013); *GTCR Golder Rauner, LLC v. Scharrer (In re Fundamental Long Term Care, Inc.)*, 501 B.R. 770 (Bankr. M.D. Fla. 2013).

[15] *In re Fundamental Long Term Care*, 500 B.R. at 156-57.

> for handling litigation related to the bankruptcy estate.
> Significantly, that is the forum the probate estates chose when
> filing this involuntary case. If parties want to litigate claims that
> conceivably affect property of the estate (such as claims over
> THMI's assets), then those claims must be litigated in this Court.[16]

In all, the Trustee and Probate Estates sued seventeen Defendants: THI Holdings (which owned THI Baltimore); five entities referred to as the "GTCR Group" (THI Holdings' principal shareholder); Ned Jannotta (a GTCR principal who approved the March 2006 transaction); General Electric Capital Corporation, Ventas Limited, and Ventas Realty (THI's major secured lenders who allegedly consented to the transaction); FLTCH (which acquired THI Baltimore's stock); FAS (which ultimately ended up with THMI's assets); Forman and Grunstein (who owned FLTCH); THI Baltimore (which was acquired by FLTCH); Fundamental Long Term Care, Inc. (which acquired THMI's stock); and Schron.[17] In their two pleading attempts, which totaled more than 300 pages and 1,600 numbered paragraphs, the Trustee and Probate Estates alleged 32 claims for relief against those seventeen Defendants.[18]

The initial complaint contained the following 22 claims for relief: substantive consolidation; breach of fiduciary duty (two counts); aiding and abetting a breach of fiduciary duty (four counts); successor liability; piercing the corporate veil (two counts); alter ego (three counts); fraudulent transfer (eight counts); and conspiracy to commit fraudulent transfer. Of the 22 initial claims, eight were asserted against Schron.

---

[16] *In re Fundamental Long Term Care*, 501 B.R. at 784.

[17] Adv. No. 13-ap-893, Adv. Doc. No. 109. The procedural posture of this proceeding is somewhat confusing. The Probate Estates initiated this proceeding by filing a two-count complaint. Adv. Doc. No. 1. The Trustee sought to intervene to file her own complaint, which she did. Adv. Doc. Nos. 12 & 36. The Probate Estates and Trustee then filed a joint amended complaint. Adv. Doc. No. 72. They later filed a redacted version of the joint amended complaint. Adv. Doc. No. 109. The Court refers to that complaint as the "initial" complaint.

[18] Adv. No. 13-ap-893, Adv. Doc. Nos. 109 & 289.

Initially, the Trustee and Probate Estates sued Schron for aiding and abetting breach of a fiduciary duty, successor liability, piercing the corporate veil, alter ego liability, fraudulent transfer, and conspiracy to commit a fraudulent transfer.[19] Although those claims were principally premised on the allegation that Schron received THMI's assets (supposedly worth hundreds of millions of dollars) for $100,000, the Probate Estates sought to hold Schron liable for the debts of THI and THMI. For instance, the Probate Estates sought a declaration that Schron was a successor to the "THI Enterprise," which the Probate Estates specifically defined to include THI.[20] The Probate Estates also sought a declaration that Schron was THI's alter ego.[21] The Court dismissed the initial claims against Schron because—despite 300 pages and 1,600 numbered paragraphs—the complaint failed to include a single plausible allegation that Schron received, participated in, or benefitted from the transfer of THMI's assets.[22]

**Schron prevents Probate Estates from circumventing injunction.**

Unsuccessful on their initial claims against Schron in this forum, the Probate Estates attempted to circumvent this Court's preliminary injunction and pursue its collection efforts against Schron back in state court, where, suffice it to say, they have had more success. In particular, this Court previously allowed three Probate Estates (the Estates of Townsend, Sasser, and Jones) to pursue their underlying negligence claims against THI in state court since those claims had not gone to trial prepetition.[23] The Townsend Estate ultimately obtained a $1.1 billion

---

[19] Adv. No. 13-ap-893, Adv. Doc. No. 109.

[20] Adv. No. 13-ap-893, Adv. Doc. No. 109 at ¶¶ 51 & 726-747.

[21] *Id.* at ¶¶ 800-23.

[22] Adv. No. 13-ap-893, Adv. Doc. No. 226. The reasoning for the Court's ruling was set forth in a reported decision, *Estate of Jackson v. Gen. Elec. Capital Corp. (In re Fundamental Long Term Care, Inc.)*, 507 B.R. 359 (Bankr. M.D. Fla. 2014).

[23] Doc. No. 1039; *see also* Doc. Nos. 1027 & 1037. Everyone agreed the claims against THMI were stayed.

judgment against THI. Despite this Court's injunction barring any collection efforts that may conceivably implicate property of the estate, however, the Townsend Estate moved to add Schron to the $1.1 billion judgment under a purported "real party in interest" theory.[24]

Under this "real party in interest" theory, Schron is supposedly liable for the *Townsend* judgment because he (1) entered into a January 5, 2012 settlement agreement with others involved in the March 2006 transaction to ensure THI was defended in the underlying negligence claims; and (2) contributed money to that defense. In *Sasser*, the Sasser Estate sought to add Schron as a defendant before trial on the same theory. This Court enjoined the Probate Estates' efforts to add Schron as a defendant in the *Townsend* and *Sasser* cases under the "real party in interest theory" because they violated the Court's preliminary injunction.[25]

**Schron obtains dismissal of claims against him with prejudice.**

In their second amended complaint, the Probate Estates asserted seven claims for relief against Schron: three claims it previously asserted against him (alter ego, aiding and abetting a breach of fiduciary duty, and constructive fraud claims) and four new claims (abuse of process, conspiracy to commit abuse of process, negligence, and avoidance of postpetition transfer claims).[26] The four new claims all hinged on an allegation that Schron and others involved in the March 2006 transaction took control of the defense of THI and THMI in the Probate Estates' state court actions under the terms of the January 5 settlement agreement, which is the same

---

[24] Adv. No. 13-ap-893, Adv. Doc. No. 237-1 & 237-4. The circumstances surrounding the Townsend Estate's efforts to add Schron and others to the judgment are set forth in *Gen. Elec. Capital Corp. v. Shattuck*, 132 So. 3d 908, 910-11 (Fla. 2d DCA 2014).

[25] Adv. No. 13-ap-893, Adv. Doc. No. 476 at 106 & Adv. Doc. No. 1166.

[26] Adv. No. 13-ap-893, Adv. Doc. No. 289.

allegation underlying the "real party in interest" theory in *Townsend* and *Sasser*. The Court dismissed all of the claims against Schron a second time—this time with prejudice.[27]

Notably, Schron was the only defendant dismissed at the pleading stage. Three more Defendants—General Electric Capital Corporation, Ventas, and Ventas Realty—were dismissed at the summary judgment stage.[28] The Court then went to trial on claims for substantive consolidation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, successor liability, fraudulent transfer, and conspiracy to commit fraudulent transfer against the GTCR Group, THI Holdings, Jannotta, FLTCH, FAS, THI Baltimore, Forman, Grunstein, and FLTCI.[29]

At the conclusion of trial,[30] the Court took an unusual step: the Court ruled in favor of the GTCR Group, THI Holdings, and Jannotta, but as to the remaining Defendants, the Court decided to announce tentative findings of fact and conclusions of law in an effort to bring this proceeding (and bankruptcy case) to a close. It was apparent at the conclusion of trial that the only potential wrongdoing in the March 2006 transaction was on the buyers' side of the transaction. But the Trustee and Probate Estates could only establish liability on a successor liability theory, and the Court was unsure which of the Defendants on the buyers' side would be liable under that theory, so it ordered FLTCH, FAS, THI Baltimore, Forman, and Grunstein,

---

[27] Adv. No. 13-ap-893, Adv. Doc. No. 596. The Court's reasoning is set forth in a reported decision, *Estate of Jackson v. Gen. Elec. Capital Corp. (In re Fundamental Long Term Care, Inc.)*, 512 B.R. 352 (Bankr. M.D. Fla. 2014). In light of the dismissal with prejudice, the Court entered final judgment in Schron's favor. Adv. Doc. No. 1168. The Court's final judgment is on appeal to the district court. *Estate of Jackson, et al. v. Schron*, Case No. 8:16-cv-00022-EAK, United States District Court, Middle District of Florida, Tampa Division.

[28] Adv. No. 13-ap-893, Adv. Doc. Nos. 907 & 908.

[29] After the Court dismissed the claims set forth in the second amended complaint, the Probate Estates and Trustee filed a restated second amended complaint that included only the counts that remained pending after the Court's rulings on the various motions to dismiss. Adv. No. 13-ap-893, Adv. Doc. No. 620.

[30] The live testimony portion of the trial lasted two weeks. In addition to the live testimony, the Court reviewed video deposition testimony in chambers. In all, the Court considered more than 100 hours of (live and video) testimony and reviewed more than 3,000 exhibits.

along with the Trustee and Probate Estates, to mediation in hopes the parties would reach a global resolution of this proceeding—and ultimately the bankruptcy case.[31]

The mediation was largely a success. It originally produced two settlements: one was an $18.5 million settlement among the Trustee, Probate Estates, FLTCH, FAS, THI Baltimore, Forman, and Grunstein (and others);[32] the other was a $1.25 million settlement among the Trustee, the Probate Estates, and one of the law firms that defended THI and THMI against the Probate Estates' claims.[33] Since then, there have been three other settlements: a $1.5 million settlement with the GTCR Group; a $1.75 million settlement with General Electric Capital Corporation and the two Ventas entities; and a $700,000 settlement with THI's state-court receiver, who was not a party to this adversary proceeding. All told, there were a total of $23.7 million in settlements.

### Schron finds himself defending the Probate Estates' efforts to relitigate the proceedings supplementary in state court all over again.

The sole non-settling Defendant was Schron. Not only did Schron refuse to settle, but he opposed the various settlements with the other Defendants unless they were conditioned on—or, at a minimum, accompanied by—a permanent injunction enjoining the Probate Estates from bringing any claims against him in state court that arose out of the March 2006 transactions.[34] Schron's need for an injunction is well founded.

Literally minutes after the Court concluded announcing its oral ruling against the Trustee and Probate Estates on all but one count, the Townsend Estate made an ore tenus motion to lift

---

[31] Adv. No. 13-ap-893, Adv. Doc. No. 1019 at 45-49, 59-62.

[32] Doc. No. 1805.

[33] Doc. No. 1596, Ex. 1 at ¶ 1. The settlement between the Trustee and the law firm—Quintairos, Prieto, Wood & Boyer—stems from a malpractice and breach of fiduciary duty action the Trustee had filed against the firm.

[34] Adv. No. 13-ap-893, Adv. Doc. Nos. 1062 & 1132.

the Court's preliminary injunction so it could pursue its "real party in interest" theory in state court.[35] More recently, the Townsend Estate again sought to remand its removed adversary proceeding back to state court so it could pursue its "real party in interest theory" against Schron.[36] When that request was denied,[37] the Townsend Estate petitioned the district court for a writ of mandamus compelling this Court to remand the "real party in interest" issue back to state court.[38]

In addition to pursuing their real party in interest theory in *Townsend* and *Sasser*, the Probate Estates have indicated at various stages of this proceeding that they intend to continue pursuing the state court proceedings supplementary against Schron in *Jackson*, *Webb*, and *Nunziata*, which were stayed by this Court's preliminary injunction. At one point, the Probate Estates also threatened to sue Schron for RICO violations in New York district court. In short, the Probate Estates have threatened to sue Schron on claims that were or could have been litigated in this forum.

This Court ultimately entered an injunction in Schron's favor.[39] In order to approve the nearly $24 million in settlements, the Court was required to determine that the settlements were fair and equitable. One of the main factors in determining that the settlements were fair and equitable was the injunction the Court entered in Schron's favor. That injunction enjoined the

---

[35] Adv. No. 13-ap-893, Adv. Doc. No. 1019 at p. 70, l. 25 – p. 74, l. 25.

[36] Adv. No. 14-ap-251, Adv. Doc. No. 51.

[37] *Id.* In its order denying remand, the Court clarified that only the attempt to add Schron and others to the judgment had been removed to this Court. They underlying personal injury claims against THI remained pending in state court.

[38] *In re Estate of Arlene Townsend*, Case No. 8:16-cv-00615-JDW-MAP, United States District Court, Middle District of Florida, Tampa Division.

[39] Adv. No. 13-ap-893, Adv. Doc. No. 1167.

Probate Estates from pursing any claims against Schron arising out of the same nucleus of operative facts in their complaint in this proceeding.[40] In its injunction order, the Court reserved jurisdiction to explain the legal basis for the injunction.[41] This opinion explains the basis for the Court's permanent injunction in Schron's favor.

## CONCLUSIONS OF LAW

This Court's authority to enjoin the Probate Estates from pursuing claims in state court is prescribed in the All Writs Act, which "codifie[s] 'the long recognized power of courts of equity to effectuate their decrees by injunctions or writs of assistance.'"[42] The Court's authority under the All Writs Act, however, is circumscribed by the Anti-Injunction Act.[43] The Anti-Injunction Act prohibits a federal court from enjoining state court proceedings except (1) as authorized by Congress; (2) where necessary in aid of jurisdiction; or (3) to protect or effectuate its judgments.[44] If an injunction falls within one the Anti-Injunction Act's three exceptions, then it is authorized under the All Writs Acts.[45]

---

[40] *Id.*

[41] *Id.*

[42] *Burr & Forman v. Blair*, 470 F.3d 1019, 1026 (11th Cir. 2006); *see also Wesch v. Folsom*, 6 F.3d 1465, 1470 (11th Cir. 1993) (explaining that the All Writs Act "also empowers federal courts to issue injunctions to protect or effectuate their judgments"); *see also* 28 U.S.C. § 1651(a).

[43] 28 U.S.C. § 2283.

[44] *Id.*

[45] *Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 701 F.3d 669, 675 (11th Cir. 2012); *Burr & Forman*, 470 F.3d at 1027-28.

**The proposed injunction is necessary
to protect this Court's prior judgments.**

At a minimum, this Court has authority to enjoin the Probate Estates from pursuing claims it already decided in order to protect the judgment it entered in Schron's favor.[46] An injunction is appropriate under this exception—known as the "relitigation exception"—where state law claims would be precluded by the doctrine of res judicata,[47] although this Court's authority to issue an injunction under this exception is slightly narrower than traditional notions of res judicata. Only claims *actually presented to* and *decided by* a federal court may be enjoined under the "relitigation exception."[48]

The Court concludes it is appropriate to enjoin the Probate Estates from asserting any claims against Schron that this Court has already decided—i.e., claims for aiding and abetting breach of a fiduciary duty, successor liability, piercing the corporate veil, alter ego liability, fraudulent transfer, conspiracy to commit a fraudulent transfer, abuse of process, conspiracy to commit an abuse of process, and negligence—to protect its judgments. There is no question these claims would be barred by res judicata if the Probate Estates attempted to reassert them in state court. To be sure, Schron could assert res judicata as a defense if the Probate Estates reassert their dismissed claims in state court.

But the relitigation exception was intended to alleviate successful federal litigants like Schron from having to go through that ordeal:

---

[46] 28 U.S.C. § 2283.

[47] *Burr & Forman*, 470 F.3d at 1029 n.30 (explaining that "[i]n a sense, the relitigation exception empowers a federal court to be the final arbiter of the res judicata effects of its own judgments because it allows a litigant to seek an injunction from the federal court rather than arguing the res judicata defense in state court."); *Wesch*, 6 F.3d at 1470.

[48] *SFM Holdings, Ltd. v. Banc of Am. Sec.*, 764 F.3d 1327, 1336 (11th Cir. 2014).

14

> The purposes of the [relitigation] exception are to prevent
> relitigation of matters that a federal court has fully adjudicated and
> to prevent the harassment of successful federal litigants through
> repetitive state litigation.[49]

The Probate Estates chose this forum when one of them filed this involuntary bankruptcy case. And they were given ample opportunity to pursue all of their claims against Schron in their chosen forum. Despite years of discovery, however, the Probate Estates could not allege a single plausible claim for relief against Schron.

The Probate Estates have justified this facially obvious forum shopping by contending that, by pursuing their proceedings supplementary in *Jackson*, *Webb*, and *Nunziata*, they are not relitigating claims this Court already decided. According to the Probate Estates, the claims in this proceeding related to THMI, whereas the state court proceedings supplementary relate only to THI. But the Probate Estates' attempts to distinguish the claims in this proceeding from those in the state court proceedings supplementary fall flat for several reasons.

For one, the Probate Estates' attempt to pursue proceedings supplementary in *Nunziata* belies their entire argument. After all, THI is not even a defendant in *Nunziata*. Only THMI is. So how could the *Nunziata* proceedings supplementary relate to THI in any way? For another, the Probate Estates are not, as they imply, pursuing THI in the proceedings supplementary. They are pursuing Schron on the same claims, arising out of the same facts, as those in this proceeding. The only purported difference is they are attempting to collect on the judgment against THI, as opposed to the same judgment against THMI. But even if there is some distinction between collecting on the THI judgment as opposed to the THMI judgment entered in the same case, that distinction is meaningless because the Probate Estates sought to hold Schron

---

[49] 17A James Wm. Moore et al., Moore's Federal Practice § 121.08[1] (3d ed. 2010).

liable for both judgments in this proceeding by seeking a declaration that he is THI's alter ego and that he is liable for THI's debts under a successor liability theory.[50]

If this Court's final judgment in favor of Schron is to mean anything, then this Court must enjoin the Probate Estates from pursing the same claims they alleged against Schron in their complaint, which were presented to and decided by this Court. The state court proceedings supplementary, wherever they are pending, involve the same claims this Court already decided. For that reason, the Probate Estates are enjoined from pursuing the state court proceedings supplementary or otherwise pursuing the same claims this Court already decided.

### The proposed injunction is necessary to aid this Court's jurisdiction.

The problem is that enjoining the Probate Estates from pursuing claims this Court actually considered and disposed of is not sufficient. It is obvious that the Probate Estates will attempt to circumvent any injunction under the "relitigation exception," which would only apply to claims actually litigated, by recasting their dismissed claims under a new theory that was not actually litigated. In fact, the Probate Estates have already attempted to recast their abuse of process, conspiracy to commit abuse of process, and negligence claims under a "real party in interest theory" in state court—in defiance of this Court's injunction—after this Court dismissed their initial claims. More recently, the Townsend Estate has sought a writ of mandamus from district court ordering this Court to remand the Townsend case back to state court. So there is no question the Probate Estates will attempt to assert claims against in Schron in state court based on the same nucleus of operative facts in their complaint.

The Court's authority to enjoin the Probate Estates from litigating claims that have not actually been decided by this Court is limited to cases where a state court's exercise of

---

[50] Adv. No. 13-ap-893, Adv. Doc. No. 109 at ¶¶ 51, 726-747 & 800-823.

jurisdiction over a case would "seriously impair the federal court's flexibility and authority to decide" the federal court case.[51] A federal court's flexibility and authority to decide a case can be seriously impaired when the court has retained jurisdiction over complex, in personam lawsuits. The Eleventh Circuit first recognized this "complex litigation" scenario in *Battle v. Liberty National Life Insurance Co.*[52]

That case involved complicated and protracted class-action litigation between a funeral insurance provider and certain policyholders. The parties litigated the case for seven years—in state and federal court—before reaching a settlement that affected the rights of 300 funeral home owners and one million policyholders.[53] After the district court entered a final judgment under the settlement, three sets of policyholders filed class-action lawsuits in state court based on claims involving the same issues that were resolved as part of the settlement.[54] The district court in *Battle* enjoined the plaintiffs from pursuing claims that were substantially similar to those that were settled as part of the federal court action.[55]

On appeal, the Eleventh Circuit upheld the district court injunction under the "in aid of jurisdiction" exception to the Anti-Injunction Act. In doing so, the *Battle* court rejected the notion that the "in aid of jurisdiction" exception applies only to in rem cases.[56] Instead, the *Battle* court explained that the "in rem" requirement is not binding because it was only the opinion of

---

[51] *Wesch*, 6 F.3d at 1470.

[52] 877 F.2d 877 (11th Cir. 1989).

[53] *Id.* at 880.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 881-82.

three justices in *First Vendo Co. v. Lektro-Vend Corp.*[57] Even if the "in aid of jurisdiction"

requirement only applied to in rem proceedings, the Eleventh Circuit reasoned that the litigation

in that case was virtually equivalent to an in rem proceeding.[58]

In particular, the *Battle* court noted that the district court judgment resolved seven years

of litigation over complicated antitrust issues.[59] The case involved several weeks of court

hearings, 2,300 pages of hearing transcripts, 200 exhibits, and 200 depositions (totaling 18,000

pages of deposition transcripts).[60] And resolution of the case affected one million policyholders

and 300 funeral home owners.[61] More importantly, allowing the plaintiffs to pursue nearly

identical claims in state court would have destroyed the settlement and threatened to waste the

years of time and effort the district court devoted to the case:

> Any state court judgment would destroy the settlement worked out
> over seven years, nullify this court's work in refining its Final
> Judgment over the last ten years, add substantial confusion in the
> minds of a large segment of the state's population, and subject the
> parties to added expense and conflicting orders. This lengthy,
> complicated litigation is the "virtual equivalent of a res."[62]

Four years later, the Eleventh Circuit reached a similar conclusion in *Wesch v. Folsom.*[63]

*Wesch* involved an Alabama congressional redistricting plan administered by a three-judge court.

After the three-judge court entered a final judgment approving a redistricting plan, a class-action

---

[57] *Id.* (discussing *First Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977)).

[58] *Id.*

[59] *Id.* at 880-81.

[60] *Id.*

[61] *Id.*

[62] *Id.* at 882 (quoting *Battle v. Liberty Nat'l Life Ins. Co.*, 660 F. Supp. 1449, 1457 (N.D. Ala. 1987)) (internal citations omitted).

[63] 6 F.3d 1465, 1470-72 (11th Cir. 1993).

lawsuit was filed in Alabama state court asserting substantially the same claims as those asserted in district court.[64] The *Wesch* Court upheld a district court injunction barring the plaintiffs from pursuing substantially similar redistricting claims in state court because the district court had "invested a great deal of time and other resources in the arduous task of reapportioning Alabama's congressional districts," and all of that effort would have been wasted if the state court redistricting case was allowed to proceed.[65]

This case, although not involving a class action or multi-district litigation, falls squarely within the Eleventh Circuit's decisions in *Battle* and *Wesch*. What started off as six negligence or wrongful death lawsuits has morphed into 25 lawsuits (including adversary proceedings) and 15 appeals before 11 courts and 17 judges in five states over 11 years. When this case was filed, it quickly became apparent the Probate Estates and Trustee were pursuing identical claims against identical parties arising out of the same nucleus of operative facts—i.e., the March 2006 transactions—in more than one forum (state court, district court, and bankruptcy court). In an effort to avoid the possibility of inconsistent results, this Court ordered the Probate Estates and Trustee to bring all of their claims here since this was the one Court that had jurisdiction over all those claims.

This Court (and others) have devoted years of time and effort to this exceedingly complex litigation. In this Court, alone, there have been nearly 100 days of hearings resulting in at least 21 reported decisions. The complaints in this proceeding, which totaled nearly 300 pages and contained more than 1,600 numbered paragraphs, alleged 32 claims for relief against 17

---

[64] *Id.* at 1468-69.

[65] *Id.* at 1471.

parties.[66] And the trial involved nearly 100 hours of testimony (live or video deposition testimony submitted for review in chambers) and more than 3,000 trial exhibits. At the conclusion of the trial, the Court took the unusual step of issuing tentative findings of fact and conclusions of law and ordered the parties to mediation hoping to bring this decade-long saga to an end. The mediation produced four settlements that will bring nearly $24 million into the bankruptcy estate (the only recovery) and, perhaps more important, resolve this adversary proceeding and bankruptcy case in their entirety.

In approving the four settlements, the Court concluded there was really no question they were fair and equitable to the settling parties and in the best interests of the bankruptcy estate.[67] No one disputes that the *Justice Oaks* factors—(i) the probability of success in the litigation between the settling parties; (ii) the difficulties, if any, to be encountered in collection; (iii) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and, (iv) the paramount interests of the creditors and a proper deference to their reasonable views—weighed in favor of approving the compromises.[68]

But the Court concluded it was not appropriate to approve the compromises until it first considered their impact on Schron. As Schron pointed out, when the rights of a non-settling third party are implicated by a proposed compromise, it is appropriate to consider the third-party's rights in deciding whether to approve the compromise.[69] At least one court has held that "fairness

---

[66] Adv. Doc. Nos. 1, 289 & 620.

[67] The Court cannot approve a compromise unless it is fair and equitable and in the best interests of the estate. *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).

[68] *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990).

[69] Doc. No. 1816 at 16 (citing *In re Stanwich Fin. Servs. Corp.*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007); *In re BG Petroleum, LLC*, 525 B.R. 260, 273 (Bankr. W.D. Pa. 2015); *Urmann v. Walsh*, 523 B.R. 472, 482 (W.D. Pa. 2014); *In re Fleming Pkg. Corp.*, 2007 WL 4556981, at *3 (Bankr. C.D. Ill. Dec. 20, 2007)). That objection was actually filed by the GTCR Group. But Schron joined in it. Doc. No. 1818.

to the settling parties of a proposed settlement agreement may not warrant its approval if the rights of others who are not parties to the agreement are unduly prejudiced."[70] In looking at the compromises as a whole, there was no question they impacted Schron's rights.

Schron and the other settling Defendants previously bargained for the right to have FAS defend THI and THMI against the Probate Estates' claims in state court. As this Court has pointed out several times, that defense was intended to serve as an outer firewall to protect Schron and others from liability. If THI or THMI was not liable for negligence in the first place, then Schron and others would not be liable on any fraudulent transfer, alter ego, or other theory. Schron personally paid $200,000 for that outer firewall. But under the approved compromises, THI's state-court receiver and FAS withdrew their defenses of the claims against THI, destroying the outer firewall, and THI's receiver stipulated to the entry $65 million in judgments against THI, which has resulted in $49.5 million in judgments against THMI under the terms of a previous Court-approved compromise.

The compromises plainly state the Probate Estates intend to pursue collection of those judgments against Schron, and Schron's only recourse in the event he is somehow found liable is to pursue indemnification or contribution claims against FAS (one of the few Defendants who would have potentially been liable), which is proposing to pay all of its money ($18.5 million) to fund the compromise and get out of this proceeding and case. So the Probate Estates' intent to pursue collection against Schron in state court on its "real party in interest" or other theory unduly prejudices Schron. By granting the injunction in Schron's favor, however, the Court has eliminated the prejudice to him.

---

[70] *In re Med. Asset Mgmt., Inc.*, 249 B.R. 659, 663 (Bankr. W.D. Pa. 2000).

It is worth noting, although not a requirement for entering an injunction under the "in aid of jurisdiction" exception, that the injunction does not harm the Probate Estates. The injunction only bars the Probate Estates from bringing claims arising out of the same nucleus of operative facts in their complaint. Those are claims that the Probate Estates have had every opportunity to bring here, as evidenced by the 300-page complaint and 32 claims for relief the Probate Estates filed here.

## CONCLUSION

The analogy to Groundhog Day in this proceeding breaks down in one crucial respect: In Groundhog Day, the loop is finally broken when Connors uses his experiences reliving the same day over and over to better himself. Here, it is the Probate Estates that are learning from their experiences. But not for the better. Here, the Probate Estates are using their experience to perpetuate the loop until Schron capitulates and settles claims he already prevailed on.

The only way the loop will be broken here is for the Court to use its authority under the Anti-Injunction Act's "relitigation" and "in aid of jurisdiction exceptions" to enjoin the Probate Estates from relitigating claims that were or could have litigated here. When the time loop is finally broken in Groundhog Day, Phil Connors happily remarks, after looking outside and noticing the Groundhog Day crowds are gone, "Today is tomorrow." For Schron, the repeated claims arising out of the same alleged "bust-out" scheme are finally gone. This litigation loop is finally broken. For Schron, today is tomorrow.


**Steven A. Engel**
   **Dechert LLP**
**Rod Anderson**
**Joseph H. Varner III**
   **Holland & Knight LLP**
*Counsel for Rubin Schron*

**James Wilkes**
**Isaac R. Ruiz-Carus**
**Bennie Lazzara, Jr.**
  **Wilkes & McHugh PA**
**Harley E. Riedel**
**Daniel R. Fogarty**
  **Stichter Riedel Blain & Prosser, P.A.**
*Counsel for the Estates of Juanita Jackson, Elvira Nunziata, Joseph Webb, Opal Lee Sasser,*
*Arlene Townsend, and Francina Spivery-Jones*


Attorney Rod Anderson is directed to serve a copy of this memorandum opinion on interested parties who are not CM/ECF users and file a proof of service within 3 days of entry of this opinion.